## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SD-Charlotte, LLC, *et al.*,[1] | ) | Case No. 20-30149 |
|  | ) |  |
| Debtors. | ) | Joint Administration Requested |
|  | ) |  |

### DECLARATION OF BRIAN ROSENTHAL IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF

**I, BRIAN ROSENTHAL,** hereby declare, under penalty of perjury, as follows:

1.      I am a Principal of Meru, LLC ("MERU"), a boutique turnaround and restructuring advisory firm based primarily in Atlanta, New York and San Francisco. I have more than fifteen years of experience advising boards of directors, senior management, creditors, and other stakeholders and parties in interest in connection with both operational and financial restructurings of distressed companies. Prior to joining MERU in November 2019, I held positions in the restructuring advisory practices of large international advisory firms AlixPartners and Ernst & Young. Over the course of my career I have assisted in managing and advising companies as debtors-in-possession through the chapter 11 process.

2.      I serve as the Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"). I was appointed as the Debtors' CRO shortly prior to and in anticipation of the filing of the Debtors' voluntary chapter 11 petitions with this Court (the "Chapter 11 Cases"). Since January 13, 2020 and prior to my appointment as CRO, I served as the Debtors' outside financial and restructuring advisory

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: SD-Charlotte, LLC (7237); RTHT Investments, LLC (2540); SD Restaurant Group, LLC (0331); SD-Missouri, LLC (8294); and Southern Deli Holdings, LLC (9425).

CHAR2\2242848v11

consultant.    In this capacity, I assisted the Debtors with, among other things, liquidity

management, operational issues, financial restructuring needs, communications and negotiations

with creditors, evaluation of strategic restructuring alternatives including potential sale

alternatives, and the preparation and filing of these Chapter 11 Cases.  The Debtors will be filing

an application to retain me as their CRO in these Chapter 11 Cases, subject to approval of the

Court.

3.       In my capacity as the Debtors' outside consultant, I became familiar with the

Debtors' financial affairs, the circumstances giving rise to the Debtors' financial distress, and the

Debtors' restructuring prospects.

4.       I submit this declaration (the "First Day Declaration") in support of the Debtors'

chapter 11 petitions and requests for relief contained in certain "first day" applications and

motions filed on or shortly after the date hereof (the "First Day Motions").[2]

5.       On February 7, 2020 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code").  The Debtors continue to operate their businesses and manage their properties as

debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Concurrently herewith, the Debtors filed a motion seeking joint administration of these Chapter

11 Cases for procedural purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

6.       Except as otherwise indicated below, all facts set forth in this First Day

Declaration are based upon my personal knowledge of the Debtors' operations and finances,

information learned from my review of relevant documents, information supplied to me by

---

[2] All capitalized terms used but not otherwise defined herein have the meanings ascribed in the applicable First Day
Motion.

members of the Debtors' management, senior employees, and advisors, or my opinion based on my professional experience.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

7.    Part I of this First Day Declaration provides background regarding the Debtors including, but not limited to, the Debtors' corporate structure, capital structure, and debt structure.  Part II of this First Day Declaration provides a summary of the events which precipitated these Chapter 11 Cases, and the Debtors' goals in these Chapter 11 Cases.  Part III sets forth the relevant details of the various First Day Motions.

## I.  BACKGROUND REGARDING THE DEBTORS

3.    The Debtors own and operate a large group of franchise restaurants located in the Southeast United States.  Specifically, the Debtors are franchisees of (i) seventy-three Sonic Drive-In restaurants in Georgia, North Carolina, Tennessee, Virginia, and Alabama; (ii) fourteen MOD Pizza restaurants in North Carolina (Charlotte, Wake-Forest, Raleigh, and Wilmington); and (iii) three Fuzzy's Taco Shop restaurants in North Carolina (Charlotte).  Collectively, the Debtors employ approximately 1,900 individuals.

## A.    Corporate Structure

4.    The Debtors are five separate and privately-held Delaware limited liability companies:  (i) Southern Deli Holdings, LLC ("SD Holdings"); (ii) SD-Charlotte, LLC ("SD-C"); (iii) SD-Missouri, LLC ("SD-M"); (iv) RTHT Investments, LLC ("RTHT"); and (v) SD Restaurant Group, LLC ("SDRG").  SD Holdings is a holding company that owns a minority equity interest (17.775%) in Debtor RTHT.  The other Debtors (SD-C, SD-M, RTHT, and SDRG) own and operate the various stores comprising the Debtors' franchise network.

5.      Set forth below is an illustration of the Debtors' franchise ownership as of the

Petition Date:



6.      SD-C and SD-M acquired all seventy-three of their Sonic Drive-In restaurants

from previous unaffiliated owners through three separate acquisition transactions during May 30,

2017 through May 30, 2018.  As Sonic Drive-In franchisees, SD-C and SD-M are parties to

certain franchise license agreements (collectively, as amended or modified from time to time, the

"Sonic Franchise Agreement") with Sonic Industries LLC and Sonic Franchising LLC (together,

"Sonic Corporate").  SD-C's and SD-M's obligations under the Sonic Franchise Agreement are

guaranteed by Yaron Pinhas Goldman ("Mr. Goldman").

7.      RTHT developed and opened fourteen MOD Pizza restaurants.  RTHT opened

seven MOD Pizza restaurants in 2015 – 2017, three MOD Pizza restaurants in 2018, three MOD

Pizza restaurants in 2019, and one MOD Pizza restaurant in January 2020.  As a MOD Pizza

franchisee, RTHT is party to certain development and franchise license agreements (collectively,

CHAR2\2242848v11

as amended or modified from time to time, the "MOD Pizza Franchise Agreement") with MOD Super Fast Pizza Franchising, LLC ("MOD Corporate").  RTHT's obligations under the MOD Franchise Agreement are guaranteed by Mr. Goldman.

8.      Between May 2018 and February 2019, SDRG developed and opened three Fuzzy's Taco Shop restaurants.  As a Fuzzy's Taco Shop franchisee, SDRG was party to (i) that certain Franchise Development Agreement, dated as of July 23, 2018 (as amended, the "Fuzzy's Development Agreement"), with Fuzzy's Taco Opportunities, LLC ("Fuzzy's Corporate") and (ii) those certain franchise license agreements with Fuzzy's Corporate (collectively, as amended or modified from time to time, the "Fuzzy's Franchise Agreement").  On January 29 and February 4, 2020, Fuzzy's Corporate delivered notices of termination with respect to the Fuzzy's Development Agreement and the Fuzzy's Franchise Agreement, respectively.  The Debtors' obligations to Fuzzy's Corporate under the Fuzzy's Franchise Agreement are guaranteed by Mr. Goldman, and Mr. Merrick McKinnie.

**B.**      **Capital Structure**

9.      Mr. Goldman is the majority equity owner of each of the Debtors.  In addition to Mr. Goldman, the Debtors' equity owners consist of certain individuals and private businesses. Set forth below is an illustration of the Debtors' ownership as of the Petition Date:



## C.   Governance

10.     Prior to the Petition Date, Mr. Goldman served as the Manager and the majority Member of each of the Debtors.  In connection with and in preparation for the Debtors' chapter 11 filing, each Debtor appointed an independent director, Matthew W. Smith of The Finley Group, and engaged Brian Rosenthal as Chief Restructuring Officer.  Effective immediately after filing of the voluntary petitions, Mr. Goldman will no longer maintain any authority (managerial or otherwise) with respect to the Debtors' affairs.

## D.   Debt Structure

### *Bridge Funding Group Credit Facilities*

11.     Bridge Funding Group, Inc. (the "Prepetition Secured Lender"), a subsidiary of BankUnited, Inc., is the prepetition senior secured lender to Debtors SD-C, SD-M, RTHT and SDRG (collectively, the "Bridge Debtors") pursuant to:

> A.     that certain Development Line Loan and Security Agreement, dated as of December 27, 2017 (as amended by that certain Amendment to

Development Line Loan and Security Agreement dated as of February 28, 2018, that certain 1st Addendum to Development Line Loan and Security Agreement dated as of November 19, 2018, and as further amended, supplemented or otherwise modified from time to time, the "2017 Bridge Loan Agreement"), by and among RTHT and SDRG, as borrowers, and the Prepetition Secured Lender, as lender, providing for up to $5,395,000 in development line loans; and

B.    that certain Loan Agreement, dated as of May 11, 2018 (as amended, supplemented or otherwise modified from time to time, the "2018 Bridge Loan Agreement") among SD-M, SD-C, and certain non-Debtor affiliates, as borrowers, and the Prepetition Secured Lender, as administrative agent and lender, providing for a Term A Loan in the original principal amount of $21,700,000 and a Term B Loan in the original principal amount of $1,900,000.

12.    As security for their obligations to the Prepetition Secured Lender under the 2017 Bridge Loan Agreement, the 2018 Bridge Loan Agreement and the other Prepetition Loan Documents (the "Prepetition Secured Indebtedness"), the Bridge Debtors granted to the Prepetition Secured Lender first priority liens in all of their property (other than, with respect to SD-M and SD-C, Excluded Property, as such term is defined in the 2018 Bridge Security Agreement (as defined below)) pursuant to:

A.    the 2017 Bridge Loan Agreement;

B.    that certain Security Agreement, dated as of May 11, 2018 (as amended, supplemented or otherwise modified from time to time, the "2018 Bridge Security Agreement") among SD-M, SD-C and the Prepetition Secured Lender; and

C.    that certain Cross-Collateral and Cross-Default Agreement, dated as of December 27, 2017 and effective as of May 11, 2018 (as amended, supplemented or otherwise modified from time to time, the "Cross-Collateralization Agreement"), among the Bridge Debtors and certain non-Debtor affiliates.

The 2017 Bridge Loan Agreement, the 2018 Bridge Loan Agreement, the 2018 Bridge Security Agreement, the Cross-Collateralization Agreement and all of the related agreements, instruments

CHAR2\2242848v11

and documents entered into in connection therewith are referred to herein, collectively, as the "Prepetition Loan Documents").

13.     As of the Petition Date, upon information and belief, the outstanding principal balance owed by the Bridge Debtors to the Prepetition Secured Lender under the Prepetition Loan Documents totaled not less than $22,344,301.56.   Upon information and belief, the obligations of the Bridge Debtors to the Prepetition Secured Lender exceed the value of the Bridge Debtors' assets.

*SRI Prepetition Advance*

14.     On February 5, 2020, the Debtors faced an immediate shortage of cash that could have forced the closure of all of their remaining restaurants—resulting in a massive loss of value for their stakeholders.   The Debtors asked the Prepetition Secured Lender to provide bridge financing sufficient to allow them to continue operating and execute on an orderly filing of these Chapter 11 Cases (a "Prepetition Advance"), but the Prepetition Secured Lender was unwilling to extend the Debtors additional credit.   The only viable alternative source of funding on such critical timing was from SRI Holding Company, (the "DIP Lender"), which agreed to provide the Prepetition Advance to stave off the Debtors' closure and ultimate liquidation so long as the Debtors agreed to seek a roll up of the Prepetition Advance into the proposed DIP Loan Facility (as defined below) and the Prepetition Secured Lender agreed to subordinate payment of the Prepetition Secured Indebtedness to the payment in full of the obligations in respect of the Prepetition Advance.   The Debtors determined, in their reasonable business judgment, that the Prepetition Advance from the DIP Lender was the best (and only) way to avoid liquidation and preserve value for the benefit of all stakeholders, and the Prepetition Secured Lender indicated its willingness to agree to such subordination.   The DIP Lender then extended the Prepetition

Advance to SD-M in the amount of $450,000 pursuant to a certain Secured Promissory Note dated as of February 5, 2020 (the "SRI Prepetition Note") on a senior secured basis (the "SRI Prepetition Liens"), and the Prepetition Secured Lender subordinated its right to payment in respect of the Prepetition Secured Indebtedness to the payment in full of obligations under the SRI Prepetition Note (the "SRI Prepetition Obligations").

*MCA Facilities*

15.     Between December 2018 and December 2019, the Debtors entered into a series of merchant cash advance agreements, pursuant to which the Debtors sold certain future receivables in exchange for upfront cash payments.  These merchant cash agreements include (collectively, the "MCA Agreements"):

A.     Future Receivables Sale Agreement, dated December 11, 2018, among the Debtors, certain non-Debtor affiliates, Mr. Goldman and Itria Ventures LLC ("Itria");

B.     Agreement for the Purchase and Sale of Future Receipts, dated April 8, 2019, among SD-M, SD-C, RTHT, certain non-Debtor affiliates, Mr. Goldman, and Advantage Platform Services Inc. d/b/a Advantage Capital Funding ("Advantage");

C.     Agreement of Sale of Future Receipts, dated as of September 9, 2019, among SD-M, SD Holdings, SD-C, RTHT, certain non-Debtor affiliates, Mr. Goldman, and Libertas Funding LLC ("Libertas");

D.     Merchant Agreement, dated November 18, 2019, among RTHT, Mr. Goldman, and AJ Equity Group, LLC ("AJ Equity");

E.     Payment Rights Purchase and Sale Agreement, dated as of November 11, 2018, among SD-C, Mr. Goldman, and EBF Partners, LLC d/b/a Everest Business Funding ("EBF");

F.     Purchase and Sale of Future Receivables Agreement, dated November 18, 2019, among the Bridge Debtors, Mr. Goldman, and EIN Cap, Inc. ("EIN");

G.     Merchant Agreement, dated December 3, 2019, among the Debtors, certain non-Debtor affiliates, Mr. Goldman, and APP Funding LLC ("APP");

CHAR2\2242848v11

H.  Future Receivables Sale and Purchase Agreement, dated December 3, 2019, among the Debtors, certain non-Debtor affiliates, Mr. Goldman, and Royal Business Group, LLC ("RBG");

I.  Agreement for the Purchase and Sale of Future Receipts, dated December 3, 2019, among SD-C, Mr. Goldman, and Mantis Funding LLC ("Mantis");

J.  Purchase and Sale of Future Receivables, dated December 11, 2019, among the Debtors, certain non-Debtor affiliates, Mr. Goldman, and BMF Capital ("BMF"); and

K.  Agreement of Sale of Future Receipts, dated as of December 17, 2019, SD-M, SD Holdings, SD-C, RTHT, certain non-Debtor affiliates, Mr. Goldman, and Libertas.

Upon information and belief, there are additional merchant cash advance agreements between the Debtors and Mr. Goldman and TVT 2.0, LLC and Region Capital (collectively with Itria, Advantage, Libertas, AJ Equity, EBF, EIN, APP, RBG and BMF, the "MCA Parties").

16.  Pursuant to the MCA Agreements, the Debtors granted to the MCA Parties certain security interests in their assets.  However, based upon UCC searches performed by the Debtors in their respective jurisdictions of organization (the "UCC Searches"), as of January 17, 2020, the only UCC-1 financing statements filed in favor of the MCA Parties against the Debtors in their respective jurisdictions of organization were UCC-1 financing statements filed in favor of (a) Corporation Service Company, as Representative ("CSC"), against each of the Debtors; (b) APP against each of the Debtors on December 4, 2019; (c) RBG against each of the Debtors on December 10, 2019; and (d) C T Corporation System ("CT Corp"), as Representative, against RTHT, SD-C and SD Holdings on December 26, 2019.  I have not yet learned on whose behalf CT Corp filed its UCC-1 financing statements.[3]

---

[3] Although the obligations due the MCA Parties are being described, in part, as secured obligations herein, the Debtors reserve all rights with respect to the MCA Agreements and the transactions, liens and obligations incurred in connection therewith, including, without limitation, rights under chapter 5 of the Bankruptcy Code.

17.     Each of the UCC-1 financing statements filed in favor of the MCA Parties and against the Bridge Debtors were filed subsequent to the UCC-1 financing statements filed in favor of the Prepetition Secured Lender.  Upon information and belief, the value of any liens held by the MCA Parties against the Bridge Debtors is $0.00.

18.     Based on the UCC Searches, the oldest active UCC-1 financing statement filed against the Debtor SD Holdings is in favor of CC Funding.  However, upon information and belief, any obligations owed by SD Holdings to CC Funding have been satisfied.  The next oldest active UCC-1 financing statement filed against SD Holdings is made in favor of CSC, which the Debtors believe to be the representative of Itria.

*Dimension Funding LLC*

19.     Debtor RTHT is party to (i) that certain Lease Agreement 06883JG19, dated as of August 29, 2019, as amended, with Dimension Funding, LLC ("Dimension"), relating to specific items of equipment that include a pizza oven and shake machine; and (ii) that certain Equipment Finance Agreement 06627JG19, dated as of May 30, 2019, as amended, with Dimension relating to certain equipment, including certain kitchen equipment and a new LED sign (together, the "Dimension Equipment Agreements").  Based on the UCC Searches, Dimension filed UCC-1 financing statements against RTHT on September 3, 2019 and May 30, 2019 in respect of the Dimension Equipment Agreements.

*US Foods PMSI*

20.     Based on the UCC Searches, US Foods, Inc. has filed purchase money security interest UCC-1 financing statements against SDMO on January 7, 2020 and SDCLT on January 16, 2020 in such entities' respective states of organization.  I am not aware of US Foods, Inc.

11

having provided notification of such purchase money security interest to the Prepetition Secured

Lender.

## II. <u>SUMMARY OF PRECIPITATING EVENTS; GOALS OF THESE CHAPTER 11 CASES</u>

### A.    <u>Summary of Precipitating Events</u>

21.    From 1999 to 2015, SD Holdings developed and acquired over 60 McAlister's

Deli franchise locations, which SD Holdings eventually sold in 2016 and 2017.  Mr. Goldman,

who began his career in the restaurant business as an employee at McAlister's Deli, spearheaded

these efforts.

22.    In May 2017, Mr. Goldman, through SD-M, acquired sixty-four (64) Sonic Drive-

In restaurants (of the current group of 73 Sonic Drive-In restaurants) from an unaffiliated large

franchisee, which acquisition was approved by Sonic Corporate.  As part of the 2017 acquisition,

the Debtors funded a portion of the purchase price through a sale-leaseback transaction with

National Retail Properties and the incurrence of senior secured debt with Pacific Premier Bank.

23.    The Sonic Drive-In restaurant business is seasonal, requiring substantial amounts

of working capital during the winter months, and the Debtors' businesses in 2017 were heavily

leveraged.  Nonetheless, in December 2017, SD-C acquired seven additional Sonic Drive-In

restaurant franchise locations, and two additional Sonic Drive-In restaurant franchise locations in

May 2018 in a distressed acquisition.  In connection with those transactions, the Debtors

refinanced the Pacific Premier Bank credit facilities with the Prepetition Secured Lender, which

provided the credit facilities under the Bridge 2017 Loan Agreement in December 2017 and the

credit facilities under the Bridge 2018 Loan Agreement in May 2018.  The Debtors also used

these credit facilities to finance the building out of their MOD Pizza and Fuzzy's Taco Shop

restaurant franchise businesses.

CHAR2\2242848v11

24.     It is my understanding from Mr. Goldman that, in October, 2018, the Debtors received an unexpected $7,000,000 tax bill relating to capital gains from the May 2017 sale-leaseback transaction, further straining the Debtors' liquidity.  During this time, the Debtors continued to develop and invest capital in the MOD Pizza and Fuzzy's Taco Shop restaurant franchises, ultimately resulting in an unsustainable liquidity situation.

25.     Due to the Debtors' severe liquidity situation, in or about late December 2018, Mr. Goldman began approaching merchant cash advance providers.  Based upon my review of the Debtors' records (including the MCA Agreements), in December 2018, the Debtors began entering into the MCA Agreements with the MCA Parties.  The MCA Agreements indicate that, between December 2018 and December 2019, the Debtors sold no less than $7,988,325 of future accounts receivable to the MCA Parties in exchange for cash payments in an amount not less than $5,880,000, less fees and certain expenses.  These records indicate that the MCA Parties purchased the Debtors' future accounts receivable at significant discounts, charged high fees and had the ability to debit the Debtors' deposit accounts directly.  The depletion of the Debtors' liquidity attributable to obligations under the MCA Agreements, coupled with the seasonal downturn in the Sonic Drive-In restaurants, left the Debtors' cash flow position untenable.

26.     During the second half of 2019, the Debtors were in advanced discussions with a potential buyer (the "Initial Potential Buyer") for their Sonic Drive-In franchise restaurant businesses, and they spent considerable time and money negotiating a definitive asset purchase agreement in connection therewith.  The sale of the Debtors' Sonic Drive-In franchise restaurant businesses (the "Sonic Disposition") was expected by the Debtors to close in November 2019. However, delays occurred.   Among other issues, the diligence process identified UCC-1 financing statements filed in favor of parties other than the Prepetition Secured Lender, and

13

concerns arose over the ability of SD-C and SD-M to convey their interests in the Sonic Drive-In franchise restaurants free and clear of encumbrances. It became clear that it would be extremely difficult to consummate a Sonic Disposition transaction out of court.

27.    In early January 2020, the Debtors initiated discussions with the Prepetition Secured Lender, Sonic Corporate and the Initial Potential Buyer regarding the possibility of filing these Chapter 11 Cases, pursuing a sale of the Debtors' assets through a process under section 363 of the Bankruptcy Code and obtaining post-petition financing to facilitate the Chapter 11 Cases.

28.    During the fourth quarter of 2019 and January 2020, the Debtors' cash position continued to deteriorate. In order to continue making payroll and paying suppliers, the Debtors ceased payments to the Prepetition Secured Lender under the Prepetition Loan Agreements and the MCA Parties under the MCA Agreements. Certain MCA Parties have instituted lawsuits against the Debtors and Mr. Goldman across the country, adding further pressure on the Debtors' financial position and operations.

29.    Despite their ceasing to pay the Prepetition Secured Lender and the MCA Parties, the Debtors still lacked sufficient cash to continue all operations. On February 3, 2020, in order to conserve cash flow, the Debtors closed its three Fuzzy's Taco Shop restaurants after concluding that additional cash support for its operations would be needed for several more months. On February 5, 2020, the Debtors faced an immediate shortage of cash that could have forced the closure of all of their remaining restaurants—resulting in a massive loss of value for their stakeholders. The Debtors asked the Prepetition Secured Lender to provide a Prepetition Advance, but the Prepetition Secured Lender was unwilling to extend the Debtors additional credit. The only viable alternative source of funding on such critical timing was the DIP Lender,

which agreed to provide the Prepetition Advance to stave off the Debtors' closure and ultimate liquidation so long as the Debtors agreed to seek a roll up of the Prepetition Advance into the proposed DIP Loan Facility and the Prepetition Secured Lender agreed to subordinate payment of the Prepetition Secured Indebtedness to the payment in full of the obligations in respect of the Prepetition Advance.  The Debtors determined, in their reasonable business judgment, that the Prepetition Advance from the DIP Lender was the best (and only) way to avoid liquidation and preserve value for the benefit of all stakeholders, and the Prepetition Secured Lender indicated its willingness to agree to such subordination.  The DIP Lender then extended the Prepetition Advance to SD-M in the amount of $450,000 pursuant to the SRI Prepetition Note secured by the SRI Prepetition Liens, and the Prepetition Secured Lender subordinated its right to payment in respect of the Prepetition Secured Indebtedness to the payment in full of the SRI Prepetition Obligations.

**B.**     **Goals of These Cases**

30.     Facing unsustainable debt loads, an untenable cash position and numerous lawsuits in multiple states, the Debtors intend to use these Chapter 11 Cases to pursue a competitive, value-maximizing sale(s) of their assets as going concerns through a process under section 363 of the Bankruptcy Code, and confirmation of a plan providing for the orderly resolution of their estates.  In an effort to maximize value for the benefit of all stakeholders, the Debtors intend to continue operating their Sonic Drive-In and MOD Pizza businesses until sold.  The proposed post-petition financing from Sonic Corporate, which has the support of the Prepetition Secured Lender, will facilitate these continued operations and is sufficient to bridge the Debtors to a Sonic Disposition, at which time the Prepetition Secured Lender has agreed to

15

permit the continued use of its cash collateral (subject to a budget to be negotiated among the parties prior to the Final Hearing) to provide for an orderly resolution of the Debtors' estates.

## PART III:  FIRST-DAY MOTIONS

A.    **Motion of the Debtors for Entry of an Order Directing the Joint Administration of Related Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(b) (the "Joint Administration Motion")**

29.    The Debtors request the joint administration of these Chapter 11 Cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for the Chapter 11 Cases under the SD-Charlotte, LLC case and also request that the caption of each of the Chapter 11 Cases be modified to reflect the joint administration of the Chapter 11 Cases.  Additionally, the Debtors request that the Court authorize the Debtors to use a combined service list for the jointly administered Chapter 11 Cases for purposes of noticing creditors of the Debtors' estates.

30.    The Debtors are direct and indirect affiliates of each other and constitute "affiliates" within the meaning of section 101(2) of the Bankruptcy Code.  Joint administration of the Chapter 11 Cases will avoid the unnecessary administrative burden on the Court and parties-in-interest in these Chapter 11 Cases.  Joint administration will also permit the Clerk to use a single general docket for the Cases and to combine notices to creditors and other parties-in-interest of the Debtors' respective estates.  Joint administration will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in each of the Chapter 11 Cases.

31.    I understand that if the Court approves joint administration of the Chapter 11 Cases, the Debtors will be able to reduce fees and costs resulting from the administration of the Cases and ease the onerous administrative burden of having to file multiple documents.  I have

also been advised that joint administration will ease the administrative burden for the Court and all parties to the Chapter 11 Cases and obviate the need for duplicative notices, motions, applications and orders, thereby saving time and expense for the Debtors and their estate. Based on the foregoing, the Debtors believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates and all parties-in-interest, and should be granted.

**B.      Motion of the Debtors for an Order : (I) Approving the Continued Use of their Bank Accounts, Cash Management System and Business Forms; (II) Granting a Waiver of the Requirements of Section 345(b) of the Bankruptcy Code; and (III) Authorizing the Debtors' Banks to Charge Certain Fees and Other Amounts (the "Cash Management Motion")**

32.      By the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the maintenance of their bank accounts and continued use of existing business forms; (ii) authorizing but not directing the continued use of their existing cash management system; and (iii) providing any additional relief required in order to effectuate the foregoing. The Debtors also request the right, in their discretion, to (i) pay any bank account related fees; and (ii) close or otherwise modify the terms of certain of the bank accounts and open new debtor-in-possession accounts as may be necessary to facilitate these Chapter 11 Cases and their operations, or as may otherwise be necessary to comply with the requirements of any debtor-in-possession financing and/or cash collateral order entered in these Chapter 11 Cases.

33.      Further, the Debtors request that the Court waive the requirements of Bankruptcy Code section 345(b) with respect to the 90 sub-accounts and certain operations and disbursement accounts as further described in the Cash Management Motion  and permit the Debtors to maintain their deposits in the bank accounts in accordance with existing deposit practices. With respect to the bank accounts that periodically exceed FDIC guidelines, the Debtors have agreed to work with the United States Bankruptcy Administrator for the Western District of North

CHAR2\2242848v11

Carolina (the "<u>Bankruptcy Administrator</u>") to get into compliance with such provisions. The Debtors' existing deposit practices are significantly less burdensome and more appropriately tailored to their business needs than the practices otherwise required under the Bankruptcy Code and by the customary operating orders filed in this district.

34.     The continued use of the cash management system and the bank accounts during the pendency of these Chapter 11 Cases is essential to the Debtors' business operations. The Debtors believe that the bank accounts and related cash management system mechanisms are well-suited to the Debtors' business needs and operations. To require the Debtors to close over 90 bank accounts and reestablish new accounts would not result in greater administrative controls and would require considerable time and expense to the Debtors' estates. Moreover, permitting the Debtors to continue using their existing bank accounts is essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their businesses and operations, including the disruption that could result if checks written but not negotiated or cashed prior to the Petition Date were dishonored.

35.     The cash management system is a practical mechanism that allows the Debtors to transfer their revenues to the payment of their obligations that decreases the burdens on the Debtors, and that provides several important benefits, including the ability to: (i) control and monitor revenue; (ii) ensure cash availability; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. Moreover, continued operation of the cash management system is crucial to the Debtors' ongoing business operations.

36.     Without the relief requested, I believe the Debtors would be unable to effectively and efficiently maintain their financial operations. Such a result would cause significant harm to

the Debtors' businesses and the value of their estates.  Accordingly, I believe that the relief

requested is in the best interest of the Debtors, their estates and creditors, and all parties in

interest.

**C.**     **Motion of the Debtors for an Order Authorizing: (I) Payment of Prepetition
Employee Wages, Salaries, and Other Compensation; (II) Reimbursement of
Prepetition Employee  Business Expenses; (III) Contributions to Prepetition
Employee Benefit Programs; (IV)  Payments for Which Payroll Deductions Were
Made; (V) Payment of All Related Costs and  Expenses; and (VI) Continuation of
Certain Prepetition Employee Programs (the "Employee Wages and Benefits
Motion")**

37.        By the Employee Wages and Benefits Motion, the Debtors seek entry of

entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) pay and/or

perform, as applicable, prepetition obligations to current employees including accrued

prepetition wages, prepetition wage checks, salaries, and other cash and non-cash compensation

claims (collectively, the "Employee Wage Obligations"); (b) maintain and continue to honor

their practices, programs, and policies for their employees that were in effect as of the Petition

Date, as such may be modified, amended or supplemented from time to time in the ordinary

course, including without limitation, the continuation and maintenance of the Debtors' various

employee benefit plans and programs (and to pay all fees and costs in connection therewith,

including those that arose prepetition) (collectively, the "Employee Benefit Obligations"); (c)

reimburse Employees for prepetition expenses incurred on behalf of the Debtors in the ordinary

course of business (the "Employee Expense Obligations"); and (d) pay all related prepetition

withholdings and payroll-related taxes and deductions (the "Employer Taxes and Deductions"

and collectively with the Employee Wage Obligations, Employee Benefit Obligations, Employee

Expense Obligations and Workers' Compensation Obligations, the "Employee Obligations")

associated with the Employee Wage Obligations and Employee Benefit Obligations; and (ii)

CHAR2\2242848v11

authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment request for payment of any prepetition Employee Obligations.

38.    As of January 31, 2020, the Debtors employ 1,878 employees, of which 1,404 are part-time or hourly and 474 are full-time or salaried employees (the "Employees").

39.    The Debtors' Employees perform a variety of critical functions, including operating 90 franchised restaurants over the Southeast.    The continued operations of the restaurants are essential to the reorganization of the Debtors.

40.    In the ordinary course of business, the Debtors incur payroll obligations for salaries, commissions and hourly wages owed to their Employees.    Salaries and hourly wages for the Employees are paid twice a month.    The average total monthly payroll obligations are approximately $2,310,341 for the Employees.    As of the Petition Date, the Debtors estimate that they owe $800,000 to their Employees for prepetition Employee Wage Obligations (collectively, the "Prepetition Wage Obligations").    The Debtors seek the authority to pay and honor Prepetition Wage Obligations in an amount not to exceed $800,000.00 in the aggregate for Employees, and to continue to honor the Employee Wage Obligations on a postpetition basis in the ordinary course of business.

41.    Further, the Debtors are seeking to pay approximately $450,000 in bonuses, Employee Benefit Obligations, Employee Expense Obligations and Employer Taxes and Deductions, plus amounts due on the current pay cycle.

42.    The Employees are essential to the continued operation of the Debtors' businesses, and the Employees' morale directly affects their effectiveness and productivity. Many of the Employees live paycheck to paycheck and would incur substantial hardship should they not be paid.    Consequently, it is critical that the Debtors continue, in the ordinary course,

CHAR2\2242848v11

those personnel policies, programs, and procedures that were in effect prior to the Petition Date.

A loss of employee morale and goodwill at this critical juncture would undermine the Debtors'

stability, and undoubtedly would have an adverse effect on the Debtors, their customers, the

value of their assets and businesses, and their ability to achieve their objectives in chapter 11.

43.     I believe that payment of all prepetition Employee Obligations in accordance with

the Debtors' prepetition business practices will enable the Debtors to retain their employees and

is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**D.      Motion of the Debtors for Entry of an Interim Order and Final Order Authorizing the Debtors to Maintain Existing Insurance Policies, Pay All Policy Premiums Arising Thereunder, and Renew or Enter into New Policies (the "Insurance Motion")**

44.     By the Insurance Motion, the Debtors request entry of interim and final orders (i)

authorizing the Debtors to pay unpaid prepetition premiums associated with the prepetition

insurance policies (collectively, the "Insurance Policies") to the extent that the Debtors might

discover and determine, in their discretion, that such payment is necessary to avoid cancellation,

default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage,

benefits, or proceeds provided under the Insurance Policies; and (ii) authorizing and directing

financial institutions to receive, process, honor, and pay all related checks and electronic

payment requests for payment of the Insurance Policies.  The Debtors are requesting this relief

solely to the extent consistent with the terms of any interim and final orders approving entry into

debtor in possession financing and authorizing use of cash collateral entered by the Court in

these Chapter 11 Cases.

45.     The Debtors maintain nine (9) Insurance Policies that have been obtained through

various third-party insurance carriers (the "Insurance Carriers"), which provide coverage for,

inter alia, commercial general liability, auto, workman's compensation, property, umbrella,

crime, flood restaurant recovery, employment practices liability insurance and internet liability. Continuation of the Insurance Policies is essential to the preservation of the Debtors' businesses. Moreover, in many cases, coverage provided by the Insurance Policies is required by regulations, laws, and contracts that govern the Debtors' commercial activities and the general operating order required by the Bankruptcy Administrator.

46.      The Debtors pay certain premiums on a periodic basis and others in an annual lump sum.  The Debtors are generally current on amounts owed to maintain the Insurance Policies. Certain amounts owed in connection with the Insurance Policies, however, are paid in arrears or have otherwise accrued before the Petition Date and have not yet been paid.  As of the Petition Date, the Debtors estimate that a total of approximately $96,300.00 in prepetition amounts is outstanding under the Insurance Policies.

47.      Additionally, other payments may come due in the future that relate to Insurance Policy obligations incurred prepetition and premiums will need to be paid in the ordinary course postpetition.  Many of the policies are paid on a month to month basis or will expire on a post-petition basis Most of the policies will expire in September or October of 2020.  Should the policies expire during the pendency of the bankruptcy filing, the Debtors will seek to procure extensions to any such policies.

48.      The Debtors believe that the Insurance Policies are necessary and essential to the operation of their businesses during these Chapter 11 Cases.  Under the terms of the Insurance Policies, the Insurance Carriers may cancel the Insurance Policies for nonpayment upon the Debtors' failure to pay the premium obligations, and such cancellation will seriously harm the Debtors' ability to continue their operations and business in the ordinary course.  The Debtors' ability to continue their existing Insurance Policies is essential to the maintenance of their

22

business.   Accordingly, the Debtors seek authorization to maintain their existing Insurance Policies, including payment of all monthly obligations, whether prepetition or postpetition, and to renew or enter into new policies as may be required as the annual terms of existing Insurance Policies expire, without further order of the Court, in the ordinary course of business. Accordingly, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**E.      Motion of the Debtors Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing Debtors to Use Cash Collateral; (III) Granting Adequate Protection to Prepetiton Secured Lender; (IV) Scheduling a Final Hearing Under Bankruptcy Rules 4001(b) and (c); and (V) Granting Related Relief (the "DIP Financing Motion")**

49.      By the DIP Financing Motion, the Debtors respectfully request that the Court enter interim and final orders (a) authorizing the Debtors to enter into senior secured and superpriority financing (the "DIP Loan Facility") with the DIP Lender, (b) authorizing the Debtors to use Cash Collateral; (c) granting liens and superpriority administrative claims to the DIP Lender pursuant to section 364 of the Bankruptcy Code; (d) granting adequate protection to the Prepetition Secured Lender; and € granting related relief.  Specifically, by the DIP Financing Motion, the Debtors request interim and final authorization for SD-C to obtain, and for each of the other Debtors to unconditionally guaranty, jointly and severally, SD-C's and each other's obligations in respect of the DIP Loan Facility, which if approved on a final basis would consist of a postpetition financing in a total amount of $4,600,000, inclusive of the rolling up the Prepetition Advance of $450,000 plus interest and fees into the DIP Loan Facility (the "Roll Up"), subject to the terms and conditions of the DIP Loan Facility.

CHAR2\2242848v11

50.    Unsecured financing is not available to the Debtors.  Representatives of the Debtors sought postpetition financing from the Prepetition Secured Lender and other third-party lenders.  However, after extensive arm's length negotiations with the Prepetition Secured Lender and the DIP Lender, the Debtors were unable to obtain terms from the Prepetition Secured Lender superior to those offered by the DIP Lender, and the discussions with other third-party lenders failed to produce any firm financing proposals.

51.    As discussed in detail above, faced with the depletion of remaining liquidity and the inability to obtain further funding outside of chapter 11, the Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Loan Facility.  The Debtors' management ultimately concluded that the DIP Loan Facility will provide immediate access to capital to pay their limited ongoing operating expenses while enabling the Debtors to pursue a sale of substantially all of the Debtors' assets on a competitive basis under the protection of chapter 11, and a wind-down of the Debtors' estates, all on more favorable terms than any other reasonably available alternative.

52.    Without this financing (and the Prepetition Advance financing provided by the DIP Lender, which the Debtors are asking to be rolled up into the DIP Loan Facility) the Debtors would have liquidated under chapter 7 with no chance for a recovery to their creditors.  The DIP Loan Facility is the Debtors' best means of obtaining the liquidity necessary to avoid a shutdown of their business, preserve going concern value, and effectuate a value-maximizing sale transaction for the benefit of all stakeholders.

53.    The DIP Loan Facility provides the Debtors the liquidity they need to maintain their assets during the Chapter 11 Cases and allows the Debtors to pursue and effectuate a competitive process and sale of the Debtors' assets.  The proceeds of the DIP Loan Facility are

CHAR2\2242848v11

sized to preserve and promote the viability of the Debtors' assets and support the Debtors

through a sale of the assets of SD-C's and SD-M's primary assets, and the Prepetition Secured

Lender has stated its willingness to leave sufficient capital from those dispositions in the

Debtors' estates to fund these Chapter 11 Cases and wind-down the Debtors. Moreover, the

financial terms and covenants of the DIP Loan Facility are standard and reasonable for financing

of this kind.

54.     Based on the Debtors' negotiations regarding the DIP Loan Facility, the terms of

the DIP Documents constitute, on the whole, the most favorable terms the Debtors could achieve

upon which the DIP Lender will extend the necessary postpetition financing.  Although the

Debtors explored whether the DIP Lender would provide the DIP Loan Facility without certain

provisions, in the course of negotiations, the DIP Lender indicated it would not be willing to

provide the DIP Loan Facility without such terms.  In particular, the DIP Lender would not

provide financing without the provisions requiring, in particular, (i) the achievement of certain

sale milestones, including the filing of a sale motion on or shortly after the Petition Date; (ii) the

conversion of the Prepetition Secured Indebtedness into the Roll Up under the DIP Loan Facility;

and (iii) securing the DIP Loan Facility with first-priority liens and superpriority claims.  These

are key components of consideration for the DIP Lender without which it has indicated it is

unwilling to provide the DIP Loan Facility.

55.     Accordingly, the Debtors, in consultation with their advisors – recognizing the

absence of any competitive alternative financing proposals and the benefits to be provided under

the DIP Loan Facility – determined that the terms of the DIP Agreement were superior to any

other set of terms reasonably available to the Debtors at this time, and in fact the only available

CHAR2\2242848v11

terms.  Therefore, the DIP Loan Facility provides the Debtors with the best, most feasible, and value-maximizing financing option available at this time.

56.     Moreover, the Debtors have concluded that the economic terms of the DIP Loan Facility are fair and reasonable and are consistent with what can be expected in a debtor-in-possession financing facility.  After a thorough analysis by the Debtors and their advisors, they have concluded that the terms of the DIP Loan Facility are reasonable and appropriate under the circumstances.  The non-economic terms of the DIP Loan Facility, including the sale milestones, are also within the range of what can be expected for a debtor-in-possession financing facility, particularly considering the facts and circumstances of these Chapter 11 Cases, the nature of the Debtors' assets, and the marketing and sale process that preceded these Chapter 11 Cases.

57.     For these reasons, in the Debtors' prudent business judgment, the terms of the DIP Loan Facility are fair and reasonable in the circumstances of the Chapter 11 Cases and the Debtors could not obtain postpetition financing from any other lending source.  Accordingly, I believe that the relief requested in the DIP Financing Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**F.      Debtors' Motion for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Pre-Petition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Requests for Additional Assurance of Payment (the "Utilities Motion")**

58.     In connection with the operation of their businesses, the Debtors obtain electricity, natural gas, water, telephone, security and/or similar services with various utility companies (collectively, the "Utility Providers").

59.     Uninterrupted utility services are essential to ongoing operations and, therefore, to the ultimate success of the Debtors' reorganization.  Should the Utility Providers refuse or

CHAR2\2242848v11

discontinue service, even for a brief period, Debtors' business operations would be disrupted.

The impact on the Debtors' ability to conduct their businesses would be significant and would

jeopardize the Debtors' reorganization efforts.  It is therefore critical that utility services continue

uninterrupted.

60.     To avert disruption to their businesses, the Debtors would be required to pay

whatever amounts are demanded by the Utility Providers to avoid the cessation of necessary

services. Accordingly, the Debtors seek the entry of an order prohibiting the Utility Providers

from altering, refusing or discontinuing services on account of prepetition invoices, authorizing

the Debtors to pay a deposit of one month's average billing to the Utility Providers, deeming

Utility Providers adequately assured of future performance, and establishing procedures for

determining requests for additional adequate assurance of payment.

61.     The Debtors submit that their ability to continue paying for utility services is

adequately assured for a number of reasons.  First, the Debtors should have adequate liquidity

through their operations and cash on hand to pay for postpetition utility services on a current

basis.  Additionally, the budgets for the DIP Loan Facility anticipate paying for the services in

the ordinary course.  Finally, the Debtors propose to make a deposit of one month's average

billing with each Utility Provider.

62.     I am advised by counsel that under the relief requested in Utilities Motion, the

Utility Providers retain the right to seek additional adequate assurance.

63.     Accordingly, I believe that the relief requested in the Utilities Motion is in the

best interest of the Debtors, their estates and their creditors.

**G.     Debtors' Motion for an Order Pursuant to 11 U.S.C. § 102 and 105(a) and Bankruptcy Rules 2002(m) and 9007 Establishing Case Management and Notice Procedures (the "Case Management Motion")**

27

64. By the Case Management Motion, the Debtors seek an order establishing certain notice and case management procedures, all subject to further order of the Court, including: (a) limiting the notice procedures in these Chapter 11 Cases and (b) designating the parties upon whom notice must be served. Regulating the service, notice and filing requirements at the outset of this case will minimize confusion regarding such important procedural matters. Further, these proposed procedures will dramatically reduce the economic burdens on the Debtors' estates as there are over 1900 employees and 1000 creditors and parties in interest.

65. Specifically, the Debtors propose that every notice, motion or application, and all briefs, memoranda, affidavits, declarations or other documents filed concurrently in support thereof in these Chapter 11 Cases (collectively, the "Filings") and all Filings, complaints and other pleadings filed in any adversary proceeding commenced in this case shall be subject to the notice procedures described in the Case Management Motion (the "Notice Procedures"), unless otherwise ordered by the Court.

66. The Debtors expect numerous parties to file notices of appearance and requests for notices and copies of pleadings as this case proceeds.

67. Based on estimates provided by counsel, the costs associated with copying and mailing or otherwise serving all notices and motions to all creditors and parties in interest would impose an administrative and economic burden on Debtors' estates and on creditors. Such mass mailings would be extraordinarily costly to the Debtors' estates and require the Debtors to divert limited resources to comply with these administrative requirements. Additionally, based on the advice of counsel, the repeated drafting and filing of motions to limit notice for each use, sale or lease of the Debtors' property out of the ordinary course of business, asset sales and for various

28

compromises and settlements, increase the administrative and economic burden on Debtors' estates.

68.     I believe that adopting the Notice Procedures will substantially reduce administrative burdens and result in substantial cost savings to the Debtors' estates because of the reduction of time and money Debtors will have to expend on the Filings.  Adopting the Notice Procedures will also significantly reduce the administrative and economic burden placed on creditors and parties in interest when filing the Filings.

69.     Accordingly, I believe that the relief requested in the Case Management Motion is in the best interest of the Debtors, their estates and their creditors.

**H.     Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. § 156(C) (I) Approving the Retention and Appointment of Stretto as Notice, Claims and Solicitation Agent to the Debtors, Effective *Nunc Pro Tunc* to the Petition Date, and (II) Granting Related Relief**

70.     The Debtors will seek the entry of an order appointing Stretto ("Stretto") as claims, noticing and voting agent in these Chapter 11 Cases.

71.     I understand that Stretto may, among other things: (a) prepare and serve all notices required in the Debtors' Chapter 11 Case, including the notice of the commencement of this case and the meeting of creditors pursuant to section 341 of the Bankruptcy Code; (b) maintain the official claims register; and (c) assist with the mailing and tabulation of ballots in connection with any vote to accept or reject any plan or plans proposed in these Chapter 11 Case. The Debtors obtained and reviewed engagement proposals from other claims, noticing and voting agents to ensure selection through a competitive process. The Debtors submit, based on all engagement proposals obtained and reviewed, that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise.

29

I. **Debtors' Motion for an Order: (I) Authorizing the Filing of (A) Consolidated Master List of Creditors and (B) Consolidated List of Top Unsecured Creditors; and (II) Approving the Form and Manner of Notice of Commencement (the "Consolidated List of Creditors Motion")**

72.     I understand that the top 20 list required to be filed with the voluntary petition primarily would be used by the Bankruptcy Administrator to understand the types and amounts of unsecured claims against the Debtors and thus evaluate prospective candidates to serve on an official committee in the Debtors' Chapter 11 Cases.

73.     The Debtors have numerous identical large creditors as a result of the type of businesses they run; including food vendors and other restaurant-oriented trade vendors. As a result, the Debtors seek authority to file and provide the Bankruptcy Administrator with a list of consolidated top 30 unsecured creditors (the "Top 30 List").

74.     The Debtors believe that providing the Bankruptcy Administrator with the Top 30 List would better facilitate the Bankruptcy Administrator's evaluation of members of an official committee of unsecured creditors.

75.     Additionally, as the Debtors have engaged Stretto to serve the over 2,900 parties on the matrix, the Debtors seek to have the form of notice of commencement approved.  The Debtors seek to relief the Clerk of Court from the expense of mailing the notice to such a large matrix population.

K. *Ex Parte* **Motion for Extension of Time Within which to File (A) Schedules of Assets and Liabilities; (B) Schedules of Executory Contracts and Unexpired Leases; and (C) Statement of Financial Affairs (the "Motion to Extend Time for Schedules")**

76.     The Debtors have sought an order extending the time within which they must file their Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs (collectively, the "Schedules and Statements").

CHAR2\2242848v11

77.     Prior to the Petition Date, the Debtors and their representatives have focused their efforts on obtaining capital, financing and sale negotiations.  Accordingly, the Debtors had little time to prepare certain materials related to the bankruptcy filing, including the Schedules and Statements.  The Debtors' representatives, and other parties as necessary, are actively working on reviewing and synthesizing information from the books and records of the Debtors to finalize the Schedules and Statements.

78.     With over 1,900 employees, 90 restaurants and over 1,000 creditors, the Debtors have a significant amount of information to accumulate in order to prepare their Schedules and Statements.

79.     I am advised by counsel that the Debtors are required to file the Schedules and Statements within the 14-day period provided by Bankruptcy Rule 1007(c).  I believe that the Debtors cannot accurately complete the Schedules and Statements within this 14-day period, but estimate that an extension of 31 additional days will provide sufficient time.  The Debtors are requesting an extension through Monday, March 23, 2020 to file the Schedules and Statements.

## IV.    CONCLUSION

For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions and respectfully request the Court to do so.

CHAR2\2242848v11

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  February 7, 2020

/s/ Brian Rosenthal
Brian Rosenthal
Chief Restructuring Officer

CHAR2\2242848v11