**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SD-Charlotte, LLC, *et al.*, [1] | ) | Case No. 20-30149 |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |
| | ) | |

**MOTION OF THE**
**DEBTORS PURSUANT**
**TO SECTIONS 105, 361, 362,**
**363(c), 364(c)(1), 364(c)(2), 364(c)(3),**
**364(d)(1) AND 364(e) AND 507 OF THE**
**BANKRUPTCY CODE AND BANKRUPTCY**
**RULES 2002, 4001 AND 9014: (I) AUTHORIZING**
**DEBTORS TO OBTAIN POSTPETITION FINANCING;**
**(II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL;**
**(III) GRANTING ADEQUATE PROTECTION TO PREPETITION**
**SECURED LENDER; (IV) SCHEDULING A FINAL HEARING UNDER**
**BANKRUPTCY RULES 4001(b) AND (c); AND (V) GRANTING RELATED RELIEF**

SD-Charlotte, LLC and its affiliated debtors and debtors in possession (collectively, the

"Debtors"), by and through their proposed counsel, Moore & Van Allen PLLC, hereby file this

motion (this "Motion"), pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3),

364(d)(1), 364(e) and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules

2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and Rule 1002-4 of the Rules of Practice and Procedure of the United States Bankruptcy

Court for the Western District of North Carolina (the "Local Rules"), for entry of an interim order

on an expedited basis (the "Interim Order"), substantially in the form annexed hereto as Exhibit

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: SD-Charlotte, LLC (7237); RTHT Investments, LLC (2540); SD Restaurant Group, LLC (0331); SD-Missouri, LLC (8294); and Southern Deli Holdings, LLC (9425).

A, and a final order (the "<u>Final Order</u>" and, together with the Interim Order, the "<u>DIP Orders</u>"), (a) authorizing the Debtors to obtain senior secured postpetition financing on a priming basis; (b) authorizing the Debtors to use Cash Collateral (as defined below); (c) granting liens and providing superpriority claims with respect to such postpetition financing; (d) approving the form of adequate protection to be provided by the Debtors; (e) modifying the automatic stay to the extent necessary to effectuate the terms of the DIP Orders; (f) scheduling a final hearing to consider entry of the Final Order; and (g) granting related relief in connection with the DIP Loan Facility (as defined below).  In support of this Motion, the Debtors respectfully state as follows:

### SUMMARY OF RELIEF REQUESTED

1.     In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their liquidity needs and operate their businesses.  In addition, the Debtors require access to sufficient liquidity to fund these chapter 11 cases (the "<u>Chapter 11 Cases</u>") while working towards one or more successful sale transactions under section 363 of the Bankruptcy Code.  Postpetition financing, in addition to the use of Cash Collateral, is necessary for the Debtors to have access to sufficient liquidity to maintain ongoing day-to-day operations, ensure proper serving of customers postpetition and to fund working capital needs.  Absent postpetition financing and the use of Cash Collateral, the Debtors will be forced to wind-down their operations due to a lack of funds.  It is, therefore, imperative that the Debtors have access to sufficient liquidity to avoid imminent irreparable harm and successfully consummate one or more sale transactions.

2.     Accordingly, by this Motion, the Debtors are seeking, *inter alia*:

   a.     authorization for SD-Charlotte, LLC ("<u>SD-C</u>" or "<u>Borrower</u>"), as borrower, and each of the other Debtors, as guarantors, to execute that certain Superpriority Debtor-In Possession Secured Promissory Note (as amended, restated, supplemented or otherwise modified from time to time, the "<u>DIP Agreement</u>"), substantially in the form attached hereto as <u>Exhibit B</u>,

2

together with the other agreements delivered or executed from time to time in connection therewith (as amended, restated, supplemented or otherwise modified from time to time, together with the DIP Agreement, the "DIP Documents"), under which the Borrower and the Guarantors shall (i) obtain up to $4,600,000 in aggregate postpetition senior secured super-priority debtor-in-possession financing (inclusive of the Roll Up (as defined below), the "DIP Loan Facility") and other extensions of credit from SRI Holding Company, a Delaware corporation ("SRI" or the "DIP Lender") and (ii) grant security interests and liens and accord superpriority claim status in favor of the DIP Lender under sections 361, 364(c) and 36(d)(1) of the Bankruptcy Code in accordance with the DIP Documents;[2]

b.      authorization for the Debtors to convert to DIP Obligations (as defined below) under the DIP Loan Facility , the outstanding principal amount, plus any accrued interest and applicable fees and expenses (the "SRI Prepetition Obligations"), under that certain Secured Promissory Note dated as of February 5, 2020 (the "SRI Prepetition Note"), whereby SRI, with the consent of the Prepetition Secured Lender, provided a bridge loan to SD-Missouri, LLC in the aggregate principal sum of $450,000 (the foregoing proposed conversion defined as the "Roll Up") on a senior secured basis (the "SRI Prepetition Liens");

c.      authorization for the Debtors to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

d.      authorization for the Debtors to use cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral") under sections 361, 362 and 363 of the Bankruptcy Code, and all other Prepetition Collateral, and to use the proceeds of the DIP Loan Facility, each in accordance with a certain budget in form and substance satisfactory to the DIP Lender and the Prepetition Secured Lender, including to fund the costs associated with the Chapter 11 Cases and to fund postpetition operating expenses of the Debtors during the Chapter 11 Cases;

e.      authorization to grant adequate protection with respect to the use of Cash Collateral and any diminution in the value of the Prepetition Collateral securing the Debtors' Prepetition Secured Indebtedness under the Prepetition Loan Documents (each as defined below);

f.      authorization for the Debtors to grant to the DIP Lender assurances for the full and timely payment of the Debtors' obligations under the DIP Loan Facility by granting to the DIP Lender (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim (a

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Documents or the proposed Interim Order, as applicable.

"Superpriority Administrative Expense Claim") having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carve-Out, (ii) liens on and security interests in all of the DIP Collateral pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code (as defined below) and (iii) liens on, and security interests in, all of the Prepetition Collateral pursuant to section 364(d)(1) of the Bankruptcy Code, in each case subject to the Carve-Out;

g.      at an interim hearing on the Motion, entry of an Interim Order:  (i) authorizing the Borrower, on an interim basis, to borrow under the DIP Agreement an aggregate principal amount not to exceed $3,700,000 (inclusive of the Roll Up, plus fees, interest and other amounts in accordance with the terms of the DIP Documents) at any time prior to entry of the Final Order (as defined below); (ii) authorizing the Debtors, on an interim basis, to use Cash Collateral and the other Prepetition Collateral; and (iii) granting, on an interim basis, adequate protection to the Prepetition Secured Lender; and

h.      pursuant to Bankruptcy Rule 4001, to schedule a final hearing (the "Final Hearing") on this Motion to consider entry of the Final Order authorizing and approving on a final basis the relief requested in the Motion, including, without limitation, authorizing and approving the Borrower, on a final basis, to borrow the balance of, and fully utilize, the DIP Loan Facility, the Debtors' ability to consummate the Roll Up, and the Debtors' ability to continue using Cash Collateral and the other Prepetition Collateral, subject to the terms and conditions of the DIP Documents and the Final Order;

i.      pursuant to section 362 of the Bankruptcy Code, modification of the automatic stay to the extent set forth in the DIP Orders and the DIP Documents;

j.      waiver any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of the Interim Order; and

k.      such further relief as this Court shall deem appropriate.

## **JURISDICTION**

3.      The Court has jurisdiction over these chapter 11 cases, the Debtors, their estates and this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The statutory predicates for the relief requested in this Motion are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014.

## BACKGROUND

**A.     General Background**

6.     On the date hereof (the "Petition Date"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.  By a motion filed on the Petition Date, the Debtors have requested that the Chapter 11 Cases be consolidated for procedural purposes only and administered jointly.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.     A comprehensive description of the Debtors' businesses and operations, capital structure, and the events leading to the commencement of these Chapter 11 Cases can be found in the *Declaration of Brian Rosenthal in Support of the Debtors' Chapter 11 Petitions and Requests for First-Day Relief* (the "First Day Declaration"), which is being filed contemporaneously herewith and which is incorporated by reference.

8.     To operate their businesses, preserve value, and successfully consummate one or more asset sales in these Chapter 11 Cases, the Debtors require access to the proposed DIP Loan Facility and the use of Cash Collateral.  Through the DIP Loan Facility and the use of Cash Collateral, the Debtors will have access to the necessary funding to (a) continue the day-to-day operations of their businesses, (b) preserve critical relationships with their employees, customers, and suppliers, (c) continue to market their assets in a manner designed to preserve value for the benefit of all stakeholders, and (d) fund these Chapter 11 Cases.  The DIP Loan Facility, in

particular, signals to the Debtors' vendors, suppliers, customers, and employees that the Debtors

will continue to meet their commitments during these cases.  The DIP Loan Facility, together with

the consensual use of Cash Collateral, provides the Debtors with their best available opportunity

to maintain their current operations and implement a successful restructuring for the benefit of

their creditors.

9.      The Debtors seek authorization to obtain postpetition financing and to use Cash

Collateral pursuant to the terms set forth in (a) this Motion; (b) the DIP Agreement attached hereto

as Exhibit B and the other DIP Documents; (c) the Interim Order in the proposed form attached

hereto as Exhibit A; and (e) after the Final Hearing, the Final Order.  The Debtors anticipate that

they will access the DIP Loan Facility immediately upon the entry of, and on the terms set forth

in, the Interim Order.

**B.      Prepetition Secured Obligations**

**I.      Bridge Funding Group, Inc. Credit Facilities**

10.     Bridge Funding Group, Inc. (the "Prepetition Secured Lender"), a subsidiary of

BankUnited, Inc., is the prepetition senior secured lender to Debtors SD-C, SD-Missouri, LLC

("SD-M"), RTHT Investments, LLC ("RTHT") and SD Restaurant Group ("SDRG" and,

collectively with the SD-C, SD-M and RTHT, the "Bridge Debtors") pursuant to:

a.      that certain Development Line Loan and Security Agreement, dated as of
December 27, 2017 (as amended by that certain Amendment to
Development Line Loan and Security Agreement dated as of February 28,
2018, that certain 1st Addendum to Development Line Loan and Security
Agreement dated as of November 19, 2018, and as further amended,
supplemented or otherwise modified from time to time, the "2017 Bridge
Loan Agreement"), by and among RTHT and SDRG, as borrowers, and the
Prepetition Secured Lender, as lender, providing for up to $5,395,000 in
development line loans; and

b.      that certain Loan Agreement, dated as of May 11, 2018 (as amended,
supplemented or otherwise modified from time to time, the "2018 Bridge
Loan Agreement") among SD-M, SD-C, and certain non-Debtor affiliates,

6

as borrowers, and the Prepetition Secured Lender, as administrative agent and lender, providing for a Term A Loan in the original principal amount of $21,700,000 and a Term B Loan in the original principal amount of $1,900,000.

11.     As security for their obligations to the Prepetition Secured Lender under the 2017 Bridge Loan Agreement, the 2018 Bridge Loan Agreement and the other Prepetition Loan Documents (the "Prepetition Secured Indebtedness"), the Bridge Debtors granted to the Prepetition Secured Lender first priority liens in all of their property (other than, with respect to SD-M and SD-C, Excluded Property, as such term is defined in the 2018 Bridge Security Agreement (as defined below)) pursuant to the 2017 Bridge Loan Agreement, that certain Security Agreement dated as of May 11, 2018 (as amended, supplemented or otherwise modified from time to time, the "2018 Bridge Security Agreement") among SD-M, SD-C and the Prepetition Secured Lender, and that certain Cross-Collateral and Cross-Default Agreement, dated as of December 27, 2017 and effective as of May 11, 2018 (as amended, supplemented or otherwise modified from time to time, the "Cross-Collateralization Agreement"), among the Bridge Debtors and certain non-Debtor affiliates.  The 2017 Bridge Loan Agreement, the 2018 Bridge Loan Agreement, the 2018 Bridge Security Agreement, the Cross-Collateralization Agreement and all of the related agreements, instruments and documents entered into in connection therewith are referred to herein, collectively, as the "Prepetition Loan Documents".

12.     As of the Petition Date, the outstanding principal balance owed by the Bridge Debtors to the Prepetition Secured Lender under the Prepetition Loan Documents was not less than $22,344,301.56.  Upon information and belief, the obligations of the Bridge Debtors to the Prepetition Secured Lender exceed the value of their assets.

CHAR2\2241646v7

## II.     SRI Bridge Loan

13.     As described more fully in the First Day Declaration, on February 5, 2020, the Debtors faced an immediate shortage of cash that could have forced the closure of all of their remaining restaurants—resulting in a massive loss of value for their stakeholders.  The Debtors asked the Prepetition Secured Lender to provide bridge financing sufficient to allow them to continue operating and execute on an orderly filing of these Chapter 11 Cases (a "Prepetition Advance"), but the Prepetition Secured Lender was unwilling to extend the Debtors additional credit.  The only viable alternative source of funding on such critical timing was the DIP Lender, which agreed to provide the Prepetition Advance to stave off the Debtors' closure and ultimate liquidation so long as the Debtors agreed to seek a roll up of the Bridge Financing into the proposed DIP Loan Facility and the Prepetition Secured Lender agreed to subordinate payment of the Prepetition Secured Indebtedness to the payment in full of the obligations in respect of the Prepetition Advance.  The Debtors determined, in their reasonable business judgment, that the Prepetition Advance from the DIP Lender was the best (and only) way to avoid liquidation and preserve value for the benefit of all stakeholders, and the Prepetition Secured Lender indicated its willingness to agree to such subordination.  The DIP Lender then extended the Prepetition Advance to SD-M in the amount of $450,000 pursuant to the SRI Prepetition Note secured by the SRI Prepetition Liens, and the Prepetition Secured Lender subordinated its right to payment in respect of the Prepetition Secured Indebtedness to the payment in full of the SRI Prepetition Obligations.

## II.     MCA Facilities

14.     Between December 2018 and December 2019, the Debtors entered into a series of merchant cash advance agreements, pursuant to which the Debtors sold certain future receivables in exchange for upfront cash payments.  These merchant cash agreements include (collectively, the "MCA Agreements"):

a.  Future Receivables Sale Agreement, dated December 11, 2018, among the Debtors, certain non-Debtor affiliates, Mr. Yaron Pinhas Goldman ("Mr. Goldman" and Itria Ventures LLC ("Itria");

b.  Agreement for the Purchase and Sale of Future Receipts dated April 8, 2019 among SD-M, SD-C, RTHT, certain non-Debtor affiliates, Mr. Goldman and Advantage Platform Services Inc. d/b/a Advantage Capital Funding ("Advantage");

c.  Agreement of Sale of Future Receipts, dated as of September 9, 2019, among SD-M, SDH, SD-C, RTHT, certain non-Debtor affiliates, Mr. Goldman and Libertas Funding LLC ("Libertas");

d.  Merchant Agreement, dated November 18, 2019 among RTHT, Mr. Goldman and AJ Equity Group, LLC ("AJ Equity");

e.  Payment Rights Purchase and Sale Agreement, November 11, 2018 among SD-C, Mr. Goldman and EBF Partners, LLC d/b/a Everest Business Funding ("EBF");

f.  Purchase and Sale of Future Receivables Agreement, dated November 18, 2019, among the Bridge Debtors, Mr. Goldman and EIN Cap, Inc. ("EIN");

g.  Merchant Agreement dated December 3, 2019 among the Debtors, certain non-Debtor affiliates, Mr. Goldman and APP Funding LLC ("APP");

h.  Future Receivables Sale and Purchase Agreement dated December 3, 2019 among the Debtors, certain non-Debtor affiliates, Mr. Goldman and Royal Business Group, LLC ("RBG");

i.  Agreement for the Purchase and Sale of Future Receipts dated December 3, 2019 among SD-C, Mr. Goldman and Mantis Funding LLC ("Mantis");

j.  Purchase and Sale of Future Receivables dated December 11, 2019 among the Debtors, certain non-Debtor affiliates, Mr. Goldman and BMF Capital ("BMF"); and

k.  Agreement of Sale of Future Receipts, dated as of December 17, 2019, SD-M, SDH, SD-C, RTHT, certain non-Debtor affiliates, Mr. Goldman and Libertas.

Upon information and belief, there are additional merchant cash advance agreements between the Debtors and Mr. Goldman and TVT 2.0, LLC and Region Capital (collectively with Itria, Advantage, Libertas, AJ Equity, EBF, EIN, APP, RBG and BMF, the "MCA Parties").

CHAR2\2241646v7

15.     Pursuant to the MCA Agreements, the Debtors granted to the MCA Parties certain security interests in their assets.  However, based upon UCC searches performed by the Debtors in their respective jurisdictions of organization (the "UCC Searches"), as of January 17, 2020, the only UCC-1 financing statements filed in favor of the MCA Parties against the Debtors in their respective jurisdictions of organization were UCC-1 financing statements filed in favor of (a) Corporation Service Company, as Representative ("CSC"), against each of the Debtors; (b) APP against each of the Debtors on December 4, 2019; (c) RBG against each of the Debtors on December 10, 2019; and (d) (c) C T Corporation System ("CT Corp"), as Representative, against RTHT, SD-C and SD Holdings on December 26, 2019.  The Debtors do not know on whose behalf CT Corp filed its UCC-1 financing statements.[3]

16.     Each of the UCC-1 financing statements filed in favor of the MCA Parties and against the Bridge Debtors were filed subsequent to the UCC-1 financing statements filed in favor of the Prepetition Secured Lender.  Upon information and belief, the value of any liens held by the MCA Parties against the Bridge Debtors is $0.00.

17.     Based on the UCC Searches, the oldest active UCC-1 financing statement filed against the Debtor Southern Deli Holdings, LLC ("SDH") is in favor of CC Funding.  However, upon information and belief, any obligations owed by SDH to CC Funding have been satisfied. The next oldest active UCC-1 financing statement filed against SDH is made in favor of CSC,

---

[3] Although the obligations due the MCA Parties are being described, in part, as secured obligations herein, the Debtors reserve all rights with respect to the MCA Agreements and the transactions, liens and obligations incurred in connection therewith, including, without limitation, rights under chapter 5 of the Bankruptcy Code.

*(continued on next page)*

CHAR2\2241646v7

which the Debtors believe to be the representative of Itria.[4]  Upon information and belief, the obligations of SDH to Itria exceed the value of its assets.

18.    Upon information and belief, to the extent the obligations due the MCA Parties under the MCA Agreements are valid and unavoidable, and any of the liens held by the MCA Parties in connection therewith are valid and properly perfected, the value of such liens is $0.00 (other than, subject to the foregoing qualifications, any lien held by Itria against the assets of SDH).

## IV.    Dimension Funding, LLC

19.    Debtor RTHT is party to (a) a certain Lease Agreement 06883JG19, dated as of August 29, 2019, as amended, with Dimension Funding, LLC ("Dimension"), relating to specific items of equipment that include a pizza oven and shake machine; and (b) a certain Equipment Finance Agreement 06627JG19, dated as of May 30, 2019, as amended, with Dimension relating to certain equipment, including certain kitchen equipment and a new LED sign (together, the "Dimension Equipment Agreements").  Based on the UCC Searches, Dimension filed UCC-1 financing statements against RTHT on September 3, 2019 and May 30, 2019 in respect of the Dimension Equipment Agreements.

## V.    US Foods PMSI

20.    US Foods, Inc. has filed purchase money security interest UCC-1 financing statements against SDMO on January 7, 2020 and SD-C on January 16, 2020 in such entities' respective states of organization.  The Debtors are not aware of US Foods, Inc. having provided notification of such purchase money security interest to the Prepetition Secured Lender.

---

[4] The date of filing for each of the UCC-1 financing statements filed against SDH in favor of CSC is the same as the date of the MCA Agreement with Itria.  The Debtors therefore believe that CSC filed these financing statements as representative for Itria.

CHAR2\2241646v7

C.      **The Debtor in Possession Financing**

21.     The Debtors believe that a going-concern sale of their businesses is the best way to maximize the value of their estates and provide the greatest recovery to stakeholders.  Accordingly, the Debtors' primary objective in obtaining postpetition financing is to secure adequate liquidity to fund a sale process while preserving their value as a going concern. In addition to the DIP Lender, representatives of the Debtors sought postpetition financing from the Prepetition Secured Lender and other third-party lenders.  However, after extensive arm's length negotiations with the Prepetition Secured Lender and the DIP Lender, the Debtors were unable to obtain terms from the Prepetition Secured Lender superior to those offered by the DIP Lender, and the discussions with other third-party lenders failed to produce any firm financing proposals.  These efforts resulted in the DIP Loan Facility proposed under this Motion.

22.     Immediate access to postpetition financing and the use of Cash Collateral is necessary to enhance the Debtors' liquidity, provide necessary working capital during the pendency of these chapter 11 cases, and provide employees, vendors, suppliers and other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course while working towards one or more sale transactions.  The Debtors determined that the use of Cash Collateral, alone, would not provide sufficient liquidity for the Debtors to operate their businesses in an appropriate manner.  If the Debtors are unable to access the DIP Loan Facility and use Cash Collateral, the Debtors' business operations, ability to effectively consummate one or more sale transactions, and the ability to satisfy obligations to customers, will be irreparably harmed.  For the foregoing reasons, the DIP Loan Facility is in the best interest of the Debtors' estates, creditors and other parties in interest.

CHAR2\2241646v7

## THE DIP LOAN FACILITY[5]

23.     The DIP Loan Facility provides the Debtors with up to $4,600,000 in availability

on a final basis, $3,700,000 of which will be available on an interim basis (inclusive of the Roll

Up, plus fees, interest and other amounts in accordance with the DIP Documents).  The Debtors

have provided a budget to the DIP Lender, a copy of which is attached hereto as Exhibit C, setting

forth in reasonable detail all projected receipts and disbursements of the Debtors through and

including the week ending April 26, 2020 (the "Budget").  As noted above, the DIP Loan Facility's

primary purpose is to fund operating expenses associated with the chapter 11 cases.  The Budget

represents a culmination of significant negotiations between the Debtors and the DIP Lender, and

the Debtors believe the DIP Loan Facility provides sufficient liquidity for the chapter 11 cases.

24.     The DIP Loan Facility contemplates the Roll Up of the SRI Prepetition Obligations

totaling approximately $450,000.  The DIP Lender would not have agreed to provide the DIP Loan

Facility without the Roll Up.

25.     The principal terms of the DIP Loan Facility required to be highlighted or disclosed

pursuant to relevant Bankruptcy Rules are as follows:

---

[5] The terms and conditions of the DIP Loan Facility set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof.  This summary is qualified in its entirety by the provisions of the DIP Agreement, the DIP Documents (as applicable) and the Interim Order.  The Debtors reserve all rights in connection with the Interim Order.

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| **Parties**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Agreement, preamble, ¶ 5<br><br>Interim Order, ¶¶ 3-4. | <u>Borrower</u>:  SD-Charlotte, LLC<br><br><u>Guarantors</u>:  SD-Missouri, LLC, RTHT Investments, LLC, SD Restaurant Group, LLC and Southern Deli Holdings, LLC<br><br><u>DIP Lender</u>:  SRI Holding Company |
| **Commitment**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Agreement, ¶ 1<br><br>Interim Order, ¶¶ (I), (VI), 3(a) | Subject to the terms and conditions of the Interim Order, the Final Order (as applicable) and the DIP Documents, the DIP Lender will lend to the Borrower (i) on the Closing Date, a Loan in the amount of $3,700,000 (inclusive of the Roll Up, plus fees, interest and other amounts in accordance with the DIP Documents); and (ii) upon entry of the Final Order, a Loan in the amount of $900,000. |
| **Interest Rate**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Agreement, ¶ 3(a) | 9.5% per annum; <u>provided</u> that upon the occurrence and during the continuance of an Event of Default, the outstanding principal amount under the DIP Agreement and any accrued and unpaid interest and all other overdue amounts shall each bear interest until paid at the stated rate plus 2.00% per annum. All payments of interest on the DIP Agreement shall be paid in kind by adding to the outstanding principal amount of the DIP Agreement. |
| **Maturity Date**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Agreement, definition of "Maturity Date" | "<u>Maturity Date</u>" means, unless extended by the DIP Lender and the Prepetition Lender in their respective sole and absolute discretion, the earliest to occur of (i) May 7, 2020, (ii) the date that is twenty-eight (28) days after the Petition Date, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (iii) the effective date of any plan of reorganization and/or a plan of liquidation of the Debtors confirmed by the Bankruptcy Court, (iv) the earlier of (x) the 363 Sale Effective Date or (y) consummation of a sale of any Sonic Assets or any assets relating to the Obligors' right, title and interest in and to their MOD Pizza restaurant locations, (v) the date the Bankruptcy Court (x) orders the conversion of the bankruptcy case of any Obligor to a case under Chapter 7 of the Bankruptcy Code or (y) dismisses the Chapter 11 Cases with respect to any Obligor, and (vi) such earlier date on which all Loans and other Obligations for the payment of |

14

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | money shall become due and payable in accordance with the terms of the DIP Agreement. |
| **Events of Default**<br><br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)<br><br>DIP Agreement, ¶ 7 | An "Event of Default" shall exist under the DIP Agreement if any one or more of the following events shall occur:<br><br>(a)    the Borrower shall fail (i) to pay any principal or any portion thereof when due, (ii) to pay any interest or any portion thereof or any other amount under the DIP Agreement or under any other DIP Document (excluding amounts required to be paid pursuant to Section 12(a)) within one (1) Business Days after the same becomes due or (iii) to pay any amounts required to be paid pursuant to Section 12(a) for ten (10) Business Days after DIP Lender has requested Borrower to pay the same; or<br><br>(b)    any Obligor shall fail to perform or observe any term, covenant or agreement to be performed or observed by it pursuant to Section 10; or<br><br>(c)    any Obligor shall fail to perform or observe any other covenant or agreement to be performed or observed by it contained the DIP Agreement or in any other DIP Document for ten (10) days after notice thereof; or<br><br>(d)    any Budget Event occurs; or<br><br>(e)    any representation or warranty of any Obligor made in the DIP Agreement or in any other DIP Document proves to have been materially incorrect when made or reaffirmed; or<br><br>(f)    any fraudulent act, fraudulent conduct or fraudulent omission by the Obligors with respect to the DIP Documents or the Chapter 11 Orders; or<br><br>(g)    a Change of Control shall occur; or<br><br>(h)    Obligors shall use Cash Collateral, DIP Collateral or Prepetition Collateral in any manner not authorized by the DIP Orders and the DIP Documents; or<br><br>(i)    any monetary or non-monetary judgment shall be rendered against any of the Obligors after the date of the |

CHAR2\2241646v7

| Required Disclosure | Material Terms |
|---|---|
| | DIP Agreement which causes or would reasonably be expected to cause a Material Adverse Effect; or |
| | (j)     any material provison of the DIP Documents, at any time after its execution and delivery and for any reason other than as expressly permitted under the DIP Agreement or thereunder or satisfaction in full of all Obligations (other than contingent obligations not due and payable as of such date) ceases to be in full force and effect or any Obligor shall contest the validity or enforceability of any part of the DIP Agreement  or any other DIP Document; or |
| | (k)     any of the Chapter 11 Cases shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of any of the Chapter 11 Cases (in either case, unless such dismissal does not provide for termination of the use of the DIP Collateral and require and result in the payment in full in cash of the Obligations)), suspended, or converted to a case under chapter 7 of the Bankruptcy Code, or any Obligor shall file any pleading requesting any such relief; or a motion shall be filed by any Obligor for the approval of, or there shall arise, any other Claim having priority senior to or pari passu with the claims of the DIP Lender under the DIP Documents or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code (other than the Carve-Out); or |
| | (l)     any Obligor files a motion in the Chapter 11 Cases to (i) obtain additional or replacement financing from a party other than DIP Lender under section 364(d) of the Bankruptcy Code or (ii) to use Collateral under section 363(c) of the Bankruptcy Code other than any application related to the DIP Order, except (i) (x) with the express written consent of the DIP Lender or (y) to the extent any such financing shall provide for the payment in full of the Obligations and (ii) to the extent such financing is secured by Prepeition Collateral, (x) with the express written consent of the Prepeition Lender or (y) to the extent any such financing shall provide for the payment in full of the Prepetition Obligations; or |
| | (m)     any Obligor shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition Claim (or the Obligor shall otherwise make |

16

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | a payment on any prepetition claim) other than (x) as provided for in the Approved Budget (including any Permitted Variance) or (y) otherwise consented to by the DIP Lender in writing, (ii) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $50,000 in the aggregate or to permit other actions that would have a material adverse effect on such Obligor or its estate or (iii) approving any settlement or other stipulation not approved by the DIP Lender and not included in the Approved Budget (including any Permitted Variance) with any secured creditor of any Obligor providing for payments as adequate protection or otherwise to such secured creditor (in each case, other than Permitted Adequate Protection Payments or as provided in the DIP Orders); or |
| | (n)    (i) entry of a judgment or order by the Bankruptcy Court or any other court modifying, limiting, subordinating, re-characterizing, or avoiding the validity, enforceability, perfection, or priority (as set forth in the DIP Agreement ) of any of the Obligations or the liens securing the Obligations (or any invalidation or impairment of such liens and/or superpriority claims of the DIP Lender shall otherwise occur), (ii) subject to entry of the Final Order, any imposition, surcharge or assesment against the DIP Lender's interest in the Collateral, or the Prepetition Lender's interest in the Prepetition Collateral (subject to entry of the Final Order), whether pursuant to sections 506(c) or 552 of the Bankruptcy Code or (iii) any material provision of any DIP Document shall cease to be effective; or |
| | (o)    any Chapter 11 Order (i) shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Obligor shall apply for authority to do so) without the written consent of the DIP Lender and Prepetition Lender, which consent may be witheld in their respective sole discretion (or any Obligor shall file, or otherwise support, any pleading seeking such relief described in this subparagraph), or (ii) shall cease to be in full force and effect; or |
| | (p)    any of the Obligors shall (i) fail to comply with the terms and conditions of any Chapter 11 Order (other than a non-monetary breach with respect to adequate protection set forth therein) or (ii) breach any non-monetary provisions with |

CHAR2\2241646v7

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | respect to the adequate potection provisions set forth in the DIP Orders and such breach shall remain uncured for five (5) Business Days after the Borrower's receipt of written notice thereof; or |
| | (q)   the Bankruptcy Court shall enter an order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of section 1106 of the Bankruptcy Code) under clause (b) of section 1106 of the Bankruptcy Code in the Chapter 11 Cases (or any Obligor shall file, or otherwise support, any pleading seeking such appointment or acquiesce in or fail to object to, any such appointment), in each case without the written consent of the DIP Lender and the Prepetition Lender (which consent may be witheld in their respective sole discretion); or |
| | (r)   entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Obligor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender; or |
| | (s)   the Obligors or any of their affiliates shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Obligors or any of their Subsidiaries) any other Person's opposition of any motion made in the Bankruptcy Court by the DIP Lender seeking confirmation of the amount of the DIP Lender's claim; or |
| | (t)   (i) The Obligors or any of their affiliates shall file any pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lender under the DIP Documents or (ii) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding brought by any other Person which results in such a material impairment of the rights or interests of the DIP Lender under the DIP Documents; or |

CHAR2\2241646v7

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | (u)   Any judgments or orders (not covered by insurance) which are in the aggregate in excess of $50,000.00 as to any postpetition obligation shall be rendered against any of the Obligors after the date of the DIP Agreement and the enforcement thereof shall not be stayed, vacated or discharged; or there shall be rendered against any of the Obligors a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Obligors to perform their obligations under the DIP Documents or the value of the Collateral; or

(v)   entry of an order by the Bankruptcy Court with respect to any pleading or proceeding brought by any Person which results in such a material impairment of the rights or interests of the DIP Lender under the DIP Documents; or

(w)   a sale order shall be entered or a plan confirmed in the Chapter 11 Cases which does not provide for payment in full in cash of the Obligations on the closing date thereof; or

(x)   the appointment of (i) a chief restructuring officer or any equivalent officer other than Brian Rosenthal of MERU or (ii) any other officer unless otherwise consented to by the DIP Lender and Prepetition Lender; or

(y)   the initiation by the Obligors, any statutory committee appointed in the Chapter 11 Cases, any trustee, any examiner or any other party in interest of any contested matter or adversary proceeding with respect to any provision of the DIP Agreement , the Obligations of the DIP Lender, including, but not limited to, any actions pursuant to Chapter 5 of the Bankruptcy Code, in each case, except as may otherwise be permitted under the DIP Orders. |
| **Liens**

Fed. R. Bankr. P. 4001(c)(1)(B), 4001(c)(1)(B)(i), (xi) | The DIP Obligations would be secured by all of the Prepetition Collateral and all other assets of the Debtors in existence or created prior to, on or after the Petition Date, and, subject to entry of the Final Order, any proceeds or property recovered in connection with the successful prosecution or settlement of any claims under sections 502(d), 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code. |

CHAR2\2241646v7

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| DIP Agreement, ¶ 6(a)(i)<br><br>Interim Order, ¶ 5(a). | |
| **Material Conditions to Closing – Interim Funding Conditions**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Agreement, ¶ 15 | <u>Conditions Precedent to Interim Funding</u>.  The obligation of the DIP Lender to lend the Interim Loan to the Borrower is subject to the satisfaction (or waiver by the DIP Lender) of the following conditions (the date on which such conditions are satisfied being referred to as the "<u>Closing Date</u>"):<br><br>(a)  *DIP Documents*.  The DIP Lender shall have received the DIP Agreement  executed and delivered by each of the Obligors.<br><br>(b)  *UCC Searches*. The DIP Lender shall have received the results of a search of the Uniform Commercial Code filings (or equivalent filings) made with respect to each Obligor in its state of formation.<br><br>(c)  *Representations and Warranties*.  The representations and warranties contained in the DIP Agreement  and each other DIP Document shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of the Closing Date (or in the case of the funding of the Final Loans on the Final Funding Date referred to below, as of such date).<br><br>(d)  *Fees and Expenses*.  The DIP Lender shall have received all fees and expenses due and payable to DIP Lender on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all reasonable and documented expenses (excluding reasonable and documented fees, charges and disbursements of counsel and other advisors which must be paid in accordance with the DIP Orders).<br><br>(e)  *Defaults*.  There shall be no default or Event of Default under the DIP Documents before and after giving effect to the relevant borrowing.<br><br>(f)  *Material Adverse Effect*.  Since the Petition Date, no event or circumstance or change shall have occurred that has or could be reasonably expected have a Material Adverse Effect. |

CHAR2\2241646v7

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | (g)    *Budget*.  The DIP Lender shall have received the Initial Budget, which shall be in form and substance acceptable to the DIP Lender in its sole discretion, and such other information (financial or otherwise) as the DIP Lender may reasonably request.<br><br>(h)    *Collateral*.  The DIP Lender shall have been granted a perfected lien on the Collateral by the Interim Order on the terms and conditions set forth in the DIP Agreement .<br><br>(i)    *Litigation*. Except for claims, actions, suits, investigations, litigation or proceedings stayed by § 362 of the Bankruptcy Code, there shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending in any court or before any arbitrator or governmental authority that, in the reasonable opinion of the DIP Lender, singly or in the aggregate, could have a Material Adverse Effect and there shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or governmental authority that, in the reasonable opinion of the DIP Lender, which relates to the Loans or the transactions contemplated by the DIP Documents.<br><br>(j)    *CRO*. Brian Rosenthal of MERU shall have been appointed chief restructuring officer of the Obligors.<br><br>(k)    *Bankruptcy Related Conditions.*<br><br>(i)    The Chapter 11 Cases shall have been commenced in the Bankruptcy Court by February 7, 2020 and all of the "first day orders" and all related pleadings to be filed at the time of commencement of the Chapter 11 Cases or shortly thereafter shall be in form and substance satisfactory to the DIP Lender.<br><br>(ii)    The Interim Order shall have been entered by the Bankruptcy Court (and no appeal thereof shall have been filed or remain pending) no later than five (5) days after the Petition Date, the DIP Lender shall have received a true and complete copy of such order and such order shall be in form and substance satisfactory to the DIP Lender in all respects, be in full force and effect, and shall not (in whole or in part) have |

CHAR2\2241646v7

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | been reversed, modified, amended, stayed or vacated absent prior written consent of the DIP Lender.<br><br>(iii)    All orders other than the DIP Orders relating to the Loans, DIP Documents or the Prepetition Obligations entered by the Bankruptcy Court, including without limitation orders pertaining to adequate protection (collectively, the "Non-DIP Orders"), and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the DIP Lender and Prepetition Lender in their respective sole discretion, be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed or vacated absent prior written consent of the DIP Lender.<br><br>(iv)    The Obligors shall be in compliance with each Chapter 11 Order.<br><br>(v)    No appeal of the DIP Orders shall have been filed or remain pending. |
| **Material Conditions to Subsequent Borrowings**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement ¶ 16 | Conditions Precedent to Final Funding. The obligation of the DIP Lender to lend the Final Loans to the Borrower is subject to the satisfaction of the conditions set forth in Section 15 (as of the Final Funding Date) and the following (the date on which such conditions are satisfied being referred to as the "Final Funding Date"):<br><br>(a)    *Approved Budget*. The DIP Lender shall have received all periodic updates required under the Note with respect to the Approved Budget, each in form and substance satisfactory to the DIP Lender in its sole discretion, and the Obligors shall be in compliance with the Approved Budget.<br><br>(b)    *Final Order*. The Final Order shall have been entered by the Bankruptcy Court (and no appeal thereof shall have been filed or remain pending) not later than twenty-eight (28) days after the Petition Date, and such Final Order shall (i) have included waivers of (x) the automatic stay in connection with the DIP Lender's enforcement of remedies upon an Event of Default, (y) any surcharge of costs or expenses with respect to the Prepetition Lender or DIP Lender's interest in the Collateral under sections 506(c) and 552 of the Bankruptcy Code or any other statue or applicable law permitting a |

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | surcharge of the Collateral, and (z) the equitable doctrine of marshaling, and otherwise be in form and substance satisfactory to the DIP Lender, be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated (in whole or in part) absent prior written consent of the DIP Lender and (ii) grant a perfected lien on the Collateral in favor of the DIP Lender on the terms and conditions set forth in the DIP Agreement. |
| **Fees & Expenses**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Agreement, ¶¶ 3(b), 12(a)<br><br>Interim Order, ¶ 14 | <u>Commitment Fee</u>.  The Borrower shall pay to the DIP Lender a commitment fee equal to 4.0% of the aggregate Commitments.<br><br><u>Expense Reimbursement</u>. The Borrower shall promptly pay on demand all costs and expenses of the DIP Lender whether incurred prior to, on, or after the Petition Date (i) in connection with the negotiation, preparation, administration, execution, implementation or consummation of the DIP Documents and any other agreement in connection therewith (other than any document regarding the purchase of any assets of the Obligors by DIP Lender, which expenses shall be separately addressed), including filing fees, taxes, assessments, attorney's fees and expenses and the allocated cost of any internal counsel to the DIP Lender and (ii) in connection with each amendment, forbearance, waiver, consent, refinancing, restructuring, reorganization (including any fees (including attorneys' fees) and costs incurred by the DIP Lender, in its capacity as such, for any reason in respect of the bankruptcy of the Borrower), enforcement or attempted enforcement, and any matter related thereto, and in each case including all out of pocket expenses of the DIP Lender or DIP Lender's attorneys that are related thereto. The Borrower shall pay on demand all reasonable fees and costs of consultants, appraisers, accountants and the like engaged by the DIP Lender in respect of the Borrower's obligations under the DIP Agreement.  The foregoing DIP Fees and Expenses shall be paid by the Debtors as follows: (a) all DIP Fees and Expenses (other than DIP Fees and Expenses paid in accordance with clause (b) below) accrued as of the date of entry of this Interim Order (including, without limitation, the Commitment Fee, as defined in the DIP Agreement) shall be paid to the DIP Lender within one (1) business day of entry of this Interim Order; and (b) all additional reasonable and documented fees and expenses incurred by the DIP Lender for |

CHAR2\2241646v7

| Required Disclosure | Material Terms |
|---|---|
| | which the Debtors are obligated under the DIP Documents shall be paid by the Debtors (without the necessity of filing any application with or obtaining further order from the Court) in accordance with the terms of the DIP Documents; provided that no written objection from the Bankruptcy Administrator, the Prepetition Lender (or its counsel)or the Committee (if any) is received within ten (10) days (the "**Review Period**") after receipt by the Bankruptcy Administrator, counsel to the Prepetition Lender and counsel to the Committee (if any) of invoices thereof (subject in all respects to applicable privilege and work-product doctrines as well as confidential or proprietary information). The DIP Lender shall concurrently provide copies of any invoices to the Bankruptcy Administrator, counsel to the Prepetition Lender and counsel to the Committee (if any) and allow such parties at least the Review Period to review and object to any fees of expenses requested therein. If an objection is received as to any portion of such invoice, the Debtors shall promptly pay after the Review Period the portion of such invoice not subject to objection, and the Bankruptcy Court shall decide any such objection unless otherwise resolved. The Debtors shall not pay any disputed portion of any such disputed invoice(s) until the Court renders a decision on the objection or the dispute is otherwise resolved. |
| **Use of Funds**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Agreement, ¶ 9(d), Annex B, clause (g)<br><br>Interim Order, ¶ H(iv) | The Debtors shall use the proceeds of the DIP Loan Facility in a manner consistent with the DIP Documents, the DIP Orders and the Budget (subject to Permitted Variances). |
| **Priority of Liens**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(i)<br><br>Interim Order, ¶ 5(b) | The DIP Liens with respect to the DIP Collateral shall have the following priorities:<br><br>i.    Unencumbered Collateral.  Under section 364(c)(2) of the Bankruptcy Code, a first-priority lien on and security interest in all DIP Collateral (including, without limitation, all real property) that is not subject to a valid and perfected lien existing on the Petition Date other than the DIP Collateral on which there are liens and security interests as described in clause (iii) below; |

CHAR2\2241646v7

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | ii.    Encumbered Collateral.  Under section 364(c)(3) of the Bankruptcy Code, a lien on and security interests in all DIP Collateral (including, without limitation, all real property) that is subject to a valid, perfected and unavoidable lien existing on the Petition Date to the extent such lien was on the Petition Date senior to the Prepetition Liens, provided that the DIP Liens shall be junior to such liens but senior to the Prepetition Liens;<br><br>iii.    Extent of Priming DIP Lien.  Under section 364(d)(1) of the Bankruptcy Code, a first-priority, senior priming lien on and security interest in all Prepetition Collateral that is valid and perfected liens existing on the Petition Date in favor of the Prepetition Lender; and<br><br>iv.    Carve-Out.   The DIP Liens shall be subject and subordinate in all respects to the Carve-Out in accordance with paragraph 11 of this Interim Order. |
| **Adequate Protection**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(ii)<br><br>Interim Order, ¶ 9 | As adequate protections under sections 361 and 363 of the Bankruptcy Code, for the Debtors' use, consumption, sale, collection or other disposition of any of the Prepetition Collateral, the Prepetition Secured Lender shall receive:<br><br>        (a)    to the extent there is a diminution in the value of the interests of the Prepetition Secured Lender in the Prepetition Collateral (whether the reason for such diminution is as a result of or from, arises from, or is attributable to, the imposition of the automatic stay, the priming of the Prepetition Liens, the use of Cash Collateral or the physical deterioration, consumption, use, sale, lease, disposition, shrinkage or decline in market value of the Prepetition Collateral), the Prepetition Lender shall (i) maintain the Prepetition Liens on the Prepetition Collateral, to the extent and priority that existed prepetition, and (ii) be granted a replacement security interest in and liens on any of the DIP Collateral in which the Prepetition Lender did not have valid, perfected liens and security interests as of the Petition Date (the "Replacement Liens"), which liens described in (i) and (ii) above are valid, binding, enforceable and fully perfected as of the date hereof, and shall be junior and subordinate only to the Carve-Out and the DIP Liens;<br><br>        (b)    an allowed administrative claim (the "Prepetition Lender's Administrative Claim") against the Debtors' estates under section 507(b) of the Bankruptcy Code |

CHAR2\2241646v7

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | to the extent that the Replacement Liens do not adequately protect the diminution in the value of the Prepetition Collateral, which Prepetition Lender's Administrative Claim, if any, shall be junior and subordinate only to the Carve-Out and the Superpriority DIP Claim; and<br><br>(c)    copies of all financial statements, projections and reports furnished to the DIP Lender by the Debtors under the DIP Documents. |
| **Acknowledgements & Stipulations**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iii)<br><br>Interim Order, ¶ F | Without prejudice to the rights of any other party (but which rights are subject to the limitations contained in paragraph 18 of the Interim Order), the Debtors admit, stipulate and agree that:<br><br>i.    as of the Petition Date, the Debtors who are party to or otherwise obligated under the Prepetition Loan Documents, without defense, counterclaim, recoupment or offset of any kind, were indebted and liable to the Prepetition Lender in the aggregate principal amount of not less than $22,344,301.56 of outstanding borrowings under the Prepetition Loan Documents, plus all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "***Prepetition Secured Obligations***"), which Prepetition Secured Obligations are secured by security interests in and liens on substantially all of such Debtors' assets, including accounts, inventory, capital stock of certain of the Debtors, contract rights, instruments, documents, chattel paper, drafts and acceptances, general intangibles and all other forms of obligations owing to the Debtors (and the proceeds, product and offspring therefrom, collectively, the "***Prepetition Collateral***") all as more fully described in the Prepetition Loan Documents, provided, however, that the Prepetition Secured Obligations are junior only to the SRI Prepetition Obligations;<br><br>ii.    the Prepetition Secured Obligations constitute the legal, valid and binding obligations of the applicable Debtors named in the Prepetition Loan Documents, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); |

26

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | iii.      the liens granted to the Prepetition Lender on the Prepetition Collateral under and in connection with the Prepetition Loan Documents (collectively, the "***Prepetition Liens***"), including, without limitation, all security agreements, pledge agreements and other security documents executed by any of the Debtors for the benefit of the Prepetition Lender, are (a) valid, binding, perfected and enforceable liens and security interests in the property described in the Prepetition Loan Documents, (b) not, under the Bankruptcy Code or other applicable law, subject to avoidance, recharacterization, recovery, subordination, attack, offset, recoupment, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind, and (c) subject and subordinate only to: (1) the DIP Liens (as defined below); (2) the SRI Prepetition Liens; (3) the Carve-Out (as defined below) to which the DIP Liens are also subject; and (4) valid, perfected and unavoidable liens and security interests permitted under the Prepetition Loan Agreements and existing as of the Petition Date; |
| | iv.      no portion of the Prepetition Secured Obligations or any payments made to the Prepetition Lender or applied to the Prepetition Secured Obligations prior to the Petition Date is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind under the Bankruptcy Code or other applicable law; |
| | v.      each Debtor hereby forever waives and releases any and all "claims" (as such term is defined in the Bankruptcy Code), counterclaims, causes of action, defenses and setoff rights against the Prepetition Lender, in its capacity as such, whether arising at law or in equity, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law; and |
| | vi.      substantially all cash, securities or other property (and the proceeds therefrom) as of the Petition Date, including without limitation, all cash, securities or other property (and the proceeds, product and offspring therefrom) and other amounts on deposit or maintained by the Debtors in |

27

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | accounts under the Prepetition Loan Agreement were subject to rights of setoff and valid, perfected, enforceable, first priority liens under the Existing Facility Agreement and the other Prepetition Secured Agreements, and applicable law, for the benefit of the Prepetition Lender.  All proceeds of the Prepetition Collateral are Cash Collateral of the Prepetition Lender within the meaning of section 363(a) of the Bankruptcy Code (collectively, the "*Cash Collateral*"). |
| **Automatic Stay**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv)<br><br>Interim Order, ¶ 17 | The Interim Order modifies the automatic stay provisions of section 362 of the Bankruptcy Code solely (a) to the extent necessary to authorize the Debtors to make payments under the DIP Documents and to authorize the DIP Lender to retain and apply payment made in accordance thereof, including, without limitation, payments of accrued interest and principal amounts outstanding under the DIP Documents, and (b) subject to entry of the Final Order, upon the occurrence of an Event of Default and following three (3) business days' notice by the DIP Lender or the Prepetition Secured Lender to each of the Debtors, counsel to the Debtors, the Prepetition Secured Lender, counsel to the Prepetition Secured Lender and the Bankruptcy Administrator of the occurrence of such Event of Default, to permit the DIP Lender or the Prepetition Secured Lender to take any and all actions and remedies to proceed against, take possession of, and protect and realize upon the DIP Collateral or the Prepetition Collateral, as applicable, and any other property of the estates of the Debtors upon which the DIP Lender or the Prepetition Secured Lender has been or may hereafter be granted liens or security interests, provided that such notice by the DIP Lender or the Prepetition Secured Lender shall not prejudice the rights of the Debtors to file a motion with the Court opposing the termination of the automatic stay on the sole basis that an Event of Default has not in fact occurred and is continuing, and provided further that upon the filing of such motion, the DIP Lender and/or the Prepetition Lender, as applicable, shall be stayed from taking any action or remedy against the DIP Collateral or the Prepetition Collateral, as applicable, until the Court hears and disposes of such motion.  If the Debtors file any such motion described in the preceding sentence, the same shall be expedited with a hearing to take place no later than fourteen (14) days from the date such motion is filed. |

CHAR2\2241646v7

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| **Lien Perfection/Enforcement**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(vii)<br><br>Interim Order, ¶ 13 | The DIP Liens and the Replacement Liens (as necessary) shall, as of the Petition Date, be deemed valid, binding, enforceable and perfected with respect to all of the DIP Collateral or Prepetition Collateral, as applicable, upon entry of this Interim Order.  Neither the DIP Lender nor the Prepetition Lender shall be required to file any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or any similar document or take any other action (including, without limitation, possession of any of the DIP Collateral, Prepetition Collateral or any other property of the Debtor or the obtaining of any consent of any third party) to validate the perfection of the DIP Liens or the Replacement Liens. |
| **Release**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(viii)<br><br>Interim Order, ¶ 18 | The Debtors' Stipulations shall be binding on all parties in interest, including, without limitation, the Debtors and any Committee (if appointed), unless, and solely to the extent that a Challenge has been commenced by the Committee or any other party in interest with requisite standing other than the Debtors (or if the Cases are converted to cases under chapter 7 of the Bankruptcy Code prior to the expiration of the Challenge Period (defined below), the chapter 7 trustee in such successor case) against the Prepetition Lender in connection with any matter related to the Prepetition Secured Indebtedness or the Prepetition Collateral, by the earlier of (a) in the case of the Committee, sixty (60) days from the engagement of counsel for the Committee, or (b) with respect to other parties in interest with requisite standing other than the Debtors or the Committee, ninety (90) days after the Petition Date (such time period established by the earlier clauses (i) and (ii) above, the "Challenge Period").  If no such adversary proceeding or contested matter is timely filed, then (x) the Prepetition Secured Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance for all purposes in the Cases and any subsequent chapter 7 case, (y) the Prepetition Lender's liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding and perfected, not subject to defense, counterclaim, recharacterization, subordination or avoidance, and (z) the Prepetition Secured Obligations and the liens of the Prepetition Lender on the Prepetition Collateral shall not |

29

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
|  | be subject to any other or further challenge by the Debtors, any committee or any other party in interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors).  If any such Challenge is timely filed, the Debtors' Stipulations shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Debtors, any Committee and any other person or entity, except as to any such finding and admission that was expressly and successfully challenged in such Challenge. |
| **Indemnity**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(ix)<br><br>DIP Agreement, ¶ 12(c) | The Debtors agree, jointly and severally, to indemnify the DIP Lender and the Prepetition Lender and each of their Related Parties (each such Person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable and documented out-of-pocket counsel and consultant or other expert fees, charges and disbursements incurred by, or asserted against, any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution, performance or delivery of the DIP Documents or Prepetition Loan Documents or any agreement or instrument contemplated hereby or thereby, the performance by the parties thereto of their respective obligations hereunder or thereunder, the Chapter 11 Cases, the borrowings hereunder and the other transactions contemplated by the DIP Documents and the Prepetition Loan Documents, (ii) the use or proposed use of the proceeds of the Loans or the loans under the Prepetition Loan Documents or (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have arisen from the gross negligence, bad faith or willful misconduct of such Indemnitee or of its Related Parties. |

CHAR2\2241646v7

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| **506(c) Waiver**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(x)<br><br>Interim Order, ¶ 6(b) | Subject to entry of the Final Order, in no event shall any costs or expenses of administration be imposed upon the DIP Lender or any of the DIP Collateral, or upon the Prepetition Lender or any Prepetition Collateral, whether under sections 105, 506(c) or 552(b) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender or the Prepetition Lender, as applicable, and no such consent shall be implied from any action, inaction or acquiescence by the DIP Lender or the Prepetition Lender, as applicable. |

## BASIS FOR RELIEF

**A.     The Requested Relief Should be Granted Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code**

26.     As set forth above, the Debtors' ability to maximize the value of their estates and successfully sell their business operations hinges upon their being able to access postpetition financing. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis. *See* 11 U.S.C. § 364. Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to super-priority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property. *See* 11 U.S.C. § 364(c).

27.     Under section 364 of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. *See* 11 U.S.C.

CHAR2\2241646v7

§ 364(d)(1). Specifically, section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that

a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior
> or equal lien on property of the estate that is subject to a lien only if—
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the
> lien on the property of the estate on which such senior or equal lien
> is proposed to be granted.

11 U.S.C. § 364(d)(1).

**I.     The Debtors Have Exercised Their Business Judgment in Entering Into the DIP Loan Facility.**

28.     A debtor's decision to enter into a postpetition lending facility under section 364 of

the Bankruptcy Code is governed by the business judgment standard. *See In re Ames Dep't Stores,*

*Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion

under section 364 is to be utilized on grounds that permit reasonable business judgment to be

exercised so long as the financing agreement does not contain terms that leverage the bankruptcy

process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in

interest."); *In re AMR Corp.,* 485 B.R. 279, 287 (Bankr. S.D.N.Y.), *aff'd,* 730 F.3d 88 (2d Cir.

2013) ("In determining whether to approve a debtor's request under Section 364, a Court must

examine whether the relief requested is an appropriate exercise of the debtor's business

judgment"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that

the interim loan, receivable facility and asset based facility were approved because they

"reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances

and in the best interest of [the debtor] and its creditors.").

29.     Bankruptcy courts routinely accept a debtor's business judgment on many business

decisions, including the decision to borrow money. *See*, *e.g.*, *In re Simasko Prod. Co.*, 47 B.R.

CHAR2\2241646v7

444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

30.     The Debtors have exercised sound business judgment in determining the appropriateness of the DIP Loan Facility and have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Agreement. The use of Cash Collateral alone is insufficient to meet the Debtors' working capital needs to operate their businesses in the ordinary course. The DIP Agreement contains terms and conditions that are the best available under the circumstances and provides the Debtors with sufficient liquidity during the period of the Budget. In addition, the Interim Order preserves the rights of other parties in interest, including any statutory committee of unsecured creditors, to investigate and challenge the validity, enforceability, perfection, and priority of the liens and security interests granted to the Prepetition Secured Lender under the Prepetition Loan Documents. This Court and other courts have previously approved similar debtor-in-possession financing agreements where the debtor was not able to obtain postpetition financing under other conditions. *See, e.g.*, *In re Hendricks Furniture Group, LLC,* Case No. 09-50790 (Bankr. W.D.N.C. June 11, 2009); *In re Personal Communications Devices, LLC, et al.*, Case No. 13-74303 (Bankr. E.D.N.Y. August 21, 2013), *In re SDI Solutions LLC, et al.*, Case No. 16-10627 (Bankr. D. Del. May 3, 2016); *In re Imris, Inc., et al.*, Case No. 15-11133 (Bankr. D. Del. May 25, 2015); *In re Cal Dive Int'l, Inc., et al.*, Case No. 15-10458 (Bankr. D. Del. April 20, 2015); *In re Digital Domain Media Group, Inc., et al.*,

Case No. 12-12568 (BLS) (Bankr. D. Del. Nov. 7, 2012); *In re Real Mex Restaurants, Inc. et al.*,

Case No. 11-13122 (BLS) (Bankr. D. Del. Nov. 9, 2011).

31.     The funds provided by the DIP Loan Facility are essential to enable the Debtors to

continue to operate during the course of these chapter 11 cases while working towards one or more

sale transactions that are in the best interest of the estates.  Indeed, failure to obtain approval of the

DIP Loan Facility will lead to a wind-down of the Debtors' business operations which, in turn,

will preclude any sale of the Debtors' assets and adversely affect the value ultimately received by

stakeholders.

32.     Accordingly, pursuant to sections 364(c) and (d) of the Bankruptcy Code, the

Debtors respectfully submit that they should be granted authority to obtain financing from the DIP

Lenders on the terms set forth in the DIP Agreement, the Interim Order and, as applicable, the

Final Order.

### II.     The DIP Loan Facility Represents the Best Financing Available

33.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must

make a reasonable effort to seek other sources of unsecured credit, but is granted deference in

acting in accordance with its business judgment and, indeed, is not required to seek credit from

every possible source.  *See*, *e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y.

1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the

standards of section 364(c) to obtain less onerous terms where debtor approached four lending

institutions, was rejected by two and selected the least onerous financing option from the remaining

two lenders); *Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085,

1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender

before concluding that such credit is unavailable").

CHAR2\2241646v7

34.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

35.     The Debtors and their advisors solicited both financing and sale proposals from various parties.  The Debtors have determined that the terms and conditions of the DIP Loan Facility are the best available under the circumstances and address the Debtors' working capital needs, and no other entity was willing to provide financing on any better terms.  Postpetition financing is not otherwise available without granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the DIP Collateral pursuant to section 364(c) and (d) of the Bankruptcy Code (in each case subject to the Carve-Out and Permitted Liens).  The Debtors are unable to obtain the necessary postpetition financing that they need on terms more favorable than those provided by the DIP Loan Facility.  Accordingly, the Debtors' efforts to obtain postpetition financing satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.

### III.    The DIP Loan Facility is Necessary to Maintain the Debtors' Ongoing Business Operations and to Successfully Consummate a Sale of the Debtors' Assts in these Chapter 11 Cases

36.    The DIP Loan Facility, if approved, will provide essential working capital, allowing the Debtors to maintain the value of their assets and their ongoing business operations while working towards a sale of the Debtors' assets in these chapter 11 cases.  In addition, the DIP Loan Facility will provide the Debtors' various constituencies, including employees, vendors, and service providers, with confidence in the Debtors' ability to maintain operations while working towards a sale transaction.

37.    If the relief sought in this Motion is denied or delayed, the Debtors likely will experience business disruptions, the Debtors' ability to properly service customers will be hindered, and the Debtors' ability to consummate a sale transaction and maximize value for the estates may be irreparably damaged.  Accordingly, the DIP Loan Facility is necessary to maximize value for the Debtors' estates and inures to the benefit of creditors and all parties in interest.

### IV.    The Terms of the DIP Loan Facility are Fair, Reasonable and Adequate Under the Circumstances

38.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See Transcript of Record* at 740:4–6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of

CHAR2\2241646v7

present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions reasonable here and now.").

39.     The terms and conditions of the DIP Loan Facility were negotiated in good faith and at arm's length among the parties, culminating in the DIP Credit Agreement that is designed to provide the Debtors with essential working capital and maintain the Debtors' ongoing business operations while working towards a sale of the Debtors' assets. Indeed, when viewed in its totality, the DIP Loan Facility reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and is supported by fair consideration.

### V.     Section 364(e) Protections Should Apply to the DIP Loan Facility

40.     The terms and conditions of the DIP Loan Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's length. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of Bankruptcy Code section 364(e) and is entitled to all of the protections afforded by that section.

### B.     The Debtors' Request for Use of the Bridge Debtors' Cash Collateral and the Proposed Adequate Protection is appropriate

41.     The Debtors' use of property of the estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

42.     Under section 363(c)(2), a debtor may not use cash collateral unless an entity that has an interest in it consents or such use is authorized by the court after notice." *In re Cerrico Realty Corp.*, 127 B.R. 319, 321 (Bankr. E.D.N.Y. 1991). "Cash collateral" is defined as, "cash,

37

negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

43.     The Debtors have an urgent need for the immediate use of the Bridge Debtors' Cash Collateral pending the final hearing on this Motion and seek to use such Cash Collateral existing on or after the Petition Date in accordance with the Interim Order and DIP Credit Agreement.  The Debtors require the use of the Bridge Debtors' Cash Collateral to, among other things, fund payroll, maintain their ongoing business operations and to pay the costs and expenses associated with the administration of these chapter 11 cases.  Absent the use of the Bridge Debtors' Cash Collateral, the Debtors' ability to perform under their various contracts and agreements would be diminished and the value of the Debtors' business as a going concern would be irreparably impaired.

44.     Because the Prepetition Secured Lender is  undersecured, the Prepetition Secured Lender is the only party holding a security interest in Bridge Debtors' Cash Collateral and has consented to the use of Bridge Debtors' Cash Collateral as requested herein, subject to its receipt of the adequate protection provided for in the Interim Order.  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include additional liens, replacement liens and other forms of relief.  *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985).  The focus of the requirement is to protect a secured creditor from the diminution in value of its interest in the particular collateral during the period of use.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

45.     Courts have also held that adequate protection may be demonstrated by showing that the secured creditor's interest in the collateral is preserved by the debtor's use of the cash

collateral in a manner that maintains or enhances the collateral's value.  *See In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was adequately protected when cash collateral was used to pay necessary operating expenses); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105–06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion); *accord in re Atrium Dev. Co.*, 159 B.R. 464, 471 (Bankr. E.D. Va. 1993) ("Adequate protection is typically established by the fact that cash is being used to maintain and enhance the value of the underlying income producing real property in which the creditor also usually holds a security interest."); *McCombs Props. VI, Ltd. V. First Tex. Sav. Ass'n (In re McCombs Props. VI, Ltd.)*, 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (holding that committing to use cash collateral for operating expenses substantially eliminated the risk of diminution in the secured creditor's interest in the collateral).

46.     The proposed adequate protection is typical and appropriate under the circumstances.  Specifically, as adequate protection for the Prepetition Secured Lender with respect to, and solely to the extent of, any diminution of value of the Prepetition Secured Lender's prepetition collateral from and after the Petition Date, the Prepetition Secured Lender shall receive: (a) an allowed administrative claim under section 507(b) of the Bankruptcy Code immediately junior to the superpriority claims held by the DIP Lender in respect of all obligations under the DIP Loan Facility (the "DIP Obligations"); (b) a perfected, second priority replacement lien immediately junior to the lien being granted to the DIP Lender under section 364(c)(2) of the Bankruptcy Code on all unencumbered property of the Debtors wherever located including (after entry of the Final Order) any amounts that are recovered or otherwise received by the Debtors in respect of avoidance actions and any proceeds thereof; (c) a perfected second priority lien

immediately junior to the liens being granted to the DIP Lender under section 364(d)(1) of the

Bankruptcy Code that is subject to valid, perfected, unavoidable liens in favor of the Prepetition

Secured Lender in existence at the time of the commencement of the Chapter 11 Cases; (d) a

perfected junior priority lien on all encumbered property of the Debtors wherever located (other

than property encumbered by liens described in clause (c) above); (e) upon entry of the Final Order,

a waiver of any rights to pursue the collateral of the Prepetition Secured Lender for any amounts

pursuant to section 506(c) of the Bankruptcy Code; and (f) copies of all financial statements,

projections and reports furnished to the DIP Lender by the Debtors under the DIP Documents;

provided, the claims and liens in each of clauses (a) through (d) above shall be subject to the Carve-

Out.  Accordingly, the Debtors should be authorized to use Cash Collateral as set forth herein.

## C.      Modification of the Automatic Stay on a Limited Basis is Warranted

47.      The relief requested herein contemplates a modification of the automatic stay

pursuant to Bankruptcy Code section 362 to the extent necessary to permit the DIP Lenders to

exercise, upon the occurrence and during the continuation of any event of default under the DIP

Documents, all rights and remedies provided for in the DIP Agreement, the other DIP Documents,

the Interim Order, and the Final Order, after three (3) business days' notice thereof, and to take

various actions without further order of or application to the Court.

48.      Stay modification provisions of this sort are ordinary and usual features of debtor

in possession financing facilities and, in the Debtors' business judgment, are reasonable under the

present circumstances.  Accordingly, the Court should modify the automatic stay to the extent

contemplated by the DIP Credit Agreement and DIP Credit Documents and the proposed DIP

Orders.

## D.      Interim Approval and Scheduling of Final Hearing

CHAR2\2241646v7

49.     As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of Cash Collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

50.     Absent relief on an interim basis pursuant to the Interim Order, the Debtors will be unable to satisfy their immediate and projected payment obligations, including payroll and other operating expenses.  Given the immediate and irreparable harm to be suffered by the Debtors absent interim relief, the Debtors respectfully request that the Court schedule and conduct a preliminary hearing on the Motion and (a) authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the DIP Credit Agreement and to utilize Cash Collateral, and (b) schedule the Final Hearing.

**E.     Waiver of Bankruptcy Rules 6004(a) and (h)**

51.     The Debtors believe an efficient and expeditious approval and implementation of the DIP Loan Facility is in the best interests of their creditors and other parties in interest. Accordingly, the Debtors seek waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of orders authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

52.     No trustee, examiner, or statutory committee of unsecured creditors has been appointed in these chapter 11 cases.  Notice of this Motion will be provided to: (a) the Bankruptcy

Administrator for the Western District of North Carolina; (b) the parties included on the Debtors'

consolidated list of thirty (30) largest creditors; (c) counsel to the DIP Lender; (d) counsel to the

Prepetition Secured Lender; (e) counsel to Itria; and (f) all other entities known or reasonably

believed to have asserted a security interest or lien against property of the Debtors' estates.  The

Debtors submit that, in light of the nature of the relief requested, no other or further notice is

necessary or required.

**CONCLUSION**

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter an order

substantially in the form of the proposed Interim Order attached hereto as Exhibit A, (ii) after the

Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court, and

(iii) grant such other and further relief as this Court deems just and proper.

Dated: February 7, 2020                    **MOORE & VAN ALLEN PLLC**

/s/ Hillary B. Crabtree
Zachary H. Smith (NC Bar 48993)
Hillary B. Crabtree (NC Bar 26500)
James Langdon (NC Bar 23241)
Gabriel Mathless (NC Bar 48857)
Joanne Wu (NC Bar 55044)
100 N. Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 339-5968
Email:    zacharysmith@mvalaw.com
Email:    hillarycrabtree@mvalaw.com
Email:    jimlangdon@mvalaw.com
Email:    gabemathless@mvalaw.com
Email:    joannewu@mvalaw.com

*Proposed Counsel to the Debtors and Debtors-In-Possession*

# EXHIBIT A

**Proposed form of Interim Order**

CHAR2\2241646v7

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

```
------------------------------------------------------------x
                                          :
In re:                                    :  Chapter 11
                                          :
SD-Charlotte, LLC, et al.,[1]             :  Case No. 20-30149
                                          :
                                          :  (Jointly Administered)
              Debtors.                    :
------------------------------------------------------------x
```

**INTERIM ORDER UNDER SECTIONS 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND 507 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDER; (IV) SCHEDULING A FINAL HEARING UNDER BANKRUPTCY RULES 4001(b) AND (c); AND (V) GRANTING RELATED RELIEF**

---

[1]     The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: SD-Charlotte, LLC (7237); RTHT Investments, LLC (2540); SD Restaurant Group, LLC (0331); SD-Missouri, LLC (8294); and Southern Deli Holdings, LLC (9425).

Upon the motion (the "***Motion***") of SD-Charlotte, LLC ("***SD-Charlotte***") and each of its affiliated debtors and debtors in possession (collectively, the "***Debtors***" and each a "***Debtor***") in the above-captioned chapter 11 cases (the "***Cases***") commenced on February 7, 2020 (the "***Petition Date***"), for interim and final orders under sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (as amended, the "***Bankruptcy Code***"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "***Bankruptcy Rules***"), and the applicable local bankruptcy rules (the "***Local Rules***") for the United States Bankruptcy Court for the Western District of North Carolina (the "***Court***"), seeking:

(I)      authorization for SD-Charlotte (the "***Borrower***") and each of the other Debtors in their respective capacities as guarantors (the "***Guarantors***") to execute that certain Superpriority Debtor-in-Possession Secured Promissory Note dated as of February [__], 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "***DIP Agreement***"), substantially in the form attached hereto as **Exhibit A**, together with the other agreements delivered or executed from time to time in connection therewith (as hereafter amended, restated, supplemented or otherwise modified from time to time, together with the DIP Agreement, the "***DIP Documents***"), under which the Borrower and Guarantors shall (a) obtain up to $4,600,000 in aggregate postpetition senior secured super-priority debtor-in-possession financing (inclusive of the Roll Up (as defined below), the "***DIP Loan Facility***") and other extensions of credit from SRI Holding Company, a Delaware corporation ("***SRI***" or the "***DIP Lender***"), and (b) grant security interests and liens and accord superpriority claim status in favor of the DIP Lender

- 2 -

under sections 361, 364(c) and 364(d)(1) of the Bankruptcy Code in accordance with the DIP Documents;[2]

(II)      authorization for the Debtors to convert to DIP Obligations (as defined below) under the DIP Loan Facility, the outstanding principal amount, plus any accrued interest and applicable fees and expenses (the "***SRI Prepetition Obligations***"), under that certain Secured Promissory Note dated as of February 5, 2020 (the "***SRI Prepetition Note***"), whereby SRI, with the consent of the Prepetition Lender, provided a bridge loan to SD-Missouri, LLC in the aggregate principal sum of $450,000 (the foregoing proposed conversion defined as the "***Roll Up***") on a senior secured basis (the "***SRI Prepetition Liens***");

(III)      authorization for the Debtors to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(IV)      authorization for the Debtors to use Cash Collateral (as defined below) under sections 361, 362 and 363 of the Bankruptcy Code, and all other Prepetition Collateral (as defined below);

(V)      authorization to grant adequate protection with respect to the use of Cash Collateral and any diminution in the value of the Prepetition Collateral securing the Debtors' Prepetition Secured Obligations (as defined below) under that certain (a) Development Line Loan and Security Agreement dated as of December 27, 2017, as amended or otherwise modified, and (b) Loan Agreement dated as of May 11, 2018, as amended or otherwise modified (together, the "***Prepetition Loan Agreements***" and collectively with all instruments and

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Documents.

documents executed at any time in connection with the Prepetition Loan Agreements, the "***Prepetition Loan Documents***"), by and among the Debtors and Bridge Funding Group, Inc. (the "***Prepetition Lender***");

(VI)    at an interim hearing (the "***Interim Hearing***") on the Motion before this Court, entry of this interim order (the "***Interim Order***"):  (a) authorizing the Borrower, on an interim basis, to borrow under the DIP Agreement an aggregate principal amount not to exceed $3,700,000 (inclusive of the Roll Up, plus fees, interest and other amounts in accordance with the terms of the DIP Documents) at any time prior to entry of the Final Order (as defined below); (b) authorizing the Debtors, on an interim basis, to use Cash Collateral and the other Prepetition Collateral; and (c) granting, on an interim basis, adequate protection to the Prepetition Lender; and

(VII)   at a final hearing (the "***Final Hearing***") for this Court to consider entry of a final order (the "***Final Order***"), authorizing and approving on a final basis the relief requested in the Motion, including, without limitation, the Borrower's ability on a final basis to utilize the DIP Loan Facility, the Debtor's ability to consummate the Roll Up, and the Debtors' ability to continue to use Cash Collateral and the other Prepetition Collateral, subject to the terms and conditions of the DIP Documents and the Final Order.

The Interim Hearing having been held by this Court on February [10], 2020, and upon the record made by the Debtors at the Interim Hearing, including, without limitation, the admission into evidence of the *Declaration of Brian Rosenthal in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* [Docket No. __], which was filed with the Court on the Petition Date, and the other evidence submitted or adduced and the arguments of counsel

- 4 -

made at the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    <u>Petition Date</u>.  On the Petition Date, each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in this Court commencing these Cases.

B.    <u>Debtors in Possession</u>.  The Debtors are currently operating their businesses as debtors in possession under section 1101 of the Bankruptcy Code.

C.    <u>Jurisdiction and Venue</u>.  This Court has core jurisdiction over the Cases, the Motion, and the parties and property affected hereby under 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

D.    <u>Official Committees</u>.  The Bankruptcy Administrator for the Western District of North Carolina (the "***Bankruptcy Administrator***") has not yet appointed any official committee in these Cases under section 1102 of the Bankruptcy Code.

E.    <u>Notice</u>.  Under the circumstances, the notice given by the Debtors of the DIP Motion, the relief requested therein and the Interim Hearing constitutes appropriate, due and sufficient notice and complies with the Bankruptcy Rules and the Local Rules.  No further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

F.    <u>Debtors' Stipulations, Admissions and Releases</u>.  Without prejudice to the rights of any other party (but which rights are subject to the limitations thereon contained in paragraph 18 of this Interim Order), the Debtors admit, stipulate and agree that:

- 5 -

i.    as of the Petition Date, the Debtors who are party to or otherwise obligated under the Prepetition Loan Documents, without defense, counterclaim, recoupment or offset of any kind, were indebted and liable to the Prepetition Lender in the aggregate principal amount of not less than $22,344,301.56 of outstanding borrowings under the Prepetition Loan Documents, plus all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "***Prepetition Secured Obligations***"), which Prepetition Secured Obligations are secured by security interests in and liens on substantially all of such Debtors' assets, including accounts, inventory, capital stock of certain of the Debtors, contract rights, instruments, documents, chattel paper, drafts and acceptances, general intangibles and all other forms of obligations owing to the Debtors (and the proceeds, product and offspring therefrom, collectively, the "***Prepetition Collateral***") all as more fully described in the Prepetition Loan Documents, provided, however, that the Prepetition Secured Obligations are junior only to the SRI Prepetition Obligations;

ii.    the Prepetition Secured Obligations constitute the legal, valid and binding obligations of the applicable Debtors named in the Prepetition Loan Documents, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code);

iii.    the liens granted to the Prepetition Lender on the Prepetition Collateral under and in connection with the Prepetition Loan Documents (collectively, the "***Prepetition Liens***"), including, without limitation, all security agreements, pledge agreements and other security documents executed by any of the Debtors for the benefit of the Prepetition Lender, are (a) valid, binding, perfected and enforceable liens and security interests in the property

- 6 -

described in the Prepetition Loan Documents, (b) not, under the Bankruptcy Code or other applicable law, subject to avoidance, recharacterization, recovery, subordination, attack, offset, recoupment, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind, and (c) subject and subordinate only to: (1) the DIP Liens (as defined below); (2) the SRI Prepetition Liens; (3) the Carve-Out (as defined below) to which the DIP Liens are also subject; and (4) valid, perfected and unavoidable liens and security interests permitted under the Prepetition Loan Agreements and existing as of the Petition Date;

iv.     no portion of the Prepetition Secured Obligations or any payments made to the Prepetition Lender or applied to the Prepetition Secured Obligations prior to the Petition Date is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind under the Bankruptcy Code or other applicable law;

v.     each Debtor hereby forever waives and releases any and all "claims" (as such term is defined in the Bankruptcy Code), counterclaims, causes of action, defenses and setoff rights against the Prepetition Lender, in its capacity as such, whether arising at law or in equity, including, without limitation, any recharacterization, subordination, avoidance or other claim arising under section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law; and

vi.     substantially all cash, securities or other property (and the proceeds therefrom) as of the Petition Date, including without limitation, all cash, securities or other property (and the proceeds, product and offspring therefrom) and other amounts on deposit or maintained by the Debtors in accounts under the Prepetition Loan Agreement were subject to

- 7 -

rights of setoff and valid, perfected, enforceable, first priority liens under the Existing Facility Agreement and the other Prepetition Secured Agreements, and applicable law, for the benefit of the Prepetition Lender.  All proceeds of the Prepetition Collateral are Cash Collateral of the Prepetition Lender within the meaning of section 363(a) of the Bankruptcy Code (collectively, the "***Cash Collateral***").

G.      <u>Certain Conditions to DIP Loan Facility</u>.  The DIP Lender's willingness to enter into and fund the DIP Loan Facility is conditioned upon, among other things: (a) the Debtors obtaining Court approval of the DIP Agreement (and all extensions of credit thereunder), including the Roll Up, as well as all of the other DIP Documents; (b) the Debtors' provision of adequate protection under sections 361 and 363 of the Bankruptcy Code for the interests of the Prepetition Lender with respect to the Prepetition Liens; (c) the DIP Lender receiving, as security for the payment of the DIP Obligations (as defined below), senior security interests in and liens upon the DIP Collateral (as defined below) and the DIP Documents; and (d) the Debtors' satisfaction of all conditions precedent in the DIP Documents, unless waived in writing by the DIP Lender in its sole discretion.

H.      <u>Findings on the Post-Petition Need for Financing and Use of Cash Collateral</u>.

i.      *Cause*.  The Debtors have shown good cause for entry of this Interim Order and authorization for the Debtors to use Cash Collateral and to obtain extensions of credit under the DIP Loan Facility (the "***DIP Credit Extensions***") under the terms of the DIP Documents.

ii.      *Need for Financing and Cash Collateral Use*.  The Debtors' need for use of Cash Collateral and financing of the type afforded by the DIP Agreement is ongoing, immediate and critical.  Entry of this Interim Order will minimize disruption of the Debtors'

businesses and operations, will preserve the assets of the Debtors' estates and their value, and

is in the best interests of the Debtors, their creditors and their estates.  The terms of the

proposed financing are fair and reasonable, reflect the Debtors' exercise of prudent business

judgment, and are supported by reasonably equivalent value and fair consideration.

iii. *No Credit Available on More Favorable Terms.*  The Debtors are unable

to obtain financing on more favorable terms from sources other than the DIP Lender under,

and for the purposes set forth in, the DIP Documents and are unable to obtain adequate

unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an

administrative expense.  The Debtors are also unable to obtain secured credit allowable under

sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors

granting to the DIP Lender, subject to the Carve-Out (as defined in paragraph 11 below), (i)

the DIP Liens (as defined in paragraph 5(a) below), including the priming DIP Liens and (ii)

the Superpriority DIP Claim (as defined in paragraph 6(a) below), in each case on the terms

and conditions set forth in this Interim Order and the DIP Documents.

iv. *Use of Proceeds of the DIP Loan Facility and the Cash Collateral.*  As a

condition to the extension of credit under the DIP Agreement and use of Cash Collateral, the

DIP Lender, the Prepetition Lender and the Debtors have agreed that proceeds of any

advance made under the DIP Agreement or use of the Cash Collateral, as applicable, shall be

exclusively in a manner consistent with the terms of the DIP Documents, the Budget (subject

to permitted variances) and this Interim Order.  No portion of the proceeds of any advance

under the DIP Agreement or any Cash Collateral shall be used, directly or indirectly, to make

any payment or prepayment that is prohibited under the DIP Documents or that is not

provided for or included in the Budget (subject to permitted variances).

- 9 -

v.    *Interim Relief.*    Absent the granting of the relief provided for in this Interim Order, the Debtors' estates would be immediately and irreparably harmed.    Entry into the DIP Documents is therefore in the best interests of the Debtors and their estates, and is consistent with the Debtors' fiduciary duties.

I.    <u>Finding of Good Faith</u>.    Based upon the record presented at the Interim Hearing, the Court finds that the DIP Agreement and the other DIP Documents, as well as the terms of this Interim Order, have been negotiated in good faith and at arm's length between the Borrower and the Guarantors, on the one hand, and the DIP Lender, on the other hand.    Therefore, all DIP Credit Extensions heretofore and hereafter made to the Borrower under the DIP Documents shall be deemed to have been extended and made in good faith within the meaning of section 364(e) of the Bankruptcy Code.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    <u>Interim Financing Approved</u>.    The Motion is granted on an interim basis in accordance with the terms of this Interim Order.

2.    <u>Objections Overruled</u>.    All objections to the Motion, to the extent not withdrawn or resolved, and all reservations of rights included therein, are hereby overruled.

3.    <u>Authorization of Interim Financing; Budget</u>.

(a)    The Court hereby authorizes: (i) the execution, delivery and performance by each Debtor of and under the DIP Agreement and other DIP Documents, as applicable, in substantially the form annexed to the Motion (with such changes, if any, as were approved by the Court at the Interim Hearing or are authorized to be made as

- 10 -

amendments to the DIP Agreement and other DIP Documents in accordance with this Interim Order) and all other instruments, security agreements, assignments, pledges, and other documents referred to therein or required by the DIP Agreement to be executed by the Borrower and/or Guarantors; (ii) the Borrower's obtaining the DIP Loan Facility and other DIP Credit Extensions, including the Roll Up, in accordance with the DIP Documents from time to time up to an aggregate principal amount outstanding at any time of $3,700,000, plus interest, fees and other charges payable in connection with the foregoing; and (iii) the Debtors satisfying all conditions precedent and performance of all obligations hereunder and under the DIP Documents in accordance with the terms hereof and thereof; provided, however, that the authorization to use proceeds of the DIP Loan Facility shall be limited solely to the purposes specified and authorized in this Interim Order, the DIP Documents and the Budget (subject to permitted variances); provided, further, that until entry of the Final Order, the Borrower may obtain DIP Credit Extensions only to the extent necessary to avoid immediate and irreparable harm to the Borrower, which, for purposes hereof, shall include, without limitation, obligations and expenses specified in the Budget (subject to permitted variances), the funding of the DIP Loan Facility used to pay the fees and expenses due and other amounts owing by the Debtors at any time to the DIP Lender under the DIP Documents, and other expenses and obligations of the Borrower to the DIP Lender that are required to be paid prior to the Final Hearing under the DIP Documents, this Interim Order or any other order of the Court.

(b)     The DIP Lender shall have no obligation or responsibility to monitor the Borrower's use of the DIP Loan Facility, and may rely upon the Borrower's

CHAR2\2244250v9

representations that the amount of the DIP Credit Extensions requested at any time, and the use thereof, are in accordance with the requirements of this Interim Order and the DIP Documents.

(c)    The Borrower shall deliver to the DIP Lender and to the Prepetition Lender, on a periodic basis as required by the DIP Loan Facility from and after the closing of the DIP Loan Facility, updates to the "Budget" (as defined in the DIP Agreement) to be acceptable to the DIP Lender and the Prepetition Lender as and to the extent required by the DIP Agreement (such updated Budgets, the "***Budget***").

4.    <u>Execution, Delivery and Performance of DIP Documents</u>.  The Borrower and each of the Guarantors are authorized to execute, deliver and perform under all the terms and conditions of each of the DIP Documents.  The DIP Documents may be executed and delivered on behalf of each Debtor by any officer, director or agent of such Debtor who is duly authorized and empowered to execute the DIP Documents for and on behalf of such Debtor, and the DIP Lender may rely upon any such person's execution and delivery of any of the DIP Documents as having done so with all requisite power and authority.  Upon entry of this Interim Order, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with their terms.  In furtherance of the provisions of this Interim Order, each Debtor is authorized to do and perform all acts, to make, execute and deliver all instruments and documents, and to pay all filing and recording fees as may be necessary or, in the opinion of the DIP Lender, are desirable to give effect to any of the terms and conditions of, or as otherwise required or contemplated by, the DIP Documents.

5.    <u>DIP Collateral and DIP Liens</u>.

(a)        All "Obligations" under (and as defined in) the DIP Agreement,

including, without limitation, all DIP Credit Extensions (including the Roll Up) and all

amounts owing in respect thereof (then existing, contingent or otherwise, all of the

foregoing collectively called the "***DIP Obligations***") shall be, and hereby are, secured,

subject and subordinate only to the Carve-Out (as defined in paragraph 11 below), by

perfected, first-priority liens (collectively, the "***DIP Liens***") in favor of the DIP Lender

on and in all of the Prepetition Collateral and all other assets of the Debtors in existence

or created prior to, on or after the Petition Date, and, subject to entry of the Final Order,

any proceeds or property recovered in connection with the successful prosecution or

settlement of any claims under sections 502(d), 544, 545, 547, 548, 549, 550, 551 or 553

of the Bankruptcy Code (collectively, the "***DIP Collateral***").

(b)        The DIP Liens with respect to the DIP Collateral shall have the

following priorities:

       i.        <u>Unencumbered Collateral</u>.    Under section 364(c)(2) of the
Bankruptcy Code, a first-priority lien on and security interest in all DIP Collateral
(including, without limitation, all real property) that is not subject to a valid and perfected
lien existing on the Petition Date other than the DIP Collateral on which there are liens
and security interests as described in clause (iii) below;

       ii.        <u>Encumbered Collateral</u>.    Under section 364(c)(3) of the
Bankruptcy Code, a lien on and security interests in all DIP Collateral (including, without
limitation, all real property) that is subject to a valid, perfected and unavoidable lien
existing on the Petition Date to the extent such lien was on the Petition Date senior to the
Prepetition Liens, <u>provided</u> <u>that</u> the DIP Liens shall be junior to such liens but senior to
the Prepetition Liens;

       iii.        <u>Extent of Priming DIP Lien</u>.    Under section 364(d)(1) of the
Bankruptcy Code, a first-priority, senior priming lien on and security interest in all
Prepetition Collateral that is valid and perfected liens existing on the Petition Date in
favor of the Prepetition Lender; and

       iv.        <u>Carve-Out</u>.  The DIP Liens shall be subject and subordinate in all
respects to the Carve-Out in accordance with paragraph 11 of this Interim Order.

- 13 -

6.      Superpriority DIP Claim; Surcharge.

(a)      Scope of Superpriority DIP Claim.  Subject to the Carve-Out, and in addition to being secured as provided in this Interim Order and any Final Order, all DIP Obligations shall constitute an allowed administrative expense claim under section 503(b) of the Bankruptcy Code and shall constitute an allowed superpriority claim (the "*Superpriority DIP Claim*") under section 364(c)(1) of the Bankruptcy Code over all other administrative expenses in the Debtors' Cases of the kind specified in, or ordered under, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the Final Order), 507(a), 507(b), 546(c), 726 or 1114 of the Bankruptcy Code.  Without limiting the generality of the foregoing, the Superpriority DIP Claim shall be superior to any and all administrative priority claims arising out of transactions, if any, between any Debtor, on the one hand, and any other Debtor or subsidiary of a Debtor, and all such intercompany claims shall be subordinate to the Superpriority DIP Claim.

(b)      No Surcharge.  Subject to the Carve-Out, it shall be an Event of Default under (and as defined in) the DIP Agreement for any costs or administrative expenses that have been or may be incurred in these Cases, in any matters or proceedings related hereto or in any superseding chapter 7 case, to be deemed or paid prior to or on a parity with the Superpriority DIP Claim of the DIP Lender for the DIP Obligations. Subject to entry of the Final Order, in no event shall any costs or expenses of administration be imposed upon the DIP Lender or any of the DIP Collateral, or upon the Prepetition Lender or any Prepetition Collateral, whether under sections 105, 506(c) or 552(b) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender or the Prepetition Lender, as applicable, and no such consent shall be implied

- 14 -

from any action, inaction or acquiescence by the DIP Lender or the Prepetition Lender, as applicable.

7.      <u>Joint and Several Liability; Borrower Reimbursement Claims</u>.  The Debtors shall be jointly and severally liable to repay and otherwise satisfy the DIP Obligations in accordance with the DIP Documents.  The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Documents and as provided herein, without offset, counterclaim, deduction or other claim of avoidance of any nature or type.  In no event shall the Debtors be authorized to offset, deduct, avoid or recoup any amounts owed, or alleged to be owed, by the DIP Lender to any Debtor against any of the DIP Obligations, unless and to the extent expressly otherwise agreed to in writing by the DIP Lender.  No Debtor shall have any right of contribution, reimbursement or subrogation from any other Debtor, or any other Debtor's assets as a result of such Debtor's use of the DIP Loan Facility.

8.      <u>Cash Collateral; Other Matters</u>.  Subject to the terms of this Interim Order and the DIP Documents, the Debtors are authorized to use Cash Collateral in accordance with this Interim Order and the DIP Documents.  The Debtors shall be deemed to hold all such proceeds in trust for the benefit of the DIP Lender and the Prepetition Lender, as applicable.  The DIP Lender may, subject to the provisions of the DIP Documents and this Interim Order, apply (and reapply) any or all Cash Collateral at any time or times to the payment of any of the DIP Obligations, in such order of application as the DIP Lender may designate or elect, and may use all or part of the Cash Collateral to collateralize any contingent DIP Obligations.  If after the repayment in full in cash of the DIP Obligations, any Challenge (as defined below), claim or cause of action is asserted against the DIP Lender or the Prepetition Lender, then such parties shall be entitled to payment from Debtors to the extent of all costs, expenses, liabilities or

- 15 -

damages incurred by it or them (including, without limitation, reasonable attorneys' fees), as secured creditors under the terms of the DIP Documents and the Prepetition Loan Documents.

9.   <u>Adequate Protection of Prepetition Lender</u>.  As adequate protection under sections 361 and 363 of the Bankruptcy Code for the Debtors' use, consumption, sale, collection or other disposition of any of the Prepetition Collateral, as of the Petition Date, the Prepetition Lender shall receive:

(a)   to the extent there is a diminution in the value of the interests of the Prepetition Lender in the Prepetition Collateral (whether the reason for such diminution is as a result of or from, arises from, or is attributable to, the imposition of the automatic stay, the priming of the Prepetition Liens, the use of Cash Collateral or the physical deterioration, consumption, use, sale, lease, disposition, shrinkage or decline in market value of the Prepetition Collateral), the Prepetition Lender shall (i) maintain the Prepetition Liens on the Prepetition Collateral, to the extent and priority that existed prepetition, and (ii) be granted a replacement security interest in and liens on any of the DIP Collateral in which the Prepetition Lender did not have valid, perfected liens and security interests as of the Petition Date (the "***Replacement Liens***"), which liens described in (i) and (ii) above are valid, binding, enforceable and fully perfected as of the date hereof, and shall be junior and subordinate only to the Carve-Out and the DIP Liens;

(b)   an allowed administrative claim (the "***Prepetition Lender's Administrative Claim***") against the Debtors' estates under section 507(b) of the Bankruptcy Code to the extent that the Replacement Liens do not adequately protect the diminution in the value of the Prepetition Collateral, which Prepetition Lender's

- 16 -

Administrative Claim, if any, shall be junior and subordinate only to the Carve-Out and the Superpriority DIP Claim; and

(c)      copies of all financial statements, projections and reports furnished to the DIP Lender by the Debtors under the DIP Documents.

10.      <u>Payment of Certain Allowed Fees and Expenses</u>.   For so long as no Event of Default under (and as defined in) the DIP Documents shall have occurred and be continuing, Borrower is authorized to use the proceeds of the DIP Loan Facility, subject in all respects to the Budget (subject to permitted variances), to pay allowed fees, compensation, costs, expenses and disbursements of professionals (including, without limitation, attorneys, accountants, appraisers, consultants and investment bankers, and collectively, "***Professional Expenses***") retained by the Debtors (the "***Debtor Professionals***") or the professionals of the Committee (if any), <u>provided</u>, <u>however</u>, that no proceeds of the DIP Loan Facility or any Cash Collateral of the DIP Lender or Prepetition Lender shall be used to pay Professional Expenses of any Debtor Professionals or of the Committee (collectively, the "***Professional Persons***") or any other costs incurred in connection with: (a) investigating, commencing or continuing any claims, causes of actions, adversary proceedings or contested matters against the DIP Lender or the Prepetition Lender with respect to any loan, repayment or other transaction, act or inaction under or in connection with the DIP Documents, the SRI Prepetition Note or the Prepetition Loan Documents (as the case may be), including, without limitation, discovery proceedings subsequent to the commencement of any such claims or causes of action; (b) except to contest whether an Event of Default has occurred and exists under the DIP Agreement, any Debtor's attempt to prevent, hinder or delay (or any Debtor's attempt to assist another party in preventing, hindering or delaying) enforcement by the DIP Lender of its rights or remedies under this Interim Order or

- 17 -

any of the DIP Documents; (c) challenging any liens granted in connection with the DIP Documents, the SRI Prepetition Note, or the Prepetition Loan Documents; or (d) challenging the DIP Obligations, the SRI Prepetition Obligations or the Prepetition Secured Obligations. Notwithstanding the foregoing limitations, up to $25,000 may be used by the Committee, if any, to investigate the matters contained in this paragraph.

11. <u>Carve-Out and Carve-Out Reserve</u>.

(a) For the purposes of this Interim Order, the "***Carve-Out***" shall mean: (i) fees under 28 U.S.C. § 1930; (ii) any fees and expenses owing to the clerk of the Court or any agent thereof; (iii)(x) unpaid and outstanding reasonable fees and disbursements of the Professional Persons actually incurred from the Petition Date through the date of delivery by the DIP Lender of a Carve-Out Trigger Notice (defined below), whether allowed prior to or after delivery of such notice, solely to the extent allowed and payable under sections 326, 328, 330 and 331 of the Bankruptcy Code (but excluding success, completion or other transaction fees) and any interim procedures order, but subject in all respects to the Budget as then applicable (subject to permitted variances), on a line-by-line and professional-by-professional basis, and (y) allowed Professional Expenses of Debtor Professionals in an aggregate amount of $100,000 and allowed Professional Expenses of retained professionals of the Committee, if any, in an aggregate amount of $25,000, in each case incurred after the first day following delivery by the DIP Lender of the Carve-Out Trigger Notice (the "***Post-Trigger Carve-Out***"). A "***Carve-Out Trigger Notice***" means a written notice delivered by the DIP Lender to counsel to the Debtors, the Bankruptcy Administrator, counsel to the Prepetition Lender and counsel to the Committee (if any), stating that (I) the Post-Trigger Carve-Out is invoked, which notice

may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Documents, and (II) acceleration of the DIP Obligations has occurred. Nothing herein shall impair the ability of any interested party to object to any Professional Expenses sought by any Professional Person.

(b)       Upon a consummation of a sale of all or substantially all of any Debtor's assets, the Debtors shall be authorized and directed (without the requirement to have received a Carve-Out Trigger Notice) to transfer from the proceeds of such sale(s) an amount equal to the sum of: (i) the sum of the fees and expenses under clauses (i) and (ii) in the definition of "Carve-Out" set forth in paragraph 11(a) above; plus (ii) the then-unpaid amount of accrued fees and disbursements under clause (iii)(x) of the definition of "Carve-Out" set forth in paragraph 11(a)(i) above, irrespective of whether such fees and disbursements have been allowed or are payable at such time; plus (iii) after the indefeasible payment in full of all then-outstanding DIP Obligations, the Wind-Down Funds (as defined below) (collectively, the "*Carve-Out and Wind-Down Reserve*"), to one or more segregated accounts to be held in trust exclusively for the payment of such Carve-Out and Wind-Down Reserve. The Prepetition Lender and the Debtors agree to negotiate in good faith to determine what amounts may be reasonably required to wind-down the Debtors' estates following such a sale(s) (the "*Wind-Down Funds*") and provide in the Final Order for the minimum amount of such funding upon the consummation of such sale(s).

12.    Preservation of Rights Granted Under this Interim Order.

(a)       Protection From Subsequent Financing Order. It shall constitute an Event of Default under (and as defined in) the DIP Documents if any Debtor seeks, or if

- 19 -

there is entered in these Cases or in any successor cases, any order that authorizes the obtaining of credit or the incurrence of indebtedness by any Debtor (or any trustee or examiner) that (i) is secured by a security, mortgage, collateral interest or lien on all or any part of the DIP Collateral that is equal or senior to the DIP Liens, except as expressly authorized by the DIP Documents, or (ii) has priority administrative status that is equal or senior to the Superpriority DIP Claim; provided, however, that nothing herein shall prevent entry of an order that specifically provides that, as a condition to the granting of the benefits of clauses (i) or (ii) above, all of the DIP Obligations must be fully and indefeasibly paid from the proceeds of such credit or indebtedness.

(b)        Rights Upon Dismissal, Conversion or Consolidation.  If any chapter 11 case is dismissed, converted or substantively consolidated with another case, then neither entry of this Interim Order nor the dismissal, conversion or substantive consolidation of such chapter 11 case shall affect the rights or remedies of the DIP Lender under the DIP Documents or the rights or remedies of the DIP Lender and the Prepetition Lender under this Interim Order, and all of the respective rights and remedies hereunder and thereunder shall remain in full force and effect as if such chapter 11 case had not been dismissed, converted, or substantively consolidated.  It shall constitute an Event of Default if any Debtor seeks, or if there is entered, any order dismissing any of the Cases.  Notwithstanding any order that may be entered in the future dismissing any of the Cases, (i) all of the liens and claims granted hereunder shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and such liens and claims shall, notwithstanding such dismissal, remain binding on all interested

- 20 -

parties), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing all such liens and claims as permitted by applicable law.

(c)        No Discharge; Credit Bid Rights.    Unless and until the DIP Obligations are fully and indefeasibly paid, all such obligations shall not be discharged by entry of any order confirming a plan of reorganization in any of the Cases.  Subject to entry of the Final Order, no plan of reorganization or liquidation, nor any order entered in connection with a sale of assets under section 363 or 1129 of the Bankruptcy Code or otherwise, shall limit or otherwise restrict the right of the DIP Lender to submit a credit bid for all or any part of the DIP Collateral.  The Prepetition Lender shall have the right to credit bid any or all of the obligations owed to it by the Company in connection with any disposition of property of the Estates; provided, however, that the following conditions must be met: (i) such credit bid by the Prepetition Lender may be exercised only at an auction in the event that a third-party bidder (other than a stalking horse bidder or the Prepetition Lender) timely submits a bid that is higher and otherwise better than a stalking horse bidder's bid; (ii) prior to the auction, the Prepetition Lender identifies an operator that is acceptable to SRI in its sole discretion, and provides adequate assurance of future performance in connection with the assumption and assignment of the franchise agreements; and (iii) contains a minimum cash component necessary to pay, among other things, the DIP Obligations, the Bid Protections and any cure payments necessary associated with the assumption/assignment of executory contracts and unexpired leases, including amounts owing to the Purchaser (or its affiliates') under its franchise agreements.  The Debtors waive the right to seek to deny or limit the DIP Lender's right

CHAR2\2244250v9

to credit bid at a sale of all or any portion of the DIP Collateral, as well as the Prepetition Lender's right to credit bid as set forth herein.

(d)     <u>No Marshaling</u>.   The Debtors agree not to assert rights under the equitable doctrine of "marshaling" or any similar doctrine with respect to any DIP Collateral at any time securing any of the DIP Obligations, and, subject to entry of the Final Order, in no event shall any DIP Liens be subject to any prepetition or post-petition lien or security interest that is avoided and preserved for the benefit of any Debtor's estate under section 551 of the Bankruptcy Code.

(e)     <u>No Requirement to File Proof of Claim</u>.   Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any bar order establishing a deadline for the filing of proofs of claims entitled to administrative expense treatment under section 503(b) of the Bankruptcy Code, neither the DIP Lender nor the Prepetition Lender shall be required to file any proof of claim with respect to any of the DIP Obligations or the Prepetition Secured Obligations, as applicable, which shall be due and payable in accordance with the DIP Documents and the Prepetition Loan Documents, as applicable, without the necessity of filing any such proof of claim, and the failure to file any such proof of claim shall not affect the validity or enforceability of any of the DIP Documents or the Prepetition Loan Documents, or prejudice or otherwise adversely affect the DIP Lender's or the Prepetition Lender's respective rights, remedies, powers or privileges under the DIP Documents, the Prepetition Loan Documents, and/or this Interim Order.

(f)     <u>Reservation of Rights</u>.   The terms, conditions and provisions of this Interim Order are in addition to, and without prejudice to the rights of, the DIP Lender

- 22 -

and the Prepetition Lender to pursue any and all rights and remedies available to them under the Bankruptcy Code and the DIP Documents and the Prepetition Loan Documents (as applicable), or any other applicable agreement or law.

13.     <u>Automatic Perfection of Liens</u>.  The DIP Liens and the Replacement Liens (as necessary) shall, as of the Petition Date, be deemed valid, binding, enforceable and perfected with respect to all of the DIP Collateral or Prepetition Collateral, as applicable, upon entry of this Interim Order.  Neither the DIP Lender nor the Prepetition Lender shall be required to file any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or any similar document or take any other action (including, without limitation, possession of any of the DIP Collateral, Prepetition Collateral or any other property of the Debtor or the obtaining of any consent of any third party) to validate the perfection of the DIP Liens or the Replacement Liens. If the DIP Lender or the Prepetition Lender chooses to file or record any such mortgages, deeds of trust, security deeds, notices of lien or UCC-1 financing statements, or take any other action to validate the perfection of the DIP Liens or the Replacement Liens, as applicable, the Debtors and their respective officers are authorized to execute any documents or instruments as reasonably requested by the DIP Lender or the Prepetition Lender, and the Debtors shall pay or reimburse the DIP Lender and the Prepetition Lender (as applicable) for the payment of any cost, fees or expenses (including, without limitation, recording taxes) payable in connection with the filing or recordation of any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or other instruments or agreements.  The DIP Lender and the Prepetition Lender, may, in each party's discretion, file a certified copy of this Interim Order in any filing office in any jurisdiction in which the Borrower or any Guarantor is organized or has or maintains any

- 23 -

DIP Collateral or an office, and each filing office is authorized to accept such certified copy of this Interim Order for filing and recording.

14.    <u>DIP Fees and Expenses</u>.  Debtors are authorized and directed to pay to the DIP Lender all fees and expenses payable under the DIP Documents (the "<u>DIP Fees and Expenses</u>"). The DIP Fees and Expenses constitute DIP Obligations and shall be paid by the Debtors as follows:  (a) all DIP Fees and Expenses (other than DIP Fees and Expenses paid in accordance with clause (b) below) accrued as of the date of entry of this Interim Order (including, without limitation, the Commitment Fee, as defined in the DIP Agreement) shall be paid to the DIP Lender within one (1) business day of entry of this Interim Order; and (b) all additional reasonable and documented fees and expenses incurred by the DIP Lender for which the Debtors are obligated under the DIP Documents shall be paid by the Debtors (without the necessity of filing any application with or obtaining further order from the Court) in accordance with the terms of the DIP Documents; <u>provided</u> <u>that</u> no written objection from the Bankruptcy Administrator, the Prepetition Lender (or its counsel)or the Committee (if any) is received within ten (10) days (the "***Review Period***") after receipt by the Bankruptcy Administrator, counsel to the Prepetition Lender and counsel to the Committee (if any) of invoices thereof (subject in all respects to applicable privilege and work-product doctrines as well as confidential or proprietary information).   The DIP Lender shall concurrently provide copies of any invoices to the Bankruptcy Administrator, counsel to the Prepetition Lender and counsel to the Committee (if any) and allow such parties at least the Review Period to review and object to any fees of expenses requested therein.  If an objection is received as to any portion of such invoice, the Debtors shall promptly pay after the Review Period the portion of such invoice not subject to objection, and the Bankruptcy Court shall decide any such objection unless otherwise resolved.

- 24 -

The Debtors shall not pay any disputed portion of any such disputed invoice(s) until the Court renders a decision on the objection or the dispute is otherwise resolved.

15.    <u>Modifications or Amendments to DIP Documents and Budget</u>.  The Debtors are hereby authorized, without further order of the Court, to execute, deliver and implement, in accordance with the terms of the DIP Documents and with the written approval of the DIP Lender and the Prepetition Lender, any non-material modifications or amendments to the DIP Documents or the Budget, <u>provided</u>, <u>however</u>, that the Debtors shall not enter into any material modification or amendment to the DIP Documents that is adverse to the Debtors' estates absent further order of the Court.

16.    <u>Events of Default; Remedies</u>.

(a)    <u>Events of Default and Remedies</u>.    An Event of Default shall be deemed to have occurred and exist for purposes of this Interim Order upon the occurrence of an "Event of Default" under (and as defined in) the DIP Documents, including, without limitation, any breach or failure of compliance by any Debtor with respect to any provision of this Interim Order.

(b)    <u>Enforcement of Remedies</u>.  Upon or after the occurrence of any Event of Default, the DIP Lender and/or the Prepetition Lender shall be authorized, in their respective sole discretion, to exercise all remedies available solely to each of them, respectively, under the DIP Documents and applicable law (including the right and ability of each of them to declare and/or provide notice of an Event of Default), subject only to the automatic stay modification provisions contained in paragraph 17 hereof.  The foregoing is without prejudice to the respective rights of the DIP Lender and the Prepetition Lender to seek earlier relief from this Court upon appropriate notice and

hearing under the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.  Upon

the occurrence, and during the continuation, of an Event of Default, and notwithstanding

the notice periods referred to above, the DIP Lender shall not be obligated to make any

DIP Credit Extensions to any of the Debtors.

(c)        <u>Rights Cumulative</u>.    The respective rights, remedies, powers and

privileges conferred upon the DIP Lender and the Prepetition Lender under this Interim

Order shall be in addition to, and cumulative with, those contained in the DIP Documents

and the Prepetition Loan Documents, as applicable.

17.    <u>Modification of Automatic Stay</u>.  The automatic stay provisions of section 362 of

the Bankruptcy Code are hereby modified solely (a) to the extent necessary to authorize the

Debtors to make payments under the DIP Documents and to authorize the DIP Lender to retain

and apply payment made in accordance thereof, including, without limitation, payments of

accrued interest and principal amounts outstanding under the DIP Documents, and (b) subject to

entry of the Final Order, upon the occurrence of an Event of Default and following three (3)

business days' notice by the DIP Lender or the Prepetition Lender to each of the Debtors,

counsel to the Debtors, the Prepetition Lender, counsel to the Prepetition Lender and the

Bankruptcy Administrator of the occurrence of such Event of Default, to permit the DIP Lender

or the Prepetition Lender to take any and all actions and remedies to proceed against, take

possession of, and protect and realize upon the DIP Collateral or the Prepetition Collateral, as

applicable, and any other property of the estates of the Debtors upon which the DIP Lender or

the Prepetition Lender has been or may hereafter be granted liens or security interests, <u>provided</u>

<u>that</u> such notice by the DIP Lender or the Prepetition Lender shall not prejudice the rights of the

Debtors to file a motion with the Court opposing the termination of the automatic stay on the

sole basis that an Event of Default has not in fact occurred and is continuing, and provided further that upon the filing of such motion, the DIP Lender and/or the Prepetition Lender, as applicable, shall be stayed from taking any action or remedy against the DIP Collateral or the Prepetition Collateral, as applicable, until the Court hears and disposes of such motion.  If the Debtors file any such motion described in the preceding sentence, the same shall be expedited with a hearing to take place no later than fourteen (14) days from the date such motion is filed.

18.    Deadline for Challenge to Prepetition Secured Obligations.  The stipulations and admissions contained in paragraph F of this Interim Order (the "**Debtors' Stipulations**") shall be binding on all parties in interest, including, without limitation, the Debtors and any Committee (if appointed), unless, and solely to the extent than an adversary proceeding or other appropriate contested matter (a "**Challenge**") has been commenced by the Committee or any other party in interest with requisite standing other than the Debtors (or if the Cases are converted to cases under chapter 7 of the Bankruptcy Code prior to the expiration of the Challenge Period (defined below), the chapter 7 trustee in such successor case) against the Prepetition Lender in connection with any matter related to the Prepetition Secured Obligations or the Prepetition Collateral, by the earlier of (a) in the case of the Committee, sixty (60) days from the engagement of counsel for the Committee, or (b) with respect to other parties in interest with requisite standing other than the Debtors or the Committee, ninety (90) days after the Petition Date (such time period established by the earlier clauses (i) and (ii) above, the "**Challenge Period**").  If no such adversary proceeding or contested matter is timely filed, then (x) the Prepetition Secured Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance for all purposes in the Cases and any subsequent chapter 7 case, (y) the Prepetition Lender's liens on the Prepetition Collateral shall be deemed to have

- 27 -

been, as of the Petition Date, and to be, legal, valid, binding and perfected, not subject to

defense, counterclaim, recharacterization, subordination or avoidance, and (z) the Prepetition

Secured Obligations and the liens of the Prepetition Lender on the Prepetition Collateral shall not

be subject to any other or further challenge by the Debtors, any committee or any other party in

interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors'

estates, including, without limitation, any successor thereto (including, without limitation, any

estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the

Debtors).  If any such Challenge is timely filed, the Debtors' Stipulations shall nonetheless

remain binding and preclusive (as provided in the second sentence of this paragraph) on the

Debtors, any Committee and any other person or entity, except as to any such finding and

admission that was expressly and successfully challenged in such Challenge.  Nothing in this

Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any

Committee, standing or authority to pursue any cause of action belonging to the Debtors or their

estates, including, without limitation, claims and defenses with respect to the Prepetition Secured

Obligations and the liens of the Prepetition Lender in the Prepetition Collateral.

      19.    <u>No Deemed Control</u>.  In determining to extend credit under the DIP Documents,

or in exercising any rights or remedies as and when permitted under this Interim Order or the

DIP Documents, the DIP Lender shall not be deemed to (a) be in control of the operations of

any Debtor, or (b) owe any fiduciary duty to the Debtors, their creditors, shareholders, or

estates.

      20.    <u>Binding Effect; Successors and Assigns</u>.  Immediately upon entry by the Court of

this Interim Order (notwithstanding any applicable law or rule to the contrary), the provisions of

this Interim Order shall be binding upon and inure to the benefit of all parties in interest in these

- 28 -

Cases, including, without limitation, the DIP Lender, the Prepetition Lender, the Borrower, the

Guarantors and their respective successors and assigns (including, without limitation, any

chapter 11 trustee hereafter appointed or elected for the estate of the Borrower or any Guarantor,

or any chapter 7 trustee appointed in any superseding chapter 7 case); provided, however that the

DIP Lender shall have no obligation to make DIP Credit Extensions to, and the Prepetition

Lender shall have no obligation to consent to the use of Cash Collateral by, any chapter 7 or

chapter 11 trustee appointed or elected for the estate of the Borrower or any Guarantor.

21.    Order Controls.  In the event of any inconsistency between the terms of the DIP

Documents and this Interim Order, the provisions of this Interim Order shall govern and control.

22.    Service of Interim Order and Final Hearing Notice.  The Final Hearing on the

Motion shall be held at _____ a/p.m., on February __, 2020 before The Honorable

[_____], at the United States Bankruptcy Court for the Western District of North

Carolina (Charlotte Division).  Promptly after entry of this Interim Order, the Debtors shall

serve, by electronic filing and/or United States mail, first-class postage prepaid, notice of entry

of this Interim Order and of the Final Hearing (the "***Final Hearing Notice***"), together with

copies of this Interim Order, the proposed Final Order and the Motion, on the following parties:

(a) the Bankruptcy Administrator; (b) the Internal Revenue Service; (c) creditors holding the

twenty (20) largest unsecured claims against the Debtors; (d) parties asserting liens against the

DIP Collateral; (e) counsel to the DIP Lender; (f) counsel to the Prepetition Lender; and (g) all

other parties requesting notice in these Cases.  Such service shall constitute good and sufficient

notice of the Final Hearing.

23.    Objections to Entry of the Final Order.  The Final Hearing Notice shall state that

any party in interest that wishes to object to entry of the proposed Final Order shall file a written

objection with the Clerk of the Court no later than February [\_\_], 2020 at 4:00 p.m. (ET), which objection shall be served so as to be received on or before such date by: (a) counsel to the Debtors, Moore & Van Allen, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: Zachary H. Smith, Esq.); (b) the Bankruptcy Administrator; (c) counsel to the DIP Lender, DLA Piper LLP (US), One Atlantic Center, 1201 W. Peachtree St. NE, Suite 2800, Atlanta, Georgia 30309 (Attn: Daniel M. Simon, Esq. and David E. Avraham, Esq.); and (d) counsel to the Prepetition Lender, Lazer Aptheker Rosella & Yedid, P.C., Melville Law Center, 225 Old Country Road, Melville, New York 11747 (Attn: Jennifer L. Silvestro, Esq.).  Any objecting party shall appear at the Final Hearing to assert the basis for such objection before the Court or the Court may otherwise deem such objection to have been waived and abandoned.

24.     _Headings_.  Section headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in interpreting, this Interim Order.

25.     _Survival_.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Lender under this Interim Order and/or the DIP Documents shall continue in full force and effect in these Cases, or following dismissal or conversion of these Cases, and shall maintain their priority as provided by this Interim Order until (a) all of the DIP Obligations have been indefeasibly paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Documents that survive such discharge by their terms), and (b) all commitments to extend credit under the DIP Documents are terminated.

26.     _Effect of Appeal_.  Consistent with section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter modified, vacated or stayed on appeal: (a) such stay, modification or vacation shall not affect the validity of any obligation,

indebtedness, liability or DIP Liens or Replacement Liens granted, created or incurred by the Debtors to the DIP Lender or the Prepetition Lender (as applicable) prior to the effective date of such stay, modification or vacation, or the validity, enforceability or priority of any DIP Liens or Replacement Liens, priority or right authorized or created under the original provisions of this Interim Order or under the DIP Documents; and (b) any indebtedness, obligation or liability incurred by the Debtors to the DIP Lender or the Prepetition Lender under the DIP Documents or this Interim Order prior to the effective date of such stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender and Prepetition Lender shall be entitled to all the rights, remedies, privileges and benefits, including, without limitation, the DIP Liens and the Replacement Liens and priorities granted herein and, as applicable, under the DIP Documents, with respect to any such indebtedness, obligation or liability.  All DIP Credit Extensions under the DIP Documents, and all agreements to permit the use of Cash Collateral, are made in reliance upon this Interim Order, and, therefore, the indebtedness resulting from such DIP Credit Extensions or the use of Cash Collateral prior to the effective date of any stay, modification or vacation of this Interim Order cannot (i) be subordinated, (ii) lose the priority of the DIP Liens or Replacement Liens, as applicable, or (iii) be deprived of the benefit of the Superpriority DIP Claim granted to the DIP Lender or the Prepetition Lender's Administrative Claim granted to the Prepetition Lender under this Interim Order, as a result of any subsequent order in any one of these Cases, or any superseding cases, of the Debtors.

27.    <u>Effectiveness</u>.  This Interim Order shall take effect and be enforceable immediately upon entry hereof notwithstanding any contrary Bankruptcy Rule or Rule of Civil Procedure and there shall be no stay of execution or effectiveness of this Interim Order.

28.    <u>Bankruptcy Rule 7052</u>.  This Interim Order shall constitute findings of fact and conclusions of law under Bankruptcy Rule 7052.

29.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

This Interim Order has been signed electronically.  The judge's                    United States Bankruptcy Court
signature and court's seal appear at the top of this Interim Order.

- 32 -

## Exhibit A

**SUPERPRIORITY DEBTOR-IN-POSSESSION SECURED PROMISSORY NOTE**

## **EXHIBIT B**

**Form of DIP Agreement**

**EXECUTION VERSION**

### SUPERPRIORITY DEBTOR-IN-POSSESSION SECURED PROMISSORY NOTE

$4,600,000                                                                February [_], 2020

FOR VALUE RECEIVED, SD-Charlotte, LLC a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), hereby promises to pay to the order of SRI Holding Company, a Delaware corporation (the "DIP Lender"), the principal sum of four million six hundred thousand and 00/100 dollars ($4,600,000) or as much thereof as has been or may be advanced (such advances, together with the Prepetition Note Obligations referred to below, being referred to herein collectively as the "Loans"), together with interest, in each case in the manner described in this Superpriority Debtor-In-Possession Secured Promissory Note (this "Note"). Certain terms used herein are defined in Annex A.

1.      Commitments. Subject to the terms and conditions hereof and relying upon the representations and warranties set forth herein and in the other Loan Documents, the DIP Lender agrees to make on the (i) Closing Date a Loan to the Borrower in the amount of $3,700,000 (the "Interim Loans") and (ii) Final Funding Date a Loan to the Borrower in the aggregate amount of $900,000 (the "Final Loans"). Effective upon the occurrence of the Closing Date, without any further action by any party to this Agreement, the Bankruptcy Court or any other Person, the Prepetition Note Obligations owing to the DIP Lender on the Closing Date shall be refinanced into and constitute Loans hereunder and the outstanding principal balance of and interest and fees accrued under the Prepetition Note and all other amounts in respect thereof owing to the DIP Lender shall constitute a portion of the outstanding amount of the Loans hereunder and shall be due and payable in accordance with the terms set forth herein applicable to all Loans.

2.      Payments of Principal. Subject to the acceleration provisions of Section 8, all unpaid principal, fees and accrued and unpaid interest shall be due and payable in full on the Maturity Date.

3.      Interest; Fees.

(a)      Interest. The unpaid principal amount of this Note shall accrue interest at a rate equal to 9.5% per annum; provided that upon the occurrence and during the continuance of an Event of Default, the outstanding principal amount of this Note and any accrued and unpaid interest and all other overdue amounts shall each bear interest until paid at the stated rate plus 2.00% per annum. All payments of interest upon this Note shall be paid in kind. Interest that the Borrower paid in kind will be added to the outstanding principal amount (the "Additional PIK Principal") of the Note. Additional PIK Principal shall be considered principal for all purposes and, without limiting the foregoing, the Additional PIK Principal of the Note shall bear interest at the rate applicable to the Note beginning on the date such interest is paid in kind and added to the principal amount of the Note. Accrued interest shall be added to the outstanding principal amount of the Note on the last Business Day of each month and, to the extent accrued on any principal amount being repaid or prepaid, on the date of such repayment or prepayment. All computations of interest shall be made on the basis of a 360-day based on the actual number of days elapsed in the period during which it accrues.

(b)      Fees. The Borrower shall pay to DIP Lender a commitment fee in cash in an amount equal to 4.0% of the aggregate Commitments (the "Commitment Fee"). The Commitment Fee shall be fully earned on the Closing Date and due and payable upon the entry of the Final Order.

4.      Prepayments; Payment Terms.  The Borrower may at any time and from time to time prepay any principal amount of this Note in whole or in part without premium or penalty. All payments of principal of, and interest upon, this Note shall be made by the Borrower to the DIP Lender in cash in immediately available funds in lawful money of the United States of America, by wire transfer to the bank account designated by the DIP Lender in writing from time to time. All payments under this Note shall be made to the DIP Lender without withholding, defense, set-off, counterclaim, or deduction. Payments and

CHAR2\2245920v2

prepayments made to the DIP Lender by the Borrower hereunder shall be applied first to expenses recoverable under Section 12, then accrued interest and then to principal. If the due date of any payment under this Note would otherwise fall on a day that is not a Business Day, such due date shall be extended to the next succeeding Business Day, and interest shall be payable on any principal so extended for the period of such extension.

5.    <u>Guarantee</u>.  The Guarantors hereby jointly and severally guarantee to the DIP Lender and its successors and assigns the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise, including amounts that would become due but for the operation of the automatic stay under the Debtor Relief Laws) of the Obligations.  The Guarantors hereby further jointly and severally agree that if the Borrower shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise, including amounts that would become due but for the operation of the automatic stay under the Debtor Relief Laws) any of the Obligations strictly in accordance with the terms of any document or agreement evidencing any such Obligations, including in the amounts, in the currency and at the place expressly agreed to thereunder, irrespective of and without giving effect to any law, order, decree or regulation in effect from time to time of the jurisdiction where the Borrower, any Guarantor or any other person obligated on any such Obligations is located, the Guarantors will promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal. The obligations of the Guarantors under this Section 5 are primary, absolute and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the obligations of the Borrower under this Note and the other Loan Documents, or any substitution, release or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 5 that the obligations of the Guarantors hereunder shall be absolute and unconditional, joint and several, under any and all circumstances and shall apply to any and all Obligations now existing or in the future arising.  The guarantee in this Section 5 is a continuing guarantee and is a guaranty of payment and not merely of collection and shall apply to all Obligations whenever arising.

6.    <u>Security and Administrative Priority</u>

(a)    *Collateral; Grant of Lien and Security Interest.*

(i)    As security for the full and timely payment and performance of all of the Obligations, upon authorization by the Bankruptcy Court under any of the DIP Orders, each of the Obligors hereby assigns, pledges and grants to the DIP Lender, a superpriority security interest in, and Lien on, all of the property, assets or interests in property or assets of such Person, of any kind or nature whatsoever, real or personal, tangible and intangible now existing or hereafter acquired or created, including all property of the "estate" (within the meaning of the Bankruptcy Code) of the Obligors, and all cash, money, cash equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, goods and inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of its subsidiaries), furniture, fixtures, equipment, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, intellectual property, general intangibles of any kind, rights to the payment of money, supporting obligations, guarantees, general intangibles, letter of credit rights, commercial tort claims, causes of action and all substitutions, books and records related to the foregoing, and accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds, the proceeds of all Avoidance Actions  (subject to entry of a Final Order), rights under section 506(c) of the Bankruptcy Code (subject to the entry of a Final Order), all Cash Collateral, and all

EXECUTION VERSION

cash and non-cash proceeds, rents, products, substitutions, accessions and profits of any of collateral described above (all property of the Obligors subject to the security interest referred to in this clause (6)(a)(i) being hereinafter, collectively, referred to as the "Collateral"). Unless otherwise specified, terms used in this Section 6(a)(i) that are defined in the UCC shall have the meanings set forth therein.

(ii)     The security interests and Liens in favor of the DIP Lender in the Collateral shall be effective immediately upon the entry of the Interim Order and have the priority set forth in the DIP Orders. Such Liens and security interests shall and their priority shall remain in effect until the Commitments shall have been terminated and all Obligations shall have been paid in full.

(iii)     Notwithstanding anything herein to the contrary, no Person entitled to the Carve-Out shall be entitled to sell or otherwise dispose of any Collateral.

(iv)     Subject only to prior payment of Carve-Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the DIP Lender against any Obligor in respect of any Obligation.

(b)     *Administrative Priority*. Each Obligor agrees that its Obligations shall constitute allowed superpriority administrative expenses in the Chapter 11 Cases, having priority set forth in the DIP Orders, and each Obligor waives all rights, claims and causes of action arising under any provision of the Bankruptcy Code or otherwise seeking to surcharge the Collateral with respect to the DIP Lender or Prepetition Collateral with respect to the Prepetition Lender, or assert damages or obtain a judgment against the Prepetition Lender or DIP Lender for any costs of the administration of the Chapter 11 Cases.

(c)     *Grants, Rights and Remedies*. This Note, the DIP Orders and any other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the DIP Lender hereunder and thereunder are cumulative.

(d)     *Survival.* The Liens, lien priority, administrative priorities and other rights and remedies granted to the DIP Lender pursuant to this Note, the DIP Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Obligors (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     except to the extent of the Carve-Out, no fees, charges, disbursements, costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the DIP Lender against the Obligors in respect of any Obligation;

(ii)     the Liens in favor of the DIP Lender set forth in clause (a)(i) of this Section shall constitute valid and perfected Liens and security interests having the priority set forth in the DIP Orders, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

**EXECUTION VERSION**

(iii)    the Liens in favor of the DIP Lender set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the DIP Lender file financing statements or mortgages, take possession or control of any Collateral, or otherwise perfect its Lien under applicable non-bankruptcy law.

7.    <u>Events of Default</u>.  An "<u>Event of Default</u>" shall exist hereunder if any one or more of the following events shall occur:

(a)    the Borrower shall fail (i) to pay any principal or any portion thereof when due, (ii) to pay any interest or any portion thereof or any other amount hereunder or under any other Loan Document (excluding amounts required to be paid pursuant to Section 12(a)) within one (1) Business Days after the same becomes due or (iii) to pay any amounts required to be paid pursuant to Section 12(a) for ten (10) Business Days after DIP Lender has requested Borrower to pay the same; or

(b)    any Obligor shall fail to perform or observe any term, covenant or agreement to be performed or observed by it pursuant to Section 10; or

(c)    any Obligor shall fail to perform or observe any other covenant or agreement to be performed or observed by it contained herein or in any other Loan Document for ten (10) days after notice thereof; or

(d)    any Budget Event occurs; or

(e)    any representation or warranty of any Obligor made herein or in any other Loan Document proves to have been materially incorrect when made or reaffirmed; or

(f)    any fraudulent act, fraudulent conduct or fraudulent omission by the Obligors with respect to the Loan Documents or the Chapter 11 Orders; or

(g)    a Change of Control shall occur; or

(h)    Obligors shall use Cash Collateral, DIP Collateral or Prepetition Collateral in any manner not authorized by the DIP Orders and the Loan Documents; or

(i)    any monetary or non-monetary judgment shall be rendered against any of the Obligors after the date hereof which causes or would reasonably be expected to cause a Material Adverse Effect; or

(j)    any material provison of the Loan Documents, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all Obligations (other than contingent obligations not due and payable as of such date) ceases to be in full force and effect or any Obligor shall contest the valdidity or enforceability of any part of this Note or any other Loan Document; or

(k)    any of the Chapter 11 Cases shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of any of the Chapter 11 Cases (in either case, unless such dismissal does not provide for termination of the use of the DIP Collateral and require and result in the payment in full in cash of the Obligations)), suspended, or converted to a case under chapter 7 of the Bankruptcy Code, or any Obligor shall file any pleading requesting any such relief; or a motion shall be filed by any Obligor for the approval of, or there shall arise, any other Claim having priority senior to or pari passu with the claims of the DIP Lender under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code (other than the Carve-Out); or

EXECUTION VERSION

(l)      any Obligor files a motion in the Chapter 11 Cases to (i) obtain additional or replacement financing from a party other than DIP Lender under section 364(d) of the Bankruptcy Code or (ii) to use Collateral under section 363(c) of the Bankruptcy Code other than any application related to the DIP Order, except (i) (x) with the express written consent of the DIP Lender or (y) to the extent any such financing shall provide for the payment in full of the Obligations and (ii) to the extent such financing is secured by Prepetition Collateral, (x) with the express written consent of the Prepeition Lender or (y) to the extent any such financing shall provide for the payment in full of the Prepetition Obligations; or

(m)      any Obligor shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition Claim (or the Obligor shall otherwise make a payment on any prepetition claim) other than (x) as provided for in the Approved Budget (including any Permitted Variance) or (y) otherwise consented to by the DIP Lender in writing, (ii) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $50,000 in the aggregate or to permit other actions that would have a material adverse effect on such Obligor or its estate or (iii) approving any settlement or other stipulation not approved by the DIP Lender and not included in the Approved Budget (including any Permitted Variance) with any secured creditor of any Obligor providing for payments as adequate protection or otherwise to such secured creditor (in each case, other than Permitted Adequate Protection Payments or as provided in the DIP Orders); or

(n)      (i) entry of a judgment or order by the Bankruptcy Court or any other court modifying, limiting, subordinating, re-characterizing, or avoiding the validity, enforceability, perfection, or priority (as set forth in this Note) of any of the Obligations or the liens securing the Obligations (or any invalidation or impairment of such liens and/or superpirority claims of the DIP Lender shall otherwise occur), (ii) subject to entry of the Final Order, any imposition, surcharge or assesment against the DIP Lender's interest in the Collateral, or the Prepetition Lender's interest in the Prepetition Collateral (subject to entry of the Final Order), whether pursuant to sections 506(c) or 552 of the Bankruptcy Code or (iii) any material provision of any Loan Document shall cease to be effective; or

(o)      any Chapter 11 Order (i) shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Obligor shall apply for authority to do so) without the written consent of the DIP Lender and Prepetition Lender, which consent may be witheld in their respective sole discretion (or any Obligor shall file, or otherwise support, any pleading seeking such relief described in this subparagraph), or (ii) shall cease to be in full force and effect; or

(p)      any of the Obligors shall (i) fail to comply with the terms and conditions of any Chapter 11 Order (other than a non-monetary breach with respect to adequate protection set forth therein) or (ii) breach any non-monetary provisions with respect to the adequate potection provisions set forth in the DIP Orders and such breach shall remain uncured for five (5) Business Days after the Borrower's receipt of written notice thereof; or

(q)      the Bankruptcy Court shall enter an order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of section 1106 of the Bankruptcy Code) under clause (b) of section 1106 of the Bankruptcy Code in the Chapter 11 Cases (or any Obligor shall file, or otherwise support, any pleading seeking such appointment or acquiesce in or fail to object to, any such appointment), in each case without the written consent of the DIP Lender and the Prepetition Lender (which consent may be witheld in their respective sole discretion); or

(r)      entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Obligor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender; or

EXECUTION VERSION

(s)      the Obligors or any of their affiliates shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Obligors or any of their Subsidiaries) any other Person's opposition of any motion made in the Bankruptcy Court by the DIP Lender seeking confirmation of the amount of the DIP Lender's claim; or

(t)      (i) The Obligors or any of their affiliates shall file any pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lender under the Loan Documents or (ii) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding brought by any other Person which results in such a material impairment of the rights or interests of the DIP Lender under the Loan Documents; or

(u)      Any judgments or orders (not covered by insurance) which are in the aggregate in excess of $50,000.00 as to any postpetition obligation shall be rendered against any of the Obligors after the date hereof and the enforcement thereof shall not be stayed, vacated or discharged; or there shall be rendered against any of the Obligors a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Obligors to perform their obligations under the Loan Documents or the value of the Collateral; or

(v)      entry of an order by the Bankruptcy Court with respect to any pleading or proceeding brought by any Person which results in such a material impairment of the rights or interests of the DIP Lender under the Loan Documents; or

(w)      a sale order shall be entered or a plan confirmed in the Chapter 11 Cases which does not provide for payment in full in cash of the Obligations on the closing date thereof; or

(x)      the appointment of (i) a chief restructuring officer or any equivalent officer other than Brian Rosenthal of MERU or (ii) any other officer unless otherwise consented to by the DIP Lender and Prepetition Lender; or

(y)      the initiation by the Obligors, any statutory committee appointed in the Chapter 11 Cases, any trustee, any examiner or any other party in interest of any contested matter or adversary proceeding with respect to any provision of this Note, the Obligations of the DIP Lender, including, but not limited to, any actions pursuant to Chapter 5 of the Bankruptcy Code, in each case, except as may otherwise be permitted under the DIP Orders.

8.      Remedies.  Upon the occurrence and during the continuance of any Event of Default, the DIP Lender may, upon three (3) Business Days' written notice as set forth below, declare the principal amount of this Note together with any interest thereon to be due and payable, and the principal amount of this Note together with any such interest shall thereupon immediately become due and payable without presentment, further notice, protest or other requirements of any kind, all of which are hereby expressly waived by the Borrower, at which point the automatic stay of section 362 of the Bankruptcy Code shall be modified without order of the Bankruptcy Court, without need for filing any motion for relief from the automatic stay or any other any other pleading, for purposes of permitting the DIP Lender to exercise any or all of its rights and remedies set forth in the DIP Orders or the Loan Documents, including, without limitation: (a) directing the DIP Lender to foreclose on the Collateral and (b) declaring a termination, reduction or restriction on the ability of the Obligors to use Loan proceeds and cash collateral derived from proceeds of Collateral. In addition, upon the occurrence of an Event of Default, the DIP Lender may file a motion to seek to terminate or modify the Obligors' plan exclusivity periods under section 1121(d) of the Bankruptcy Code and have such motion heard on shortened notice (but in no event on less than three (3) Business Days' notice). Without limiting the foregoing, upon the occurrence and during the continuance of an Event of Default, upon three (3) Business Days' prior written notice as set forth below, the DIP Lender

may protect and enforce its rights under this Note and the other Loan Documents by any appropriate proceedings, including proceedings for specific performance of any covenant or agreement contained in this Note or any other Loan Document, and the DIP Lender may enforce payment of any Obligations due and payable hereunder or enforce any other legal or equitable right and remedies which it may have under this Note, any other Loan Document, or under applicable law or in equity. Notwithstanding the foregoing, any exercise of remedies is subject to the requirement of the giving of three (3) Business Days' prior written notice to counsel for the Obligors, counsel for the Prepetition Lender, the Office of the Bankruptcy Administrator for the Western District of North Carolina and counsel for the Official Committee (if any). For the avoidance of doubt, the waivers in this paragraph shall not apply to any opposition as to the existence of an Event of Default.

9.     Obligors' Representations and Warranties.  Each Obligor represents and warrants to the DIP Lender that, (i) on the Closing Date, subject to the Bankruptcy Court's entry of the Interim Order, and (ii) on the Final Funding Date, subject to the Bankruptcy Court's entry of the Final Order:

(a)     General Representations. It is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has full power and authority to execute, deliver and perform its obligations under this Note and the other Loan Documents.  It has duly authorized and taken all other appropriate action for the execution, delivery and performance of this Note and any other document or instrument delivered pursuant hereto or in connection herewith and the consummation of the transactions provided for in this Note.  It has duly executed and delivered each Loan Document and each Loan Document constitutes its legal, valid and binding obligation, enforceable in accordance with its terms. The execution and delivery of the Loan Documents, the performance of the transactions contemplated thereby and the fulfillment of the terms thereof will not (i) conflict with or violate any of its organizational documents or its contractual obligations, (ii) conflict with or violate any postpetition order, judgment or decree of governmental authority binding on it, (iii) require any approval of its equity-holders or any approval or consent of any Person under any contractual obligation of such Obligor, except for such approvals or consents which will be obtained on or before the date hereof, (iv) conflict with or violate any applicable laws, or (v) result in or require the creation or imposition of any Lien upon any of its properties or assets (other than any Liens created hereunder).  Other than the Chapter 11 Cases, there are no actions, suits or proceedings by or before any arbitrator or governmental authority pending against or, to the knowledge of such Obligor, threatened against or affecting any Obligor (A) that arose on or after the Petition Date and as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (B) that involve the Loan Documents or the transactions contemplated hereby.  It is not an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.  No representation or warranty of any Obligor contained in any Loan Document or in any other documents, certificates or statements given to the DIP Lender for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made.  There are no facts known (or which should upon the reasonable exercise of diligence be known) to the Borrower (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements given to the DIP Lender for use in connection with the transactions contemplated hereby.

(b)     Collateral Representations. It owns the Collateral purported to be owned by it or otherwise has rights or the power to transfer rights in the Collateral in which it purports to grant a security interest hereunder and no Lien exists upon the Collateral other than (i) the security interest created or provided for herein and (ii) Permitted Liens. The full and correct legal name, type of organization, jurisdiction of organization and mailing address of each Obligor are correctly set forth in Schedule I.

(c)     *Bankruptcy Representations.*

(i)     The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motions seeking approval of the Loan Documents and the Interim Order, and (y) the hearing for the approval of the Interim Order was given in each case.  Borrower shall give, on a timely basis as specified in the DIP Orders, all notices required to be given to all parties specified in the DIP Orders.

(ii)     all Obligations (x) and all other obligations of the Obligors under the Loan Documents at all times shall constitute allowed super-priority administrative expense claims in the Chapter 11 Cases having the priority set forth in the DIP Orders and (y) are secured by a Lien on all assets of the Obligors (now existing or hereafter acquired) and all proceeds thereof and such Lien has the priority set forth in the DIP Orders.

(iii)     The Interim Order and Final Order (on and after the Final Funding Date), as applicable, and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of the DIP Lender.

(iv)     The Approved Budget was prepared in good faith by the management of the Obligors, based on assumptions believed by the management of the Obligors to be reasonable at the time made and upon information believed by the management of the Obligors to have been accurate based upon the information available to the management of Obligor at the time such Approved Budget was furnished.

(d)     *Purpose of Loans; Cash Collateral.*  Cash Collateral and proceeds of the Loans shall solely be used in the manner specified in clause (g) of Annex B.

10.     <u>Covenants</u>.  Each Obligor covenants and agrees as provided in <u>Annex B</u>.

11.     <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial, Etc.</u>  This Note shall be governed by, and construed in accordance with, the law of the State of New York except to the extent superseded by the Bankruptcy Code. **ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS NOTE OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS NOTE, EACH OBLIGOR HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT AND IRREVOCABLY WAIVES ANY OBJECTION IN RESPECT THEREOF.  EACH OBLIGOR HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE OBLIGORS AT THEIR ADDRESS FOR NOTICES AS SET FORTH IN SECTION 12.  EACH OBLIGOR AND THE DIP LENDER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS NOTE OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS NOTE, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  EACH OBLIGOR HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE DIP LENDER ENTERING INTO THIS NOTE.**

EXECUTION VERSION

12.    Expenses; Amendments; Indemnity; Notices.

(a)    *Expenses*. The Borrower shall promptly pay on demand all costs and expenses of the DIP Lender whether incurred prior to, on, or after the Petition Date (i) in connection with the negotiation, preparation, administration, execution, implementation or consummation of the Loan Documents and any other agreement in connection therewith (other than any document regarding the purchase of any assets of the Obligors by DIP Lender, which expenses shall be separately addressed), including filing fees, taxes, assessments, attorney's fees and expenses and the allocated cost of any internal counsel to the DIP Lender and (ii) in connection with each amendment, forbearance, waiver, consent, refinancing, restructuring, reorganization (including any fees (including attorneys' fees) and costs incurred by the DIP Lender, in its capacity as such, for any reason in respect of the bankruptcy of the Borrower), enforcement or attempted enforcement, and any matter related thereto, and in each case including all out of pocket expenses of the DIP Lender or DIP Lender's attorneys that are related thereto. The Borrower shall pay on demand all reasonable fees and costs of consultants, appraisers, accountants and the like engaged by the DIP Lender in respect of the Borrower's obligations hereunder. Notwithstanding the foregoing, the DIP Lender shall concurrently provide copies of any invoices with respect to the costs and expenses specified in this Section 12(a) to the Bankruptcy Administrator, counsel to the Prepetition Lender and counsel to the Committee (if any) and allow such parties up to ten (10) Business Days to review and object to any fees and expenses requested therein and if any objection is asserted, the Obligors shall promptly pay the undisputed portion of such fees and expenses and the Bankruptcy Court shall decide the issue as to any unresolved dispute related to fees and expenses. Upon resolution by the Bankruptcy Court of such disputed fees and expenses, the Obligors shall promptly cause the same to be paid to the DIP Lender.

(b)    *Amendments*. This Note may not be changed, modified or terminated orally, but only by an agreement in writing signed by the Obligors and the DIP Lender.

(c)    *Indemnity*. The Obligors agree, jointly and severally, to indemnify the DIP Lender and the Prepetition Lender and each of their Related Parties (each such Person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable and documented out-of-pocket counsel and consultant or other expert fees, charges and disbursements incurred by, or asserted against, any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution, performance or delivery of the Loan Documents or Prepetition Loan Documents or any agreement or instrument contemplated hereby or thereby, the performance by the parties thereto of their respective obligations hereunder or thereunder, the Chapter 11 Cases, the borrowings hereunder and the other transactions contemplated by the Loan Documents and the Prepetition Loan Documents, (ii) the use or proposed use of the proceeds of the Loans or the loans under the Prepetition Loan Documents or (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have arisen from the gross negligence, bad faith or willful misconduct of such Indemnitee or of its Related Parties.

(d)    *Notices*. All notices and other communications in respect of this Note shall be given or made in writing at the address set forth (i) on the signature pages hereto for the DIP Lender and on Schedule I hereto for the Obligors.  Except as otherwise provided in this Note, all such communications shall be deemed to have been duly given when transmitted by electronic transmission or personally delivered or, in the case of a mailed notice, upon receipt, in each case given or addressed as aforesaid. For purposes of this Note, any notice delivered to the Borrower shall be deemed delivered to all Obligors.

13.    Right of Setoff.  If an Event of Default shall have occurred and be continuing, the DIP Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable

CHAR2\2245920v2

EXECUTION VERSION

law, to set off and apply any and all deposits at any time held and other obligations at any time owing by the DIP Lender to or for the credit or the account of any Obligor against any and all of the obligations of such Obligor now or hereafter existing hereunder to the DIP Lender or, irrespective of whether or not the DIP Lender shall have made any demand hereunder and although such obligations of the Borrower may be contingent or unmatured or are owed to a branch or office of the DIP Lender different from the branch or office holding such deposit or obligated on such indebtedness.

14.     <u>Assignments</u>.  The Borrower may not assign any of its rights or obligations under this Note or the other Loan Documents without the consent of the DIP Lender.  The DIP Lender may at any time assign all or a portion of its rights and obligations under this Note and the other Loan Documents without the prior written consent of any party.

15.     <u>Conditions Precedent to Interim Funding</u>.  The obligation of the DIP Lender to lend the Interim Loan to the Borrower is subject to the satisfaction (or waiver by the DIP Lender) of the following conditions (the date on which such conditions are satisfied being referred to herein as the "<u>Closing Date</u>"):

(a)     *Loan Documents*.  The DIP Lender shall have received this Note executed and delivered by each of the Obligors.

(b)     *UCC Searches*. The DIP Lender shall have received the results of a search of the Uniform Commercial Code filings (or equivalent filings) made with respect to each Obligor in its state of formation.

(c)     *Representations and Warranties*.  The representations and warranties contained in this Note and each other Loan Document shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of the Closing Date (or in the case of the funding of the Final Loans on the Final Funding Date referred to below, as of such date).

(d)     *Fees and Expenses*.  The DIP Lender shall have received all fees and expenses due and payable to DIP Lender on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all reasonable and documented expenses (including reasonable and documented fees, charges and disbursements of counsel and other advisors subject to the provisions of the DIP Orders).

(e)     *Defaults*.  There shall be no default or Event of Default under the Loan Documents before and after giving effect to the relevant borrowing.

(f)     *Material Adverse Effect*.  Since the Petition Date, no event or circumstance or change shall have occurred that has or could be reasonably expected have a Material Adverse Effect.

(g)     *Budget*.  The DIP Lender shall have received the Initial Budget, which shall be in form and substance acceptable to the DIP Lender in its sole discretion, and such other information (financial or otherwise) as the DIP Lender may reasonably request.

(h)     *Collateral*.  The DIP Lender shall have been granted a perfected lien on the Collateral by the Interim Order on the terms and conditions set forth in this Note.

(i)     *Litigation*. Except for claims, actions, suits, investigations, litigation or proceedings stayed by § 362 of the Bankruptcy Code, there shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending in any court or before any arbitrator or governmental authority that, in the reasonable opinion of the DIP Lender, singly or in the aggregate, could have a Material Adverse Effect and there shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or governmental

authority that, in the reasonable opinion of the DIP Lender, which relates to the Loans or the transactions contemplated by the Loan Documents.

(j)    *CRO*. Brian Rosenthal of MERU shall have been appointed chief restructuring officer of the Obligors.

(k)    *Bankruptcy Related Conditions.*

(i)    The Chapter 11 Cases shall have been commenced in the Bankruptcy Court by February 7, 2020 and all of the "first day orders" and all related pleadings to be filed at the time of commencement of the Chapter 11 Cases or shortly thereafter shall be in form and substance satisfactory to the DIP Lender.

(ii)    The Interim Order shall have been entered by the Bankruptcy Court (and no appeal thereof shall have been filed or remain pending) no later than five (5) days after the Petition Date, the DIP Lender shall have received a true and complete copy of such order and such order shall be in form and substance satisfactory to the DIP Lender in all respects, be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed or vacated absent prior written consent of the DIP Lender.

(iii)    All orders other than the DIP Orders relating to the Loans, Loan Documents or the Prepetition Obligations entered by the Bankruptcy Court, including without limitation orders pertaining to adequate protection (collectively, the "Non-DIP Orders"), and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the DIP Lender and Prepetition Lender in their respective sole discretion, be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed or vacated absent prior written consent of the DIP Lender.

(iv)    The Obligors shall be in compliance with each Chapter 11 Order.

(v)    No appeal of the DIP Orders shall have been filed or remain pending.

16.    Conditions Precedent to Final Funding. The obligation of the DIP Lender to lend the Final Loans to the Borrower is subject to the satisfaction of the conditions set forth in Section 15 (as of the Final Funding Date) and the following (the date on which such conditions are satisfied being referred to herein as the "Final Funding Date"):

(a)    *Approved Budget*. The DIP Lender shall have received all periodic updates required hereunder with respect to the Approved Budget, each in form and substance satisfactory to the DIP Lender in its sole discretion, and the Obligors shall be in compliance with the Approved Budget.

(b)    *Final Order*. The Final Order shall have been entered by the Bankruptcy Court (and no appeal thereof shall have been filed or remain pending) not later than twenty-eight (28) days after the Petition Date, and such Final Order shall (i) have included waivers of (x) the automatic stay in connection with the DIP Lender's enforcement of remedies upon an Event of Default, (y) any surcharge of costs or expenses with respect to the Prepetition Lender or DIP Lender's interest in the Collateral under sections 506(c) and 552 of the Bankruptcy Code or any other statue or applicable law permitting a surcharge of the Collateral, and (z) the equitable doctrine of marshaling, and otherwise be in form and substance satisfactory to the DIP Lender, be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated (in whole or in part) absent prior written consent of the DIP Lender and (ii) grant a perfected lien on the Collateral in favor of the DIP Lender on the terms and conditions set forth in this Note.

CHAR2\2245920v2

17.    <u>Credit Bid</u>. Each Obligor hereby irrevocably authorizes the DIP Lender and Prepetition Lender (or their respective designees), to bid and purchase by credit bidding their respective claims or otherwise (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted (i) under the provisions of the UCC, including pursuant to sections 9-610 or 9-620 of the UCC, (ii) under the provisions of the Bankruptcy Code, including sections 363, 365 and 1129 of the Bankruptcy Code or (iii) in accordance with Applicable Law (any such sale described clauses (i), (ii) or (iii), a "<u>Collateral Sale</u>"), and in connection with any Collateral Sale; <u>provided</u> that, in the case of the Prepetition Lender, the following conditions must be met: (a) such credit bid by the Prepetition Lender may be exercised only at an auction in the event that a third-party (other than the SRI Operating Company, an Oklahoma corporation, or an affiliate thereof  (the "<u>Purchaser</u>") or the Prepetition Lender) timely submits a bid that is higher and otherwise better than the Purchaser's bid; (b) prior to the auction, the Prepetition Lender identifies an operator that is acceptable to Purchaser in its sole discretion, and provides adequate assurance of future performance in connection with the assumption and assignment of the franchise agreements; and (c) contains a minimum cash component necessary to pay, among other things, the Obligations, the Bid Protections and any cure payments necessary associated with the assumption/assignment of executory contracts and unexpired leases, including amounts owing to the Purchaser (or its affiliates') under its franchise agreements.

18.    <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any person shall be construed to include such person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Note in its entirety and not to any particular provision hereof, (d) all references herein to Sections shall be construed to refer to Sections of this Note and (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, supplemented or otherwise modified from time to time.  The rules of construction set forth in this Section 18 shall be applicable to the Loan Documents mutatis mutandis.

*[signature pages follow]*

**EXECUTION VERSION**

IN WITNESS WHEREOF, the undersigned have caused this Note to be executed and delivered by their duly authorized officers, as of the date and year and at a place first above written.

**SD-CHARLOTTE, LLC**, as Borrower

By: _____

Name:

Title:

**SD-MISSOURI, LLC**, as a Guarantor

By: _____

Name:

Title:

**RTHT INVESTMENTS, LLC**, as a Guarantor

By: _____

Name:

Title:

**SD RESTAURANT GROUP, LLC**, as a Guarantor

By: _____

Name:

Title:

**SOUTHERN DELI HOLDINGS, LLC**, as a Guarantor

By: _____

Name:

Title:

Confirmed, Acknowledged and Agreed:

**SRI HOLDING COMPANY**, as DIP Lender

By: _____

Name:

Title:

CHAR2\2245920v2

ANNEX A

Definitions.  The following capitalized terms, when used in this Note, shall have the following meanings:

"Acquired Assets" means all of the Borrower's and SD-Missouri, LLC's rights, titles and interests in and relating to (i) those certain Sonic Drive-In restaurant locations listed on Schedule II hereto (the "Sonic Assets"); and (ii) the Designated Contracts.

"Approved Budget" means each of (a) the Initial Budget and (b) any subsequent Budget delivered by the Borrower and approved in writing by the DIP Lender and Prepetition Lender in their respective sole discretion.

"Avoidance Actions" means all causes of action arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), 732(2) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as applicable to the Chapter 11 Cases, now and hereafter in effect or any successors to such statute.

"Bankruptcy Court" means the United States Bankruptcy Court for the Western District of North Carolina.

"Bid Protections" has the meaning set forth in that certain SD-Charlotte, LLC et al. Term Sheet for Debtor-In-Possession Financing and Sale of Assets Under Section 363 of The Bankruptcy Code with respect to, among other things, the Loans issued under this Note.

"Business Day" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of New York.

"Budget" means a 13-week rolling operating budget and cash flow forecast, in form and substance satisfactory to the DIP Lender and the Prepetition Lender in their respective sole discretion, which shall reflect the Borrower's good faith projection of all weekly cash receipts and disbursements in connection with the operation of the Obligors and their respective Subsidiaries business during such 13-week period, as such budget and forecast may be updated from time to time in accordance with the terms of this Note.

"Budget Event" means (a) the actual amount of aggregate cumulative operating disbursements and expenses (excluding professional fees and expenses) during any Budget Testing Period shall exceed the projected operating disbursements (on a cumulative basis) in the Approved Budget for such Budget Testing Period by more than 10% or (b) the aggregate amount of actual receipts during any Budget Testing Period shall be less than 90% of the aggregate cumulative receipts in the Approved Budget for such Budget Testing Period (the variances described in (a) and (b), the "Permitted Variance", and such Permitted Variance subject to receipt by DIP Lender of the Variance Report).

"Budget Testing Date" means the fourth Business Day of each calendar week.

"Budget Testing Period" means, with respect to the initial Budget Testing Date, the period beginning on the Petition Date and ending on the Friday immediately preceding the initial Budget Testing Date and for each Budget Testing Date thereafter, the one-week period ending on the Friday immediately preceding the Budget Testing Date.

"Cash Collateral" has the meaning assigned to such term in the DIP Orders.

"Carve-Out" has the meaning assigned to such term in the DIP Orders.

"Cash" means money, currency or a credit balance in any demand or deposit account.

"Change of Control" means that the Obligors shall, directly or indirectly, in one or more related transactions, (a) consolidate or merge with or into another Person, or (b) sell, assign, license, lease, transfer, convey or otherwise dispose of all or substantially all of their properties or assets to another Person or (c) consummate a stock purchase agreement or other business combination (including a reorganization, recapitalization, spin-off or scheme of arrangement).

"Chapter 11 Cases" means the voluntary cases commenced by the Obligors under Chapter 11 of the Bankruptcy code in the Bankruptcy Court.

"Chapter 11 Orders" means the DIP Orders and the Non-DIP Orders.

"Claim" has the meaning assigned to such term in section 101(5) of the Bankruptcy Code.

"Commitment" means (i) the commitment of the DIP Lender to make Loans hereunder *plus* (ii) for purposes of computing the Commitment Fee, $450,000.

"Controlled Account" means a deposit account maintained by an Obligor at a depository approved by the DIP Lender and, if requested by the DIP Lender, that is subject to a deposit account control agreement in favor of the DIP Lender (each, a "DACA").

"DIP Orders" means, collectively, the Interim Order and the Final Order.

"Debtor Relief Law" means the Bankruptcy Reform Act of 1978, codified as 11 U.S.C. §§101 et seq, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Designated Contracts" means the executory contracts and unexpired leases to be assumed, sold and assigned to the purchaser at a 363 Sale of the Acquired Assets.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Final Order" means the final order of the Bankruptcy Court with respect to the Obligors, among other things, approving the Note and the other Loan Documents and granting the Prepetition Lender adequate protection, in form and substance satisfactory to the DIP Lender and Prepetition Lender in all respects, as the same may be amended, modified or supplemented from time to time with the express written consent of the DIP Lender and Prepetition Lender.

"Guarantors" means signatories hereto designated as a "Guarantor".

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred

in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all guarantees by such Person of Indebtedness of others, (h) all capital lease obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Initial Budget" shall mean the Budget prepared by the Borrower and furnished to and approved in writing by the DIP Lender and the Prepetition Lender in the form of Exhibit A hereto.

"Interim Order" means the interim order of the Bankruptcy Court with respect to the Obligors, among other things approving the Note and the other Loan Documents and granting the Prepetition Lender adequate protection, in form and substance satisfactory to the DIP Lender and Prepetition Lender in all respects, as the same may be amended, modified or supplemented from time to time with the written consent of the DIP Lender and Prepetition Lender.

"Lien" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Equity Interests, any purchase option, call or similar right of a third party with respect to such Equity Interests.

"Loan Documents" means this Note, the Budget, any other documents, instruments or agreements entered into or made by the DIP Lender and/or the Borrower in connection with the foregoing, together with the DIP Orders.

"Material Adverse Effect" means a material adverse effect on and/or material adverse developments (except for the commencement of the Chapter 11 Cases and the effects that customarily result therefrom) with respect to (i) the business, operations, properties, assets or condition (financial or otherwise) of the Obligors, (ii) the ability of any Obligor to fully and timely perform its Obligations, (iii) the legality, validity, binding effect or enforceability against an Obligor of any Loan Document or (iv) the rights, remedies and benefits available to, or conferred upon, the DIP Lender under this Note or any other Loan Document.

"Maturity Date" means, unless extended by the DIP Lender and the Prepetition Lender in their respective sole and absolute discretion, the earliest to occur of (i) May 7, 2020, (ii) the date that is twenty-eight (28) days after the Petition Date, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (iii) the effective date of any plan of reorganization and/or a plan of liquidation of the Obligors confirmed by the Bankruptcy Court, (iv) the earlier of (x) the 363 Sale Effective Date or (y) consummation of a sale of any Sonic Assets or any assets relating to the Obligors' right, title and interest in and to their MOD Pizza restaurant locations, (v) the date the Bankruptcy Court (x) orders the conversion of the bankruptcy case of any Obligor to a case under Chapter 7 of the Bankruptcy Code or (y) dismisses the Chapter 11 Cases with respect to any Obligor, and (vi) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Note.

"Obligations" means, collectively, (a) in the case of the Borrower, all obligations of the Borrower under this Note and the other Loan Documents to pay principal, fees, interest (including default interest),

expenses and other amounts whatsoever, whether direct or indirect, absolute or contingent, now or hereafter from time to time owing by the Borrower to the DIP Lender, and (b) in the case of the Guarantors, all obligations of the Guarantors in respect of its guarantee under Section 5 and all other obligations of the Guarantors under this Note or any other Loan Document and (c) in the case of each of the foregoing, including all interest thereon and expenses related thereto.

"Obligors" means the Borrower and the Guarantors.

"Official Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

"Permitted Adequate Protection Payments" means any adequate protection payments to the Prepetition Lender and Prepetition Agent in accordance with the DIP Orders.

"Permitted Investments" means investments expressly contemplated by the Approved Budget (including any Permitted Variances).

"Permitted Liens" means, with respect to any person: (a) Liens arising by operation of law which were incurred in the ordinary course of business and which do not in the aggregate materially detract from the value of the property subject thereto or materially impair the use thereof in the operations of the business of such person; (b) pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other similar social security legislation; (c) Liens securing taxes, assessments and other governmental charges, the payment of which is not yet due or is being contested in good faith by appropriate proceedings promptly initiated and diligently conducted and for which such reserve or other appropriate provisions, if any, as shall be required by generally accepted accounting principles shall have been made; (d) Liens in respect of the Prepetition Obligations; (e) Liens existing on the Petition Date; and (f) Liens granted pursuant to the DIP Orders.

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governmental authorities.

"Petition Date" means the date on which the Obligors commenced the Chapter 11 Cases which is February 7, 2020.

"Prepetition Agent" means Bridge Funding Group, Inc. in its capacity as administrative under the loan agreement referenced in clause (ii) in the definition of Prepetition Loan Agreement.

"Prepetition Collateral" means collectively "Collateral" as defined in each of the Prepetition Loan Documents.

"Prepetition Lender" means Bridge Funding Group, Inc.

"Prepetition Loan Agreements" means collectively, (i) Development Line Loan and Security Agreement, dated as of December 27, 2017, between the Obligors party thereto and the Prepetition Lender, and (ii) Loan Agreement, dated as of May 11, 2018 between the Obligors party thereto and the Prepetition Lender.

"Prepetition Loan Documents" means the Prepetition Loan Agreements and all instruments and documents executed at any time in connection with either thereof.

CHAR2\2245920v2

"<u>Prepetition Note</u>" means the Secured Promissory Note dated as of February 5, 2020 whereby the DIP Lender, with the consent of the Prepetition Lender, provided a bridge loan to SD-Missouri, LLC in the aggregate principal sum of $450,000.

"<u>Prepetition Note Obligations</u>" means "Obligations" as defined in the Prepetition Note, the outstanding principal amount of which as of the Closing Date is $450,000.

"<u>Prepetition Obligations</u>" means all indebtedness, obligations and liabilities of the Obligors to the Prepetition Agent and the Prepetition Lender incurred prior to the Petition Date arising from or related to the Prepetition Loan Agreement and the other agreements, instruments and other documents related thereto including fees, premiums, expenses, indemnities and reimbursement obligations due thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"<u>Related Parties</u>" shall mean, with respect to any specified Person, such Person's affiliates and the respective equityholders, managers, investors, fiduciaries, trustees, officers, directors (including directors or authorized signatories of the general partner of any Person), employees, agents, advisors, representatives, controlling persons, members, partners, successors and permitted assigns of such Person and such Person's affiliates.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in any of the Obligors or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests.

"<u>Sellers</u>" means collectively SD-Charlotte, LLC and SD-Missouri, LLC.

"<u>Subsidiary</u>" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"<u>UCC</u>" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"<u>Variance Report</u>" has the meaning set forth in clause (k) of Annex B.

*[remainder of page intentionally left blank]*

CHAR2\2245920v2

ANNEX B

Each Obligor covenants and agrees as follows:

(a)      <u>Indebtedness</u>.    The Obligors shall not create, incur, assume or permit to exist any Indebtedness, except:

(i)      Indebtedness created hereunder;

(ii)     Indebtedness of any Obligor to any other Obligor;

(iii)    Indebtedness existing in respect of the Prepetition Obligations;

(iv)     Indebtedness existing on the Petition Date;

(v)      Indebtedness incurred in the ordinary course of business; and

(vi)     other unsecured Indebtedness in an aggregate principal amount not exceeding $50,000 at any time outstanding.

(b)      <u>Liens</u>.    The Obligors shall not create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except Permitted Liens.

(c)      <u>Fundamental Changes</u>.    The Obligors shall not merge into or consolidate with any other Person (other than an Obligor), or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) any assets except in the ordinary course of business, or any stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve.

(d)      <u>Investments, Loans, Advances, Guarantees and Acquisitions</u>.    The Obligors shall not purchase, hold or acquire (including pursuant to any merger with any Person that was not an Obligor prior to such merger) any capital stock, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except Permitted Investments and investments by the Obligors existing on the date hereof in the capital stock of their respective Subsidiaries.

(e)      <u>Restricted Payments</u>.    The Obligors shall not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except Restricted Payments expressly identified and provided for in the Approved Budget (including any Permitted Variances).

(f)      <u>Transactions with Affiliates</u>.    The Obligors shall not sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its affiliates, except transactions expressly identified and provided for in the Approved Budget (including any Permitted Variance).

(g)      <u>Use of Proceeds/Collateral</u>.    No portion of any Cash Collateral or proceeds of the Loans shall be used in any manner that is not permitted by the DIP Orders and expressly provided for or included in the Approved Budget (including any Permitted Variance).

(h)    <u>Milestones</u>.  The Obligors shall ensure that the following actions are completed on a timely basis:

(i)    no later than ten (10) days after the Petition Date, Sellers shall file a motion in form and substance satisfactory to the DIP Lender and Prepetition Lender seeking approval of bid procedures for a sale pursuant to section 363 of the Bankruptcy Code of the Acquired Assets (the "<u>Bidding Procedures</u>") with the ability of the DIP Lender (or an affiliate thereof) and/or the Prepetition Lender (or an affiliate thereof) to credit bid up to the full amount of its claims (whether arising under this Note or the Prepetition Credit Agreements and which credit bid may provide for the assignment of the right to purchase the acquired assets to a newly formed acquisition vehicle) (the "<u>363 Sale</u>");

(ii)    no later than twenty-eight (28) days after the Petition Date, the Bankruptcy court shall enter the Final Order, in form and substance satisfactory to the DIP Lender and Prepetition Lender;

(iii)    no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Bidding Procedures in a form satisfactory to SRI Holding Company, an Oklahoma corporation, the DIP Lender and the Prepetition Lender;

(iv)    no later than fifty-five (55) days after the Petition Date, the Obligors shall have commenced an auction for the sale of the Acquired Assets pursuant to the Bidding Procedures; and

(v)    no later than sixty (60) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the 363 Sale (such date, the "<u>363 Sale Effective Date</u>").

(i)    <u>Cash Management.</u>  The Borrower shall (i) at all times maintain proceeds of the Loans in a Controlled Account and otherwise maintain cash managements systems acceptable to the DIP Lender and in accordance with the applicable Chapter 11 Orders and (ii) not withdraw proceeds of the Loans from a Controlled Account in excess of the maximum amount projected to be utilized during the next weekly period set forth in the Approved Budget (including any Permitted Variance).

(j)    <u>Variance Report</u>.  The Borrower shall deliver to the DIP Lender and the Prepetition Lender by 5:00 p.m. prevailing Eastern Time on each Budget Testing Date a budget variance report/reconciliation (in form and substance satisfactory to the DIP Lender and Prepetition Lender) certified by a responsible officer of the Borrower (such budget report/reconciliation, the "<u>Variance Report</u>") setting forth: (i) current cash balance calculations as of the immediately preceding Friday and (ii) by line item actual cash receipts, disbursements, professional fees, capital expenditures, and billings for the immediately preceding week, the immediately preceding rolling four-weeks and on a cumulative period on and after the entry of the Interim Order, noting therein all variances, on a line-item basis, from amounts set forth for such period in the Approved Budget, and shall include explanations for all material variances for such week; <u>provided</u> that that the reconciliations in the preceding clause (ii) shall be delivered beginning on the Budget Testing Day dated February 20, 2020.

(k)    <u>Chapter 11 Filings</u>.  The Borrower shall furnish to the DIP Lender and Prepetition Lender and their respective counsel (i) in advance of filing, the motion seeking approval of and proposed forms of the Interim Order and Final Order, which motion shall be in form and substance satisfactory to the DIP Lender and Prepetition Lender in their respective sole discretion, (ii) as applicable, any motions seeking approval of the Bidding Procedures and any sale pursuant to section 363 of the Bankruptcy Code of any assets of the Obligors, and the proposed forms of orders related thereto, which shall be in form and substance satisfactory to the DIP Lender and Prepetition Lender in their respective sole discretion, (iii) any such proposed orders and pleadings relating to the Loan Documents, which orders and pleadings shall be

in form and substance satisfactory to the DIP Lender and Prepetition Lender in their respective sole discretion, (iv) as applicable, any Chapter 11 plan and/or any disclosure statement relating to such plan (which plan or disclosure statement shall comply with the requirements set forth herein); (v) all "first-day" pleadings and proposed interim and final orders related thereto; (vi) any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive, retention or severance plan, or the assumption, rejection, modification or amendment of any material contract (each of which must be in form and substance satisfactory to the DIP Lender and the Prepetition Lender in their respective sole discretion); and (vii) to the extent not covered by the preceding clauses (i) – (vi) promptly after the same is available, copies of all other pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrower or any other Obligor with the Bankruptcy Court in the Chapter 11 Cases.

(l)       <u>Chapter 11 Orders</u>.  The Borrower shall comply with each Chapter 11 Order.

(m)      <u>Further Assurances</u>. Each Obligor shall promptly from time to time give, execute, deliver, file, record, authorize or obtain all such financing statements, continuation statements, notices, instruments, documents, agreements or consents or other papers as may be necessary or, in the judgment of the DIP Lender, desirable to create, preserve, perfect, maintain the perfection of or validate the security interest granted pursuant hereto or to enable the DIP Lender to exercise and enforce its rights hereunder with respect to such security interest.

CHAR2\2245920v2

Schedule I

Legal Names of Obligors

| Legal Name of Obligor | Type of Entity | Jurisdiction of Organization | Notice Information |
|---|---|---|---|
| RTHT Investments, LLC | Limited Liability Company | Delaware | 131 East Lincoln Ave., Ste C<br>Fort Collins, CO 80524<br>Attn: Brian Rosenthal, CRO |
| SD Restaurant Group, LLC | Limited Liability Company | Delaware | 131 East Lincoln Ave., Ste C<br>Fort Collins, CO 80524<br>Attn: Brian Rosenthal, CRO |
| SD-Charlotte, LLC | Limited Liability Company | Delaware | 131 East Lincoln Ave., Ste C<br>Fort Collins, CO 80524<br>Attn: Brian Rosenthal, CRO |
| SD-Missouri, LLC | Limited Liability Company | Delaware | 131 East Lincoln Ave., Ste C<br>Fort Collins, CO 80524<br>Attn: Brian Rosenthal, CRO |
| Southern Deli Holdings, LLC | Limited Liability Company | Delaware | 131 East Lincoln Ave., Ste C<br>Fort Collins, CO 80524<br>Attn: Brian Rosenthal, CRO |

CHAR2\2245920v2

Schedule II

Sonic Assets

**Store #**

| | | | |
|---|---|---|---|
| Sonic 1091 | 2115 E Andrew Johnson Hwy | Greeneville | TN |
| Sonic 2315 | 4515 Chapman Hwy | Knoxville | TN |
| Sonic 2945 | 308 E Main Street | Sevierville | TN |
| Sonic 3183 | 3307 N Broadway | Knoxville | TN |
| Sonic 3333 | 1319 State Street | White Pine | TN |
| Sonic 3824 | 256 W Broadway | Newport | TN |
| Sonic 4437 | 1033 Highway 92 South | Dandridge | TN |
| Sonic 5727 | 7519 Mountain Grove Drive | Knoxville | TN |
| Sonic 5650 | 2246 Parkway | Pigeon Forge | TN |
| Sonic 5789 | 10642 Chapman Hwy | Seymour | TN |
| Sonic 2841 | 3555 Franklin Road SW | Roanoke | VA |
| Sonic 5552 | 4504 Challenger Avenue | Roanoke | VA |
| Sonic 5604 | 5040 Rutgers Blvd, Bldg B | Roanoke | VA |
| Sonic 5871 | 150 Holt Garrison Parkway | Danville | VA |
| Sonic 6513 | 999 Independence Blvd | Bedford | VA |
| Sonic 4877 | 14315 E. Independence Blvd. | Indian Trail | NC |
| Sonic 5133 | 2525 S New Hope Rd | Gastonia | NC |
| Sonic 5425 | 7820 Forest Point Boulevard | Charlotte | NC |
| Sonic 5701 | 265 Mt Holly-Huntersville Rd | Charlotte | NC |
| Sonic 1697 | 1015 Volunteer Parkway | Bristol | TN |
| Sonic 2320 | 1124 E Stone Drive | Kingsport | TN |
| Sonic 3480 | 1214 E Main Street | Rogersville | TN |
| Sonic 4156 | 3845 Fort Henry Drive | Kingsport | TN |
| Sonic 4323 | 2709 W State St | Bristol | TN |
| Sonic 5763 | 695 Commonwealth Drive | Norton | VA |
| Sonic 5839 | 2308 West Stone Drive | Kingsport | TN |
| Sonic 1872 | 355 N Franklin Street | Christiansburg | VA |
| Sonic 1298 | 602 Market Street | North Tazewell | VA |
| Sonic 2788 | 647 E Main | Pulaski | VA |
| Sonic 3236 | 790-B E Main Street | Wytheville | VA |
| Sonic 3358 | 113 W Main Street | Radford | VA |
| Sonic 4804 | 500 Boundary St Sw | Newton | NC |
| Sonic 4983 | 2204 S. Sterling Street | Morganton | NC |
| Sonic 4725 | 128 Williamson Road | Mooresville | NC |
| Sonic 1996 | 1003 W Elk Avenue | Elizabethton | TN |
| Sonic 2282 | 2619 N Roan Street | Johnson City | TN |

| Sonic 2290 | 3300-A W Market Street | Johnson City | TN |
| Sonic 2490 | 1153 S Cumberland Street | Morristown | TN |
| Sonic 3327 | 2403 W Andrew Johnson Hwy | Morristown | TN |
| Sonic 3664 | 1210 N Main St | Marion | VA |
| Sonic 3700 | 877 Old Airport Road | Bristol | VA |
| Sonic 3213 | 208 Avalon | Muscle Shoals | AL |
| Sonic 3348 | 914 Highway 72 East | Athens | AL |
| Sonic 3440 | 3763 Sullivan Street | Madison | AL |
| Sonic 3574 | 2650 Helton Dr | Florence | AL |
| Sonic 3722 | 1325 6th Avenue SE | Decatur | AL |
| Sonic 4108 | 7871 Highway 72 West | Madison | AL |
| Sonic 4436 | 2841 Florence Blvd | Florence | AL |
| Sonic 5279 | 12438 Alabama Hwy 157 | Moulton | AL |
| Sonic 1090 | 354 East Meighan Blvd | Gadsden | AL |
| Sonic 3426 | 3507 Summerville Rd | Phenix City | AL |
| Sonic 3507 | 1705 Columbus-Manchester Exp | Columbus | GA |
| Sonic 3733 | 8269 U S Highway 431 North | Albertville | AL |
| Sonic 3389 | 1810 Wynnton Road | Columbus | GA |
| Sonic 4439 | 5586 Milgen Road | Columbus | GA |
| Sonic 5270 | 3464 Victory Dr | Columbus | GA |
| Sonic 6006 | 5555 Whittlesey Blvd Lot 13 | Columbus | GA |
| Sonic 3446 | 322 N Dean Road | Auburn | AL |
| Sonic 3530 | 1705 S Broad Ave | Lanett | AL |
| Sonic 4675 | 1703 S College St | Auburn | AL |
| Sonic 5364 | 2100 Frederick Road | Opelika | AL |
| Sonic 1246 | 1829 E Main Street | Prattville | AL |
| Sonic 3167 | 5801 Atlanta Highway | Montgomery | AL |
| Sonic 4100 | 2025 Carter Hill Road | Montgomery | AL |
| Sonic 4378 | 1901 Coliseum Blvd | Montgomery | AL |
| Sonic 5267 | 77 Dudley Dr | Millbrook | AL |
| Sonic 5365 | 7065 East Chase Pkwy | Montgomery | AL |
| Sonic 1112 | 3222 Bob Wallace Ave | Huntsville | AL |
| Sonic 1114 | 2120 Sparkman Dr Nw | Huntsville | AL |
| Sonic 3946 | 11606 Memorial Parkway Sw | Huntsville | AL |
| Sonic 4325 | 907 Jordan Lane NW | Huntsville | AL |
| Sonic 5503 | 366 Sutton Road | Hampton Cove | AL |
| Sonic 5842 | 7230 Bailey Cove Rd | Huntsville | AL |

CHAR2\2245920v2

Exhibit A

<u>Initial Budget</u>

CHAR2\2245920v2

# EXHIBIT C

## Budget

# SD Restaurant Group

*($ in 000s)*

| | Weeks: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Remaining | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ending: | 2/9 | 2/16 | 2/23 | 3/1 | 3/8 | 3/15 | 3/22 | 3/29 | 4/5 | 4/12 | 4/19 | 4/26 | | |
| **Receipts** | | | | | | | | | | | | | | | |
| Cash Receipts [1] | $ | 275 | $ 1,553 | $ 1,587 | $ 1,803 | $ 1,769 | $ 1,896 | $ 1,919 | $ 2,016 | $ 2,057 | $ - | $ - | $ - | $ - | $ 14,875 |
| Sales Tax | | - | - | (528) | (0) | 0 | 0 | (604) | (116) | (762) | - | - | - | - | (2,010) |
| Other Receipts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Receipts | $ | 275 | $ 1,553 | $ 1,059 | $ 1,803 | $ 1,769 | $ 1,896 | $ 1,315 | $ 1,899 | $ 1,295 | $ - | $ - | $ - | $ - | $ 12,865 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Food, Beverage & Paper Supplies | $ | 190 | $ 570 | $ 550 | $ 578 | $ 578 | $ 593 | $ 606 | $ 606 | $ 606 | $ - | $ - | $ - | $ - | $ 4,876 |
| Employee Costs | | 63 | 592 | 529 | 592 | 592 | 603 | 592 | 688 | 718 | - | - | - | - | 4,967 |
| G&A | | - | 322 | 172 | 172 | 172 | 172 | 146 | 146 | 146 | - | - | - | - | 1,448 |
| Royalties | | - | 184 | 123 | 148 | 148 | 148 | 148 | 159 | 159 | - | - | - | - | 1,218 |
| Utility Deposits | | - | 284 | - | - | - | - | - | - | - | - | - | - | - | 284 |
| Rent & Lease | | - | 479 | - | 44 | 512 | - | - | - | - | - | - | - | - | 1,035 |
| Custodial / payroll tax | | - | 248 | - | - | - | - | - | - | - | - | - | - | - | 248 |
| Contingency (5%) | | 13 | 134 | 69 | 77 | 100 | 76 | 75 | 80 | 81 | - | - | - | - | 704 |
| Total Disbursements | $ | 266 | $ 2,813 | $ 1,442 | $ 1,610 | $ 2,102 | $ 1,591 | $ 1,567 | $ 1,679 | $ 1,710 | $ - | $ - | $ - | $ - | $ 14,781 |
| **Operating Cash Flow** | $ | 9 | $ (1,260) | $ (383) | $ 192 | $ (333) | $ 305 | $ (252) | $ 221 | $ (415) | $ - | $ - | $ - | $ - | $ (1,916) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| DIP Loan Cash Debt Service [2] | $ | - | $ 184 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 184 |
| Adequate Protection | | | | | | | | | | | | | | | - |
| Restructuring Costs | | - | 274 | 361 | 196 | 535 | 130 | 240 | 140 | 289 | 153 | 110 | 10 | 304 | 2,741 |
| Other | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Non-Operating Disbursements | $ | - | $ 458 | $ 361 | $ 196 | $ 535 | $ 130 | $ 240 | $ 140 | $ 289 | $ 153 | $ 110 | $ 10 | $ 304 | $ 2,925 |
| Total Disbursements | $ | 266 | $ 3,270 | $ 1,802 | $ 1,806 | $ 2,637 | $ 1,722 | $ 1,807 | $ 1,819 | $ 2,000 | $ 153 | $ 110 | $ 10 | $ 304 | $ 17,705 |
| **Net Cash Flow** | $ | 9 | $ (1,717) | $ (743) | $ (3) | $ (867) | $ 175 | $ (492) | $ 80 | $ (704) | $ (153) | $ (110) | $ (10) | $ (304) | $ (4,840) |

(1) Assumes cash at filing is zero, cash receipts include those received on the Friday filing date; final DIP budget will be updated for actual receipts and any cash at filing.

(2) Assumes interim funding in week 2 of $3.7M, which funds through week 5 and includes $450k bridge funding roll-up. Estimates final DIP funding of $0.9M through sale closing, subject to revision in final DIP budget.

(2) Includes 4% origination fee assumed to be paid in week 2; DIP interest will PIK and is assumed to be paid with sale proceeds.

MERU

## Restructuring Expenses

| ($ in 000's) | Weeks: 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Remaining [3] | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 2/9 | 2/16 | 2/23 | 3/1 | 3/8 | 3/15 | 3/22 | 3/29 | 4/5 | 4/12 | 4/19 | 4/26 | | |
| **Debtor** | | | | | | | | | | | | | | |
| MERU [1] | $  - | $  75 | $  65 | $  65 | $  65 | 48 | 48 | 48 | 48 | - | - | - | - | $  460 |
| Moore & Van Allen [1] | - | 150 | 100 | 100 | 100 | 75 | 75 | 75 | 75 | - | - | - | - | 750 |
| Investment Banker - TBD | - | - | - | - | - | - | 100 | - | - | - | 100 | - | - | 200 |
| Total Debtor Fees | - | 225 | 165 | 165 | 165 | 123 | 223 | 123 | 123 | - | 100 | - | - | 1,410 |
| **Sr. Lender Professionals** | | | | | | | | | | | | | | |
| Senior Lender Counsel | - | - | 10 | 10 | 10 | 10 | 10 | - | - | - | - | - | - | 50 |
| DIP Lender Counsel [2] | - | - | 185 | - | 135 | - | - | - | 85 | - | - | - | - | 405 |
| Total Sr. Lender Fees | - | - | 195 | 10 | 145 | 10 | 10 | - | 85 | - | - | - | - | 455 |
| **UCC Professionals** | | | | | | | | | | | | | | |
| Counsel | - | - | - | - | 24 | - | - | - | 24 | - | - | - | 12 | 60 |
| Total UCC Fees | - | - | - | - | 24 | - | - | - | 24 | - | - | - | 12 | 60 |
| **Other** | | | | | | | | | | | | | | |
| Claims Management | - | - | - | - | 200 | - | - | - | 50 | - | - | - | 50 | 300 |
| Independent Board Director | - | 10 | - | 10 | - | - | - | 10 | - | - | - | - | - | 30 |
| D&O Insurance | - | - | - | - | - | - | - | - | - | - | - | 10 | - | 10 |
| Conflict Counsel | - | 25 | - | - | - | - | - | - | - | - | - | - | - | 25 |
| Ordinary Course Professionals | - | - | - | 10 | - | - | 10 | - | - | - | 10 | - | - | 30 |
| UST Fees | - | - | - | - | - | - | - | - | - | 153 | - | - | 242 | 395 |
| Total Other | - | 35 | - | 20 | 200 | - | 10 | 10 | 50 | 153 | 10 | 10 | 292 | 790 |
| TOTAL FEES INCURRED | - | 260 | 360 | 195 | 534 | 133 | 243 | 133 | 282 | 153 | 110 | 10 | 304 | 2,715 |
| (+) EXPENSES | - | - | - | - | 28 | - | - | - | 26 | - | - | - | 20 | 74 |
| **TOTAL FEES & EXPENSES** | - | 260 | 360 | 195 | 562 | 133 | 243 | 133 | 307 | 153 | 110 | 10 | 324 | 2,789 |

*(1) Retainers for MERU ($75k) and Moore & Van Allen ($150k) to be funded upon filing.*
*(2) Includes local counsel.*
*(3) Remaining includes all run off expenses including holdbacks, payable after week 12, but does not include all professional fees associated with the wind-down; additional wind-down fees to be included in final DIP budget as needed.*

MERU