**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Joint Administration) |
| | ) | |
| SD-Charlotte, LLC, *et al.*,[1] | ) | Case No. 20-30149 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |

**DEBTORS' MOTION FOR ORDERS (I)(A) APPROVING BIDDING PROCEDURES
AND AUCTION AND (B) SCHEDULING SALE HEARING AND APPROVING NOTICE
THEREOF; (II) AUTHORIZING THE SALE OF ALL OF THE
DEBTORS' ASSETS RELATED TO THE SONIC DRIVE-IN RESTAURANTS FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER
INTERESTS; (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
AND (IV) GRANTING RELATED RELIEF**

SD-Charlotte, LLC, on behalf of itself and its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**"), hereby submits this motion (this "**Motion**") for entry of orders (I)(A) approving bidding procedures and related auction and (B) scheduling a sale hearing and approving notice thereof; (II) authorizing the sale of substantially all of the Debtors' assets related to the Sonic Drive-In restaurants free and clear of all liens, claims, encumbrances, and other interests; (III) authorizing the assumption and assignment of certain executory contracts and unexpired leases and establishing procedures to determine cure amounts and establishing deadlines for objections with respect thereto; and (IV) granting related relief. In support of this Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: SD-Charlotte, LLC (7237); RTHT Investments, LLC (2540); SD Restaurant Group, LLC (0331); SD-Missouri, LLC (8294) and Southern Deli Holdings, LLC (9425).

**Jurisdiction and Venue**

1.        This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.        The statutory predicates for the relief requested herein are sections 105(a), 363, 364, 365, 503, 507 and 554 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

**Background**

3.        On February 7, 2020 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the Court for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Western District of North Carolina (the "**Court**"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases. As of the date hereof, no creditors' committee has been appointed.

4.        Factual background relating to the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in detail in the *Declaration of Brian Rosenthal in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**") [Doc. No. 17] and is incorporated herein by reference.[2]

---

[2] Terms not defined herein are ascribed to in the First Day Declaration.

5.      Concurrently herewith, the Debtors are filing their *Motion to Shorten Notice with Respect to Debtors' Motion for Orders (I)(A) Approving Bidding Procedures and Auction and (B) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (IV) Granting Related Relief* (the "**Motion to Shorten Notice**") seeking to shorten the notice period for a hearing on this Motion.

## Facts Specific to the Relief Requested

6.      SD-Charlotte, LLC and SD-Missouri, LLC (collectively, the "**Selling Debtors**") acquired all seventy-three of their Sonic Drive-In restaurants from previous unaffiliated owners through three separate acquisition transactions that occurred between May 30, 2017 and May 30, 2018.  The Selling Debtors' Sonic Drive-In restaurants are subject to franchise agreements with Sonic Industries LLC and Sonic Franchising LLC (together, "**Sonic Corporate**"). The Selling Debtors' rights, title and interests in and relating to their seventy-three Sonic Drive-In restaurants and the assets relating thereto are referred to herein, collectively, as the "**Sonic Assets**".

7.      As detailed in the First Day Declaration, during the 18 months leading up to the Petition Date, the Debtors faced increasingly heavy liquidity pressures arising from a confluence of factors that included the leveraged acquisitions of their Sonic Assets, an unexpected $7,000,000 tax bill relating to a sale and leaseback transaction, a highly seasonal business environment and obligations under numerous merchant cash advance agreements.

8.      During the latter half of 2019, the Debtors pursued a sale process for their Sonic Assets. This sale process reached advanced stages in November and December 2019, but ultimately failed to close. Among other issues, the potential purchaser's diligence process identified liens filed in favor of parties other than the Debtors' Prepetition Secured Lender, and

3

concerns arose over the ability of the Debtors to convey their interests in the Sonic Assets free and clear of encumbrances.

9.       As noted in the First Day Declaration, the Debtors filed these Chapter 11 Cases with the goal of (a) avoiding interruptions in the operations of their restaurants and a liquidation of their businesses that would have depleted most of the value of their estates; and (b) pursuing competitive, value-maximizing sales of their assets as going concerns through a competitive auction process under section 363 of the Bankruptcy Code.  Indeed, this concern for an expeditious sale of the Sonic Assets is reflected in the Court's approval of the Debtors' postpetition financing facility (the "**DIP Facility**") with SRI Holding Company, an affiliate of Sonic Corporate (the "**DIP Lender**"), which established a timeframe enabling the Debtors to execute on the sale of the Sonic Assets without creating undue risk of loss to the DIP Lender. See Order Referencing Motion for Debtor-In-Possession Financing [Docket No. 59]. This timeframe includes certain key dates and deadlines, including milestones established under the DIP Facility (the "**Milestones**") as discussed further below.

10.       Toward these ends, prior to filing these Chapter 11 Cases, the Debtors and another affiliate of Sonic Corporate, SRI Operating Company (the "**Stalking Horse Bidder**"), along with the Debtors' prepetition secured lender, Bridge Funding Group, Inc. (the "**Prepetition Secured Lender**"), engaged in good-faith negotiations for the purchase of the Sonic Assets by the Stalking Horse Bidder. The parties reached an agreement on the salient terms and conditions for a stalking horse asset purchase agreement and are currently in the process of finalizing a definitive agreement, subject to this Court's approval. The Debtors expect to file a supplement to this Motion containing such a definitive agreement (the "**Stalking Horse Agreement**") on or before February 21, 2020.

11.      The Debtors are also in ongoing discussions with a potential stalking horse bidder for their MOD Pizza restaurants as well other potential bidders for both their Sonic Assets and MOD Pizza assets. The sale of the MOD Pizza restaurants will be addressed through a separate motion before the Court. The Debtors' primary value is in their continued operations, and the Stalking Horse Bidder is interested in acquiring the Sonic Assets as going-concern restaurants with active employee workforces.

12.      The Debtors are prepared to meet their obligations to their stakeholders and under the DIP Facility by executing on the final phases of the sale process for the Sonic Assets, which will include postpetition marketing campaigns consistent with the terms of the Bidding Procedures. Additionally, the Prepetition Secured Lender and the DIP Lender, who respectively hold the senior liens encumbering the Sonic Assets, each support the Debtors' pursuit of the sale of the Sonic Assets to the Stalking Horse Bidder (or another bidder that presents a higher or otherwise better offer) and the related relief requested in this Motion.

13.      Based on the foregoing and the facts referenced in the First Day Declaration, the Debtors believe that the best available means of maximizing the value of the Sonic Assets is to conduct the sale process described herein and attempt to increase recoveries through a competitive auction process for the Sonic Assets on the proposed timeline. In furtherance thereof, the Debtors have engaged Peak Franchise Capital, an investment banker with extensive experience in selling franchisee assets in a restructuring, to assist with soliciting bidders and potential parties in interest to create a competitive auction process contemplated by the Bidding Procedures (defined below). The Debtors also seek authority, with the consent of the DIP Lender and Prepetition Secured Lender, to provide the Stalking Horse Bidder with certain customary bid protections, including a breakup fee and expense reimbursement.

14.    The Debtors propose that the hearing to approve the Bidding Procedures be held on **March 4, 2020 at 2:00 p.m. (EST)** (the "**Bidding Procedures Hearing**"), with objections to the Bidding Procedures, if any, to be filed on or before **February 28, 2020 at 4:00 p.m. (EST)** (the "**Bidding Procedures Objection Deadline**"). The Debtors propose that the bid deadline be set for **March 24, 2020 at 4:00 p.m. (EDT)** (the "**Bid Deadline**"), and that the auction of the Selling Debtors' Sonic Assets (the "**Auction**"), if required, be scheduled for **April 1, 2020 at 10:00 a.m. (EDT)**. The Debtors propose that the Court hold the hearing to approve the sale and enter the Sale Order (the "**Sale Hearing**") on **April 8, 2020 at 10:00 a.m (EDT)** with objections to the relief requested in the Sale Order (other than with respect to the conduct of the Auction), if any, to be filed on or before **April 3, 2020 at 4:00 p.m. (EDT)** and objections to the conduct of the Auction, if any, to be filed prior to the commencement of the Sale Hearing. Further, pursuant to their post-petition financing agreement, the Debtors have agreed to close a sale by no later than [April 12, 2020] (the "**Sale Closing Date**").

## **Relief Requested**

15.    Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Bankruptcy Rules, the Debtors hereby seek entry of the following:

   a.    an order (the "**Bidding Procedures Order**"), substantially in the form attached hereto as **Exhibit A**, granting the following relief:

      i.    approving the procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1 (the "**Bidding Procedures**"), to be used in connection with one or more sales (each, a "**Sale Transaction**") of the Sonic Assets;

      ii.    approving the form of the notice attached to the Bidding Procedures Order as Exhibit 2 (the "**Notice of Auction and Sale Hearing**") of the deadline to bid on the Sonic Assets;

6

      iii.     authorizing the Debtors to enter into the Stalking Horse Agreement with the Stalking Horse Bidder (the bid of the such Stalking Horse Bidder under the Stalking Horse Agreement, a "**Stalking Horse Bid**"), and to provide certain Stalking Horse Protections (as defined below), including a Break-Up Fee (as defined below), to the Stalking Horse Bidder in connection therewith;

      iv.     scheduling (A) the Auction at **10:00 a.m. (EDT) on April 1, 2020** and (B) the Sale Hearing at **10:00 a.m. (EDT) on April 8, 2020;**

      v.     approving procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, the "**Contracts**") in connection with any Sale Transaction (the "**Assumption and Assignment Procedures**");

      vi.     approving the form and manner of notice to each relevant non-debtor counterparty to a Contract (each, a "**Counterparty**") of (A) the Debtors' calculation of the amount necessary to cure any defaults under an applicable Contract (the "**Cure Amounts**") and (B) certain other information regarding the potential assumption and assignment of Contracts in connection with a Sale Transaction, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "**Notice of Assumption and Assignment**") and granting related relief; and

b.     one or more orders (each, a "**Sale Order**"), the form of which to be provided as a supplement to this Motion prior to the Sale Hearing, granting the following relief:

      i.     authorizing one or more Sale Transactions for the sale of the Sonic Assets free and clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances as determined by the Debtors and any Successful Bidder (as defined below), with liens to attach to the proceeds of the applicable Sale Transaction;

      ii.     authorizing the assumption and assignment of certain Contracts in connection with an applicable Sale Transaction; and

      iii.     granting related relief.

16.     The Milestones include the following key dates and deadlines:

| SALE PROCESS KEY DATES AND DEADLINES | |
|---|---|
| **March 4, 2020 at 2:00 p.m. (EST)** | Bidding Procedures Hearing |
| **March 6, 2020** | Deadline to obtain entry of the Bidding Procedures Order |
| **March 24, 2020 at 4:00 p.m. (EDT)** | Bid Deadline |
| **April 2, 2020** | Auction, if necessary |
| **April 8, 2020 at 10:00 a.m. (EDT)** | Sale Hearing |
| **April 12, 2020** | Deadline for Closing of Sale Transaction |

### Stalking Horse Agreement and Stalking Horse Protections

17.     As detailed above, the Debtors and the Stalking Horse Bidder are negotiating a Stalking Horse Agreement to which the Selling Debtors would sell, transfer and assign the Sonic Assets (the "**Sale**") to the Stalking Horse Bidder for a base purchase price of $15,000,000 and the assumption of certain liabilities as will be set forth in the Stalking Horse Agreement (the "**Stalking Horse Purchase Price**"). Upon Court approval of the Stalking Horse Protections (as defined below), the Stalking Horse Bidder will enter into definitive sale documentation containing customary terms and conditions and will provide to the Debtors a good faith deposit in the amount of $1,500,000 (the "**Deposit**") to be held in escrow pursuant to an escrow agreement. At the closing of the Sale to the Stalking Horse Bidder, the Deposit shall be applied against the Stalking Horse Purchase Price.

18.     In exchange for the Stalking Horse Purchase Price, the Stalking Horse Bidder will purchase substantially all of the Sonic Assets, including, without limitation, all owned personal property, equipment, inventory, accounts, accounts receivable and intellectual property owned by the Selling Debtors necessary to operate the Sonic Drive-In locations free and clear of any and all claims, liens and encumbrances. Further, the Stalking Horse Bidder intends to retain current employees at these locations to operate the restaurants, but such employment will be "at will" and otherwise subject to the provisions set forth in the Stalking Horse Agreement.

19.     A summary of other terms that will be included in the definitive Stalking Horse Agreement, which the Debtors expect to file as a supplement to this Motion on or before February 21, 2020 is substantially as follows:

a.      <u>Bankruptcy Approval</u>. The Sale would be consummated only following competitive bidding pursuant to the Bidding Procedures and approval by this Court pursuant to a Sale Order.

b.      <u>Closing Date</u>. Closing of a transaction with the Successful Bidder(s) would occur on or before April 12, 2020.

c.      <u>Covenants</u>. Prior to consummation of the Sale or the termination or expiration of the Stalking Horse Agreement, the Selling Debtors would be required, among other things, to maintain operations through the date of the closing of the Sale.

d.      <u>Stalking Horse Protections.</u> If the Stalking Horse Bidder is not the successful bidder or the Stalking Horse Agreement is terminated as set forth in Section 3.4(b)-(m) or (o) therein, the Stalking Horse Bidder will be entitled to (i) an aggregate break-up fee equal to $450,000, solely to the extent that the final order approving the Debtors' postpetition financing from the DIP Lender does not provide for a "roll-up" of the Prepetition Advance due and owing by SD-Missouri to the Stalking Horse Bidder (the "**Break-Up Fee**") and (ii) the aggregate amount of the reasonable charges, costs, fees, payments, and expenses (including, without limitation, all reasonable fees, expenses and disbursements of any representatives of the Stalking Horse Bidder) paid or incurred by or on behalf of Stalking Horse Bidder relating to or in connection with its bid, to the extent not otherwise paid, which such amount shall be estimated and communicated to the Qualified Bidders on or prior to the Auction (the "**Expense Reimbursement**," and together with the Break-Up Fee, the "**Stalking**

**Horse Protections**").[3]   The Stalking Horse Protections shall be payable as provided for pursuant to the terms of the Stalking Horse Agreement.

e.  <u>Priority Status.</u> The Debtors have agreed that their obligation to pay the Stalking Horse Protections pursuant to the Stalking Horse Agreement shall survive termination of the Stalking Horse Agreement, and, to the extent owed by the Debtors, constitute an administrative expense claim under sections 503(b) and 507 of the Bankruptcy Code against the Selling Debtors, and, notwithstanding section 507(a) of the Bankruptcy Code, be payable in accordance with the terms and conditions of the Stalking Horse Agreement and the Bidding Procedures Order.

f.  <u>Assumed Liabilities</u>. As will be set forth definitively in the Stalking Horse Agreement, the Stalking Horse Bidder reserves the right to have the Debtors assume and assign any Contracts. For the avoidance of doubt, if any Contracts are assigned to the Stalking Horse Bidder, the Stalking Horse Bidder shall be responsible for and pay all Cure Amounts in cash in addition to the Stalking Horse Purchase Price. Notwithstanding the above, all assumed real property lease Cure Amounts shall be the sole and exclusive responsibility of the Selling Debtors.

20.   The Sale is subject to higher or otherwise better offers pursuant to the Bidding Procedures. Based on their business judgment, the Debtors believe that the proposed structure of the Bidding Procedures will facilitate a full and fair process that will maximize the realized value of the Sonic Assets for the benefit of the Debtors and their estates and creditors, while also compensating the Stalking Horse Bidder for its efforts and agreements to date. The Stalking Horse Bidder has already devoted considerable time, money and effort in pursuit of the Sale and is likely to expend additional resources throughout the sale process for the Sonic Assets. The Debtors, the Stalking Horse Bidder and the Prepetition Secured Lender have negotiated in good faith regarding the Sale, and have developed a definitive term sheet that will serve as the basis for the Stalking Horse Agreement. The Debtors assert that the Stalking Horse Agreement, which the Debtors expect to file on or before February 21, 2020, is in the best interests of the Debtors and their estates and creditors. Moreover, the Debtors have determined that the Stalking Horse Agreement will

---

[3]NTD:  Without a cap the Court will not approve.

10

further the goals of the Bidding Procedures by setting a floor which all other bids must exceed and establishing a foundation for a competitive bidding process.

21.     Based on the foregoing, the Debtors seek approval from this Court of the Stalking Horse Protections and the allowance thereof as an administrative claim under Section 507(b) and 503(b) of the Bankruptcy Code against the Debtors' bankruptcy estates.

## The Bidding Procedures

### A.     Overview

22.     The Bidding Procedures are designed to promote a competitive and expedient sale process for the Sonic Assets. If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or best offer for the Sonic Assets on a schedule consistent with the Milestones and the Debtors' chapter 11 strategy. As the Bidding Procedures are attached to the Bidding Procedures Order, they are not herein restated in their entirety. Certain key terms of the Bidding Procedures for potential bidders to submit a bid (each a "**Bid**") that satisfy the terms for a qualified bid are highlighted in the chart below:[4]

| MATERIAL TERMS OF THE BIDDING PROCEDURES[5] | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids** | A. **Due Diligence**. Each Potential Bidder (as defined below) must execute a confidentiality agreement with the Debtors.<br><br>B. **Bid Deadline**. Qualified Bids due by 4:00 p.m. (EDT) on March 24, 2020 |

---

[4] This summary is qualified in its entirety by the provisions of the Bidding Procedures. To the extent that there is any inconsistency between the terms of the Bidding Procedures and this summary, the terms of the Bidding Procedures shall control. Capitalized terms used but not defined prior to or in this summary shall have the respective meanings ascribed to such terms later in the Motion or in the Bidding Procedures, as applicable.

[5] NTD:  To be updated once the Bidding Procedures are finalized.

C. **Qualified Bidder Requirements**.  All persons, other than the Stalking Horse Bidder, who wish to participate in the bidding process (a "**Potential Bidder**") must deliver the following to the Notice Parties to be a "**Qualified Bidder**":

(i)   written disclosure of the identity of the Potential Bidder;

(ii)   information sufficient to demonstrate the Potential Bidder has the financial wherewithal to consummate the proposed Sale Transaction; and

(iii)   an executed confidentiality agreement.

As used herein, "**Notice Parties**" means, collectively: (i) counsel for the Debtors; (ii) counsel for the DIP Lender and Stalking Horse Bidder; (iii) counsel for the Prepetition Secured Lender; and (iv) counsel for the Official Committee of Unsecured Creditors (the "**Committee**"), if any.

D. **Qualified Bid Requirements**.  To be a "**Qualified Bid**", a Bid must be submitted by a Qualified Bidder and the Debtors determine, in consultation with (i) the Prepetition Secured Lender, (ii) the Committee, (iii) the DIP Lender and (iv) and Sonic Holding Company, as franchisor ("**Sonic**" and together with the Prepetition Secured Lender, the Committee and the DIP Lender, the "**Consultation Parties**"), that such Bid complies with all of the following:

a.  it states whether such Bid is an offer to purchase, in cash, through a credit bid or a combination of both, all or a portion of the Sonic Assets upon terms and conditions no less favorable to the Debtors than those in the Stalking Horse Agreement;

b.  if such Bid offers to purchase only a portion of the Sonic Assets, the value of such Bid, in combination with the value of other Bids for other Sonic Assets, must exceed the Minimum Initial Overbid Amount;

c.  such Bid includes a signed writing stating that it is irrevocable until the selection of the Successful Bidder; provided that if such bidder is the Back-Up Bidder, its Bid will remain irrevocable until the later of (i) the closing of the Sale to the Successful Bidder or the Back-Up Bidder, and (ii) the date that is twenty (20) days after the Sale Hearing;

d.  it includes confirmation such bidder has all necessary internal and shareholder approvals upon making the Bid,

and there are no conditions precedent to such Qualified Bidder's ability to enter into a definitive agreement;

e.  it includes a duly authorized and executed copy of an asset purchase agreement, including the purchase price for the Sonic Assets (the "**Purchase Price**") and a copy marked to show amendments and modifications to the Stalking Horse Agreement (an "**Asset Purchase Agreement**");

f.  it includes information sufficient to establish the ability of the Qualified Bidder to consummate the proposed Sale, pay the Purchase Price and any Cure Amounts and consummate the transaction contemplated by the Asset Purchase Agreement;

g.  it has a value to the Debtors that is greater than the sum of the Stalking Horse Agreement, plus the Stalking Horse Protections, plus $250,000 (the "**Minimum Initial Overbid Amount**");

h.  it identifies which Contracts will be assumed and details the Qualified Bidder's proposal for the treatment of Cure Amounts and the provision of Adequate Assurance Information;

i.  if such Qualified Bidder is not already an approved Sonic franchisee, the Bid should include Adequate Assurance Information for the Sonic franchise agreements that is customarily required by Sonic in connection with its franchisee approval process;

j.  it includes an acknowledgment and representation that such Qualified Bidder (i) has had an opportunity to conduct due diligence prior to making its offer; (ii) has relied solely on its due diligence in making its Bid; (iii) has not relied on any anything or anyone in making its Bid or in connection with the Auction except as expressly stated in the Asset Purchase Agreement; and (iv) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its Bid;

k.  it includes evidence that such Qualified Bidder has corporate authorization and approval with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement;

|  | l.   it is accompanies by a good faith deposit in an amount equal to 10% of the Purchase Price (a "**Good Faith Deposit**"); |
|---|---|
|  | m.   it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Selling Debtors; and |
|  | n.   it is received prior to the Bid Deadline of March 24, 2020 at 4:00 p.m. (EDT). |
|  | Notwithstanding the foregoing, the Stalking Horse Bidder shall be deemed a Qualified Bidder, and the Stalking Horse Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale without compliance with the above enumerated requirements. |
| **Modification of Bidding Procedures** | The Bidding Procedures sets forth the Debtors' reservation of rights to, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, and after consulting with the Consultation Parties, modify the Bidding Procedures, including, among other things, extend or waive deadlines or other terms and conditions set forth therein; adopt new rules and procedures for conducting the bidding and Auction process; if applicable, provide reasonable accommodations to a Stalking Horse Bidder; or otherwise modify the Bidding Procedures to further promote competitive bidding for and maximizing the of value of the Sonic Assets. |
| **Closing with Alternative Back- up Bidders** | **The Bidding Procedures sets forth the primary requirements with respect to Back-Up Bids.** <br><br> Prior to the conclusion of the Auction, the Debtors (in consultation with the Consultation Parties) will review the Qualified Bids submitted at the Auction and determine which offer is the highest or otherwise best offer (one or more such bids, collectively the "**Successful Bid**" and the bidder(s) making such bid(s), collectively, the "**Successful Bidder**") and communicate to the Auction Participants the identity of the Successful Bidder and the details of the Successful Bid. <br><br> In determining the Successful Bid, the Debtors will consider, *inter alia* the following factors; <br><br>   •  Total expected consideration to be received by the Debtors; <br><br>   •  Likelihood of bidder's ability to close the Sale Transaction and the timing thereof; <br><br>   •  Qualified Bidder's ability to satisfy necessary approvals and the timing of such approvals; and |

|  | • The expected net benefit to the Debtors' estates. |
|---|---|
|  | The Qualified Bidder with the next highest or otherwise best Qualified Bid will be required to serve as the back-up bidder ("**Back-Up Bidder**"). The Back-Up Bidder's bid will remain open and irrevocable until the later to occur of twenty (20) days after the Sale Hearing and closing on the Successful Bid with the Successful Bidder; <u>provided</u>, unless stated on the record at the Auction, the Stalking Horse Purchaser agrees that if it is not the Successful Bidder at the Auction, it will serve as the Back-Up Bidder on the terms set forth in the Stalking Horse Agreement (and not any subsequent bids made by Stalking Horse Purchaser at the Auction), in the event the Successful Bidder fails to consummate the Sale. If the Successful Bidder fails to consummate the Sale, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized and directed to consummate the Sale with the Back-Up Bidder without further order of the Court. |
| **Provisions Governing the Auction** | **The Bidding Procedures sets forth the procedures governing the Auction.** |
|  | If the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Agreement, the Debtors will conduct an Auction of the Sonic Assets, which shall take place at 10:00 a.m. (EDT) on April 1, 2020, at the offices of Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202, or such other date, time and location as shall be timely communicated to all entities entitled to attend the Auction. The Auction, which shall be recorded and transcribed, shall run in accordance with the following procedures: |
|  | a.  only the Debtors, the Stalking Horse Bidder, any other Qualified Bidder that has timely submitted a Qualified Bid, the Prepetition Secured Lender, the DIP Lender, Sonic and the Committee, and the advisors to each of the foregoing shall attend the Auction in person; |
|  | b.  only the Stalking Horse Bidder and such other Qualified Bidders who have timely submitted Qualified Bids will be entitled to make any subsequent bids at the Auction; |
|  | c.  the Stalking Horse Bidder will, notwithstanding the elements of the Stalking Horse Purchase Price, be entitled to make subsequent bids for all or substantially all or any combination of the Sonic Assets comprised of further credit bids, cash, additional or different consideration of any type, or any combination of the foregoing; |
|  | d.  each Qualified Bidder shall be required to confirm that it has not engaged in any collusion, within the meaning of |

section 363(n) of the Bankruptcy Code with respect to any Bids submitted or not submitted in connection with the Sale;

e.  at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction_and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the selection of the Successful Bidder and Back-Up Bidder at the conclusion of the Auction.  At least one (1) business day prior to the Auction, the Debtors will provide copies of the Qualified Bid, or combination of Qualified Bids, which the Debtors believe, after consultation with the Consultation Parties, is the highest or otherwise best offer for all or any portion of the Sonic Assets (the "**Starting Bid**") to the Stalking Horse Bidder and all other Qualified Bidders who have timely submitted Qualified Bids.  For the avoidance of doubt, the Starting Bid may comprise multiple Qualified Bids if bids are submitted for less than all of the Sonic Assets, so long as the aggregate consideration paid in connection with such multiple Qualified Bids, taken together, represents the highest and best offer for the Sonic Assets;

f.  all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction;

g.  the Debtors, after consultation with the Consultation Parties, may modify, employ and announce at the Auction additional or amended procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules (i) are not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith; and (ii) are disclosed to each Qualified Bidder attending the Auction; and

|  | h. bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each, a "**Subsequent Bid**") providing a net value to the Debtors' estates of at least $100,000 above the prior bid. After the first round of bidding and between each subsequent round of bidding, the Debtors, after consultation with the Committee (and to the extent that the Stalking Horse Bidder does not have a Subsequent Bid pending, the DIP Lender), shall announce the bid (and the value of such bid) that they believe to be the highest or otherwise best Bid (each, the "**Leading Bid**"). |
|--|--|
|  | i. A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. |
|  | j. Except as specifically set forth in the Bidding Procedures, for the purpose of evaluating the value of the Purchase Price provided by each Subsequent Bid (including any Subsequent Bid by the Stalking Horse Bidder), the Debtors shall consider the Stalking Horse Protections as well as any additional liabilities to be assumed by a Qualified Bidder, and any additional costs which may be imposed on the Debtors. |
|  | k. The Debtors may accept bids for any portion of the Sonic Assets, as well as bids for substantially all of the Sonic Assets; provided, however, that a Qualified Bid that offers to purchase only a portion of the Sonic Assets may only be part of the Successful Bid to the extent that the value of such Qualified Bid, in combination with the value of other Qualified Bids for other Sonic Assets, exceeds the value of any then-pending Qualified Bid for all or substantially all the Sonic Assets. |

**B.**     **Sale Noticing and Objection Procedures**

23.     Given the desire to wind-down the Debtors' businesses expeditiously and minimize administrative expenses, on the one hand, and their desire to ensure a fair and transparent opportunity for all potentially interested parties to participate in the sale process, on the other hand, the Debtors propose that the Bidding Procedures, and related notice and other procedures set forth

herein be implemented in connection with the marketing and sale of the Sonic Assets. The Debtors

propose the following sale noticing and objection procedures (the "**Objection Procedures**"):

| SALE NOTICING AND OBJECTION PROCEDURES | |
|---|---|
| **Sale Notice** | No later than three business days after entry of the Bidding Procedures Order, the Debtors shall cause the Notice of Auction and Sale Hearing, attached as Exhibit 2 to the Bidding Procedures Order, and a copy of the Bidding Procedures Order to be served by first class mail upon: (a) the United States Bankruptcy Administrator for the Western District of North Carolina; (b) the Debtors' consolidated top forty (40) largest unsecured creditors as set forth in the list filed with the Debtors' petition; (c) counsel to the Prepetition Secured Lender (d) counsel to the DIP Lender; (e) counsel to the MCA Parties, if known; (f) the Securities and Exchange Commission; (g) the Internal Revenue Service; (h) all non-Debtor parties to the Contracts and any parties who are known to claim interests therein; (e) all applicable federal, state, and local taxing authorities; (f) all applicable county and state consumer protection agencies; (g) all applicable state attorneys general; (h) all other government agencies required to receive notice under the Bankruptcy Rules; (i) counsel to the unsecured creditors committee, if one is appointed in these Chapter 11 Cases; and (j) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002. |
| **Sale Objections** | Objections to the sale of the Sonic Assets, including any objection to (i) a sale of Sonic Assets free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (ii) the entry of any Sale Order must (A) be in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (B) be filed with the Court; and (C) served no later than the later of (x) **April 3, 2020 at 4:00 p.m. (EDT)** and (y) three business days prior to the Sale Hearing (the "**Sale Objection Deadline**") on the following parties: (i) counsel for the Debtors; (ii) counsel for the DIP Lender and Stalking Horse Bidder; and (iii) counsel for the Prepetition Secured Lender (collectively, the "**Objection Notice Parties**"). |
| **Stalking Horse Protection Objections** | Any objections to the Stalking Horse Protections must (i) be in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (ii) filed with the Court; and (iii) served on the Objection Notice Parties by no later than the Bidding Procedures Objection Deadline. |

| Auction Results | Within two (2) business days after conclusion of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents necessary to consummate the Successful Bid. Within two (2) business days after conclusion of the Auction, the Debtors shall file a notice with the Court identifying the Successful Bidder and the Back-Up Bidder. |
|---|---|
| | The Debtors will sell the Sonic Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Court at the Sale Hearing. |
| | All Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or a Back-Up Bidder no later than five (5) business days following the conclusion of the Auction |

24.     The Debtors submit that the Sale Noticing and Objection Procedures, coupled with the Assumption and Assignment Procedures set forth below, constitute adequate and reasonable notice of the key dates and deadlines and other important information regarding the sale process for the Sonic Assets, including the Objection Deadlines (as defined below), the Bid Deadline and the time and location of the Auction and Sale Hearing. Accordingly, the Debtors request that the Court approve the form of Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 and find that the Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 2002.

**<u>Assumption and Assignment Procedures</u>**

25.     In connection with any Sale Transaction, the Debtors may seek to assume and assign to a Successful Bidder one or more Contracts. The Assumption and Assignment Procedures are designed to, among other things, govern the Debtors' provision of information sufficient to demonstrate the Successful Bidder's proposed form of, and ability to provide, adequate assurance of future performance with respect to each Contract to be assumed and assigned ("**Adequate**

**Assurance Information**") and notice of Cure Amounts to applicable Counterparties. The below

chart sets forth the Assumption and Assignment Procedures:

| ASSUMPTION AND ASSIGNMENT PROCEDURES | |
|---|---|
| **Assumption and Assignment Notice** | Not later than the later of (x) March 7, 2020 and (y) three (3) business days after the Court's entry of the Bidding Procedures Order, the Debtors will file with the Court and serve on each Counterparty to a Contract that may be assumed in connection with any Sale Transaction and Notice of Assumption and Assignment, which will (i) identify the applicable Contracts; (ii) list the Debtors' good-faith calculation of Cure Amounts with respect to each Contract; (iii) expressly state that assumption or assignment of a Contract is not guaranteed and is subject to Court approval and (iv) prominently display the deadlines to file Cure Objections and Adequate Assurance Objections (each as defined below). |
| **Cure Objections** | Cure Objection Deadline. Any Counterparty to a Contract that wishes to object to the Debtors' proposed Cure Amounts (each such objection, a "Cure Objection") shall file with the Court and serve on the Objection Notice Parties its Cure Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by no later than the earlier of (x) fourteen (14) days after service of the Notice of Assumption and Assignment; and (y) **March 21, 2020, at 4:00 p.m. (EDT)** (the "**Cure Objection Deadline**"). Resolution of Cure Objections. The Debtors (in consultation with the Consultation Parties) and the objecting Counterparty shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention.If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the Court shall make all necessary determinations relating to the applicable Cure Amounts and Cure Objection at a hearing scheduled pursuant to the following paragraph. If a Cure Objection is resolved in a manner that is not in the best interests of the Debtors and their estates, whether or not such resolution occurs prior to or after the closing of the applicable Sale Transaction, the Debtors may determine that any Contract subject to such resolved Cure Objection will no longer be assumed and assigned pursuant to the applicable Sale Transaction (subject to the terms of the applicable Sale Transaction). All other objections to the proposed assumption and assignment of the Debtors' right, title and interest in, to and under a Contract will be heard at the Sale Hearing. Adjournment. If a timely filed Cure Objection cannot otherwise be resolved by the parties, the Cure Objection may be heard at the Sale Hearing, or, at the Debtors' option, be adjourned to a subsequent hearing (each such Cure Objection, an "**Adjourned Cure Objection**"). An Adjourned Cure Objection may be resolved after the closing date of the applicable Sale Transaction. Upon resolution of an Adjourned Cure Objection and the payment of the applicable cure amount, if any, the |

20

| | |
|---|---|
| | applicable Contract that was the subject of such Adjourned Cure Objection shall, as applicable, be deemed assumed and assigned to the applicable Successful Bidder as of the closing date of the applicable Sale Transaction. |
| | <u>Failure to Timely Object</u>. If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty forever shall be barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract. The Cure Amounts set forth in the applicable Notice of Assumption and Assignment shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract and satisfy the requirements of section 365(b) of the Bankruptcy Code, and the Counterparty to the Contract shall be bound by and deemed to have consented to the Cure Amounts. |
| **Adequate Assurance Objections** | <u>Adequate Assurance Objection Deadline</u>. Any Counterparty to a Contract that wishes to object to the proposed assumption and assignment of the Contract, the subject of which objection is a Successful Bidder's (or any other relevant assignee's) proposed form of adequate assurance of future performance (each such objection, an "**Adequate Assurance Objection**"), shall file with the Court and serve on the Objection Notice Parties an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by no later than the later of **(i) April 3, 2020, at 4:00 p.m. (EDT)** and (ii) three business days prior to the Sale Hearing (the "**Adequate Assurance Objection Deadline**" and, together with the Cure Objection Deadline, the Sale Objection Deadline and the Supplemental Sale Objection Deadline, the "**Objection Deadlines**"). |
| | <u>Resolution of Adequate Assurance Objections</u>. The Debtors and the objecting Counterparty shall first confer in good faith to attempt to resolve the Adequate Assurance Objection without Court intervention. If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Adequate Assurance Objection and all issues of adequate assurance of future performance of the applicable Successful Bidder (or any other relevant assignee) shall be determined by the Court at the Sale Hearing. |
| | <u>Failure to Timely Object</u>. If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any objection to the assumption and/or assignment of the applicable Contract with regard to adequate assurance of future performance. The applicable Successful Bidder (or any other relevant assignee) shall be deemed to have provided adequate assurance of future performance with respect to the Contract in accordance with Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or any other document. |

| | |
|---|---|
| **Designation Rights** | Pursuant to the terms of a Stalking Horse Agreement or other asset purchase agreement executed by the Debtors, a Successful Bidder may have the right to, prior to the closing date of the applicable Sale Transaction, designate (i) for assumption and assignment Contracts that were not originally included in the Sonic Assets to be acquired in connection with the applicable Successful Bid and (ii) Contracts that previously were included in the Sonic Assets to be acquired in connection with the applicable Successful Bid as "excluded assets" that will not be assigned to or otherwise acquired by the Successful Bidder. The Debtors will use commercially reasonable efforts to, as soon as reasonably practicable after the Debtors receive notice of any such designation, file with the Court, serve on the applicable Counterparties and cause to be published on the website maintained by Bankruptcy Management Solutions, Inc. d/b/a/ Stretto, the Debtors' claims and noticing agent in these Chapter 11 Cases, located at http://https://cases.stretto.com/sdcharlotte (the "**Stretto Website**") a notice of such designation (each, a "**Designation Notice**"). |
| **Notice of Assumed Contracts** | As soon as reasonably practicable after the closing of a Sale Transaction, the Debtors will file with the Court, serve on the applicable Counterparties and cause to be published on the Stretto Website, a notice containing the list of Contracts that the Debtors assumed and assigned pursuant to any asset purchase agreement with a Successful Bidder. |
| **Reservation of Rights** | The inclusion of a Contract or Cure Amounts with respect to any Contract on any Notice of Assumption and Assignment or any Notice of Auction Results, shall not constitute or be deemed a determination or admission by the Debtors, any Successful Bidder or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned. The Debtors reserve all of their rights, claims and causes of action with respect to each Contract listed on the aforementioned notices. |

## I.      APPLICABLE AUTHORITY

A.  Bidding Procedures

26.      Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, a debtor-in-possession "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor-in-possession seeking bankruptcy court approval to sell or otherwise dispose of estate property pursuant to section 363 must demonstrate that the proposed disposition is supported by a sound business reason. See In re Charlotte Commercial Group, Inc., No. B-01-52684 C-7W, 2002 WL 31055241 at *2 (Bankr. M.D.N.C.

2002) ("The sale of an asset under section 363 requires a 'sound business reason.'") (citing In re

Lionel Corp., 722 F. 2d 1063, 1071 (2d Cir. 1983)); In re Chateaugay Corp., 973 F.2d 141, 145

(2d Cir. 1992) (bankruptcy court had discretion to approve section 363 sale based on finding that

"a good business reason existed to proceed with the sale"); In re Lionel Corp., 722 F. 2d at 1071

(establishing rule requiring that "a judge determining a section 363(b) application expressly find

from the evidence presented before him at the hearing a good business reason to grant such an

application."); Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986).

27.    In general, "[a] debtor's business decision [to monetize assets pursuant to section

363] should be approved by the court unless it is shown to be so manifestly unreasonable that it

could not be based upon sound business judgment, but only on bad faith, or whim or caprice." In

re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (citations omitted). Moreover, a debtor

that presents a business justification for a section 363 sale is entitled to the benefit of the business

judgment rule, which raises "a presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action was

in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated

Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992), citing Smith v. Van Gorkom, 488 A.2d 848,

872 (D. Del. 1985); Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984). The principles of the

business judgment rule, which were originally articulated by Delaware state courts, are strongly

applicable to the chapter 11 context and particularly so when the debtors (as here) are Delaware

limited liability companies organized under the laws of Delaware. See id.

28.    Based on the foregoing, there is ample business justification to sell the Sonic Assets

in accordance with the Bidding Procedures. Based on the current circumstances of the Debtors, a

sale of the Sonic Assets pursuant to the Bidding Procedures will likely generate greater value for

the Debtors, their estates and their creditors than the continued use of such Sonic Assets by the Debtors or post-conversion disposition of such Sonic Assets out of a Chapter 7 estate. Moreover, the competitive auction structure of the proposed Bidding Procedures will maximize the return from the sale by securing the highest or best offer available on the open market.

29.    Notably, every potential buyer from whom the Debtors received serious expressions of interest in purchasing some or all of the Sonic Assets specified a requirement that the Debtors maintain ongoing operations and an ability to employ the Debtors' current employees. Therefore, significant considerations in the Debtors' exercise of their business judgment to pursue the Stalking Horse Bid and the Bidding Procedures proposed in this Motion included (a) the Prepetition Secured Lender's consent to limited use of cash collateral and the DIP Lender's funding of the DIP Facility in combination with pursuit of an expedited sale process based upon the proposed sale of the Sonic Assets, and the (b)  the willingness of the Stalking Horse Bidder to undergo a bidding process in which other competing bids would be solicited and considered.

B.    Bid Protections

30.    The Debtors believe that bid protections in the form of the Stalking Horse Protections, consisting of a proposed Break-Up Fee in the amount of $450,000.00 (which is contingent on such amount not being rolled up into the DIP Facility) and the Expense Reimbursement (consisting of the reasonable charges, costs, fees, payments and expenses paid or incurred by or on behalf of the Stalking Horse Bidder relating to or in connection with its bid), was an essential motivating factor in the Stalking Horse Bidder's decision to incur the costs of submitting a bid for the Sonic Assets and negotiating the Stalking Horse Agreement. Considering the substantial resources that have been expended by the Stalking Horse Bidder in furtherance of the Sale Transaction, the Stalking Horse Protections are fair and reasonable. The Break-Up Fee is

3.00% of the Stalking Horse Bid's base purchase price of $15,000,000—falling squarely within the standard range for these types of fees—and, unlike other break-up fees, is entirely contingent upon the Prepetition Advance of $450,000 not being rolled into the DIP Facility. If the Prepetition Advance is rolled into the DIP Facility, the only Stalking Horse Protections would be the Expense Reimbursement. Absent this Court's approval of the Stalking Horse Protections, the Debtors believe that the Stalking Horse Bidder would decline to maintain its offer for the Sonic Assets under the terms of the bid, which in turn would remove the minimum threshold return the Debtors have negotiated and would decrease the likelihood that the Debtors will be able to obtain the highest and best offer for the Sonic Assets.

31.    Bid protections such as the Stalking Horse Protections are routinely approved in the section 363 sale context by bankruptcy courts. Such provisions incentivize potential bidders to dedicate the substantial amounts of time, resources and energy that are required to consummate an acquisition of a debtor's assets, in spite of the inherent risks and uncertainties of the chapter 11 process. See In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bid protections may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking" (citation omitted)). Bankruptcy courts, including this Court, have approved similar bid protections.  See e.g., In re Schletter, Case No. 18-40169 (JCW) (Bankr. W.D.N.C. June 11, 2018) (3.00% break-up fee);  In re J.A. Jones, Inc., Case No. 03-33532 (JCW) (Bankr. W.D.N.C. 2003) (3.75% break-up fee).

32.    Most courts apply the business judgment rule to bid protections with equal force as to other aspects of a section 363 sale. See In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has seriously argued the inapplicability of the business judgment test, and if any such argument had been made, the Court would be compelled . . . to reject it.");

Integrated Resources, 147 B.R. at 660 ("[T]he business judgment rule does not become inapplicable simply because a court decides a break-up fee is too large."). Alternatively, at least one Circuit Court has held that the administrative expense provisions of section 503(b) of the Bankruptcy Code govern bid protections in the bankruptcy context and, accordingly, that bid protections must provide some benefit to the debtor's estate to merit court approval. Calpine Corp. v. O'Brien Envtl. Energy, Inc., 181 F.3d 527, 533 (3d Cir. 1999). The Third Circuit specifically identified at least two instances where bid protections can provide benefit to the estate. First, it would be beneficial to an estate if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, if the availability of bidding incentives induces a Bidder(s) to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other Bidder(s)s can rely, "the Bidder(s) may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

33.       The Fourth Circuit has not spoken to the issue of what standard should be applicable to approval of bid protections. Nevertheless, whether evaluated under the business judgment rule or the Third Circuit's "benefit to the estate" standard, the Stalking Horse Protections pass muster. The Stalking Horse Protections are incentive and compensation for the Stalking Horse Bidder to act as a "stalking horse," generating interest among potential participants in the Auction in spite of the attendant risk that a higher or better offer could prevail. The Debtors' decision to agree on the terms and amount of the Stalking Horse Protections was made on the basis of information gleaned from the Debtors' own investigation after good-faith negotiations with the Stalking Horse Bidder and in the honest belief that these protections will serve the best interests of the estates.

26

Thus, based on their sound business judgment, the Debtors believe that the Stalking Horse Protections are fair and reasonable in proportion to the time, effort, cost and expense that the Stalking Horse Bidder has incurred in negotiating the bid and will incur in negotiating the Stalking Horse Agreement and the aggregate consideration it has committed to pay thereunder.

34.    Furthermore, the Break-Up Fee of approximately 3.0% of the purchase price is well within the range of similar fees approved by bankruptcy courts in chapter 11 cases pursuant to section 363.  See e.g., In re Schletter, Case No. 18-40169 (JCW) (Bankr. W.D.N.C. June 11, 2018) (3.00% break-up fee);  In re J.A. Jones, Inc., Case No. 03-33532 (JCW) (Bankr. W.D.N.C. 2003) (3.75% break-up fee); In re Genuity Inc., Case No. 02-43558 (PCB) (Bankr. S.D.N.Y. 2002) (4.13% break-up fee); In re PSINet, Inc., Case No. 01-13213 (REG) (Bankr. S.D.N.Y. 2001) (4.28% break-up fee); In re Teligent, Inc., Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. 2001) (1.3% to 4.25% break-up fee, depending on value of alternative transaction); In re Ameriserve, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (3.64% break-up fee); In re FoxMeyer Corp. et al., Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (7.47% break-up fee); In re Edison Bros. Stores. Inc. et al., Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (3.5% break-up fee).

35.    In sum, the Debtors' ability to offer the Stalking Horse Protections enables the Debtors to lock the sale of the Sonic Assets into a contractually-committed bidder at a fair price, while also providing them with the potential of even greater benefit to the estate. Thus, the Stalking Horse Protections should be approved.

C.    <u>Sale Free and Clear</u>

36.    Section 363(f) of the Bankruptcy Code provides that a debtor-in-possession may sell property "free and clear of any lien, claim, or interest in such property of an entity other than the estate" if, among other things:

> a.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> b.    such entity consents;
>
> c.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> d.    such interest is in bona fide dispute; or
>
> e.    such entity could be compelled in a legal or equitable proceeding, to accept a money satisfaction of such interest.
>
> 11 U.S.C. § 363(f).

37.    Except for any permitted liens identified in the Stalking Horse Agreement with the Stalking Horse Bidder, each lien or encumbrance would attach with equal priority to the proceeds of the Sale Transaction, and therefore satisfies at least one of the five conditions of section 363(f). The Debtors submit that any such lien or encumbrance will be adequately protected by attachment to the net proceeds of the Sale Transaction, subject to any claims and defenses the Debtors may possess with respect thereto. Accordingly, except for the permitted liens and encumbrances discussed in the Stalking Horse Agreement, the Debtors request that the Sonic Assets be transferred to the Successful Bidder(s) or Back-up Bidder(s), as the case may be, free and clear of all liens, claims and encumbrances, with such liens, claims and encumbrances to attach to the proceeds of the sale of the Sonic Assets.

D.    <u>Good-Faith Stalking Horse Bidder</u>

38.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does
> not affect the validity of a sale or lease under such authorization to
> an entity that purchased or leased such property in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

39.    The Stalking Horse Agreement memorializes an arms'-length transaction, the terms

of which were arrived at only after intense good-faith negotiations. The Stalking Horse Bidder

holds no interest in, and is not otherwise affiliated with, the Debtors other than as an affiliate of

certain creditors and the franchisor of the Selling Debtors.[6] Further, pursuant to the terms of the

Bidding Procedures, the Debtors have committed to negotiate subsequent bids, if any are received,

at arms'-length and in good faith. Accordingly, the Debtors request that the Court find the

Successful Bidder(s) or, if applicable, the Back-up Bidder(s), to be acting in good faith and entitled

to the full protections available to a good faith buyer pursuant to section 363(m) of the Bankruptcy

Code. See In re Oyster Bay Cove, Ltd., 196 B.R. 251, 254 (E.D.N.Y. 1996); Allstate Ins. Co. v.

Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr.

S.D.N.Y. 1990).

E.    Assumption and Assignment of the Contracts

40.    The Debtors respectfully submit that the Court should approve procedures relating

to the assumption and assignment of the Contracts. In assuming and assigning the Contracts, the

Debtors intend to comply with the provisions of Bankruptcy Code Section 365(f)(2).

---

[6] The Stalking Horse Bidder is an affiliate of Sonic Corporate, a general unsecured creditor and franchisor of the
Selling Debtors, and the DIP Lender.

41.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and assign its executory contracts and unexpired leases subject to the approval of the bankruptcy court. See, generally, 11 U.S.C. § 365(a). Section 365 specifically provides, in pertinent part, that a debtor may assume and assign executory contracts and leases provided that all defaults under such agreements are cured and adequate assurance of future performance is provided by the assignee to the non-debtor party to such contracts or leases. See 11 U.S.C. § 365(a), (b)(1), (f)(2).

42.     The general standard applied by courts considering whether to approve assumption of unexpired leases or executory contracts is the business judgment rule, which requires that a debtor determine in its sound business judgment that assumption and assignment is in its best interests. See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, (4th Cir. 1985); Orion Pictures Corp. v. Showtime Networks, Inc., 4 F.3d 1095, 1098-99 (2d Cir. 1993); Control Data Corp. v. Zelman, 602 F.2d 38, 42 (2d Cir. 1979). This standard for assumption of a lease or contract is fundamentally identical to the standard for an asset disposition pursuant to section 363(b) of the Bankruptcy Code. See Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); In re III Enterprises, Inc., 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject a contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment – a standard which we have concluded many times is not difficult to meet.").

43.     Courts give the phrase "adequate assurance of future performance" a "practical, pragmatic construction." EBG Midtown South Corp. v. Mcharen/Hart Envtl. Engig Corp., 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d Cir. 1993); see Sanshoe Worldwide, 139 B.R. at 592 (presence of adequate assurance should be "determined under the facts of each

particular case"). Courts have uniformly held that the Bankruptcy Code does not require total assurances. See In re Natco Industries, Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor will thrive and make a profit."); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Adequate assurance has been provided by demonstrating the Stalking Horse Bidder's financial health and experience in managing the type of enterprise or property assigned. See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance existed when prospective assignee of lease from debtor had financial resources and had expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

44.     The Debtors hereby move to assume and/or assign the Contracts to the Successful Bidder(s) or Back-Up Bidder(s) as appropriate, should any such buyer choose to have such Contracts assigned, and to pay (or cause the Successful Bidder(s) or Back-Up Bidder(s) to pay) the Cure Amounts in connection therewith. The Debtors believe that any Successful Bidder(s) or Back-up Bidder(s) necessarily will be an established and sophisticated entity with the financial resources to perform under the Contracts. Moreover, if necessary, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Successful Bidder(s) or Back-up Bidder(s), as the case may be, and their willingness and ability to perform under the Contracts to be assumed and assigned to them.

45.     In accordance with the foregoing, the Debtors request that the Court grant authorization for the Debtors to assume (where applicable) and assign the Contracts to the Successful Bidder(s) or Back-up Bidder(s), as the case may be.

F.    Further Relief

46.    The Debtors request that the Court waive the stay imposed by Bankruptcy Rule

6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other than

cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." As set forth above and in the First Day Declaration, time is of the essence and

it is imperative that the Debtors be able to consummate a sale on the timeline proposed. In order

to maximize the value of the assets and minimize the estates' unnecessary administrative expenses,

the Debtors believe a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and

6006(d), to the extent that they apply, is in the best interest of the Debtors' estates and stakeholders.

## NOTICE

47.    Notice of this Motion will be provided to: (a)  the United States Bankruptcy

Administrator for the Western District of North Carolina; (b) the Debtors' consolidated top forty

(40) largest unsecured creditors as set forth in the list filed with the Debtors' petition; (c) counsel

to the Prepetition Secured Lender (d) counsel to the DIP Lender; (e) counsel to the MCA Parties,

if known; (f) the Securities and Exchange Commission; (g) the Internal Revenue Service; (h) all

parties asserting liens or interests in the Sonic Assets; and (h) all parties that have requested or that

are required to receive special notice pursuant to Bankruptcy Rule 2002.  The Debtors respectfully

submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully requests that the Court enter the Bidding

Procedures Order in the form attached hereto and grant such other and further relief as is just and

proper under the circumstances.

Dated: February 17, 2020

**MOORE & VAN ALLEN PLLC**

/s/ Zachary H. Smith
Zachary H. Smith (NC Bar 48993)
Hillary B. Crabtree (NC Bar 26500)
James Langdon (NC Bar 23241)
Gabriel Mathless (NC Bar 48857)
Joanne Wu (NC Bar 55044)
100 N. Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 339-5968
Email:   zacharysmith@mvalaw.com
Email:   hillarycrabtree@mvalaw.com
Email:   jimlangdon@mvalaw.com
Email:   gabemathless@mvalaw.com
Email:   joannewu@mvalaw.com

*Proposed Counsel to the Debtors and Debtors-In-Possession*

**<u>EXHIBIT A</u>**

Form of Bidding Procedures Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Joint Administration) |
| | ) | |
| SD-Charlotte, LLC, *et al.*,[1] | ) | Case No. 20-30149 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |

**ORDER (I)(A) APPROVING BIDDING PROCEDURES
AND AUCTION AND (B) SCHEDULING SALE HEARING AND APPROVING NOTICE
THEREOF; (II) AUTHORIZING THE SALE OF ALL OF THE
DEBTORS' ASSETS RELATED TO THE SONIC DRIVE-IN RESTAURANTS FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER
INTERESTS; (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession

(collectively, the "**Debtors**"), for entry of an order (this "**Order**"), pursuant to sections 105(a),

363, 365, 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002,

6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"):

(i) approving bidding procedures in connection with the sale of all or substantially all of the Selling

Debtors' Sonic Assets; (ii) scheduling an auction and a hearing to consider the sale of the Sonic

Assets, (iii) approving the form and manner of notice thereof; and (iv) granting related relief; and

the Court having considered the Motion and all exhibits, objections, and other papers filed in

connection therewith; and the Court having determined that the relief provided herein is in the best

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: SD-Charlotte, LLC (7237); RTHT Investments, LLC (2540); SD Restaurant Group, LLC (0331); SD-Missouri, LLC (8294) and Southern Deli Holdings, LLC (9425).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Motion or incorporated therein.

interest of the Debtors, their estates, creditors and other parties in interest; and due and adequate notice of the Motion having been given under the circumstances; and upon the record of the hearing on the Motion, and the full record of these cases; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby:

### FOUND AND DETERMINED THAT:[3]

A.      This Court has jurisdiction over the Motion and the transactions contemplated therein pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      Notice of the Motion, the relief sought therein and the hearing on the Motion was good and sufficient under the circumstances, and no other or further notice is required except as set forth herein with respect to the Bidding Procedures and the Assumption and Assignment Procedures.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

C.      The bidding procedures attached hereto as **Exhibit 1** (the "**Bidding Procedures**") are fair, reasonable and appropriate and are designed to maximize the value of the proceeds of Sale Transactions with respect to the Sonic Assets.

D.      The procedures set forth herein regarding the Debtors' assumption and assignment of executory contracts and unexpired leases (collectively, the "**Contracts**") in connection with any Sale Transaction (the "**Assumption and Assignment Procedures**") are fair,

---

[3]  Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when applicable.

-2-

reasonable and appropriate and comply with the provisions of section 365 of the Bankruptcy Code and Rule 6006 of the Bankruptcy Rules.

E.      The Debtors have articulated good and sufficient business reasons for the Court to approve (i) the Bidding Procedures; (ii) the form and manner of notice of the Bidding Procedures, the auction of the Sonic Assets (the "**Auction**") and the hearing to consider approval of any proposed Sale Transaction(s) (the "**Sale Hearing**"), substantially in the form attached hereto as **Exhibit 2** (the "**Notice of Auction and Sale Hearing**"); (iii) the form and manner of notice to each relevant non-debtor counterparty to a Contract (each, a "**Counterparty**") of (a) the Debtors' calculation of the amount necessary to cure any defaults under an applicable Contract ("**Cure Amounts**") and (b) certain other information regarding the potential assumption and assignment of Contracts in connection with a Sale Transaction, substantially in the form attached hereto as **Exhibit 3** (the "**Notice of Assumption and Assignment**"); and (iv) the Assumption and Assignment Procedures.

F.      The Bidding Procedures are reasonably designed to promote participation in, and active bidding at, the Auction to ensure that the highest or otherwise best value is generated for the Sonic Assets.

G.      The Notice of Auction and Sale Hearing and the Notice of Assumption and Assignment are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Sale Hearing, the Bidding Procedures, the Assumption and Assignment Procedures, the Debtors' proposed Cure Amounts, any proposed assumption of a Contract in connection with a Sale Transaction and all relevant and important dates and deadlines with respect to the foregoing, and no other or further notice of the Auction, the sale of the Sonic Assets or the assumption and assignment of Contracts in connection therewith shall be required.

CHAR2\2248207v3

H.      Good and sufficient business reasons exist for the Court to authorize the "stalking horse" provisions of the Bidding Procedures, which permit the Debtors to designate SRI Operating Company as a stalking horse bidder for the Sonic Assets (the "**Stalking Horse Bidder**") and seek authorization of certain bidding protections pursuant to the terms of the Stalking Horse Agreement, including the payment of a "break up" fee and an expense reimbursement (together, the "**Stalking Horse Protections**").

I.      The entry of this Order is in the best interests of the Debtors, their estates, creditors, and other parties in interest.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      All objections to the relief granted in this Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

**A.      The Bidding Procedures**

3.      The Bidding Procedures attached hereto as **Exhibit 1** are hereby approved and incorporated herein by reference.  The Bidding Procedures shall govern the bids and proceedings related to the Auction and the sale of the Sonic Assets.  The Debtors are authorized to take all actions necessary or appropriate to implement the Bidding Procedures.

4.      Subject to this Order and the Bidding Procedures, the Debtors, in the exercise of their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, shall have the right to: (a) determine which bidders qualify as "Qualified Bidders" and which bids qualify as "Qualified Bids"; (b) determine the amount of each minimum overbid; (c) determine which Qualified Bid(s) is the highest or otherwise best bid(s) for the Sonic

Assets (a "**Successful Bid**") and which Qualified Bid(s) are the next highest and best bid(s) after the Successful Bid (the "**Back-Up Bids**"); (d) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of this Order or any other order of the Court, the Bidding Procedures, the Bankruptcy Code or other applicable law or (iii) contrary to the best interests of the Debtors and their estates; (e) adjourn or cancel the Auction with respect to any or all of the Sonic Assets in accordance with the Bidding Procedures; and (f) adjourn the Sale Hearing with respect to a Sale Transaction involving any or all of the Sonic Assets in accordance with the Bidding Procedures.

5.     In accordance with the Bidding Procedures, the Debtors, in the exercise of their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, shall have the right to modify the Bidding Procedures, including to: (a) extend or waive deadlines or other terms and conditions set forth herein; (b) adopt new rules and procedures for conducting the bidding and Auction process; (c) if applicable, provide reasonable accommodations to the Stalking Horse Bidder; and (d) otherwise modify the Bidding Procedures to further promote competitive bidding for, and maximizing the value of, the Sonic Assets.

**B.     Stalking Horse Agreement and Stalking Horse Protections**

6.     The Debtors, in the exercise of their reasonable business judgment and in a manner consistent with the Bidding Procedures, their fiduciary duties and applicable law, may designate SRI Operating Company as the Stalking Horse Bidder for the sale of the Sonic Assets and provide the Stalking Horse Protections in connection therewith.  Any Stalking Horse Bid from the Stalking Horse Bidder shall be deemed a Qualified Bid for all purposes of the Bidding Procedures, and the Stalking Horse Bidder shall be deemed a Qualified Bidder for all purposes of the Bidding Procedures.

CHAR2\2248207v3

7.     Unless authorized by order of the Court, no person or entity (other than the Stalking Horse Bidder as set forth herein) shall be entitled to any expense reimbursement or "termination," "break-up," "topping" or other similar payment or fee by the Debtors for submitting a bid for any of the Sonic Assets or in any way participating in the Auction or Sonic Asset sale process.

## C.     Bid Deadline and Auction

8.     Each person other than the Stalking Horse Bidder that intends to participate in the Auction must submit in writing to the Notice Parties (as defined in the Bidding Procedures) a Qualified Bid on or before **4:00 p.m. (EDT) on March 24, 2020** (the "**Bid Deadline**").

9.     If the Debtors receive more than one Qualified Bid for a Sonic Asset, the Debtors shall conduct an Auction for such Sonic Asset (for the avoidance of doubt, a Stalking Horse Agreement shall be deemed a Qualified Bid).  With respect to Sonic Assets for which the Debtors receive one Qualified Bid, the Debtors, in their reasonable business judgment, may determine to consummate Sale Transaction with the applicable Qualified Bidder (subject to Court approval) or include such Sonic Assets in the Auction.

10.     The Auction, if required, will be conducted at the offices of Moore & Van Allen PLLC, 100 N. Tryon St., Charlotte, North Carolina 28202 at **10:00 a.m. (EDT) on April 1, 2020**, or such other date, time and location as designated by the Debtors after providing notice to the Notice Parties and all parties entitled to attend the Auction.  The Auction shall be recorded and transcribed.

11.     In the event the Debtors determine not to hold an Auction for some or all of the Sonic Assets, the Debtors shall file with the Court, serve on the Notice Parties and cause to be published on the website maintained by Bankruptcy Management Solutions, Inc. d/b/a/ Stretto, the

-6-

Debtors' claims and noticing agent in these Chapter 11 Cases, located at    http://
https://cases.stretto.com/sdcharlotte (the "**Stretto Website**"), a notice containing the following
information (as applicable): (a) a statement that the Auction for the relevant Sonic Assets has been
cancelled; (b) the identity of the Successful Bidder; (c) a copy of the Successful Bid or a summary
of the material terms of such bid, including any assumption or assignment of Contracts
contemplated thereby; and (d) the date, time and location of the Sale Hearing.

12.    Only a Qualified Bidder that has submitted a Qualified Bid shall be eligible
to participate in the Auction, subject to any other limitations as the Debtors may reasonably impose
in accordance with the Bidding Procedures.  Qualified Bidders participating in the Auction must
appear in person at the Auction or through a duly authorized representative who has the ability to
bind such Qualified Bidder.  The Debtors may establish a reasonable limit on the number of
representatives and/or professional advisors that may appear on behalf of or accompany each
Qualified Bidder at the Auction.  Notwithstanding the foregoing, the Auction shall be conducted
openly, and all creditors shall be permitted to attend (subject to any security screening procedures
set forth in the Notice of Auction and Sale Hearing).

13.    Each Qualified Bidder participating in the Auction shall confirm in writing
on the record that (a) it has not engaged in any collusion with respect to the Auction or the
submission of any bid for any of the Sonic Assets; and (b) the Qualified Bid that gained the
Qualified Bidder admission to participate in the Auction constitutes a binding, good-faith and bona
fide offer to purchase the Sonic Assets identified in such bid.

14.    Within two business days after conclusion of the Auction, the Debtors shall
file with the Court and cause to be published on the Stretto Website, a notice setting forth the
results of the Auction (the "**Notice of Auction Results**"), which shall (a) identify each Successful

Bidder and each Back-Up Bidder; (b) include a copy of each Successful Bid and each Back-Up Bid or a summary of the material terms of such bids, including any assumption and assignment of Contracts contemplated thereby; and (c) set forth the date, time and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Notice Parties of the outcome of the Auction.

**D.      Sale Noticing and Objection Procedures**

15.      The Notice of Auction and Sale Hearing, substantially in the form attached hereto as **Exhibit 2**, is approved, and no other or further notice of the proposed sale of the Sonic Assets, the Auction, the Sale Hearing or the Sale Objection Deadline shall be required if the Debtors serve the Notice of Auction and Sale Hearing in the manner provided in the Bidding Procedures and this Order.

16.      By no later than three business days after entry of this Order, the Debtors will cause the Notice of Auction and Sale Hearing and a copy of this Order to be sent by first-class mail, postage prepaid, to the following: (a) the United States Bankruptcy Administrator for the Western District of North Carolina; (b) the Debtors' consolidated top forty (40) largest unsecured creditors as set forth in the list filed with the Debtors' petition; (c) counsel to the Prepetition Secured Lender; (d) counsel to the DIP Lender; (e) counsel to the MCA Parties, if known; (f) the Securities and Exchange Commission; (g) the Internal Revenue Service; (h) all non-Debtor parties to the Contracts and any parties who are known to claim interests therein; (i) all applicable federal, state, and local taxing authorities; (j) all applicable county and state consumer protection agencies; (k) all applicable state attorneys general; (l) all other government agencies required to receive notice under the Bankruptcy Rules; (m) counsel to the unsecured creditors committee, if one is appointed in these Chapter 11 Cases; and (n) all parties that have requested or that are required to

CHAR2\2248207v3

receive special notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Sale Notice Parties**").
In addition to the foregoing, electronic notification of the Motion, this Order and the Notice of
Auction and Sale Hearing shall also be posted on the Stretto Website.

17.     On or before three business days after entry of this Order, the Debtors will
(a) serve the Notice of Auction and Sale Hearing on all creditors appearing on the Debtors' creditor
matrix (to the extent not already served pursuant to paragraph 19); and (b) subject to applicable
submission deadlines and cost considerations (and consistent with the DIP Facility and the
Approved Budget), publish the Notice of Auction and Sale Hearing in one or more publications as
the Debtors deem appropriate.

18.     Within two business days after conclusion of the Auction, the Successful
Bidder shall complete and execute all agreements, contracts, instruments and other documents
necessary to consummate the Successful Bid.  Within two business days after conclusion of the
Auction, the Debtors shall file a notice with the Bankruptcy Court identifying the Successful
Bidder and the Back-Up Bidder.  Consummation of any Sale Transaction pursuant to a Successful
Bid shall be subject to Court approval.

19.     All Good Faith Deposits shall be returned to each bidder not selected by the
Debtors as the Successful Bidder or a Back-Up Bidder no later than five business days following
the conclusion of the Auction.

20.     All objections to any Sale Transaction (each, a "**Sale Objection**"),
including (a) any objection to the sale of any Sonic Assets free and clear of liens, claims, interests
and encumbrances pursuant to section 363(f) of the Bankruptcy Code to a Successful Bidder and/or
a Back-Up Bidder (as applicable) and (b) any objection to the entry of any Sale Order shall be (i)
in writing and state, with specificity, the legal and factual bases thereof and include any appropriate

CHAR2\2248207v3

documentation in support thereof; (ii) be filed with the Court; and (ii) served by no later than the later of (x) **4:00 p.m. (EDT) on April 3, 2020** and (y) three business days prior to the Sale Hearing (the "**Sale Objection Deadline**") on the following: (i) counsel for the Debtors, Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700, Charlotte, NC 28202 (Attn:  Zachary H. Smith, Esq.); (ii) counsel for the DIP Lender and Stalking Horse Bidder, DLA Piper LLP, One Atlantic Center 1201 West Peachtree Street, Suite 2800, Atlanta, Georgia  30309-3450 (Attn: Daniel M. Simon) and Robinson, Bradshaw & Hinson, P.A., 101 N. Tryon St., Suite 1900, Charlotte, NC 28246 (Attn: David M. Schilli); (iii) counsel for the Prepetition Secured Lender, Lazer, Aptheker, Rosella & Yedid PC, Melville Law Center, 225 Old Country Road, Melville, NY 11747 (Attn: Jennifer L. Silvestro) and Grier Wright Martinez, PA, 521 E. Morehead Street, Suite 440, Charlotte, NC 28202 (Attn: A. Cotten Wright) (collectively, the "**Objection Notice Parties**").

21.    Any party who fails to file and serve a timely Sale Objection in accordance with the terms of this Order shall be forever barred from asserting, at the Sale Hearing or thereafter, any Sale Objection, including to the consummation or performance of the applicable Sale Transaction(s) and the transfer of Sonic Assets to the applicable Successful Bidder free and clear of liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to "consent" to such sale for purposes of section 363(f) of the Bankruptcy Code.

22.    The Sale Hearing shall be held before the Court on **April 8, 2020 at 10:00 a.m. (EDT)**, or as soon thereafter as counsel and interested parties may be heard; provided, the Debtors may seek an adjournment of the Sale Hearing, consistent with the Bidding Procedures and paragraph 4 of this Order.

E.       **Assumption and Assignment Procedures**

23.      The Notice of Assumption and Assignment, substantially in the form attached hereto as **Exhibit 3**, is approved, and no other or further notice of the Debtors' proposed Cure Costs with respect to the Contracts listed on a Notice of Assumption and Assignment is necessary or required.

24.      By no later than the later of (x) March 7, 2020 and (y) three business days after the Court's entry of the Bidding Procedures Order, the Debtors shall file with the Court, serve on the applicable Counterparties and cause to be published on the Stretto Website, the Notice of Assumption and Assignment.  The Notice of Assumption and Assignment shall identify the calculation of the Cure Amounts that the Debtors believe must be paid to cure all defaults under the Assigned Contracts.  If the Debtors or Successful Bidder identify additional executory contracts or unexpired leases that might be assumed by the Debtors and assigned to the Successful Bidder or that were not set forth in the original Notice of Assumption and Assignment, the Debtors will promptly send a supplemental notice (a "**Supplemental Notice of Assumption and Assignment**") to the applicable counterparties to such additional executory contracts and unexpired leases.[4]

25.      Any objection to the Debtors' proposed Cure Amounts (each such objection, a "**Cure Objection**") shall be: (a) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (b) filed with

---

[4]  The inclusion of any contract or unexpired lease of nonresidential real property on any Notice of Assumption and Assignment or Supplemental Notice of Assumption and Assignment shall not be an admission by the Debtors or their estates that any such contract or unexpired lease so included is an executory contract.  Nor shall the inclusion of any contract or unexpired lease on any Notice of Assumption and Assignment or Supplemental Notice of Assumption and Assignment constitute an admission of liability by the Debtors or their estates or effectuate the assumption or assignment of such contract or lease, absent entry of an order of the Court approving the assumption and/or assignment of such contract or lease of nonresidential real property in conjunction or as part of the Sale Order.

the Court; and (c) served on the Objection Notice Parties by no later than the earlier of (x) fourteen
(14) days after service of the Notice of Assumption and Assignment; and (y) **March 21, 2020, at
4:00 p.m. (EDT)** (the "**Cure Objection Deadline**").

26.     The Debtors and the objecting Counterparty shall first confer in good faith
to attempt to resolve the Cure Objection without Court intervention.  If the parties are unable to
consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the Court
shall make all necessary determinations relating to the applicable Cure Amounts and Cure
Objection at the Sale Hearing.  If a Cure Objection is resolved in a manner that is not in the best
interests of the Debtors and their estates, whether or not such resolution occurs prior to or after the
closing of the applicable Sale Transaction, the Debtors may determine that any Contract subject to
such resolved Cure Objection will no longer be assumed and assigned in connection with the
applicable Sale Transaction (subject to the terms of the applicable Sale Transaction).  All other
objections to the Debtors' proposed assumption and assignment of the Debtors' right, title and
interest in, to and under a Contract shall be heard at the Sale Hearing.

27.     If a timely Cure Objection cannot otherwise be resolved by the parties, the
Cure Objection may be heard at the Sale Hearing or, at the Debtors' option, be adjourned to a
subsequent hearing (each such Cure Objection, an "**Adjourned Cure Objection**").  An Adjourned
Cure Objection may be resolved after the closing date of the applicable Sale Transaction.  Upon
resolution of an Adjourned Cure Objection and the payment of the applicable cure amount, if any,
the Contract that was the subject of such Adjourned Cure Objection shall be deemed assumed and
assigned to the applicable Successful Bidder as of the closing date of the applicable Sale
Transaction.

CHAR2\2248207v3

28.     If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty forever shall be barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract.  The Cure Amounts set forth in the applicable Notice of Assumption and Assignment shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract and satisfy the requirements of section 365(b) of the Bankruptcy Code, and the Counterparty to the Contract shall be bound by and deemed to have consented to the Cure Amounts.

29.     In accordance with the Bidding Procedures, Qualified Bids shall be accompanied by information sufficient to demonstrate the Successful Bidder's proposed form of, and ability to provide, adequate assurance of future performance with respect to each Contract to be assumed and assigned ("**Adequate Assurance Information**").  The Debtors shall use commercially reasonable efforts to furnish all available Adequate Assurance Information to the applicable Counterparties as soon as reasonably practicable following their receipt of such information.

30.     Any objection to the proposed assumption and assignment of a Contract, the subject of which objection is a Successful Bidder's (or any other relevant assignee's) proposed form of adequate assurance of future performance with respect to such Contract (each such objection, an "**Adequate Assurance Objection**") shall (a) be in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (b) be filed with the Court; and (c) served on the Objection Notice Parties by no later than the later of **(i) 4:00 p.m. (EDT) on April 3, 2020 and (ii) three business days prior to the Sale Hearing**.

31.     The Debtors and a Counterparty that has filed an Adequate Assurance Objection shall first confer in good faith to attempt to resolve the Adequate Assurance Objection

CHAR2\2248207v3

without Court intervention. If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Adequate Assurance Objection and all issues of adequate assurance of future performance of the applicable Successful Bidder (or any other relevant assignee) shall be determined by the Court at the Sale Hearing.

32.     If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any objection to the assumption and/or assignment of a Contract with regard to adequate assurance of future performance. The applicable Successful Bidder (or any other relevant assignee) shall be deemed to have provided adequate assurance of future performance with respect to a Contract in accordance with Bankruptcy Code sections 365(b)(1)(C), 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or any other document.

33.     Successful Bidders (including the Stalking Horse Bidder or Back-Up Bidder ultimately named a Successful Bidder) may, pursuant to the terms of an applicable asset purchase agreement executed with the Debtors (including the Stalking Horse Agreement), designate (a) for assumption and assignment to the applicable Successful Bidder (or other relevant assignee) Contracts that were not originally included among the Sonic Assets to be acquired in connection with the applicable Successful Bid or for which the Successful Bidder had not determined to acquire or exclude as of the filing of the Notice of Auction Results and (b) Contracts that previously were included among the Sonic Assets to be acquired in connection with the applicable Successful Bid or for which the Successful Bidder had not determined to acquire or exclude as of the filing of the Notice of Auction Results as "excluded assets" that will not be assigned to or otherwise acquired by the Successful Bidder. The Debtors shall use commercially

CHAR2\2248207v3

reasonable efforts to, as soon as reasonably practicable after the Debtors receive notice of any such designation, file with the Court, serve on the applicable Counterparties and cause to be published on the Stretto Website, a Designation Notice containing sufficient information to apprise Counterparties of the designation of their respective Contracts.

34.    As soon as reasonably practicable after the closing of a Sale Transaction, the Debtors shall file with the Court, serve on the applicable Counterparties and cause to be published on the Stretto Website, a notice containing the list of Contracts that the Debtors assumed and assigned pursuant to any asset purchase agreement with a Successful Bidder.

35.    The inclusion of a Contract or Cure Amounts with respect to any Contract on any Notice of Assumption and Assignment, shall not constitute or be deemed a determination or admission by the Debtors, any Successful Bidder or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned. The Debtors reserve all of their rights, claims and causes of action with respect to each Contract listed on any Notice of Assumption and Assignment.

36.    For the avoidance of doubt, the Stalking Horse Bidder (and any of its affiliates), as a franchisor of  the Sonic Drive-In restaurants, shall maintain any and all applicable consent rights arising under applicable law or contract, based upon whether any Successful Bidder qualifies as a potential Sonic Drive-In franchisee, consistent with Sonic Drive-In standards and qualifications employed in the ordinary course of business, it being understood that the Stalking Horse Bidder (and any of its affiliates), in its capacity as a franchisor, maintains all rights in connection with Cure Amounts associated with existing franchise agreements in the event the Successful Bidder is not the Stalking Horse Bidder.

-15-

**F.     Other Related Relief**

37.     All persons and entities that participate in the Auction or bidding for any Sonic Asset during the sale process shall be deemed to have knowingly and voluntarily (a) consented to the core jurisdiction of the Court to enter any order related to the Bidding Procedures, the Auction, or any other relief requested in the Motion or granted in this Order; (b) waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction or any other relief requested in the Motion or granted in this Order; and (c) consented to the entry of a final order or judgment in connection with any disputes relating to the Bidding Procedures, the Auction or any other relief requested in the Motion or granted in this Order, if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the relevant parties.

38.     Notwithstanding the applicability of any of Bankruptcy Rules 6004(h), 6006(d) or any other provisions of the Bankruptcy Rules the terms and provisions of this Order shall be immediately effective and enforceable upon its entry, and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

39.     The Debtors are authorized to take all steps necessary or appropriate to implement the relief granted in this Order.

40.     This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.

CHAR2\2248207v3

41.    This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order.

Charlotte, North Carolina
Date: _____, 2020

_____
The Honorable Laura T. Beyer
United States Bankruptcy Judge

## <u>Exhibit 1</u>

## Bidding Procedures

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed in connection with the proposed sale of certain tangible and intangible assets (the "Purchased Assets") of SD-Missouri, LLC and SD-Charlotte, LLC (in such capacity, the "Sellers", and collectively with RTHT Investments, LLC, SD Restaurant Group, LLC, and Southern Deli Holdings, LLC, the "Debtors"), that relate to each of the Sonic restaurant locations owned or operated by the Sellers in connection with the Debtors' jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the Western District of North Carolina (the "Court"), lead case number 20-30149.

As set forth in the *Debtors' Motion for Orders (I)(A) Approving Bidding Procedures and Auction and (B) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing the Sale of All of the Debtors' Assets related to the Sonic Drive-In Restaurants Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (III) Authorizing the Assumption and assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the "Motion"), as of the filing date of the Motion, the Sellers and SRI Operating Company (the "Stalking Horse Bidder") have reached an agreement on the salient terms and conditions for a stalking horse asset purchase agreement and are currently in the process of finalizing a definitive agreement, subject to the Court's approval.  The Debtors expect to file a supplement to the Motion containing such a definitive agreement (the "Stalking Horse Agreement") within 4 days of filing the Motion.  The sale transaction pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth herein.  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Motion.

## ASSETS TO BE SOLD

The Debtors seek to consummate a sale of some or all of the Purchased Assets (the "Sale"), which include the assets described in Section 1.1 of the Stalking Horse Agreement.  The sale of the Purchased Assets is on an "as is, where is" and "with all faults" basis and without representations, warranties or guarantees, express, implied or statutory, written or oral, of any kind, nature or description by any Seller, its affiliates or any of their respective representatives, agents or estates, except to the extent set forth in the purchase agreement of the Successful Bidder (as defined herein) as approved by the Court.  Except as otherwise provided in such approved purchase agreement, all of the Seller's right, title and interest in and to each Purchased Asset to be acquired shall be sold free and clear of all liens, claims, interests and encumbrances (collectively, the "Encumbrances"), such Encumbrances to attach solely to the net proceeds of the Sale.

## THE BIDDING PROCEDURES

In order to ensure that the Debtors receive the maximum value for the Purchased Assets, the Stalking Horse Agreement is subject to higher or better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Purchased Assets.

### Provisions Governing Qualifications of Bidders

Unless otherwise ordered by the Court, in order to participate in the bidding process, prior to the Bid Deadline (defined below), each person other than the Stalking Horse Bidder who wishes to participate in the bidding process (a "Potential Bidder") must deliver the following to the Notice Parties (as defined below):

> (i)    a written disclosure of the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid; and

(ii)    information satisfactory to the Sellers that the Potential Bidder has the financial wherewithal to consummate the proposed Sale, including payment of any cure amount with respect to any contract that may be assigned; and

(iii)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Debtors and their advisors.

A Potential Bidder that delivers the documents and information described above or that the Debtors determine, in consultation with the Consultation Parties (as defined below), is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale, will be deemed a "Qualified Bidder."

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtors will determine, in consultation with the Consultation Parties, and will notify the Potential Bidder if such Potential Bidder is a Qualified Bidder.

**Due Diligence**

The Debtors will provide any Potential Bidder such due diligence access or additional information as the Debtors deem appropriate, which may include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information; provided, however, that with respect to any strategic bidders, the Debtors may make reasonable commercial efforts to provide such strategic bidders with the same information provided to the Stalking Horse Bidder.  The Debtors will use commercially reasonable efforts to promptly (a) advise the Stalking Horse Bidder in the event any other Potential Bidder receives diligence the Stalking Horse Bidder has not previously received and deliver and (b) promptly deliver access to such diligence materials to the Stalking Horse Bidder.  The Debtors reserve the right to withhold any diligence materials that the Debtors determine are business-sensitive or otherwise not appropriate for disclosure to a competitor of Debtors; provided, that such information is withheld from all Potential Bidders and the Stalking Horse Bidder.  The due diligence period will extend through and include the Bid Deadline.  Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors.  All due diligence requests must be directed to:

Peak Franchise Capital
Attn: Michael M. Elliott
4100 Spring Valley Road, Suite 535
Dallas, TX 75244
972-982-2292
Mike.Elliott@peakfranchisecapital.com

**Provisions Governing Qualified Bids**

A bid will be considered a "Qualified Bid" only if the bid is submitted by a Qualified Bidder and the Debtors determine, in consultation with (i) the Prepetition Secured Lender, (ii) the Committee, (iii) SRI Holding Company, as lender under that certain Superpriority Debtor-in-Possession Secured Promissory Note (the "DIP Lender" and (iv) Sonic Franchising LLC, as franchisor ("Sonic" and together with the Prepetition Secured Lender, the Committee, the DIP Lender and Sonic the "Consultation Parties"), that such bid complies with all of the following:

- 2 -

a.  it states that the applicable Qualified Bidder offers to purchase, in cash or, if applicable, through a credit bid, or any combination of the two, all or a portion of the Purchased Assets upon the terms and conditions that the Debtors, in consultation with the Consultation Parties, reasonably determine are no less favorable to the Debtors than those set forth in the Stalking Horse Agreement;

b.  it offers to purchase all or substantially all of the Purchased Assets or only a portion of the Purchased Assets; provided, however, that a Bid that offers to purchase only a portion of the Purchased Assets may only be a Qualified Bid to the extent that the value of such Bid, in combination with the value of other Bids for other Purchased Assets, exceeds the Minimum Initial Overbid Amount (as defined below) applicable to Qualified Bids for all or substantially all the Purchased Assets;

c.  it includes a signed writing stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder (each, as defined below) its offer shall remain irrevocable until the later of (i) the closing of the Sale to the Successful Bidder or the Back-Up Bidder, and (ii) the date that is twenty (20) days after the Sale Hearing;

d.  it includes confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the submission of the Bid;

e.  it includes a duly authorized and executed copy of an asset purchase agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement (an "Asset Purchase Agreement");

f.  it includes financial statements or other written evidence, including (if applicable) a firm, irrevocable commitment for financing, establishing the ability of the Qualified Bidder to consummate the proposed Sale and pay the Purchase Price, including payment of any cure amount with respect to any contract that may be assigned, in cash, such as will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Asset Purchase Agreement;

g.  it has a value to the Debtors, determined in the Debtors' reasonable business judgment after consultation with the Committee that is greater than or equal to the sum of the value offered under the Stalking Horse Agreement, plus (i) the aggregate amount of the Stalking Horse Protections, plus (ii) $250,000 (the "Minimum Initial Overbid Amount");

h.  it identifies with particularity which Contracts the Qualified Bidder wishes to assume and provides details of the Qualified Bidder's proposal for the treatment of related cure costs and the provision of adequate assurance of future performance to the counterparties to such Contracts, it being understood that in connection with a third-party Qualified Bidder's proposal that the franchise agreements among the Debtors and Sonic (or its affiliates) be assumed and assigned, with all pre-petition defaults being cured;

CHAR2\2248998v4

i. to the extent such Qualified Bidder is not already an approved Sonic franchisee, it provides reasonable information necessary or appropriate for Sonic to determine whether such Qualified Bidder can provide adequate assurance of future performance under Sonic franchise agreements, which such information shall be consistent with the documentation, financial statements, and other information customarily required by Sonic in connection with its franchisee approval process;

j. it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Asset Purchase Agreement; and (iv) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its Bid;

k. it includes evidence, in form and substance reasonably satisfactory to the Debtors, in consultation with the Consultation Parties, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement;

l. it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, in consultation with the Consultation Parties, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to 10% of the Purchase Price (a "Good Faith Deposit");

m. it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Sellers; and

n. it is received prior to the Bid Deadline (as defined below).

Notwithstanding the foregoing, the Stalking Horse Bidder shall be deemed a Qualified Bidder, and the Stalking Horse Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale without compliance with the above enumerated requirements.

The Debtors reserve the right to negotiate with any Qualified Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid.

No later than one (1) business day prior to the Auction, the Debtors shall notify the Stalking Horse Bidder, the DIP Lender, the Prepetition Secured Lender and all Qualified Bidders in writing as to whether or not any bids (other than the Stalking Horse Agreement) constitute Qualified Bids, and will notify each Qualified Bidder that has submitted a bid (other than the Stalking Horse Bidder), whether such Qualified Bidder's bid constitutes a Qualified Bid promptly after such determination has been made.

Each Potential Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Potential Bidder's financial wherewithal to consummate the Sale. Failure by the Potential Bidder to comply with such requests may be a basis for the Debtors to determine that a

Potential Bidder is not a Qualified Bidder and that bid made by a Potential Bidder or a Qualified Bidder is not a Qualified Bid.

### Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) proposed counsel to the Debtors: Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, NC 28202 (Attn: Zachary H. Smith), zacharysmith@mvalaw.com; (ii) counsel to the Stalking Horse Bidder, the DIP Lender and Sonic: DLA Piper LLP (US), 1201 W. Peachtree Street N.E., Suite 2800, Atlanta, GA 30309 (Attn: Daniel M. Simon), daniel.simon@dlapiper.com; (iii) counsel to the Prepetition Secured Lender, Lazer, Aptheker Rosella & Yedid, P.C., Melville Law Center, 225 Old Country Road, Melville, NY 11747 (Attn: Jennifer L. Silvestro), silvestro@larypc.com; and (iv) counsel to the Committee, if any, so as to be received by the foregoing parties no later than 4:00 p.m. (EST) on March 24, 2020 (the "Bid Deadline"). The Bid Deadline may be extended by the Debtors in consultation with the Consultation Parties.

### Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, (1) the amount of the Purchase Price provided by such bid, (2) the risks and timing associated with consummating such bid, (3) any proposed revisions to the Stalking Horse Agreement and/or the proposed sale order, (4) the ability of the Qualified Bidder to obtain appropriate franchise approvals, and (5) any other factors deemed relevant by the Debtors, in consultation with the Committee (and to the extent that the Stalking Horse Bidder does not have a Subsequent Bid pending, the DIP Lender). For purposes of such valuation, the full face amount of a credit bid shall be deemed to have the same value as the equivalent amount of cash. The Debtors shall treat comparable credit bids and cash bids as equivalent and no credit bid shall be considered inferior to a comparable cash bid because it is a credit bid. The DIP Lender shall have the right, and neither the Debtors nor the Prepetition Secured Lender shall oppose such right, to credit bid any or all of the obligations under the DIP Facility in connection with any disposition of property of the Debtors' estates. The Prepetition Secured Lender shall have the right to credit bid any or all of the obligations owed to it by the Debtors in connection with any disposition of property of the Debtors' estates; provided, however, that the following conditions must be met: (i) such credit bid by the Prepetition Secured Lender may be exercised only at an Auction (as defined below) in the event that a third-party (other than the Stalking Horse Bidder or the Prepetition Secured Lender) timely submits a bid that is higher and otherwise better than the Stalking Horse Bidder's bid; (ii) prior to the Auction, the Prepetition Secured Lender identifies an operator that is acceptable to Sonic in its sole discretion, and provides adequate assurance of future performance in connection with the assumption and assignment of the franchise agreements; and (iii) contains a minimum cash component necessary to pay, among other things, the outstanding obligations under the DIP Facility, the Stalking Horse Protections any cure payments necessary associated with the assumption/assignment of executory contracts and unexpired leases, including amounts owing to the Stalking Horse Bidder (or its affiliates') under its franchise agreements.

### No Qualified Bids

If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement, the Debtors will not hold an auction and the Stalking Horse Bidder will be named the Successful Bidder upon the expiration of the Bid Deadline.

CHAR2\2248998v4

**Auction Process.**

If the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Agreement, the Debtors will conduct an auction of the Purchased Assets (the "Auction"), which shall take place at <u>10:00 a.m. (EDT) on April 1, 2020</u>, at the offices of Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202, or such other date, time and location as shall be timely communicated to all entities entitled to attend the Auction. The Auction, which shall be recorded and transcribed, shall run in accordance with the following procedures:

a. only the Debtors, the Stalking Horse Bidder, any other Qualified Bidder that has timely submitted a Qualified Bid, the Prepetition Secured Lender, the DIP Lender, Sonic and the Committee, and the advisors to each of the foregoing shall attend the Auction in person;

b. only the Stalking Horse Bidder and such other Qualified Bidders who have timely submitted Qualified Bids will be entitled to make any subsequent bids at the Auction;

c. the Stalking Horse Bidder will, notwithstanding the elements of the Stalking Horse Purchase Price, be entitled to make subsequent bids for all or substantially all or any combination of the Purchased Assets comprised of further credit bids, cash, additional or different consideration of any type, or any combination of the foregoing;

d. each Qualified Bidder shall be required to confirm that it has not engaged in any collusion, within the meaning of section 363(n) of the Bankruptcy Code with respect to any Bids submitted or not submitted in connection with the Sale;

e. at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction <u>and</u> all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person; <u>provided</u> that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the selection of the Successful Bidder and Back-Up Bidder at the conclusion of the Auction. At least one (1) business day prior to the Auction, the Debtors will provide copies of the Qualified Bid, or combination of Qualified Bids, which the Debtors believe, after consultation with the Consultation Parties, is the highest or otherwise best offer for all or any portion of the Purchased Assets (the "<u>Starting Bid</u>") to the Stalking Horse Bidder and all other Qualified Bidders who have timely submitted Qualified Bids. For the avoidance of doubt, the Starting Bid may comprise multiple Qualified Bids if bids are submitted for less than all of the Purchased Assets, so long as the aggregate consideration paid in connection with such multiple Qualified Bids, taken together, represents the highest and best offer for the Purchased Assets;

f. all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction;

g. the Debtors, after consultation with the Consultation Parties, may modify, employ and announce at the Auction additional or amended procedural rules that are

- 6 -

reasonable under the circumstances for conducting the Auction, <u>provided</u> that such rules (i) are not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith; and (ii) are disclosed to each Qualified Bidder attending the Auction; and

h.    bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each, a "<u>Subsequent Bid</u>") providing a net value to the Debtors' estates of at least $100,000 above the prior bid.  After the first round of bidding and between each subsequent round of bidding, the Debtors, after consultation with the Committee (and to the extent that the Stalking Horse Bidder does not have a Subsequent Bid pending, the DIP Lender), shall announce the bid (and the value of such bid) that they believe to be the highest or otherwise best Bid (each, the "<u>Leading Bid</u>").

i.    A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

j.    Except as specifically set forth herein, for the purpose of evaluating the value of the Purchase Price provided by each Subsequent Bid (including any Subsequent Bid by the Stalking Horse Bidder), the Debtors shall consider the Stalking Horse Protections as well as any additional liabilities to be assumed by a Qualified Bidder, and any additional costs which may be imposed on the Debtors.

k.    The Debtors may accept bids for any portion of the Purchased Assets, as well as bids for substantially all of the Purchased Assets; <u>provided</u>, <u>however</u>, that a Qualified Bid that offers to purchase only a portion of the Purchased Assets may only be part of the Successful Bid to the extent that the value of such Qualified Bid, in combination with the value of other Qualified Bids for other Purchased Assets, exceeds the value of any then-pending Qualified Bid for all or substantially all the Purchased Assets.

## <u>Selection of Successful Bid</u>

Prior to the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, will review and evaluate each Qualified Bid submitted at the Auction (including by the Stalking Horse Bidder) in accordance with the procedures set forth herein and determine which offer is the highest or otherwise best offer (one or more such bids, collectively the "<u>Successful Bid</u>" and the bidder(s) making such bid(s), collectively, the "<u>Successful Bidder</u>"), and communicate to the Stalking Horse Bidder and the other Auction participants the identity of the Successful Bidder and the details of the Successful Bid.  The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final, subject only to approval by the Court.  In determining whether a bid is a Successful Bid, in the exercise of their reasonable, good-faith business judgment, and in the exercise of their fiduciary duties, the Debtors shall, in good faith, consider, *inter alia*, the following factors:

a.    The total expected consideration to be received by the Debtors;

b.    The likelihood of the bidder's ability to close a transaction and the timing thereof;

c.    The ability of the bidder to satisfy necessary approvals (regulatory, Sonic franchisee, or otherwise), and the timing for obtaining such; and

d.    The expected net benefit to the estates.

CHAR2\2248998v4

The Qualified Bidder with the next highest or otherwise best Qualified Bid, as determined by the Debtors in consultation with the Committee and the Prepetition Secured Lender (and to the extent that the Stalking Horse Bidder does not have a Subsequent Bid pending, the DIP Lender), will be required to serve as the back-up bidder ("Back-Up Bidder") and its bid open and irrevocable until the later to occur of twenty (20) days after the Sale Hearing and closing on the Successful Bid with the Successful Bidder; provided, unless stated on the record at the Auction, the Stalking Horse Purchaser agrees that if it is not the Successful Bidder at the Auction, it will serve as the Back-Up Bidder on the terms set forth in the Stalking Horse Agreement (and not any subsequent bids made by Stalking Horse Purchaser at the Auction), in the event the Successful Bidder fails to consummate the Sale. If the Successful Bidder fails to consummate the Sale, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized and directed to consummate the Sale with the Back-Up Bidder without further order of the Court.

Within two (2) business days after conclusion of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents necessary to consummate the Successful Bid. Within two (2) business days after conclusion of the Auction, the Debtors shall file a notice with the Court identifying the Successful Bidder and the Back-Up Bidder.

The Debtors will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Court at the Sale Hearing.

### Return of Deposits

The Good Faith Deposit of the Successful Bidder shall, upon consummation of the Successful Bid, be credited to the purchase price paid. If the Successful Bidder fails to consummate the Successful Bid, then the Good Faith Deposit shall be forfeited to, and retained by, the Debtors in accordance with the applicable transaction agreement. All Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder no later than five (5) business days following the conclusion of the Auction.

## THE STALKING HORSE PROTECTIONS

In recognition of its expenditure of time, energy, and resources, the Debtors have agreed that if the Stalking Horse Bidder is not the Successful Bidder, the Debtors will pay the Stalking Horse Bidder (i) an aggregate break-up fee equal to $450,000, solely to the extent that the final order approving the Debtors' postpetition financing from the DIP Lender does not provide for a "roll-up" of at least $450,000 of prepetition obligations due and owing by SD-Missouri to the DIP Lender and (ii) an amount in cash equal to the aggregate amount of the reasonable charges, costs, fees, payments, and expenses (including, without limitation, all reasonable fees, expenses and disbursements of any representatives of the Stalking Horse Bidder) paid or incurred by or on behalf of Stalking Horse Bidder relating to or in connection with its bid, to the extent not otherwise paid, which such amount shall be estimated and communicated to the Qualified Bidders on or prior to the Auction (the "Expense Reimbursement," and together with the Break-Up Fee, the "Stalking Horse Protections"). The Stalking Horse Protections shall be payable as provided for pursuant to the terms of the Stalking Horse Agreement.

The Sellers have agreed that their obligation to pay the Stalking Horse Protections pursuant to the Stalking Horse Agreement shall survive termination of the Stalking Horse Agreement, and, to the extent owed by the Sellers, constitute an administrative expense claim under sections 503(b) and 507 of the Bankruptcy Code against each Seller, and, notwithstanding section 507(a) of the Bankruptcy Code, be payable in accordance with the terms and conditions of the Stalking Horse Agreement and the Bidding Procedures Order.

**SALE HEARING**

The Debtors will seek entry of an order from the Court at a hearing (the "Sale Hearing") to begin on or before April 8, 2020 at 10:00 a.m. (EDT), subject to the availability of the Court, to approve and authorize the Sale to the Successful Bidder on the terms and conditions memorialized in the Successful Bid and in accordance with the Bidding Procedures.

- 9 -

**Exhibit 2**

**Notice of Auction and Sale Hearing**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

_____
                                                )
In re:                                          )        Chapter 11 (Joint Administration)
                                                )
SD-Charlotte, LLC, *et al.*,[1]                 )        Case No. 20-30149
                                                )
            Debtors.                            )
                                                )
_____)

## NOTICE OF AUCTION AND SALE HEARING

### PLEASE TAKE NOTICE THAT:

1.      On February 17 2020, SD-Charlotte, LLC, RTHT Investments, LLC, SD Restaurant Group, LLC, SD-Missouri, LLC and Southern Deli Holdings, LLC (the "Debtors") filed a motion (the "Motion")[2] [Docket No. __] for Orders Pursuant to 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002 and 6004 (I)(A) Approving Bidding Procedures and Auction and (B) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing the Sale of Substantially All of the Sonic Drive-In Restaurants Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief.

2.      The Debtors are seeking to sell the Sonic Assets to the Successful Bidder(s) or Back-Up Bidder(s).  Approval of the sale of Sonic Assets to either the Successful Bidder(s) or Back-Up Bidder(s) may result in, among other things, the assumption, assignment and/or transfer by the Debtors of certain executory contracts and unexpired leases.  If you are a party to an executory contract or lease with one or more of the Debtors, you will receive a separate notice that contains relevant dates and other information that may impact you as a party to any such executory contract or lease.

3.      On _____, 2020, the United States Bankruptcy Court for the Western District of North Carolina entered the Bidding Procedures Order.  Pursuant to the Bidding Procedures Order, if the Debtors receive any Qualified Bids (as defined in the Bidding Procedures), other than the bid of the Sonic Stalking Horse Bidder, auction for any or all

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: SD-Charlotte, LLC (7237); RTHT Investments, LLC (2540); SD Restaurant Group, LLC (0331); SD-Missouri, LLC (8294) and Southern Deli Holdings, LLC (9425).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

1

of the Sonic Assets shall take place on **April 1, 2020, at 10:00 a.m. (EDT)**, at the offices of Moore & Van Allen PLLC, 100 North Tryon, Suite 4700, Charlotte, NC 28202, or at such other place and time as the Debtors shall notify all Qualified Bidders and other invitees and creditors.  Only parties that have submitted a Qualified Bid in accordance with the Bidding Procedures, attached to the Bidding Procedures Order as Exhibit 1, by no later than **March 24, 2020 at 4:00 p.m. (EDT)** (the "Bid Deadline"), may participate at the Auction.  If, however, no such Qualified Bid is received by the Bid Deadline (other than the bid of the Sonic Stalking Horse Bidder), then the Auction will not be held.  Any party that wishes to take part in this process and submit a bid for the Sonic Assets must submit its bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

4.     The Sale Hearing to consider approval of the Sale of the Sonic Assets to the Successful Bidder(s) or Back-Up Bidder(s) free and clear of all liens, claims and encumbrances will be held before the Honorable Laura T. Beyer in the United States Bankruptcy Court for the Western District of North Carolina, 401 West Trade Street Charlotte, NC 28202 on **April 8, 2020, at 10:00 a.m. (EDT)**, Courtroom 1-5, or at such other time thereafter as counsel may be heard.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

5.     Objections, if any, to the Sale, adequate assurance of future performance by the Sonic Stalking Horse Bidder, or the relief requested in the Motion (other than with respect to (i) cure amounts (which are subject to a separate notice)); or (ii) the conduct of the Auction or adequate assurance of future performance if the Sonic Stalking Horse Bidder is not the Successful Bidder (which are subject to paragraph 6 below)) must:  (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the clerk of the Bankruptcy Court for the Western District of North Carolina, 401 West Trade Street, Room 111, Charlotte, NC 28202, on or before the later of (x) **April 3, 2020 at 4:00 p.m. (EDT)** and (y) three business days prior to the Sale Hearing  (the "Sale Objection Deadline"), or such later date and time as the Debtors may agree; and be served so as to be received no later than 4:00 p.m. (EDT) on the same day, upon counsel for the Debtors, Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700, Charlotte, NC 28202 (Attn:  Gabriel Mathless, Esq.).

6.     Objections, if any, to the conduct of the Auction, or adequate assurance of future performance by the Successful Bidder if the Successful Bidder is not the Sonic Stalking Horse Bidder, may be raised at the Sale Hearing.

**7.     UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER HEARING AND NOTICE.**

8.     This Notice and the Sale Hearing is subject to the complete terms and conditions of the Motion, the Bidding Procedures Order, and the Bidding Procedures, which shall control in the event of any conflict and the Debtors encourage parties-in-

2

interest to review such documents in their entirety.  Parties interested in receiving more information regarding the sale of the Sonic Assets or in obtaining a copy of any related document, subject to any necessary confidentiality agreement, may make a written request to proposed counsel for the Debtors, Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700, Charlotte, NC 28202 (Attn:  Gabriel Mathless, gabemathless@mvalaw.com).

Dated:  February [__], 2020     **MOORE & VAN ALLEN PLLC**

_____
Zachary H. Smith (NC Bar 48993)
Hillary B. Crabtree (NC Bar 26500)
James Langdon (NC Bar 23241)
Gabriel Mathless (NC Bar 48857)
Joanne Wu (NC Bar 55044)
100 N. Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 339-5968
Email:    hillarycrabtree@mvalaw.com
Email:    jimlangdon@mvalaw.com
Email:    gabemathless@mvalaw.com
Email:    joannewu@mvalaw.com

*Proposed Counsel to the Debtors and Debtors-In-Possession*

3

## Exhibit 3

**Notice of Assumption and Assignment**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____
                                              )
In re:                                        )        Chapter 11 (Joint Administration)
                                              )
SD-Charlotte, LLC, *et al.*,[1]               )        Case No. 20-30149
                                              )
        Debtors.                              )
                                              )
_____)

## NOTICE OF ASSUMPTION AND ASSIGNMENT

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On [_____], the United States Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court") entered an order (the "Bidding Procedures Order"),[2] pursuant to sections 105(a), 363, 365, 503, 506, 507 and 552 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy, in the chapter 11 cases of SD-Charlotte, LLC, RTHT Investments, LLC, SD Restaurant Group, LLC, SD-Missouri, LLC and Southern Deli Holdings, LLC (the "Debtors") approving, among other things, the fixing of cure amounts (the "Cure Amounts") related to the Debtors' potential assumption, assignment and/or transfer of certain executory contracts, unexpired leases, and other agreements (the "Executory Contracts and Unexpired Leases") listed on **Exhibit A** annexed hereto in connection with the sale (the "Sale") of certain of the Debtor's assets (the "Assets").  The Debtors may assume, assign, and/or transfer the Executory Contracts and Unexpired Leases to the Successful Bidder or Back-Up Bidder for the Assets under the bidding procedures (the "Bidding Procedures") approved by the Bankruptcy Court and attached to the Bidding Procedures Order as Exhibit 1.  A hearing to consider approval of the Sale of the Assets to the Successful Bidder or Back-Up Bidder free and clear of all liens, claims and encumbrances will be held before the Honorable Laura T. Beyer in the United States Bankruptcy Court for the Western District of North Carolina, 401 West Trade Street Charlotte, NC 28202 on **April 8, 2020 at 10:00 a.m. (EDT)**, or at such other time thereafter as counsel may be heard (the "Sale Hearing").

2.      **The Debtors have identified the Executory Contract(s) or Unexpired Lease(s) to which you are a party listed on Exhibit A.**  In the event that a determination is made by the Debtors and the Successful Bidder(s) or Back-Up Bidder(s) to seek

_____

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: SD-Charlotte, LLC (7237); RTHT Investments, LLC (2540); SD Restaurant Group, LLC (0331); SD-Missouri, LLC (8294) and Southern Deli Holdings, LLC (9425).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

CHAR2\2248399v2

assumption and assignment of such Executory Contract(s) or Unexpired Lease(s) in connection with the Sale, the Debtors believe that any and all defaults (other than the filing of these Chapter 11 Cases) and actual pecuniary losses under the Executory Contracts and Unexpired Leases can be cured by the payment of the Cure Amounts listed on **Exhibit A** annexed hereto.  If no amount is listed on the Notice of Assumption and Assignment with respect to an Executory Contract or Unexpired Lease, the Debtors believe that there is no Cure Amount applicable to such Executory Contract or Unexpired Lease.

3.	Any objections to (i) the assumption, assignment and/or transfer of an Executory Contract or Unexpired Lease; or (ii) the amount asserted as the Cure Amount (each, a "Cure Amount/Assignment Objection"), must be in writing and shall set forth the cure amount being claimed by the objecting party, the dates and corresponding amounts of the alleged defaults by the Debtors, and a brief statement of any and all other grounds for objection to assumption and assignment.  If a Cure Amount/Assignment Objection is timely filed, the Debtors, with the approval of the Successful Bidder, may resolve any Cure Objection by mutual agreement with the objecting counterparty to any Executory Contract or Unexpired Lease without further order of the Court.  In the event that the Debtors, the Successful Bidder and any objecting party are unable to consensually resolve any Cure Objection prior to the Sale Hearing, the Debtors shall request that the Court resolve such Cure Objection at the Sale Hearing.

4.	Unless the Cure Amount/Assignment Objection is timely filed and served, the assumption, assignment and/or transfer of the applicable Executory Contracts and Unexpired Leases will proceed without further notice at the Sale Hearing.

5.	Parties that fail to file and serve timely Cure Amount/Assignment Objections shall (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract or Unexpired Lease and the Debtors shall be entitled to rely solely upon the Cure Amount listed on **Exhibit A**; and (ii) subject to the procedures for objecting to adequate assurance of future performance as set forth below, be deemed to have consented to the assumption, assignment and/or transfer of such Executory Contract or Unexpired Lease to the Successful Bidder or Back-Up Bidder and shall be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder or Back-Up Bidder, in relation to this sale, that any additional amounts are due or defaults exist, or additional conditions to assumption, assignment and/or transfer must be satisfied, under such Executory Contract or Unexpired Lease.

6.	If no Cure Amounts are due under an Executory Contract or Unexpired Lease, or if the non-Debtor Party agrees to the Cure Amounts listed on **Exhibit A** hereto, and the non-Debtor party to the Executory Contract or Unexpired Lease does not otherwise object to the Debtors' assumption, assignment and/or transfer of the Executory Contract or Unexpired Lease, no further action needs to be taken on the part of that non-Debtor party.

7.	To be considered a timely Cure Amount/Assignment Objection, the Cure Amount/Assignment Objection must be filed with the Bankruptcy Court and served upon (i) counsel for the Debtors, Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700,

Charlotte, NC 28202 (Attn:  Hillary B. Crabtree) ("MVA") by no later than the earlier of (x) fourteen (14) days after service of this Notice and (y) March 21, 2020, at 4:00 p.m. (EDT) (the "Cure/Assignment Objection Deadline").

8.     Any objection (the "Stalking Horse Adequate Assurance Objection") concerning whether the Stalking Horse Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code must be in writing and set forth with specificity the nature of the objection.  To be considered a timely Stalking Horse Adequate Assurance Objection, the Stalking Horse Adequate Assurance Objection must be filed with the Bankruptcy Court and served upon MVA by no later than the later of (x) April 3, 2020 at 4:00 p.m. (EDT) and (y) three business days prior to the Sale Hearing.

9.     An entity other than the Stalking Horse Bidder may be selected as the Successful Bidder(s) or Back-Up Bidder(s) at the Auction.  The non-Debtor counterparty to any Executory Contract or Unexpired Lease wishing to know the identities of all Qualified Bidders (and therefore potential Successful Bidders(s)), and the actual Successful Bidder, prior to the Sale Hearing, may provide such non-Debtor counterparty's email address or fax number to Debtors' counsel (at the contact information provided below) prior to the Bid Deadline.  All such parties who provide an email address or fax number to Debtors' counsel as provided in the immediately preceding sentence (i) will be emailed by Debtors' counsel the identities of all Qualified Bidders the day after the Bid Deadline; and (ii) if they wish, may request prior to the Auction copies from Debtors' counsel of the adequate assurance information submitted to the Debtors by any Qualified Bidder (which information shall be provided subject to such non-Debtor counterparty's entry into a confidentiality agreement acceptable to such Qualified Bidder).  All such non-Debtors counterparties who provide an email address or fax number to Debtors' counsel in accordance with the foregoing will be notified of the Successful Bidder by email from Debtors' counsel immediately (and by no later than two (2) hours) after the Auction concludes.  If the Stalking Horse Bidder is not the Successful Bidder, then any objection by non-Debtor parties to the Assigned Contracts solely concerning the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code may be raised at the Sale Hearing.

10.     The Successful Bidder(s) or Back-Up Bidder(s), as the case may be, may determine to exclude any Executory Contract or Unexpired Lease from the list of Executory Contracts and Unexpired Leases proposed to be assumed and assigned under the Purchase Agreement or Stalking Horse Agreement through the Closing Date; provided, however, the non-Debtor party or parties to any such excluded contract or lease will be notified of such exclusion by written notice mailed within two (2) business days of such determination.

11.     The Debtors' decision to sell, assign and/or transfer to the Successful Bidder(s) or Back-Up Bidder(s) the Executory Contracts and Unexpired Leases is subject to Court approval and the Sale Closing Date.  Accordingly, absent such Sale Closing Date, the Executory Contracts and Unexpired Leases shall not be deemed to be sold, assigned and/or transferred, and shall in all respects be subject to further administration under the Bankruptcy Code.  The inclusion of any document on the list of Executory Contracts and

Unexpired Leases shall not constitute or be deemed to be a determination or admission that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).  Nor shall the inclusion of any document constitute an admission of liability by the Debtors or their estates.

Dated:  March [_], 2020          **MOORE & VAN ALLEN PLLC**

                                   _____

Zachary H. Smith (NC Bar 48993)
Hillary B. Crabtree (NC Bar 26500)
James Langdon (NC Bar 23241)
Gabriel Mathless (NC Bar 48857)
Joanne Wu (NC Bar 55044)
100 N. Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 339-5968
Email:    hillarycrabtree@mvalaw.com
Email:    jimlangdon@mvalaw.com
Email:    gabemathless@mvalaw.com
Email:    joannewu@mvalaw.com

*Proposed Counsel to the Debtors and Debtors-In-Possession*