**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

In re:

**SD-CHARLOTTE, LLC, et al.,**[1]
    Debtors.

Case No. 20-30149

Chapter 11

**LIMITED OBJECTION BY NWWP LP TO MOTION OF THE DEBTORS PURSUANT TO SECTIONS 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND 507 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDER; (IV) SCHEDULING A FINAL HEARING UNDER BANKRUPTCY RULES 4001(b) AND (c); AND (V) GRANTING RELATED RELIEF**

NWWP LP ("Landlord"), by and through its undersigned counsel, hereby files this limited objection (the "Objection") to the *Motion of the Debtors Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing Debtors to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Lender; (IV) Scheduling a Final Hearing Under Bankruptcy Rules 4001(B) and (C); and (V) Granting Related Relief* [D.N. 18] (the "Motion"). In support of this Objection, Landlord respectfully states as follows:

**BACKGROUND**

1.  On February 7, 2020, SD-Charlotte, LLC and its affiliated debtors and debtors in possession (together, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code.

2.  Landlord is the lessor with regard to that certain *Shopping Center Lease*, dated on

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: SD-Charlotte, LLC (7237); RTHT Investments, LLC (2540); SD Restaurant Group, LLC (0331); SD-Missouri, LLC (8294); and Southern Deli Holdings, LLC (9425).

or about July 28, 2017, as amended, between it and lessee and debtor RTHT Investments, LLC

(the "Debtor"), for certain space in the shopping center located at 316 Colonades Way, Suite

206-C, Cary, North Carolina 27518 (the "Premises"; as amended and supplemented from time to

time, the "Lease"). Debtor SD Missouri, LLC is a guarantor under the Lease pursuant to its own

*Guaranty of Lease*. A copy of the Lease and the guaranty is Exhibit A hereto.

3.      By the Motion, the Debtors seek the Court's approval of post-petition financing

and, among other things, the granting of liens in connection therewith. An interim order dated

February 11, 2020 has already been entered with respect to the Motion (the "Interim Order")

[D.N. 59], and a final hearing is scheduled to consider further relief on March 4, 2020 at 2:00

p.m. Interim Order, ¶ 22.

4.      Paragraph 5(a) of the Interim Order grants perfected, first-priority liens in what

appears to be nearly all of the Debtors' assets, subject to an inapplicable carveout. Paragraph

6(a)(i) of the attached *Superpriority Debtor-in-Possession Secured Promissory Note* is similarly

broad.

5.      For the reasons set forth herein, Landlord objects to certain relief sought by the

Debtors in the Motion.

## **LIMITED OBJECTION**

6.      Landlord objects to the Motion, Interim Order, any final order, all loan

documents, and any other documents filed with the Court to the extent the Debtor to grants,

assigns, or pledges any mortgage, lien, and/or security interest in the Lease, the leasehold

interests, the Premises, or any other property of the Landlord.

7.      Part of the Lease is a *Lease Addendum* (beginning on PDF page 93 of Exhibit A)

that discusses Debtor financing and limits the Debtor's ability to lien certain property in

paragraph 8:

PPAB 5433032v1

> Lessee Financing. Notwithstanding anything to the contrary contained in this Lease, Lessee shall have the right to obtain financing secured by its inventory, personal property, movable fixtures and equipment. Further, for so long as there exists any third party financing, Lessor hereby waives any contractual or statutory lien available to Lessor with respect to Tenant's inventory, personal property, movable fixtures and equipment. **Under no circumstances, however, shall Lessee's lender or Franchisor have any security interest in any permanent leasehold improvements or to the leasehold estate itself or to any fixtures or improvements paid for in whole or in part with any Allowance provide by Landlord; and further, under no circumstances shall the lender have any greater rights than does the Lessee under the Lease, unless otherwise specifically provided in the document, which document shall be subject to Lessor's reasonable approval.**

Emphasis added.

8.      There are also subordination provisions in the Lease.  Paragraph 26(a) states in part:

> Upon request by any holder of a mortgage ("Mortgagee") which now or hereafter has a mortgage encumbering the Shopping Center ("Mortgage"), Tenant covenants and agrees to subordinate Tenant's rights under this Lease to such Mortgagee, and to any and all advances to be made under its Mortgage and the interest thereon, and to all renewals, modifications, replacements, and extensions thereof.

And paragraph 45 states:

> **QUIET ENJOYMENT.**  Upon payment by Tenant of the rents herein provided, and upon the observance of all covenants, terms and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term without hindrance or interruption by Landlord or any other person or persons lawfully claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease, and any mortgage and/or deed of trust to which this Lease is subordinate.

9.      The Debtors now seemingly seek to invalidate, or at least adversely affect, these Lease terms, perhaps among other terms, in connection with DIP financing.

10.      Section 365 of the Bankruptcy Code requires that the Debtor timely perform its obligations under the Lease (until assumption and assignment or rejection of the same).  The lien and encumbrance covenants at issue are material and enforceable provisions of the Lease that affect Landlord's ability to finance, refinance, and convey its property.  The Debtors have

provided no basis or authority for disregarding such terms.

11.     To address this issue, acceptable language to Landlord in the final order would be,

for example:

> For the avoidance of doubt and notwithstanding anything to the contrary contained herein, any loan documents, any other Orders of the Court, and otherwise, unless expressly permitted by the terms of the applicable lease, any mortgages, liens, and/or security interests granted, assigned, and/or pledged under this Final Order shall not include the Debtors' real property leases, the leased premises, the Debtors' interests in any such leases or premises, and any lessor property, but shall include the proceeds from the disposition of all such leases.

## RESERVATION OF RIGHTS

12.     Landlord expressly reserves all rights and waives none, including any and all

rights to supplement or amend this Objection.

## JOINDER

13.     Landlord joins in the objections to the Debtors' requested relief filed by other

landlords to the extent they are not inconsistent with this Objection.

## CONCLUSION

WHEREFORE, the Landlord respectfully requests that this Court enter an order: (a)

sustaining this Objection; (b) modifying the relief request by the Debtors to address the issues

raised by Landlord; and (c) granting Landlord such other and further relief as this Court deems

just and appropriate under the circumstances.

This the 20th day of February, 2020.

/s/ Ashley A. Edwards, Esq.
Ashley A. Edwards, Esq. (NC Bar No. 40695)
Parker Poe Adams & Bernstein LLP
401 South Tryon Street, Suite 3000
Charlotte, North Carolina 28202
Telephone: (704) 372-9000
ashleyedwards@parkerpoe.com
*Attorney for NWWP LP*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **OBJECTION** with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the following:

Hillary B. Crabtree
Zachary H. Smith
Joanne Wu
Moore & Van Allen PLLC
100 N. Tryon Street, Suite 4700
Charlotte, NC 28202-4003
*Attorney for Debtor*

U.S. Bankruptcy Administrator Office
402 W. Trade Street
Suite 200
Charlotte, NC 28202-1669

Felton Parrish
Hull & Chandler, P.A.
1001 Morehead Square Drive, Suite 450
Charlotte, NC 28203
*Attorney for Debtor*

This the 20th day of February, 2020.

/s/ Ashley A. Edwards, Esq.
Ashley A. Edwards, Esq. (NC Bar No. 40695)
Parker Poe Adams & Bernstein LLP
401 South Tryon Street, Suite 3000
Charlotte, North Carolina 28202
Telephone: (704) 372-9000
ashleyedwards@parkerpoe.com
*Attorney for NWWP LP*

**EXHIBIT A**

SHOPPING CENTER LEASE

BETWEEN

NWWP LP,
a Delaware limited partnership
Landlord

AND

RTHT INVESTMENTS, LLC,
a Delaware limited liability company,
Tenant

FOR

Mod Pizza
Suite 206-C
302 Colonades Way
Cary, North Carolina 27518

Dated: _July 28_, 2017

WAVERLY PLACE, CARY, NORTH CAROLINA

300609184 v5

**INDEX**

| Article | Title |
|---|---|
| | Fundamental Lease Provisions |
| 1 | References |
| 2 | Premises |
| 3 | Term |
| 4 | Minimum Rent |
| 5 | Intentionally Omitted |
| 6 | Percentage Rent |
| 7 | Gross Sales Defined |
| 8 | Landlord and Tenant's Work/Tenant Allowance |
| 9 | Conduct of Business |
| 10 | Common Area; Common Area Maintenance Cost |
| 11 | Use of Premises; Compliance with Laws |
| 12 | Marketing and Advertising Fund |
| 13 | Utilities and Services |
| 14 | Repairs by Landlord |
| 15 | Repairs and Maintenance by Tenant |
| 16 | Taxes |
| 17 | Tenant Fixtures Decorations |
| 18 | Signs |
| 19 | Alterations; Liens |
| 20 | Indemnity; Liability of Tenant and Landlord |
| 21 | Insurance |
| 22 | Damage by Fire or Other Casualty |
| 23 | Assignment and Subletting |
| 24 | Condemnation |
| 25 | Default; Remedies |
| 26 | Mortgages |
| 27 | Successors and Assigns |
| 28 | Access to Premises |
| 29 | Termination |
| 30 | Estate in Land |
| 31 | Holding Over |
| 32 | Interest:  Attorney's Fees |
| 33 | Recording |
| 34 | Non-Waiver |
| 35 | Time of the Essence |
| 36 | Severability |
| 37 | Relocation |
| 38 | Notices |
| 39 | Force Majeure |
| 40 | Brokerage |
| 41 | Entire Agreement; Amendment; Consents |
| 42 | Jurisdiction and Venue |
| 43 | Rules and Regulations |
| 44 | Waiver of Counterclaims |
| 45 | Quiet Enjoyment |
| 46 | Furnishing of Financial Statements |

i.

300609184 v5

| 47 | Trade Name |
| 48 | Waiver of Trial by Jury |
| 49 | Specific Performance of Landlord's Rights |
| 50 | Execution and Authority |
| 51 | Tenant Damages |
| 52 | Guaranty |
| 53 | Satellite Dish |
| 54 | Miscellaneous |
| 55 | Radius Restriction |
| 56 | Tenant's Exclusive Use |
| 57 | Existing Tenant |

Exhibits:
Exhibit A - Site Plan of Shopping Center (depicting the No Build Area and the Relocation Area)
Exhibit B – Premises (depicting the Patio Area)
Exhibit C - Landlord's Work and Tenant's Work
Exhibit C-1- Construction Rules
Exhibit D - Rules and Regulations
Exhibit E – Guaranty
Exhibit F-  Existing Exclusives and Prohibited Uses
Exhibit G-  Tenant's Rough Sketch for Improvements to the Premises
Exhibit H- Menu
Franchisor Addendum

300609184 v5

## SHOPPING CENTER LEASE

### WAVERLY PLACE SHOPPING CENTER

THIS SHOPPING CENTER LEASE (the "Lease") is made as of *July 28* 2017, ("Effective Date") by and between NWWP LP, a Delaware limited partnership (herein called "Landlord"), and RTHT INVESTMENTS, LLC, a Delaware limited liability company, (herein called "Tenant")

### FUNDAMENTAL LEASE PROVISIONS

Certain Fundamental Lease Provisions are presented herein and represent the agreement of the parties hereto, subject to further definition and elaboration elsewhere in this Lease:

(a)   Tenant's Trade Name: MOD Pizza

(b)   Term:            Ten (10) Lease Years

      Option(s) to Renew:      Two (2) successive consecutive renewal options of five (5) Lease Years each.

(c)   Tenant Store Designation: One-level space known as Suite 206-C, depicted on Exhibit B and located in the Area, as shown on the site plan attached hereto as Exhibit A.

(d)   Gross Leasable Area ("GLA") of Premises:      Approximately 2,800 square feet. See also Section 2 for Patio Area.

(e)   Commencement Date: The earlier to occur of (x) Tenant's opening for business or (y) one hundred eighty (180) days following the Delivery Date.

(f)   Minimum Rent:

| Period | Annual Amount | Monthly Amount | Square Foot Rate |
|---|---|---|---|
| Lease Years 1-5 | $ 92,400.00 | $ 7,700.00 | $ 33.00 |
| Lease Years 6-10 | $106,260.00 | $ 8,855.00 | $ 37.95 |
| Option Periods | | | |
| Lease Years 11-15 | $122,199.00 | $10,183.25 | $ 43.64 |
| Lease Years 16-20 | $140,528.85 | $11,710.74 | $ 50.19 |

(g)   Percentage Rent: Four percent (4%) (the "Percentage") of Gross Sales as follows in excess of the Gross Sales Breakpoint as follows:

| Lease Year | Sales Breakpoint |
|---|---|
| Lease Years 1-5 | $ 2,310,000.00 |
| Lease Years 6-10 | $ 2,656,500.00 |

1

Option Periods

| | |
|---|---|
| Lease Years 11-15 | $ 3,054,975.00 |
| Lease Years 16-20 | $ 3,513,221.25 |

(h)    Security Deposit: Not Applicable

(i)    Marketing and Advertising Fund Charge:    $0.65 per square foot, subject to annual increase

(j)    Certain Other Charges Payable by Tenant:
   Tax Charge: $2.27 per square foot per annum
   CAM Charge: $5.44 per square foot per annum (inclusive of insurance)
   Utilities: pursuant to usage

(k)    "Agent" and
  To Whom Rent
  Payable:   NWWP LP
        c/o Northwood Investors – Denver
        1819 Wazee Street, 2nd Floor
        Denver, Colorado 80202

(l)    Permitted Use:    For the operation of a pizza restaurant, offering dine-in, carry out service and optional delivery services, and offering alcoholic and non-alcoholic beverages and other foods and beverages customarily sold at MOD Pizza restaurants with a menu that is generally consistent in overall food and beverage mix to the menu attached hereto as Exhibit H  (provided, however, that the sale of alcoholic beverages shall be limited to beer and/or wine and shall exclude so called hard liquor or spirits, and must be for on-premises consumption only, and ancillary to the sale of the food products). It is expressly understood and agreed that Tenant's right to sell beer and wine shall be subject to Tenant obtaining a valid liquor license and otherwise complying with the terms and conditions imposed by the applicable governmental authority and by the terms of this Lease. In no event shall Tenant operate a store or facility or restaurant or sell any food, merchandise, accessories, goods or services that are prohibited or restricted under Exhibit F, which exhibit is annexed hereto and incorporated herein by reference.  The Premises shall be operated in accordance with all Laws, and for no other use or purpose. See Section 57 hereof.

(m)    Guarantor: SD-Missouri, LLC, a Delaware limited liability company

(n)    Notices:

  Landlord:

  NWWP LP
  c/o Northwood Investors
  575 Fifth Avenue, 23rd Floor
  New York, New York 10017
  Attention: Brian Crittendon
  Email: bcrittendon@northwoodinvestors.com

with a copy to:       c/o Northwood Investors
1819 Wazee Street, 2nd Floor
Denver, Colorado 80202
Attention: Michael O'Shaughnessy
Email: osh@northwoodinvestors.com

and

Northwood Retail, LLC
302 Colonades Way, Suite 205
Cary, North Carolina 27518
Attention: Mary Langdon
Email: mlangdon@northwoodretail.com

<u>Tenant</u>:

RTHT Investments, LLC
131 East Lincoln Ave, Suite C
Fort Collins, CO 80524
Taxpayer ID No. _____

300609184 v5

## WITNESSETH:

**1. REFERENCES.** Each reference in this Lease to any of the Fundamental Lease Provisions shall be construed to incorporate all of the terms provided for under such provisions, and such provisions shall be read in conjunction with all other provisions of this Lease applicable thereto. If there is any conflict between any of the Fundamental Lease Provisions and any other provisions of this Lease, the latter shall control. The listing of monetary charges payable by Tenant in the Fundamental Lease Provisions shall not be construed to be an exhaustive list of all charges or the amount thereof payable by Tenant under this Lease, nor shall they be construed to be anything more than an estimate of first year charges.

**2. PREMISES.** (a) For and in consideration of the rents, covenants and agreements hereinafter reserved and contained on the part of Tenant to be observed and performed, Landlord leases to Tenant, and Tenant leases and agrees to accept from Landlord certain premises constituting a portion of the mixed use center known as Waverly Place Shopping Center, or such other name as Landlord may designate from time to time, located in the City of Cary, State of North Carolina ("Shopping Center") as more particularly shown on Exhibit A attached hereto and made a part hereof which premises leased to Tenant ("Premises") are described as follows:

A store without basement having a GLA of Premises, indicated on the Fundamental Lease Provisions, measured from the center lines of common walls and from the exterior of any walls not shared by Tenant in common with others), the approximate boundaries and location of which store are shown on Exhibit B attached hereto and made a part hereof.

The Premises are demised and leased subject to all applicable zoning ordinances, laws, ordinances, orders, regulations, rules or requirements of any federal, state, city, county or other governmental, public or quasi-public authority, or any department or bureau thereof, now existing or hereafter created (collectively, "Laws"), and the state of title of the Shopping Center, and any statement of facts which an accurate survey may disclose, together with all easements, mortgages, deeds of trust, agreements, encumbrances, and all other liens, charges or other matters of any nature, recorded, now or hereafter affecting the Premises or the Shopping Center, including but not limited to the Declaration of Covenants, Conditions and Restrictions for Waverly Place, dated December 18,1987 and recorded in the Registry of Deeds on December 23, 1987 ("Declaration"). To the extent applicable to Tenant, Tenant agrees to comply with the provisions of the Declaration and any other currently existing recorded or unrecorded documents affecting the Shopping Center of which Landlord has provided a copy to Tenant. The Premises do not include the exterior walls, any space above the underside of the roof deck of the ceiling above the Premises, roof, slab or the land beneath the Premises, and no rights, licenses or easements are created hereunder, except as expressly demised hereunder, and no easement for light or air is leased with or included in the Premises. Exhibit A shall not be deemed to be a warranty, representation or agreement on the part of the Landlord that the Shopping Center is or will be as indicated on said diagram. As soon as the Commencement Date (as hereinafter defined) is known, Landlord and Tenant shall execute an agreement setting forth the Commencement Date and termination date of the initial term.

(b) So long as Federal, State and local laws, codes, zoning restrictions, ordinances, regulations, and safety requirements permit, Landlord agrees that Tenant shall, during the Term of this Lease, have the right to use an area of approximately eight hundred square feet, located immediately adjacent to the Premises (the "Patio Area"), as approximately shown on Exhibit A, for use as a patio seating area for the exclusive seating and serving of food and beverages to Tenant's customers (but not cooking), provided that:

(1)    Tenant's use of the Patio Area complies with all laws, codes, zoning restrictions, approvals, permits, and licenses relating thereto but shall not identify with markings of any type that is proprietary to Tenant as would suggest that seating is limited to Tenant's customers;

4

(2)    All necessary approvals, permits, and licenses in connection with such use are obtained and paid for by Tenant (with copies furnished to Landlord) and remain in full force and effect during Tenant's use of the Patio Area;

(3)    The Patio Area shall only be open for business during those hours the Premises is open for business.

(4)    Tenant shall at its sole cost and expense install all furniture, tables, chairs, umbrellas (in Tenant's choice of color, subject to Landlord's approval and consent not to be unreasonably withheld, conditioned or delayed), equipment and lighting surrounding the Patio Area required by Tenant's use thereof (collectively "**Furniture and Equipment**").

(5)    Tenant acknowledges that:

    i.   all Furniture and Equipment shall be of quality and appearance consistent with a first class restaurant design;

    ii.   the Furniture and Equipment shall not be used or placed in the Patio Area until its design, size, color, position and method of attachment or installation are first approved by Landlord in writing, such approval not to be unreasonably withheld, conditioned or delayed; and

    iii.   Tenant shall be responsible for any destruction, damage, theft, or vandalism of, or to, the Furniture and Equipment.

(6)    Tenant hereby covenants and agrees that it shall not:

    i.   erect or place any canopy or other enclosure or covering on or over the Patio Area without obtaining Landlord's prior written approval, such approval not to be unreasonably withheld, conditioned or delayed;

    ii.   emit any music or other similar sounds in the Patio Area without obtaining Landlord's prior written approval, such approval not to be unreasonably withheld, conditioned or delayed;

    iii.   materially impede with pedestrian traffic at or about the Shopping Center.

(7)    Tenant shall clean and keep in good repair the Patio Area and its Furniture and Equipment and shall remove all trash generated therefrom on a daily basis or more frequently as reasonably needed.

(8)    Tenant shall pay no rent or other fees for the Patio Area but all sales derived from the Patio Area shall be included in the calculation of Gross Sales.

(9)    If Tenant shall be unable to obtain the approvals or permits necessary for the lawful use of the Patio Area, Tenant shall have no right to utilize any portion of the exterior of the Premises for dining purposes, and in no event shall Tenant have any right to any reduction in Rent or any right or option to terminate this Lease.

Landlord acknowledges that Landlord shall be responsible, at Landlord's cost and expense, for the removal of any presently existing landscaping located in or immediately adjacent to the Patio Area and the cost of installing any additional landscaping required by governmental authorities as a direct result of the creation of the Patio Area.

**3. TERM.** (a) The term ("Term") of this Lease shall commence upon the Commencement Date as defined in the Fundamental Lease Provisions and shall expire on the last day of the full calendar month in which the tenth (10th) anniversary of the Commencement Date has occurred, unless the Commencement Date

5

shall have occurred on the first day of calendar month in which event the Lease shall expire on the day prior to the tenth (10th) anniversary of the Commencement Date (the "Expiration Date"). In the event that Tenant occupies the Premises prior to the Commencement Date for any purpose, then, other than the payment of Minimum Rent, the Tax Charge and Common Area Maintenance Charges, all remaining obligations of Tenant set forth in this Lease shall be applicable throughout such period of occupancy prior to the Commencement Date.

(b) Option to Renew. Tenant shall have the option(s) to extend the initial term of this Lease as set forth in the Fundamental Lease Provisions. In order to be effective, Tenant must give the Landlord at least one hundred eighty (180) days' prior written notification from the scheduled expiration date of the Term of the Lease to extend this Lease for each Option Term. As a condition precedent, Tenant must be open and operating for business from the Premises and must not be in default in any of its obligations under this Lease at the time such notice is given or upon the effective date of such renewal. In no event shall a renewal by Landlord be deemed, by any party, to be a waiver of a default nor shall Landlord be estopped from demanding that Tenant cure such default, solely by virtue of extending the Term of the Lease.

(c) Definition of Lease Year. As used in this Lease, the term "Lease Year" shall have the following meaning: In the event the Commencement Date is the first day of a month, then the first Lease Year shall be the period commencing on the Commencement Date and ending on the day before the first anniversary of the Commencement Date. In all other cases, the first Lease Year shall be the period from the Commencement Date to the last day of the month in which the first anniversary of the Commencement Date occurs. Each subsequent Lease Year shall be each twelve (12) month period thereafter. The final Lease Year may be a period of less than twelve (12) months, ending on the Expiration Date, or earlier termination of this Lease.

4. **MINIMUM RENT.**

(a) Tenant covenants and agrees to pay to Landlord at the office of Agent set forth above, or at such other place as Landlord may designate from time to time, without notice or demand therefor, and without any abatement, deduction, reduction, recoupment or set-off whatsoever, a fixed minimum rental ("Minimum Rent") as set forth on the Fundamental Lease Provisions which shall be punctually paid monthly in advance commencing on the Commencement Date and continuing thereafter on the first day of each succeeding calendar month throughout the Term. If mailed, Minimum Rent and all other payments under this Lease shall be mailed in sufficient time and with adequate postage thereon to be actually received by Landlord not later than the due date.

A pro rata monthly installment of Minimum Rent shall be due on the Commencement Date for the first month of the Term if the Commencement Date is a day other than the first day of a calendar month. A pro rata monthly installment of Minimum Rent shall be due on the first day of the last calendar month of the Term to cover rent for the last month of the term if the Term for any reason expires or terminates on a day other than the last day of a calendar month. The pro rata calculation will be based on a thirty (30) day month.

5. Intentionally omitted.

6. **PERCENTAGE RENT.**

(a) Tenant shall: (i) not later than the fifteenth (15th) day after the close of each calendar month, deliver to Landlord a written statement, certified by Tenant or an authorized officer of Tenant, showing Gross Sales (as hereinafter defined) made in the immediate preceding calendar month; and (ii) not later than sixty (60) days after the end of each Lease Year deliver to Landlord an annual statement, certified by Tenant or an authorized officer of Tenant, showing annual Gross Sales for the Lease Year just concluded, the correctness of which is certified to by an independent certified public accountant. If Tenant fails to comply

6

with the foregoing, Landlord shall have the right to employ a certified public accountant to make such examination as is necessary to certify the amount of Gross Sales for any period at Tenant's expense.

(b) During any Lease Year, following the date upon which Tenant's Gross Sales exceed the annual Breakpoint applicable for such Lease Year, Tenant shall, on or before the fifteenth (15th) day after the end of each month occurring during such Lease Year, pay to Landlord, as Percentage Rent, an amount equal to the amount set forth on the Fundamental Lease Provisions as a percentage of Gross Sales during such month (or such longer or shorter period, as the case may be, at the beginning or end of the Term), which Gross Sales are in excess of the "Gross Sales Breakpoint" (as hereinafter defined) for the applicable period. The Gross Sales Breakpoint shall mean that amount calculated with respect to the period for which Percentage Rent is being paid in accordance with the schedule set forth on the Fundamental Lease Provisions with regard to the amount of Minimum Rent payable for the applicable period.

(c) Notwithstanding anything to the contrary contained in this Lease, if the first Lease Year or the last Lease Year of the Term contains other than three hundred sixty-five (365) days, then, in either event, Percentage Rent for the first Lease Year, or the last Lease Year, as the case may be, shall be computed using the otherwise applicable annual Gross Sales Breakpoint multiplied by a fraction, the numerator of which shall be the number of days in the first Lease Year, or the last Lease Year, as the case may be, and the denominator of which shall be three hundred sixty-five (365). Further, in the event that Tenant is closed for business during any portion of the Lease Year, except as a result of casualty, condemnation, utility interruption or as a result of force majeure, the Gross Sales Breakpoint shall be ratably reduced for each day that Tenant is closed for business; and if Minimum Rent is abated during any portion of the Lease Year, then the Gross Sales Breakpoint shall be ratably reduced for each day that Minimum Rent is abated.

(d) Tenant shall retain for at least two (2) years, at the address for sending notices to Tenant hereinafter set forth, full, complete and proper original books, records, accounts and source documents in accordance with generally accepted accounting principles disclosing all information pertaining to Gross Sales. Landlord and its agents shall have the right during business hours to examine and audit such books and records as well as Tenant local and Federal tax returns. If such examination or audit discloses a liability for Percentage Rent of five percent (5%) or more in excess of Percentage Rent paid by Tenant for any period, Tenant shall promptly pay Landlord the cost of said examination or audit and the deficiency in rents, together with interest thereon for the period from the date such sums were originally due to the date paid at the rate of four hundred (400) basis points above the prime rate published in the Wall Street Journal or its successor (but in no event higher than the highest rate enforceable by law) which deficiency together with such interest shall be payable in any event. If such examination or audit discloses a liability for Percentage Rent paid by Tenant for any period and Tenant does not pay the amount due under this subsection (d) within thirty (30) days after written notice thereof, then in addition to the foregoing, at Landlord's option, the same shall be deemed an event of default hereunder. Landlord's rights under this subsection (d) shall expire fifteen (15) months after the expiration or sooner termination of the Term.

(e) Nothing contained in this Lease is intended, or shall be construed, to create a partnership between Landlord and Tenant, to make them joint venturers, or to make Landlord in any way responsible for any debts or losses of Tenant.

7. **"GROSS SALES" DEFINED.** As used in this Lease, "Gross Sales" means the sale prices, rentals and rental fees of all goods, wares and merchandise sold, rented or leased and the charges for all services performed by Tenant or any other person or entity, in, at or from the Premises and the Patio Area, for cash, credit or otherwise, without reserve or deductions for uncollected amounts, including but not limited to sales and services (i) where the orders originate in, at or from the Premises or the Patio Area, regardless from whence delivery or performance is made, (ii) pursuant to telephone, telegraph, internet or otherwise received or filled at the Premises or the Patio Area, or (iii) resulting from transactions originating in, at or from the Premises or

7

the Patio Area and deposits not refunded to customers. Excluded from Gross Sales shall be (i) exchanges of merchandise between Tenant's stores made only for the convenient operation of Tenant's business and not to consummate a sale made in, at, or from the Premises, provided further that the return of any merchandise to the Premises purchased through a catalog or the internet shall not be a deduction from Gross Sales, (ii) returns to manufacturers, (iii) refunds to customers on transactions otherwise included in Gross Sales, (iv) sales of fixtures, machinery and equipment after use in Tenant's business in the Premises, (v) sales, excise or similar taxes imposed by a governmental authority and collected from customers, (iv) products or services given to a charity (not to exceed two percent [2%] of Gross Sales per annum), (v) tips or gratuities payable to employees of Tenant (vi) bad debts (not to exceed two percent [2%] of Gross Sales per annum, (vii) financial charges on credit card sales, and (viii) discounted sales to employees of Tenant (not to exceed two percent [2%] of Gross Sales per annum). Each sale upon installment or credit shall be treated as a sale for the full price in the month during which such sale shall be made irrespective of the time when Tenant may receive payment from its customer. No deduction shall be made from Gross Sales for any franchise, income or gross receipts, taxes or for any other taxes based upon income of Tenant.

## 8. LANDLORD'S AND TENANT'S WORK.

(a)  Landlord shall at its expense perform the construction work designated as Landlord's Work in Exhibit "C" attached hereto and made a part hereof ("Landlord's Work") in accordance with the provisions of this Article 8 and in compliance with all legal requirements, including permits. The Premises shall be delivered to Tenant ("Delivery Date") on the date that Landlord makes the Premises available to Tenant with Landlord's Work substantially complete as evidenced by a certificate of substantial completion from Landlord. Further, Landlord hereby warrants Landlord's Work for one (1) year following the Delivery Date.

Landlord anticipates that the Delivery Date shall occur within ninety (90) days of the Effective Date (the "Anticipated Delivery Date"), provided that Tenant furnishes Landlord with the information required from Tenant for Landlord to perform Landlord's Work (including but not limited the exact location and placement of Tenant's pizza oven and exhaust stack) within ten (10) days following the Effective Date ("Information Date"). Landlord shall provide to Tenant a detailed list of such information within two (2) business days after execution of this Lease. For every day beyond the Information Date that Tenant fails to furnish such information, (a) the Anticipated Delivery Date (i.e. the 90-day period) shall be extended by one day for every day of delay and (b) Tenant's 180-day work period shall be shortened by one day of every day of delay. Landlord shall, in a commercially reasonable manner, diligently and promptly pursue the completion of Landlord's Work to achieve delivery by the Anticipated Delivery Date, as such date may be extended as described above or otherwise extended due to a force majeure event or a cause solely attributable to Tenant.

In the event (i) the Delivery Date does not occur on or before the Anticipated Delivery Date (as such date shall be extended as described above), and (ii) Tenant is not in default of this Lease; and (iii) Tenant has obtained its necessary permits and is ready to commence Tenant's Work, then Tenant shall receive a credit of one (1) day of Minimum Rent for each day delivery is delayed beyond the Anticipated Delivery Date (as extended if applicable). If the Delivery Date shall not occur within one hundred eighty (180) days of the Anticipated Delivery Date for any reason other than force majeure or a delay solely attributable to Tenant, Tenant shall thereafter have the right to terminate this Lease by giving written notice of such termination to Landlord at any time prior to the Delivery Date. In the event Landlord shall be delayed due to a force majeure event or a cause solely attributable to Tenant, Landlord shall promptly notify Tenant of the same, and the one hundred eighty (180) day period shall be tolled on a day for day basis for each resulting day of delay. If within thirty (30) days of the date of the giving of Tenant's notice of termination the Delivery Date shall not occur, this Lease shall cease and come to an end, and thereupon there shall be no further liability or obligation upon either party hereto. Such right of termination shall be the sole and exclusive remedy, either at law or in equity, available to Tenant in the event of the Landlord's failure to timely deliver the Premises to Tenant.

8

(b)  All additional work which is not part of the Landlord's Work but is necessary or desirable to prepare and fixture the Premises in order to open for business shall be performed by Tenant at Tenant's expense and shall be deemed to be Tenant's Work, including but not limited to all work designated as Tenant's Work in Exhibit "C". Tenant shall cause to be performed all Tenant's Work diligently and promptly in order to open for business fully fixtured, stocked and staffed by the Commencement Date designated in the Fundamental Lease Provisions. Tenant shall employ only such duly licensed and insured professionals whose presence at the Premises or the Shopping Center will not result in any labor unrest, dispute, slowdown, strike or disharmony whatsoever by labor rendering or scheduled to render services at or within, or delivering goods or materials at the Premises or the Shopping Center, in which event Tenant shall immediately and permanently cease its use of the professional(s) whose presence at the Premises or the Shopping Center was the basis for such unrest, slowdown or strike.

(c)  Tenant's rough sketch of its intended improvements to the Premises is annexed to this Lease as Exhibit G, which sketch has been approved by Landlord and Tenant and is the basis for Landlord's Work and Tenant's Work. Tenant agrees to submit to Landlord for Landlord's review and approval, not to be unreasonably withheld, conditioned or delayed, complete plans and specifications including all engineering, mechanical and electrical work comprising Tenant's Work (the "Plans and Specifications"), and all layouts, in such detail as Landlord may reasonably require and in compliance with Exhibit "C" and all applicable statutes, ordinances, regulations and codes, within sixty (60) days after the Effective Date of this Lease. Landlord shall have twenty (20) days to review and respond to Tenant's Plans and Specifications. Tenant shall revise and resubmit the Plans and Specifications to Landlord within ten (10) days thereafter for Landlord's approval. This process shall be repeated until Landlord has approved Tenant's Plans and Specifications. Upon receipt of Landlord's approval, Tenant will promptly apply for appropriate permits from governmental authorities having jurisdiction over the Premises and diligently pursue all permits and approvals until they are issued. Tenant agrees to revise its drawings in order to meet all code requirements. All Tenant's Work shall be performed in accordance with the Pans and Specifications approved by Landlord (which approval shall not be deemed to be a representation by Landlord that such Plans and Specifications comply with applicable laws) and in compliance with all legal requirements, including permits issued and obtained by Tenant; and Tenant shall abide by the construction rules attached hereto as Exhibit C-1.

(d)  Tenant's taking possession of the Premises shall be conclusive evidence of Tenant's acceptance thereof in good order and satisfactory condition and agreement that the satisfactory delivery of the Premises by Landlord to Tenant has occurred, except such items as may be agreed upon in writing by both parties prior to entry. Further latent defects in Landlord's Work shall be and remain the sole responsibility of Landlord provided that Tenant has given Landlord notice of the existence of such latent defect(s) prior to the date which is one (1) year from the Delivery Date. Landlord represents and warrants that Landlord's Work shall be in compliance with all legal requirements, including permits, and that all systems to the extent existing or installed by Landlord shall be in good and working order upon delivery to Tenant. Tenant agrees that unless otherwise expressly stated in this Lease to the contrary, the Premises are being delivered in their "as is" and "where is" condition and state of repair and no representations respecting the condition of the Premises (including the HVAC system) have been made by Landlord or Agent to Tenant. Any disagreement between Landlord and Tenant with reference to the work to be performed by either pursuant to Exhibit "C" or whether such work has been properly completed shall be resolved by the decision of Landlord's licensed architect.

(e)  Provided that Tenant is not in default under this Lease, Landlord hereby agrees to reimburse Tenant, at Tenant's election, for the amounts actually incurred by Tenant in the performance of Tenant's Work (the "Allowance") in an amount not to exceed One Hundred Sixty-Eight Thousand and 00/100 Dollars ($168,000.00), calculated at the rate of $60.00 per square foot of GLA in the Premises.

Tenant shall, within one hundred eighty (180) days after completion of Tenant's Work and Tenant obtaining the following items, submit Tenant's request for payment of the Allowance to Landlord along with the

9

documents set forth below. The Allowance shall be paid to Tenant within thirty (30) days after the date upon which:

(1)  Tenant opens for business to the public in the Premises;

(2)  Tenant pays its first full monthly installment of Minimum Rent (i.e., for the full month commencing as of the Commencement Date);

(3)  Tenant furnishes to Landlord affidavits from Tenant or Tenant's general contractor listing all contractors, subcontractors and other suppliers whom Tenant or its general contractor has contracted with for labor or materials valued in excess of $5,000.00, and properly executed final lien waivers from all of the contractors and subcontractors performing such Tenant's Work or providing materials valued in excess of $5,000.00 (including all parties listed in such affidavit) and such other evidence as Landlord may reasonably request to evidence that no liens can arise from Tenant's Work;

(4)  Tenant furnishes to Landlord evidence of the total amount spent by Tenant for Tenant's Work;

(5)  Tenant provides Landlord with a copy of the final Certificate of Occupancy;

(6)  Tenant furnishes Landlord with a Certificate of Final Completion issued by Tenant's architect; and

(7)  Submission to Landlord of two (2) copies of Tenant's Plans, as built. As-Built Drawings shall be certified as such by signature of Tenant's contractor and Landlord's project representative.

If the GLA of the Premises measures other than 2,800 square feet, the Allowance amount shall be re-calculated based upon the rate of $60.00 per square foot multiplied by the remeasured GLA of the Premises.

Notwithstanding anything in this Lease to the contrary, in no event will the cost of any of Tenant's trade fixtures, equipment, furnishings or merchandise be included in the Allowance. Notwithstanding anything to the contrary contained in Article 38, Tenant shall send any notice regarding the Allowance to the following address: NWWP, LP, c/o Northwood Investors, LLC, 575 Fifth Avenue, 23rd Floor, New York, NY 10017, Attn: Brian Crittendon, with a copy to Northwood Retail LLC, 302 Colonades Way, Suite 208, Cary, NC 27518, Attn: Mary Langdon.

**9. CONDUCT OF BUSINESS.** Throughout the Term, except as otherwise provided herein, Tenant shall continuously use and occupy all of the Premises for the business described in Article 11 hereof, without interruption during such regular and customary business hours as such businesses at the Shopping Center are customarily kept open for business; provided that Tenant shall (unless prohibited by Law or requested by Landlord) be open for business at least the following minimum hours: Monday through Saturday, from 10:00 a.m. - 9:00 p.m. and Sunday from 12:00 Noon through 6:00 p.m. Further, Tenant, at Tenant's discretion, shall be permitted to be open for business 7:00 a.m. - 11:00 p.m. Monday through Sunday and shall be permitted to be closed on New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day and other federally recognized holidays.

If Tenant shall elect to operate for business prior to or on excess of two (2) hours of the customary business hours of the Shopping Center, Tenant shall be responsible for all additional expenses associated with any additional services required, including but not limited to the costs of lighting the Common Areas of the Shopping Center beyond such normal hours of operation.

Except for commercially reasonable amounts of cleaning products, which Tenant shall at all times use, store and dispose of in compliance with all Laws, Tenant shall not cause or permit any Hazardous Substance (as hereinafter defined) to be used, stored, generated or disposed of on or in the Premises. If Hazardous Substances are used, stored, generated or disposed of on or in the Premises or if the Premises become contaminated in any manner by Tenant's, Tenant's agents, employees', contractors' or licensees' activities, Tenant shall indemnify and hold harmless the Landlord from any and all actual claims, damages, fines, judgments, penalties, costs, liabilities or losses arising as a result of such contamination by Tenant. This indemnification shall survive the termination of this Lease and shall be binding upon Tenant and its successors

10

in interest whenever such threat, claim or cause of action may arise. As used herein, "Hazardous Substance" means any substance which is toxic, ignitable, reactive, or corrosive and which is regulated by any local government, the State or Commonwealth (as applicable) in which the Premises is located, or the United States Government. Hazardous Substance includes, but is not restricted to, any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to state, federal or local government law. Hazardous Substance includes but is not restricted to asbestos, polychlorobiphenyls ("PCB's"), trichloroethylene, tetrachloroethylene, perchloroethylene and other chlorinated solvents, and petroleum and its components.

Landlord represents that, as of the Delivery Date, the Premises shall not contain any known Hazardous Substances at levels that are in violation of legal requirements, including, without limitation, asbestos containing materials. Notwithstanding the generality of the foregoing, in the event any Hazardous Substances are present at the Premises as of the Delivery Date at levels that are in violation of legal requirements, then, provided that Tenant notifies the Landlord in writing of such presence promptly after such discovery, the removal, abatement or neutralization of such Hazardous Substances in the manner and to the extent required by legal requirements, taking into consideration the extent such Hazardous Substances would otherwise be disturbed by Tenant in the performance of Tenant's Work, shall be accomplished by Landlord at no cost or expense to the Tenant, except to the extent that such removal, abatement or neutralization is required as a result of the Tenant or its contractors or their respective employees or agents bringing or releasing such Hazardous Substances onto the Premises, in which event the Tenant shall be responsible for such related removal, abatement or neutralization. If the Tenant is delayed in its completion of Tenant's Work as a result of the Landlord's activity in removing, abating or neutralizing said hazardous materials, then Tenant's one hundred eighty (180) day work period shall be tolled on a day for day basis; provided, however, that if Landlord's activities under this Section delay Tenant by more than one hundred eighty (180) days, Tenant shall have the right to terminate this Lease by written notice to Landlord. Provided Tenant is then open and operating for business from the Premises if, while the Landlord is in the process of satisfying its requirement to remove, abate or neutralize any Hazardous Substances as aforesaid, the Tenant shall be required to close its ongoing operations in the Premises, then the Tenant's sole remedy therefor shall be an abatement of Minimum Rent and any and all other charges payable by the Tenant hereunder until the date the Landlord shall complete such removal, abatement or neutralization as aforesaid and Tenant reopens for business from the Premises (provided Tenant uses commercially reasonable efforts to so reopen promptly following the date that Landlord completes its remediation work and provided that Tenant shall be permitted to terminate this Lease if such closure continues for more than one hundred eighty (180) days). In no event shall Tenant be liable or responsible for any Hazardous Substances that were not placed in or upon or introduced to the Premises by Tenant, its agents, employees, contractors, licensees, concessionaires or subtenants.

## 10.  COMMON AREA; COMMON AREA MAINTENANCE COST.

(a)  Landlord grants to Tenant a non-exclusive right to use the entrances, exits, parking areas, sidewalks and other portions of the Common Area (as hereinafter defined) as they are or may be from time to time constituted and designated by Landlord for the common usage of Landlord and the tenants of the Shopping Center and their respective successors, assigns, employees, agents, customers, invitees and licensees. Landlord shall be entitled to designate specific areas or spaces in the parking lot for the parking of automobiles and other vehicles of Tenant and Tenant's employees, and upon such designation Tenant and Tenant's employees shall park their automobiles and other vehicles only in such areas or spaces. Tenant covenants that it will enforce the parking by its employees in such designated areas and will furnish automobile license numbers of employees' cars to Landlord within five (5) days after Landlord's request. If any vehicle is parked by an employee of Tenant in a non-employee parking area, Landlord shall have the right to cause the vehicle to be towed to a location designated by Landlord, and Tenant shall be obligated to reimburse Landlord for all towing charges. Landlord shall have the unrestricted right to construct additional improvements in the Shopping Center or increase, reduce, eliminate, relocate or change the size, dimensions, design or location of any or all Common Area,

11

buildings, or other improvements in the Shopping Center from time to time in any manner whatsoever as Landlord shall deem proper, so long as Tenant has materially similar ingress and egress to the Shopping Center. Notwithstanding the foregoing provisions of this Section 10(a) Landlord agrees that it will not hereafter place any building, structure, barrier or obstruction, including kiosks, or pushcarts (whether temporary or permanent) within the area depicted as the "No Build Area" on Exhibit "A", but the foregoing shall not prohibit the placement of trees and shrubs, light stanchions and benches, in a manner reasonably acceptable to Landlord and Tenant.

Landlord will provide up to two (2) non-exclusive parking spaces nearby the Premises that will be identified as either "To Go" or "Short Term Parking". The designations on the parking spaces shall not identify Tenant or any other tenant or occupant in the Shopping Center. If during the Term, a tenant or any other party to the Declaration or any other recorded or unrecorded documents affecting the Shopping Center (the "Underlying Documents") objects or claims that the parking spaces are in violation of its lease or any Underlying Documents, or are otherwise in violation of any legal requirement, the abovementioned designations placed on the parking spaces shall be immediately removed by Landlord.

(b) Tenant shall pay to Landlord as additional rent commencing on the Commencement Date and continuing on the first day of each calendar month in advance during the Term, Landlord's estimate of Tenant's Proportionate Share of the Common Area Maintenance Costs (the "CAM Charge"), which estimate shall be determined by multiplying Landlord's estimate of the Common Area Maintenance Costs by a fraction, the numerator of which shall be the total gross square footage of the Premises, and the denominator of which shall be the total square footage of leasable space in all of the buildings in the Shopping Center, as determined by Landlord (said fraction being herein called "Tenant's Proportionate Share"). Notwithstanding the foregoing, if any tenant or occupant of the Shopping Center has the right pursuant to its lease, to perform and pay for Common Area Maintenance obligations for portion of the Common Area of the Shopping Center in lieu of paying a percentage share of all charges for the Shopping Center, and such occupant actually provides and pays for its own Common Area Maintenance for any part thereof, then the corresponding costs for such Common Area Maintenance shall be excluded from the overall CAM Charge and the gross leasable area of such tenant's premises shall be excluded from the calculation of Tenant's Proportionate Share (with respect to the component thereof so affected) and such sums shall be adjusted accordingly.

"Common Area Maintenance Costs" shall mean the total costs and expenses incurred in operating, maintaining, repairing and replacing the Common Area including without limitation the costs and expenses of: painting; paving; lighting; electrical power; sanitary control; installing, maintaining, operating and repairing all sprinkler and suppression systems in all buildings in the Shopping Center; removal and/or relocation of snow and ice, including removal of snow and ice from the rooftop of buildings in the Shopping Center; removal and other treatment of trash, garbage and other refuse; cleaning and sweeping of the Common Area; gardening, maintenance and operation of underground sprinklers; landscaping; lighting; heating, ventilating and air conditioning (if applicable to the Common Area); fire protection; water and sewer charges; insurance carried by Landlord covering any portion of the Shopping Center (excluding any portion leased to or occupied by Landlord or a third party), including without limitation, public liability, personal and bodily injury and property damage liability and automobile coverage, fire and extended coverage, sign, vandalism and malicious mischief and all broad form coverage, sign insurance, rent insurance and any other insurance including umbrella coverage that may be carried by Landlord covering any portion of the Shopping Center; installing and renting of signs; maintenance, repair and replacement of utility systems serving the Common Area, including water, sanitary sewer and storm water lines, electric and other utility lines and pipes; security costs; the cost of operating machinery and equipment owned in and used in the operation, policing, maintenance and repair of the Common Area or the rental charges for such machinery and equipment; reasonable holiday promotions and decorations; the cost of personnel at or below the level of property manager (including applicable payroll taxes, workmen's compensation insurance and disability insurance) to implement all of the foregoing, and a charge for administrative costs and/or management fees equal to ten percent (10%) of all of

12

such operating costs.  Landlord may cause any or all of said services to be provided by an independent contractor or contractors.  Common Area Maintenance Costs shall exclude the following: (i) expenses incurred for a specific tenant (or for less than all tenants) in the Shopping Center, (ii) the cost of Landlord's Work, (iii) any expenses which are capital expenditures unless amortized over the useful life of the improvement, (iv) costs which are reimbursable by other tenants or insurance proceeds, (v) leasing commissions, attorneys' fees and other costs associated with leasing to or disputes with other tenants, (vi) depreciation, (vii) advertising and promotional expense, (viii) ground rent, debt service, financing or refinancing expenses, (ix) art work, (x) political or charitable expenses, (xi) costs associated with hazardous substances (to the extent not Tenant's responsibility hereunder), (xii)  costs associated with the formation, maintenance, or operation of the legal entity comprising Landlord, (xiii) costs associated with the original construction of the Shopping Center.

(c)  Tenant's Proportionate Share of the CAM Charge shall be due and payable on the first day of each month during the Term and any extension or renewal thereof.  Landlord may adjust said amount at any time effective for the next monthly payment, on the basis of Landlord's experience and reasonably anticipated costs.

(d)  Within fifteen (15) months after the expiration of each calendar year during the Term, Landlord shall determine the total actual Common Area Maintenance Costs for such calendar year, together with the determination of Tenant's Proportionate Share thereof.  In the event the amounts for such preceding calendar year paid by Tenant under this Article 10 shall be less than Tenant's Proportionate Share thereof, as so determined by Landlord, the deficiency shall be paid by Tenant to Landlord within thirty (30) days after notice of such determination, or, in the alternative, any payment made by Tenant under this Article 10 in excess of Tenant's Proportionate Share shall be credited to the next sums due from Tenant under this Article 10, unless at the end of the Term in which case there shall be a refund.

(e)  Any delay or failure of Landlord, within one hundred eighty (180) days after expiration of each calendar year during the Term, in computing or billing shall not prejudice the right of Landlord to thereafter render bills (or correct bills previously submitted) for such period or any subsequent period, nor constitute a waiver of, nor in any way impair the continuing obligation of Tenant to pay Tenant's Proportionate Share of the CAM Charge. Notwithstanding the foregoing, Tenant shall have no obligation to pay any portion of the CAM Charge unless Landlord provides a statement of the same within twenty (20) months after the applicable calendar year.

(f)  "Common Area" shall mean, but not necessarily be limited to, (i) that part of the Shopping Center on which no building is constructed for the sale or rental of merchandise or the rendition of services to the general public, (ii) all areas and space provided by Landlord for the common or joint use and benefit of tenants in the Shopping Center (including any expansion thereof to adjacent and contiguous land) their employees, agents, customers and other invitees, including parking areas, access roads, driveways, retaining walls, landscaped areas, truck serviceways or tunnels, pedestrian walks, outside courts and curb cuts and (iii) all other portions of the Shopping Center not leased or leasable to tenants and which are available for the common or joint use of all tenants in the Shopping Center. Off-site improvements (such as, by way of illustration only, access roads, traffic lights, private or public sewage treatment plants, sewer connections, pipes and appurtenances and basins for the retention of run-off waters) which are necessary to the operation of the Shopping Center and which are required to be maintained by Landlord and shall be included in the definition of Common Area.

(g)  Landlord's estimate of the CAM Charge (including insurance) for calendar year 2017 is estimated to be $ 5.44 per square foot per annum; but in no event shall Landlord incur any liability whatsoever in the event that Tenant's Proportionate Share of CAM Charge exceed the foregoing amount.

300609184 v5

(h) Notwithstanding anything contained herein to the contrary, following the first full calendar year of the Term, Tenant's annual contribution toward "Controllable CAM" (as defined below) shall not increase by more than five percent (5%) per annum, over the amount payable in the immediately preceding year. As used herein, the term "Controllable CAM" means all chargeable costs and expenses pursuant to this Section 10 excluding utilities, labor costs, insurance charges properly includable in this Section 10, taxes, security charges, and snow/ice removal costs. In the event, however, there is an option for Tenant to extend the Lease for any Option Term period(s), Landlord reserves the right to lift the aforementioned "cap" for the first year of each of the Option Term period(s), but the cap shall be reinstated and apply for each of the remaining four (4) years of the Option Term period(s).

## 11. USE OF PREMISES; COMPLIANCE WITH LAWS.

The Premises and the Patio Area shall be used solely for the Permitted Use described in the Fundamental Lease Provisions and for no other use or purpose whatsoever, all in accordance with the Laws, and the requirements herein set forth.

In no event shall the Premises or the Patio Area or any portion thereof be used in the following manner, nor for any of the following purposes: (i) any illegal use, (ii) in violation of any Laws or certificate of occupancy covering the Premises or the Patio Area, (iii) any manner which creates or permits a nuisance or trespass, (iv) any manner inconsistent with Tenant's normal usage, which increases the rate of insurance on the Premises or Shopping Center, (v) any manner which produces, reproduces, or transmits sounds which are audible outside the Premises or the Patio Area or which produces vibrations which are discernable outside of the Premises or the Patio Area and which constitute a nuisance, (vi) any manner which in the reasonable judgment of Landlord impairs or adversely affects the character, reputation or appearance of the Shopping Center as a first class shopping center, (vii) any manner which obstructs or encumbers the sidewalks or other Common Area of the Shopping Center (excluding the use of the Patio Area permitted hereunder), (viii) any hazardous or wasteful manner, (ix) any manner which exceeds the floor load which such floor was designed, or is permitted by law, to carry, (x) any manner which violates any exclusive usage rights granted to any other tenants in the Shopping Center disclosed on Exhibit F hereto, (xi) operation of vending machines or coin or token operated amusement devices, (xii) an auction, fire, bankruptcy, discount, outlet store, going out of business sale or similar type sale, or for any unethical method of business, (xiii) any manner which causes or permits any odors, fumes, dust or vapors to emanate or to be dispelled from the Premises (when its doors or closed), or the Patio Area (provided that normal restaurant odors and use of the Patio Area as provided herein shall be permitted), or (xiv) any form of lewdness, or any form of establishment employing partially or totally nude entertainers, employees or waiters or waitresses, or any usage as an adult entertainment facility, massage parlor, bathhouse, or facility or entertainment which caters to the prurient interests of patrons, including but not limited to, the depiction of "X-Rated" or sexually explicit conduct or nudity by movies, peep shows, live entertainment, or the sale of books, magazines, or other periodicals, or sex-centered objects. In no event and under no circumstances shall Tenant operate a store or facility or sell any merchandise that is prohibited or restricted under Exhibit F, which exhibit is annexed hereto and incorporated herein by reference.

Tenant shall not permit usage of the front entrance of the Premises for truck delivery or pick-up of merchandise or supplies, unless such front entrance is the only means of access to the Premises.

Tenant, at Tenant's sole expense, shall comply with any and all provisions, recommendations and requirements of any fire, liability or other insurer affecting or covering the Premises, the Patio Area and Shopping Center, or any part thereof.

Tenant will not distribute or cause to be distributed in the Shopping Center any handbills or other advertising devices.

14

**12. MARKETING AND ADVERTISING FUND.** During the Term of this Lease, Tenant shall pay to Landlord an amount (the "Marketing and Advertising Fund Contribution") determined by multiplying the GLA of the Premises by $0.65. The Marketing and Advertising Fund Contribution shall be paid by Tenant in monthly installments in such amounts as are designated and billed by Landlord at the beginning of each Lease Year, each installment being due on the first day of each month. The Marketing and Advertising Fund Contribution shall be adjusted annually, as of the first day of each Lease Year during the Term, by Landlord, in its reasonable discretion, to provide for the proper and necessary marketing and advertising of the Shopping Center.

**13. UTILITIES AND SERVICES.**

(a)  Tenant shall, at Tenant's sole cost and expense from and after the Delivery Date, arrange for and obtain, from the public utility companies providing such services, direct service for all utilities necessary for Tenant's operations in the Premises and the Patio Area, including but not limited to electricity and gas service. Unless any service and/or capacity available at the Premises is expressly stated in Landlord's Work, Landlord makes no representations as to availability or adequacy of such services and Tenant shall have no right to terminate this Lease or to an abatement or off-set of the rents set forth herein in the event such service is not available or in the event such services are not sufficient for the Permitted Use hereunder. Any furnishing by Landlord of water, sewer, condenser water, electricity and gas service shall be conditioned upon the availability of adequate resources. Tenant shall pay when due all costs, charges and deposits related to the hook-up, tap in, furnishing, consumption, maintenance and installation of water, water pressure, gas, electricity, fuel, heat, condenser water (if applicable), power, telephone, sewage service, trash removal, sanitary charges and assessments, security protection or any other utilities or services (collectively, "Utilities") used by Tenant in the Premises or the Patio Area, provided, however, that Landlord shall be entitled, but not required, to pay any costs or charges, or Landlord's estimate of Tenant's pro rata share of same, and all amounts so paid by Landlord shall be payable by Tenant to Landlord upon demand, and shall constitute additional rent hereunder. Landlord shall have no liability to Tenant or any other party for any inadequacy, cessation, or interruption of any Utilities, except to the extent caused by Landlord. Tenant covenants and agrees not to install or utilize any equipment which may or will exceed or overload the capacity of any Utilities furnished or servicing the Premises or Shopping Center. Tenant, as part of Tenant's Work, shall cause all utilities to be submetered for the Premises and the Patio Area and shall be responsible for the repair, maintenance and replacement of all utility facilities (including all submeters) to the point of entry into the Premises.

(b)  Trash and Garbage Removal. Landlord presently arranges for trash and garbage removal from tenantable spaces, including the Premises, to be included as a CAM Charge. Landlord reserves the right, with reasonable prior notice, at any time during the Term of this Lease, to have tenants (including Tenant) arrange for trash and garbage removal on a direct basis at the tenant's cost and expense.

(c)  Tenant agrees that: (i)   Tenant shall not permit any goods or merchandise to remain in, on or near any doorways, loading docks, receiving areas or

other areas of the Premises or the Shopping Center; any goods or merchandise remaining in such areas shall be reasonably deemed to be trash and may be disposed of by Landlord in such manner as Landlord may deem advisable and without liability to Tenant therefor, and the cost of such removal shall be owed to Landlord as additional rent, together with an administrative fee equal to fifteen percent (15%); (ii) If any leaking or spillage shall occur or if any goods or merchandise shall fall out of any containers or packages delivered for Tenant or being transported out of the Premises, Tenant shall be responsible therefor and immediately shall cause the same to be cleaned-up and removed and shall remedy any damage that may result therefrom; (iii) Tenant immediately shall transport to the Premises all goods and merchandise that are received by or for it at the Shopping Center and shall properly store the same in the Premises so as to retard any spoilage thereof, to prevent any odor from emanating therefrom and to prevent the infestation thereof; (iv) Tenant shall store all garbage, trash and other waste ("trash") within the Premises in containers that are leak-free, odor-proof and vermin-proof and that are kept in areas of the Premises which are not visible to members of the public. Tenant, at Tenant's expense, shall attend to the frequent disposal of such items, as provided below. Tenant understands and agrees that trash removal must be done by Tenant using containers that are approved by Landlord and at such times, in such manner and subject to such rules and regulations as Landlord may reasonably specify. Tenant further understands and agrees that such rules and regulations may be different than those which apply to trash removal by other tenants in the Shopping Center which have operations dissimilar to Tenant; and (v) Tenant shall be responsible, at Tenant's sole cost and expense, for the daily removal from the Premises and the Shopping Center of all garbage, trash and other waste trash) which is generated by the operation of Tenant's business to a dumpster or compactor to be supplied by Landlord. At no time shall Tenant leave or store any trash in the Common Area of the Shopping Center or outside the Shopping Center or the Premises (other than in the approved dumpsters). If, in Landlord's reasonable judgment, Tenant is not adequately complying with the requirements of this subsection, Landlord shall have the right, but not the obligation, upon twenty-four (24) hours prior written notice, to remove such trash and charge Tenant for all costs incurred in connection therewith, as additional rent.

(d)  Construction Trash.  While Tenant is performing Tenant's Work, Tenant shall be solely responsible for removing its construction trash/waste/used materials (collectively, the "Construction Trash") from the Premises and its work site each day.

(e)  Water and Sewer. The cost of water and sanitary sewer for usage by tenants in the Shopping Center shall not be included in the CAM Charge. Tenant, as a portion of Tenant's Work, at Tenant's sole cost, shall install a sub-meter for the same for the Premises.  If Landlord furnishes such service to the tenants in the Shopping Center, Landlord shall sub-meter the same (utilizing submeters installed by Tenant) for the Premises, at Tenant's sole cost, and Tenant agrees to pay for such service promptly upon receipt of an invoice therefor based on its sub-metered actual usage.  If a third party supplies the water and sanitary service, Tenant agrees to pay such bill when due directly to such third party supplier. Tenant shall be required, at its cost and expense, to install a meter or sub-meter, as the case may be, in a location reasonably designated by Landlord, in a location accessible for regular readings.

(f)  Landlord's Right to Interrupt Utilities.  When necessary by reason of accident or other cause occurring in the Premises or elsewhere in the Shopping Center, or in order to make any repairs or alterations or additions or improvements in or relating to the Premises or to other portions of the Shopping

16

Center, Landlord reserves the right, with reasonable prior notice, to enter the Premises, to interrupt the supply to the Premises or to the Common Area, of steam, electricity, water, gas, and other utilities, if any, and also to suspend the operation of the heating or air-conditioning systems in or to the Premises or any other portion of the Shopping Center, until said repairs, alterations, additions or improvements shall have been completed. Provided Landlord shall pursue such work within 24-hours of commencement, there shall be no abatement in Rent because of any such interruption or suspension. Notwithstanding anything contained in this Lease to the contrary, if as a direct result of Landlord's negligence or willful misconduct utility service is interrupted or curtailed and Tenant is compelled to close for business in excess of three (3) consecutive days, then Rent shall thereafter abate until the earlier of (i) the date upon which Tenant is able to re-open for business or (ii) the utility service is substantially restored.

(g) Grease Removal. (i) A grease interceptor has heretofore been installed (or will prior to the Delivery Date be installed) for the use at the Premises. Such grease interceptor may be shared with one or more other tenants. Landlord shall maintain, repair and replace the grease trap (including causing the grease trap to be emptied as frequently as is reasonably necessary). Tenant shall reimburse Landlord (within thirty (30) days of written request therefor) for Tenant's proportionate share (calculated based on a fraction where the numerator is the total square feet of the Premises, and the denominator is the aggregate square feet of all restaurants or food service operations that are utilizing such grease trap) of all such repair, replacement and maintenance costs, including the costs of emptying the grease trap (the "Grease Trap Maintenance Fee"); provided, however, that if another tenant uses the grease trap materially more than Tenant, then the proportionate share of costs under this section may be reallocated based on usage, at Tenant's request. Notwithstanding the foregoing, during any period in which Tenant's restaurant is the sole food service use served by a grease trap, then Landlord may require Tenant to maintain, repair and replace such grease trap (including empting such grease trap as frequently as is reasonably necessary), all at Tenant's expense

(ii) Tenant shall, at Tenant's sole cost and expense, provide cooking grease recycling containers within the Premises. Landlord may, at its option, contract with a vacuum-pump type service provider for the removal and recycling of cooking grease through the pumping system to a common collection location determined and provided by Landlord. In the event Landlord elects to provide the cooking grease recycling system, Tenant must participate is such system (provided that such service is commercially competitive in both terms of price and level of service), and Landlord shall be solely entitled to any and all revenue generated by the sale, resale, donation, recycling or any other means of disposal of the used cooking grease. In the event Landlord elects not to provide a vacuum-pump type cooking grease recycling system, Tenant shall, at Tenant's election, contract directly with a pumping-type service provider, or participate in Landlord's alternative cooking grease recycling program. Notwithstanding the foregoing, if Landlord elects to furnish cooking grease recycling services (other than pump-system) to restaurant tenants in the Shopping Center, provided that such service is commercially competitive in both terms of price and level of service, Tenant agrees to use only the service provided by Landlord and to pay for such service monthly, as additional rent in accordance with the uniform schedule of charges to be established by Landlord. Cooking grease recycling containers placed by Tenant at any location outside the Premises are strictly forbidden.

(h) Infestation and Ventilation. (i) Infestation. Tenant at all times will keep the Premises free from insects, rodents, vermin and other pests. Without limiting the generality of the foregoing, Tenant, at its sole cost and expense, will engage reputable professional exterminators to provide pest extermination to the Premises (including, without limitation, all food preparation and food storage areas) on a monthly basis (or at such greater frequency as Landlord may reasonably require) and as otherwise may be necessary to keep the Premises free of insects, rodents, vermin and other pests and to prevent insects, rodents, vermin and other pests from infesting the Common Areas or spaces leased to other tenants in the Shopping Center. Tenant will provide to Landlord, upon demand, reasonable proof that Tenant is causing such extermination to be performed. If Tenant fails or refuses to have such extermination performed, Landlord may arrange for such extermination to be done, and Tenant will pay all costs incurred in connection therewith, as additional rent. Landlord will not

17

be liable to Tenant for any loss or damage that may be sustained to Tenant's stock in trade, food and beverage inventory or business by reason thereof, including but not limited to any loss of revenues resulting from any limitation or cessation of Tenant's business while such extermination is performed or as a result thereof. Landlord's arranging for such extermination will not release Tenant from Tenant's obligations hereunder nor will the same be deemed to be a waiver by Landlord of Tenant's default for the failure to have such extermination performed. Landlord will at all times maintain customary extermination services for the Common Areas.

(ii)    Ventilation. Tenant shall regularly and adequately clean all exhaust systems serving the Premises. Such cleaning shall occur no less than once a month. This cleaning shall include degreasing of all hoods, fans, vents, pipes, flues, grease traps and other areas of such systems that are subject to grease buildup. All contractors used by Tenant for such cleaning must be approved by Landlord (not to be unreasonably withheld, conditioned or delayed). Tenant shall provide to Landlord, upon demand, reasonable proof that Tenant is doing such cleaning. In the event that Tenant shall fail or refuse to clean any such systems, Landlord, upon twenty-four (24) hours prior written notice to Tenant, may arrange for the cleaning thereof, and Tenant shall pay all costs incurred by Landlord in connection therewith, on demand, as additional rent. Landlord shall not be liable to Tenant for any loss or damage that may be sustained to Tenant's stock in trade, food and beverage inventory or business by reason thereof, including, but not limited to, any loss of revenues resulting from any limitation or cessation of Tenant's business while such cleaning is performed or as a result thereof. Landlord's performance of any such cleaning shall not release Tenant from any of Tenant's obligations hereunder nor shall the same be deemed to be a waiver by Landlord of Tenant's default for the failure to perform such cleaning.

14.    **REPAIRS BY LANDLORD.** Except as otherwise provided herein, Landlord's only obligation with respect to the Premises shall be to make necessary roof repairs and structural repairs to the exterior walls excluding Tenant's storefront, and other load bearing walls and foundation and slab of the Premises and any repairs occasioned by Landlord's negligence or willful misconduct. Landlord shall have no obligation whatsoever to perform any repair, replacement, or maintenance, structural or non-structural: (a) to any exterior or interior portions of any windows, doors, glass, plate glass, store fronts, locks, hardware, signs, or any casing frames, or caulking which support or surround same, or (b) arising out of any act or omission or negligence of Tenant, or any assignee, subtenant or concessionaire of Tenant, or their respective employees, agents, servants, invitees, licensees, visitors or contractors. Landlord's obligation to repair as set forth in this Article 14 is conditioned upon actual receipt by Landlord's Agent of written notice of the need for such repair, after receipt of which Landlord shall be obligated to commence and complete such repair within a reasonable time. Except as expressly provided herein, Tenant shall in no event be entitled to withhold or offset any payment of Minimum Rent or any other sum payable under this Lease due to any breach by Landlord of this Article 14 or any other provision of this Lease. Except as otherwise permitted pursuant to Article 10 of this Lease, all repairs by Landlord shall be performed at Landlord's sole expense, with materials and labor of the kind and quality equal or superior to the original work and in such a manner as is customary for similar shopping centers located in the metropolitan regional vicinity of Cary, North Carolina. Notwithstanding the foregoing, if the repair or replacement is occasioned by the negligence or willful misconduct of Tenant, its agents, employees, contractors or licensees, Tenant shall be responsible for the cost of repair or replacement, as applicable.

15.    **REPAIR AND MAINTENANCE BY TENANT.** Tenant shall keep and maintain the Premises and all buildings and improvements thereon and all portions thereof, throughout the Term in first class order, condition and repair, including, without limitation, all trade fixtures and other fixtures and equipment contained therein, all improvements and alterations made by Tenant, the exterior and interior portions of all windows, doors, glass, plate glass, store fronts, locks, hardware, signs, or any casing, frames or caulking which support or surround same, and all plumbing, sewage, sprinkler, electrical, heating, ventilating and air conditioning equipment and systems within and serving the Premises, and all interior walls, floors, and ceilings. Any and all such repairs, replacements and maintenance shall be performed at Tenant's sole expense with materials and

18

labor of the kind and quality equal or superior to the original work. Tenant shall keep in force at all times during the Term a standard maintenance agreement on all heating, ventilating and air conditioning equipment exclusively service the Premises and provide a copy of said maintenance agreement to Landlord, which agreement shall require at least a semi-annual inspection of such equipment. Tenants shall also keep in force at all times during the Term a pest control agreement to keep the Premises free of vermin and other pests, and shall provide a copy of said agreement to Landlord. Tenant shall commit no waste, damage or injury to the Premises or any part or system thereof. Tenant further covenants and agrees to surrender the Premises at the expiration of the Term as same may be broom clean and in as good condition as when Tenant's Work was completed or in such better condition as the Premises may be put during the Term, excepting only deterioration caused by normal and ordinary wear and tear or by fire or other casualty.

If any Federal, State or local governmental body having jurisdiction over the Premises requires or recommends any changes, modifications or alterations in the sprinkler system or additional sprinkler heads or other equipment (collectively, "changes") by reason of Tenant's business, or the location of partitions, trade fixtures, or other contents of the Premises, or for any other reason, or if any such changes become necessary to prevent the imposition of a penalty or charge against the full allowance for a sprinkler system in the fire insurance rates, Tenant, at Tenant's expense, shall promptly make such changes as required.

In the event (a) Tenant fails to promptly repair, clean or maintain the Premises or any portion thereof as required hereunder, or (b) Landlord, in the exercise of its reasonable discretion, determines that emergency repairs, replacement, cleaning or maintenance for which Tenant is responsible are necessary, or (c) any repairs, cleaning or maintenance to the Shopping Center or to the Premises are made necessary by any act or omission or negligence of Tenant, its agents, employees, subtenants, assignees, concessionaires, contractors or licensees, then, in any of such events, then Landlord shall be entitled, (but not obligated) to perform or cause to be performed such repairs, cleaning, or maintenance without incurring any liability to Tenant for any damage caused thereby, and Tenant shall pay to Landlord upon demand, as additional rent, the cost thereof plus a charge of fifteen percent (15%) of such costs and expenses to compensate Landlord for administration.

16. **TAXES**.

(a)    Tenant covenants and agrees to pay to Landlord, as additional rent, without offset or deduction, the sums computed in this Article 16 (the "Tax Charge").

(b)    The following definitions shall apply to this Article 16:   (i) the term "Tenant's Proportionate Share" shall have the definition set forth in Article 10(b), and (ii) the term "Taxes" shall mean all real estate taxes, ad valorem taxes, assessments (including, without limitation, general and special assessments for public improvements or benefits whether or not commenced or completed during the Term but prorated for the Term), sanitary and trash removal assessments, water charges or sewer rents and any and all other taxes and assessments levied, assessed or imposed against the Shopping Center or any portion thereof at any time whether general or special, ordinary or extraordinary, unforeseen or foreseen, of any kind and nature whatsoever, whether in lieu of or in addition to so called "real estate taxes" by any governmental authority together with interest paid on any installment payments.

Taxes shall also include any tax or excise on, or measured in whole or in part by, rents or gross receipts or any other tax however characterized unless in the nature of a franchise tax or a tax on Landlord's profit unless such franchise tax or tax on profits shall be in lieu of "so called" real estate taxes in which case such franchise taxes and taxes on profits shall be included in the definition of Taxes.

Except as may be expressly set forth above in this Article 16, Taxes shall not include: (a) any net income, excise, profits (other than a tax on gross profits), estate, inheritance, succession, gift, transfer, franchise, or capital stock tax or assessment upon Landlord; (b) any fine, penalty, cost or interest for any tax or

19

assessment, or part thereof, which Landlord failed to timely pay (except if same are imposed by reason of Tenant's default hereunder); or (c) any Taxes assessed to any residential parcels, or Taxes assessed and payable directly by other owners/lessees within the Shopping Center.

(c) Tenant shall pay to Landlord, as additional rent, throughout the Term, commencing on the Commencement Date and continuing thereafter on the first day of each month in advance, such amount as Landlord shall estimate or determine to be equal to one-twelfth (1/12) of Tenant's Proportionate Share of the Taxes for the then current calendar and/or fiscal year as the case may be with respect to impositions which are part of the Taxes. Upon final determination of the Taxes for such year, Landlord shall compute Tenant's Proportionate Share thereof, and a summary and copy of the bill shall be furnished to Tenant reflecting the actual amount of the Taxes for such year. In the event the additional rent paid by Tenant during the preceding period shall be in excess of Tenant's Proportionate Share, the excess shall either be credited against the next ensuing payments due from Tenant under this Article 16 or, at Landlord's option, refunded to Tenant; in the event the amount paid by Tenant shall be less than Tenant's Proportionate Share, then Tenant shall pay the remaining balance to Landlord within thirty (30) days after such notice is furnished. The notice so furnished to Tenant shall also include a computation of the estimated sums to become due from Tenant each month for the ensuing year under this Article 16 and the monthly payments to be made under this Article 16 shall be adjusted accordingly for such ensuing year.

(d) A pro rata installment of Tenant's Proportionate Share of such Taxes shall be due for the last year of the Term if the Term for any reason terminates on a day other than the end of the applicable fiscal year. The obligation of Tenant with respect to this Article 16 shall survive the expiration of the Term.

(e) Landlord may, at Landlord's option, contest any and all Taxes, and the actual third party cost for any such protest (including attorney's fees) shall be considered part of the Taxes.

(f) Any delay or failure of Landlord in computing or billing shall not prejudice the right of Landlord to thereafter render bills (or correct bills previously submitted) for such period of any subsequent period, nor constitute a waiver of, nor in any way impair the continuing obligation of Tenant to pay Tenant's Proportionate Share of such Taxes; provided, however, that any such billing must be delivered to Tenant within eighteen (18) months after the conclusion of the applicable calendar year and/or fiscal year as may be applicable. Photostatic copies of bills for taxes submitted by Landlord to Tenant shall be conclusive of the actual amount thereof.

(g) Landlord estimates Tenant's initial Tax Charge for calendar year 2017 is estimated to be $2.27 per square foot per annum; but in no event shall Landlord incur any liability whatsoever in the event that Tenant's Proportionate Share of the Tax Charge exceeds the foregoing amount.

17. **TENANT FIXTURES; DECORATIONS.**

(a) Tenant, at Tenant's sole expense, shall provide, install, maintain and repair all trade fixtures, lighting fixtures, store fixtures, floor coverings, signs, plumbing, shades and other fixtures and equipment necessary for the operation of Tenant's business. Prior to the execution of this Lease, Tenant acknowledges that it has received from Landlord the Contractor Rules & Regulations ("Contractor Rules & Regulations"). The contents of the Contractor Rules & Regulations are subject to change at Landlord's reasonable discretion and upon reasonable prior, written notice to Tenant. Tenant shall abide by and comply with all terms, conditions, rules and regulations set forth in the Contractor Rules & Regulations. In the event of any conflict between the Contractor Rules & Regulations, this Lease or Tenant's approved Plans and Specifications, Tenant's approved Plans and Specifications shall prevail. After completion of Tenant's Work, Tenant shall have the right to make changes to the interior of the Premises, the cost of which does not exceed, in the aggregate for any one Lease Year, the sum of Twenty Thousand Dollars ($20,000.00) and further

20

provided that such changes (i) do not require a building permit, (ii) affect the structure of the Premises or the building systems in the Premises, and (iii) are not visible from the exterior of the Premises, without Landlord's approval provided that Tenant shall be responsible for returning the Premises to its condition at the time Tenant's Work was completed at the expiration or sooner termination of this Lease.

(b) Tenant shall remove any and all of its personal property, fixtures and equipment prior to the expiration or sooner termination of this Lease, whereupon Tenant shall promptly repair any damage to the Premises caused by such removal. In the event that Tenant desires to leave any such items and Landlord consents, in writing, any such items shall remain and become the sole property of Landlord upon the termination of this Lease, without the necessity of further documentation.

(c) Tenant shall pay Landlord, on demand, as additional rent, any and all expenses reasonably incurred by Landlord in removing personal property and cleaning or otherwise restoring the Premises to the condition in which Tenant is required to leave them, including, without limitation, court costs, reasonable attorneys' fees, and moving, transportation and cleaning charges. Ten (10) days following the termination or expiration of this Lease, Landlord may, at Landlord's option and without notice, retain all or any portion of personal property remaining in the Premises, or sell same at public or private sale without legal process, for such prices as Landlord may obtain, and apply the value of such property or the proceeds of such sale to any amounts due from Tenant under this Lease. Except as expressly provided herein, Tenant shall not be authorized to remain on or leave Tenant's personal property on the Premises after the expiration of the Term.

18. **SIGNS.**

(a) Prior to the execution of this Lease, Tenant acknowledges that it has received from Landlord the Shopping Center Sign Criteria (the "Sign Criteria"). The contents of the Sign Criteria are subject to change at Landlord's reasonable discretion and upon reasonable prior, written notice to Tenant; provided, however, that any change required by Landlord shall be at no cost to Tenant after installation of its signage in compliance with the previously enacted Sign Criteria. Tenant shall abide by and comply with all terms, conditions, rules and regulations set forth in the Sign Criteria. In the event of any conflict between the Sign Criteria, this Lease or Tenant's approved Plans and Specifications, Tenant's approved Plans and Specifications shall prevail. Subject to Landlord's prior approval and Tenant obtaining approval from all governmental bodies having jurisdiction thereof, Tenant shall be permitted to install signs on two (2) sides of the storefront façade, in the maximum size permitted by the governmental bodies having jurisdiction thereof.

(b) Tenant shall not place, without first obtaining prior consent from both Landlord (as to compliance with the Sign Criteria) and all governmental bodies having jurisdiction thereof, any signs, awnings, advertising matter, or any other items of any kind on the roof, door, windows, store front, or the exterior of the Premises or Common Area ("Signs"). In addition, all Signs must conform to Landlord's Sign Criteria. Any interior signs must be in good taste and prepared professionally (not hand-lettered). Any sign or display visible from the exterior of the Premises which does not meet the above criteria may be removed at any time by Landlord without Landlord incurring any liability therefor. No symbol, design, name, mark or insignia adopted by Landlord for the Shopping Center, other than the name of the Shopping Center, shall be used on any of Tenant's signage without the prior written approval of Landlord.

19. **ALTERATIONS; LIENS.**

(a) Except as otherwise provided in Article 17(a) hereof, Tenant shall not alter the Premises or any part thereof either as part of its initial renovations and Tenant's Work or otherwise without first: (i) submitting to Landlord Plans and Specifications in reasonable detail of any proposed alterations, and (ii) obtaining Landlord's prior approval thereof.

300609184 v5

(b) Tenant shall promptly pay for all work, labor, services and materials furnished for any work, performed by or on behalf of Tenant (excluding Landlord's obligations hereunder), and Tenant shall not permit any mechanic's, materialmen's, or any other type of lien or claim of lien to be filed against the Premises by reason of or related to any work, labor, services or materials supplied or claimed to have been supplied to Tenant or anyone holding the Premises through or under Tenant. Tenant shall deliver to Landlord prior to commencement of any construction at the Premises a building permit, if required by applicable Law. Promptly following the completion of any construction at the Premises, Tenant shall deliver to Landlord a signed release of mechanic's liens from each contractor utilized for the construction work. If any such mechanic's, materialmen's, or other lien or claim of lien shall at any time be filed against or affecting Landlord, the Premises or the Shopping Center, Tenant shall indemnify and hold Landlord harmless from same and shall within twenty (20) days after notice of the filing thereof, cause such lien to be cancelled and discharged of record or bonded over in accordance with local custom. If Tenant shall fail to cause such lien to be cancelled and discharged or bonded within such twenty (20) day period, then in addition to any other right or remedy of Landlord, Landlord shall be entitled, but not obligated, to discharge such lien in any manner that Landlord shall reasonably determine, and the cost of so doing, including attorneys' fees, shall be repaid by Tenant to Landlord, as additional rent, immediately upon demand. In no event shall Tenant act as agent of Landlord or on behalf of Landlord in purchasing any materials or causing, contracting for, or permitting any work, labor, services, maintenance, improvement, alteration or addition of or to the Premises or Shopping Center. Notice is hereby given that Landlord shall not be liable for any labor or materials or services furnished or to be furnished to Tenant upon credit, and that no mechanic's, materialmen's or other lien or claim of lien for any such labor, materials or services shall attach to or affect the fee or any other ownership interest of Landlord in the Premises or Shopping Center.

(c) All construction done by Tenant at the Premises including the construction and installation of Tenant's Work and subsequent alterations (collectively, "Construction") shall be performed in a first class and workmanlike manner, using materials at least equal in kind and quality to those used at the original construction of the Premises, and in compliance with all applicable Laws, with the provisions of this Lease, with the Plans and Specifications approved by Landlord in writing and with all reasonable rules Landlord and its agents may make. All Construction done by Tenant shall be conducted and coordinated so as not to interfere with other work in progress at the Shopping Center or with the transaction of business by the other tenants at the Shopping Center. Pursuant to Article 8(c) of this Lease, Tenant shall employ only such duly licensed and insured professionals whose presence at the Premises or the Building will not result in any labor unrest or disharmony. Work shall not be done on days or during hours that will in the reasonable discretion of Landlord interfere with the operation of Landlord or the peace and tranquility of the other tenants of the Shopping Center. In connection with any such Construction, Tenant shall apply for, obtain and display any required permits, certificates or approvals, including any applicable certificates from the Board of Fire Underwriters or similar body having jurisdiction and shall provide Landlord with copies of any such permits, certificates or approvals.

20. <u>INDEMNITY; LIABILITY OF TENANT AND LANDLORD.</u>

(a) (i) Tenant shall, and does hereby, indemnify, release and save harmless Landlord, and Landlord's partners, agents, officers, servants, employees, officers, attorneys, shareholders, directors, mortgagees and master lessors (collectively, "Landlord Group") from and against any and all suits, actions, judgments, damages, costs, expenses, and attorney's fees incurred in the defense of any actions or proceedings arising out of or related to any loss of life, bodily or personal injury, property damage, or other demand, claim or action of any nature arising out of or related to this Lease or any transaction or occurrence in, on, upon, near, or involving the Premises or the Patio Area or the occupancy or use thereof by Tenant, its subsidiaries, assignees, licensees, agents, employees, contractors, invitees or servants, excluding any matter caused by the negligence or willful misconduct of the Landlord Group (or any part thereof).

22

(ii) Landlord shall, and does hereby indemnify, release and save harmless the Tenant from and against all third party claims (x) arising from any occurrence in the Common Areas of the Shopping Center, except to the extent the same are attributable to the negligence or willful misconduct of the Tenant, or the Tenant's contractors, licensees, agents, servants, or employees, or (y) occurring anywhere in the Shopping Center to the extent attributable to the negligence or willful misconduct of the Landlord or the Landlord Group. This indemnity and hold harmless agreement shall include indemnity against all reasonable costs, expenses and liabilities incurred in or in connection with any such claim or proceeding brought thereon, and the defense thereof. In no event shall Landlord be responsible for any indirect or consequential damages.

(b) Tenant shall store, sell and use Tenant's property, fixtures, inventory, and equipment in, and shall use and occupy the Premises, the Patio Area, and all other portions of the Common Area and Shopping Center, at Tenant's own risk, and Tenant shall and does hereby release the Landlord Group from and against any and all claims of any nature arising out of or related thereto.

(c) Except as provided herein, neither Landlord nor Landlord Group shall be liable for any defect in the Premises, the Patio Area, Common Area, or Shopping Center or in any of the improvements, equipment, machinery, or apparatus thereon, nor shall Landlord nor Landlord Group be liable for any loss of life, bodily or personal injury, or property damage of Tenant or any other party caused by or resulting from: (i) steam, snow or ice, (ii) leakage, backing up, seepage, or overflow of water or sewer, (iii) fire, casualty, act of God or the elements, or (iv) negligence or acts of commission or omission in the design, construction, operation or use of any improvement, machinery, apparatus or equipment in or on the Premises, the Patio Area, Common Area or Shopping Center.

(d) In the event the Landlord or Landlord Group or any member thereof shall be made a party to any litigation (i) commenced by or against Tenant or (ii) arising out of or related to Tenant's use or possession of Premises, the Patio Area, Shopping Center or Common Area, or use thereof by Tenant or any of its subtenants, assignees, invitees, employees, servants or agents (but specifically including any matter arising out of or related to Landlord's negligence or willful misconduct) d\then Tenant shall indemnify, protect and save harmless the Landlord and Landlord Group therefrom and shall pay upon demand all damages, costs, settlement amounts (whether in the form of cash payouts or lease concessions) expenses and attorneys' fees arising out of or related thereto.

(e) Anything in this lease to the contrary notwithstanding, neither Landlord nor Landlord Group shall have personal liability hereunder and Tenant shall look solely to the estate and property of Landlord in the land and buildings comprising the Shopping Center, the rents or other income from such property receivable by Landlord, or out of the consideration received y Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center, subject nevertheless, to the rights of Landlord's mortgagee, for the collection of any judgment or other judicial process arising out of any default or breach by Landlord with respect to any of the terms of covenants of this lease to be observed or performed by Landlord, and no other assets of Landlord or Landlord Group shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies.

(f) Neither Landlord nor Tenant shall be liable under any circumstances for incidental or consequential, punitive, compensatory damages or loss profits or for claims hereunder. Notwithstanding the foregoing, Tenant shall remain liable for consequential damages resulting for Tenant's failure to timely vacate the Premises following the expiration or sooner termination of this Lease.

(g) Notwithstanding the generality of the foregoing to the contrary, Tenant hereby indemnifies and holds Landlord harmless from and against any and all liabilities, claims, fees and costs, including, without limitation, reasonable attorney's fees, related directly or indirectly to the purchase, sale, distribution or consumption of alcoholic beverages in any manner relating directly or indirectly relating to either Tenant, the

23

Premises and/or Patio Area. The terms and condition of this paragraph shall survive the expiration or sooner termination of this Lease. Tenant shall conduct the sale of alcoholic beverages at the Premises and Patio Area in compliance with all current and future applicable laws, rules, regulations and ordinances pertaining to the sale of alcoholic beverages including, but not limited to, the City of Cary Code of Ordinances. Tenant shall have the sole responsibility to prevent any unlawful activity from occurring on the Premises and/or Patio Area in violation of such laws, rules, regulations, and ordinances. Tenant agrees that Landlord shall have no obligation to monitor Tenant's sale of alcoholic beverages at the Premises or to inspect for or prevent the occurrence of any illegal activity on the Premises.

(h) This Article 20 shall survive the termination of this Lease.

21. **INSURANCE.**

(a)     Tenant, at Tenant's sole cost and expense, shall obtain and maintain in effect, commencing with the Delivery Date and continuing throughout the Term, insurance policies providing for the following coverage: (i) standard "special form" property insurance against fire, theft, vandalism, malicious mischief, sprinkler leakage and such additional perils as now are or hereafter may be included in a standard extended coverage endorsement from time to time in general use in the State of North Carolina, insuring Tenant's Work, Tenant's merchandise, trade fixtures, furnishings, equipment and all items of personal property of Tenant located in, on or about the Premises and/or the Patio Area, and the amount of such insurance will be set forth in an "agreed value endorsement" to the policy of such insurance, of one hundred percent (100%) of the full replacement value thereof without deduction for depreciation, and with a deductible amount of not more than Twenty Thousand Dollars ($20,000.00); (ii) a commercial general liability policy, naming Landlord, the property manager, and any mortgagee of the Shopping Center as additional insureds, protecting against any and all claims for injury to persons or property occurring in the Premises and/or the Patio Area and protecting against assumed or contractual liability under this Lease with respect to the Premises and/or the Patio Area and the operations of Tenant and any subtenant of Tenant in, on or about the Premises and/or the Patio Area, with such policy to be in the minimum amount of Two Million Dollars ($2,000,000.00) per occurrence, and with an aggregate limit of at least Three Million Dollars ($3,000,000.00); (iii) products liability insurance for merchandise offered for sale or lease from the Premises and/or the Patio Area, including (if this Lease covers Premises and/or Patio Area in which food and/or beverages are sold and/or consumed) liquor liability coverage (if applicable to Tenant's business) and coverage for liability arising out of the consumption of food and/or alcoholic beverages on or obtained at the Premises and/or the Patio Area, of not less than Five Million Dollars ($5,000,000.00) per occurrence for physical injury and death and property damage; (iv) workers' compensation coverage as required by law, with employer's liability limits in the minimum amount of Five Hundred Thousand Dollars ($500,000.00); (v) with respect to alterations, improvements and the like required or permitted to be made by Tenant hereunder, contingent liability and builder's risk insurance in amounts satisfactory to Landlord; and (vi) automobile liability insurance in the minimum amount of One Million Dollars ($1,000,000).

(b)     All insurance policies herein to be procured by Tenant shall: (i) be issued by insurance companies, reasonably satisfactory to Landlord and authorized to do business in the State of North Carolina; (ii) be written as primary policy coverage and non-contributing with respect to any coverage which Landlord may carry; (iii) insure and name Landlord, Landlord's managing agent, any mortgagee of the Shopping Center and any parties in interest designated by Landlord as additional insureds, as their respective interests may appear (except with respect to workers' compensation insurance); (iv) be primary and non-contributory and (v) contain, in the case of Tenant's property insurance coverage, an express waiver of any right of subrogation by the insurance company against Landlord, Landlord's managing agent and their respective agents, employees and representatives which arises or might arise by reason of any payment under such policy or by reason of any act or omission of Landlord, its agents, employees or representatives. The minimum limits of Tenant's

24

commercial general liability policy of insurance shall be subject to increase from time to time (but not more frequently than once every five [5] years), if Landlord reasonably deems it necessary for adequate protection. Within thirty (30) days after demand therefore by Landlord, Tenant shall furnish Landlord with evidence of Tenant's compliance with such demand. Neither the issuance of any insurance policy required hereunder nor the minimum limits specified herein with respect to Tenant's insurance coverage shall be deemed to limit or restrict in any way Tenant's liability arising under or out of this Lease. With respect to each and every one of the insurance policies herein required to be procured by Tenant, on or before the Delivery Date and at least thirty (30) days before any such insurance policy shall expire, Tenant shall deliver to Landlord a certificate of the insurer certifying that such policy has been issued, providing the coverage required by this Lease and containing the provisions specified herein, together with evidence of payment of all applicable premiums. The term "insurance policy" as used herein shall be deemed to include any extensions or renewals of such insurance policy. In the event that Tenant shall fail to promptly furnish any insurance coverage hereunder required to be procured by Tenant, Landlord, at its sole option, shall have the right after ten (10) days' prior written notice to Tenant to obtain the same and pay the premium therefor for a period not exceeding one (1) year in each instance, and the premium so paid by Landlord shall be immediately due and payable by Tenant to Landlord as additional rent.

(c)    Tenant shall not do or permit to be done any act or thing upon the Premises or the Patio Area that will invalidate or be in conflict with any fire insurance policies covering the building containing the Premises or any part thereof, including the Common Area, or fixtures and property therein, or any other insurance policies or coverage referred to above in this Article 21; and Tenant shall promptly comply with all rules, orders, regulations or requirements relating to such insurance policies, and shall not do anything, or prevent anything to be done, in, on or about the Premises or the Patio Area in violation of or in conflict with such insurance policies. If any act or omission of Tenant, its agents, employees or contractors shall result in any increase in the premium rates applicable to any such insurance policies carried by Landlord, or other increased costs to Landlord in connection therewith, then Tenant shall reimburse Landlord on demand as additional rent for the amount of any such increased rates or costs.

(d)    Waiver of Subrogation. LANDLORD AND TENANT HEREBY WAIVE AND RELEASE ANY CLAIM THAT EITHER OF THEM MAY HEREAFTER HAVE AGAINST THE OTHER ON ACCOUNT OF ANY DAMAGE TO THE PROPERTY OF THE WAIVING PARTY, EVEN IF SUCH DAMAGE SHALL BE DUE TO THE NEGLIGENT ACT OR OMISSION OF THE OTHER PARTY. LANDLORD AND TENANT SHALL EACH CAUSE THEIR RESPECTIVE PROPERTY INSURANCE POLICIES TO CONTAIN EITHER A WAIVER OF ANY RIGHT OF SUBROGATION THE INSURER OF ONE PARTY HERETO MAY ACQUIRE AGAINST THE OTHER PARTY HERETO BY VIRTUE OF PAYMENT OF ANY LOSS UNDER ANY SUCH INSURANCE OR AN ACKNOWLEDGMENT BY THE INSURER THAT THE FOREGOING WAIVER OF CLAIMS DOES NOT IMPAIR OR INVALIDATE SUCH POLICY OF INSURANCE.

## 22. DAMAGE BY FIRE OR OTHER CASUALTY.

(a)    Tenant shall immediately notify Landlord of any damage or destruction to the Premises and, if Landlord shall not terminate this Lease as hereinafter provided, Landlord shall repair and restore the Premises to substantially its condition as of the Delivery Date if such repair is covered by insurance proceeds. If insurance proceeds are insufficient to complete repair or such repair cannot be completed within two hundred seventy (270) days, Landlord or Tenant may terminate this Lease by notice given within thirty (30) days of Landlord receiving written notice that insurance proceeds will not be sufficient unless Tenant agrees to pay the difference in cost. If during the last two (2) years of the Term the Premises shall be substantially damaged or destroyed by fire or other casualty, either Landlord or Tenant may terminate this Lease by giving notice of its election to terminate, such notice to be given within ninety (90) days after the occurrence of such damage or destruction, provided, however, that Tenant shall have the right to negate Landlord's notice of termination by

25

giving notice to Landlord within thirty (30) days after Landlord's notice of termination, of its election to exercise the next applicable unexercised Option Term. Tenant shall be entitled to an abatement of Rent from and after the applicable casualty until the earlier of the date which occurs (i) one hundred eighty (180) days following the delivery of the Premises substantially in the conditions required on the Delivery Date, or (ii) on the date Tenant reopens for business in the Premises. Unless this Lease is terminated by Landlord, Tenant shall repair and refixture the interior of the Premises in a manner and to a condition at least equal to that existing prior to the damage or destruction, and reopen for business, within ninety (90) days (or such longer period as is reasonable under the circumstances) after Landlord has substantially completed its repairs to the Premises.

(b)  Landlord's obligation to rebuild and repair under this Article 22 shall in any event be limited to restoring Landlord's Work to substantially the same condition in which the same existed on the date the Premises was originally delivered to Tenant. In no event shall Landlord be required to repair or replace Tenant's improvements and betterments, merchandise, trade fixtures, furnishings or equipment.

(c)  Tenant agrees that during any period of reconstruction or repair of the Premises it shall continue the operation of its business within the Premises to the extent practicable. During the period from the occurrence of the casualty until Landlord's repairs are completed, the Minimum Rent and additional rent shall be reduced to such extent as may be fair and reasonable under the circumstances; however, there shall be no abatement of the Percentage Rent, and other charges provided for herein nor shall there be any abatement of rent in the event the underlying damage was caused by Tenant, or its contractors, subcontractors, employees, agents or invitees.

### 23. ASSIGNMENT AND SUBLETTING.

(a)  Except as otherwise provided in this Article 23, Tenant shall not assign, mortgage, sell (directly or indirectly), or otherwise encumber this Lease or any part thereof, nor underlet the Premises or any part thereof to be used by others, without the prior consent of Landlord in each instance, which consent shall not be unreasonably withheld, delayed or conditioned. The prohibition against assigning or subletting shall be construed to include a prohibition against any assignment or subletting by operation of law. If Tenant (or any subtenant) is a corporation, the foregoing prohibition shall include the issuance of additional stock, a stock voting agreement or change in class(es) of stock) which results in a change of control of Tenant as if such transfer of stock were an assignment of this Lease, and if Tenant is a partnership or joint venture, said provision shall apply with respect to a transfer (by one or more transfers or additions of general partnership or limited partnership interests) which results in a change of control of such partnership or joint venture, as if such transfers or additions were an assignment of this Lease. Any agreement pursuant to which (x) Tenant is relieved from the obligation to pay, or a third party agrees to pay on Tenant's behalf, all or a part of Minimum Rent, Percentage Rent or additional rent under this Lease and/or (y) such third party undertakes or is granted any right to assign or attempt to assign this Lease or sublet or attempt to sublet all or any portion of the Premises, shall be deemed an assignment of this Lease and subject to the provisions of Article 23.

Notwithstanding anything  hereinabove to the contrary, Landlord's consent shall not be required to the following transactions: (i) a transfer to a parent, subsidiary, division, or other entity controlling, controlled by, or under common control with Tenant; (ii) a transfer to a successor entity related to Tenant by merger, consolidation, reorganization or governmental action; (iii) assignment of lease to a party that acquires Tenant's leasehold interest along with all or substantially all of Tenant's other store locations (with a minimum of 5 stores as a requirement) provided that (1) such party engages in the same use as the Permitted Use; (2) the tangible net worth of the acquiring entity is at least equal to three million dollars or (iv) assignment to Tenant's franchisor or another MOD Pizza franchisee. In all such permitted transactions, Landlord must receive at least thirty (30) days' notice of such assignment, the successor entity must assume in writing all of Tenant's obligations under this Lease, and Landlord must receive a fully executed copy of the assignment instrument

26

between Tenant and the successor. In such transactions, the Tenant named herein and the Guarantor shall continue to remain fully liable for all payment and performance obligation under the Lease and the Guaranty.

(b) If Tenant desires to obtain Landlord's consent to an assignment or subletting, Tenant shall, by notice as provided in Article 38 of the Lease, furnish Landlord with (i) the name and address of the proposed subtenant or assignee); (ii) a description identifying the space to be sublet; (iii) all of the terms, conditions and consideration of the proposed subletting or assignment; (iv) the nature and character of the business of the proposed subtenant or assignee and its proposed use of the Premises; (v) current certified financial information; and (vi) any other information as Landlord may reasonably request with respect to the proposed subtenant or assignee. Within thirty (30) days following receipt of the foregoing, Landlord shall have the right to terminate this Lease as of the day prior to the effective date of such proposed sublease or assignment, in which event Tenant shall vacate and surrender the Premises to Landlord on the date specified in Landlord's notice electing to terminate this Lease; provided, however, if Landlord so elects to terminate this Lease, Tenant may withdraw its request for consent to an assignment or subletting by written notice to Landlord delivered within ten (10) days after receipt of Landlord's termination notice, whereupon Landlord's termination notice shall be rendered null and void and the Lease shall continue in full force and effect.

(c) If Landlord shall not elect to terminate the Lease, Landlord shall not unreasonably withhold its consent to the proposed subletting or assignment. Any consent given by the Landlord shall be on the conditions that (i) such assignee shall execute and deliver to Landlord an assumption agreement acceptable to Landlord wherein it agrees to perform all the obligations of the Tenant under this Lease in form appropriate for recording, and provided, in the case of a sublease, the subtenant shall execute and deliver to Landlord an agreement wherein it agrees to be subject to all of the terms and conditions of this Lease; (ii) there shall be no advertisement or public communication of any kind whatsoever relating to the proposed subletting or assignment which mentions or refers to a rental rate lower than that being offered by Landlord; (iii) no subletting or assignment shall be to a person or entity which does not have acceptable financial standing, good character, experience in similar business, or to a person or entity which proposes to use the Premises in a manner not in keeping with the standards for a first-class shopping center in the area in which the Premises are located; (iv) the subletting shall be subject to all of the obligations of Tenant under this Lease and, the sublease shall impose at least the same restrictions and conditions with respect to use as are contained in this Lease and shall specifically provide that there shall be no further subletting of the sublet premises or any assignment thereof; (v) the terms of any such sublease or any renewal or extension thereof shall not extend beyond a date one day prior to the expiration of the initial Term or the exercised Option Term, (vi) Landlord shall be furnished with a duplicate original of the sublease or assignment no less than ten (10) days prior to the effective date of such assignment or sublease; (vii) Tenant shall pay to Landlord (x) seventy-five (75%) percent of any rent or other consideration set forth in such sublease to be paid to Tenant by any subtenant which is in excess of the rent then being paid by Tenant to Landlord pursuant to the terms hereof, after deducting therefrom reasonable brokerage commissions actually incurred by Tenant, and (y) seventy-five (75%) percent of any other profit or gain realized by Tenant from any such subletting or consideration paid to or benefiting Tenant pursuant to any assignment. All sums payable hereunder by Tenant shall be paid to Landlord as additional rent immediately upon receipt thereof by Tenant. If only a part of the Premises is sublet, then the rent paid therefor by Tenant to Landlord shall be deemed to be that fraction thereof that the area of said sublet space bears to the Premises; and (viii) there shall be no default by Tenant under this Lease at the time that Landlord's consent to any such subletting or assignment is requested or on the date of the commencement of the term of any sublease or the effective date of any such assignment.

(d) No assignment of this Lease or subletting of all or any portion of the Premises, whether or not consented to by Landlord, shall release or discharge Tenant from any of its obligations to be performed under this Lease. Landlord's consent to any assignment or subletting shall not relieve Tenant's requirement to obtain Landlord's consent for any future or further assignment or subletting.

27

(e) If Tenant assigns, sells, conveys, transfers, mortgages or pledges this Lease or sublets the premises, or any portion thereof, in violation of this Article 23, or if the Premises are occupied by anybody other than Tenant, Landlord may collect rent from any assignee, sublessee or party claiming a right to this Lease or who occupies the Premises, and Landlord shall apply the net amount collected to the annual rental herein reserved; and no such collection shall be deemed a waiver by Landlord of the covenants contained in this Article 23 nor an acceptance by Landlord of any such assignee, sublessee, claimant or occupant as Tenant, nor release Tenant from the further performance by Tenant of the covenants contained herein.

(f) Tenant shall pay, as additional rent, all of Landlord's costs, including but not limited to fees for credit checks and reports, attorneys' fees (including in-house counsel) in connection with any subletting or assignment proposed by Tenant, in the amount of $1,500.00 per request, whether or not consented to by Landlord.

24. **CONDEMNATION.** In the event that (i) any portion of the No-Build Area, (ii) twenty-five percent (25%) or more of the Premises,  or (iii) any portion of the Shopping Center that materially, adversely impacts access to the Premises shall be lawfully condemned or taken in a manner for any public or quasi-public use, or conveyed in lieu thereof, this Lease shall terminate as of the date of vesting of title. In the event that only a portion of the Premises shall be so condemned or taken then, effective as of the date of vesting of title, the Minimum Rent and additional rent hereunder shall be abated in an amount directly proportionate to Tenant's economic loss resulting from such condemnation as measured by a reduction in Tenant's Gross Sales during the twelve (12) month period immediately following substantial completion of the Condemnation Repairs (as hereinafter defined) as may be reasonably attributable to such condemnation. The applicable Gross Sales Breakpoint shall also be proportionately decreased. Except in the event of a total condemnation, Landlord, upon receipt of the award in condemnation, shall make necessary repairs and alterations ("Condemnation Repairs") so as to constitute the Premises an architectural unit. Notwithstanding the foregoing, Landlord shall not be obligated to expend monies in excess of those received; provided, however, that if the Premises are not restored such that Tenant can reasonably operate its business therein in a manner substantially similar to the manner of operation prior to prior to the condemnation, Tenant may terminate this Lease. If the proceeds received are insufficient to complete the Condemnation Repairs, Landlord may elect to terminate this Lease unless Tenant shall agree to reimburse Landlord for the additional expense. If Landlord elects not to terminate this Lease, as aforesaid, this Lease shall be and remain unaffected by such condemnation or taking, except that the Minimum Rent and additional rent shall be abated to the extent, if any, hereinbefore provided. In the event of any condemnation or taking of all or a portion of the Premises, Landlord shall be entitled to receive the entire award in condemnation proceedings, including, without limitation, any award for the value of the unexpired term of this Lease and the interest vested by this Lease in Tenant, and Tenant irrevocably assigns to Landlord any and all right, title and interest of Tenant now or hereafter arising in or to any such award or any part thereof. Tenant shall be entitled to claim damages equal to the unamortized cost of leasehold improvements made by Tenant at Tenant's cost during the Term and any actual business loss or relocation award available provided such claim does not decrease Landlord's award. Any restoration to the Premises relating to Tenant's Work or alterations made necessary by such condemnation shall be performed by Tenant at Tenant's sole expense immediately following Landlord's substantial completion of the Condemnation Repairs.

25. **DEFAULT; REMEDIES.**

(a) Tenant shall be in default under this Lease upon the occurrence of any one or more of the following events or occurrences:

(i) Landlord does not actually receive any payment of the full amount of the Minimum Rent, Percentage Rent or additional rent or other rent or other payment or reimbursement due within ten (10) days following notice that rent is past due;

28

(ii) Tenant fails to fully and timely observe or perform any of the terms or covenants of this Lease other than those referred to in Articles 25(a)(i), (iii), (iv) or (v) within thirty (30) days after Landlord gives notice to Tenant specifying the nature of such failure, unless the failure is of such a nature as to require more than thirty (30) days to completely cure or be remedied, in which event, Tenant shall be in default if Tenant shall fail to promptly commence such cure within said thirty (30) day period and thereafter diligently prosecute the cure to completion in a commercially reasonable manner;

(iii) Tenant fails to take possession or occupancy of, or deserts or abandons the Premises or the same becomes vacant for more than five (5) consecutive days excluding in the case of a casualty, condemnation, force majeure event or utility interruption (the presence of personalty alone in the Premises shall not be deemed evidence that the Premises are not vacant);

(iv) The filing or execution or occurrence of: (aa) a petition by or against Tenant or any guarantor hereof in bankruptcy or seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any provision of law which is not released within 60 days, (bb) adjudication of Tenant or any guarantor hereof as a bankrupt or insolvent, or insolvency in the bankruptcy or equity sense, (cc) an assignment by Tenant or any guarantor hereof for the benefit of creditors, (dd) a petition or other proceeding by or with respect to any portion of Tenant's or guarantor's property, (ee) any levy, execution or attachment against Tenant or any guarantor hereof or their property, (ff) any transfer or passage of any interest of Tenant under this Lease by operation of law, (gg) the revocation or suspension of Tenant's permit(s) or license(s), if any, issued by any authority permitting Tenant to conduct its business at the Premises; (hh) the issuance of any citation or violation notice against Tenant by any governmental authority which is not cured within thirty (30) days, (ii) the maintenance of unsafe, unsanitary or unhealthy conditions at the Premises, which is not cured within thirty days, or (jj) the discontinuance or interruption of normal and continuous business operations at the Premises for more than five (5) business days excluding any discontinuance or interruption resulting from a casualty, condemnation, utility interruption or force majeure; or

(v) an assignment or sublease in breach of Article 23.

(b) Upon the occurrence of one or more of the aforesaid events of default set forth in Article 25(a), or upon the occurrence of any other default or defaults by Tenant under this Lease, and the elapse of the grace period, if any, set forth herein, Landlord may, at Landlord's option, without any demand or notice unless required in this Article 25:

(i) Terminate this Lease by giving Tenant notice of termination, in which event this Lease shall expire and terminate on the date specified in such notice of termination, which date shall be five (5) days after such notice of termination, with the same force and effect as though the date so specified were the date herein originally fixed as the termination date of the Term, and all rights of Tenant under this Lease and in and to the Premises shall expire and terminate, and Tenant shall remain liable for all obligations under this Lease arising up to the date of such termination, and Tenant shall surrender the Premises to Landlord on the date specified in such notice; or

(ii) Terminate this Lease as provided in Article 25(b)(i) hereof and recover from Tenant all damages Landlord may incur by reason of Tenant's default, including, without limitation, a sum which, at the date of such termination, represents the then value of the excess, if any, of (aa) the Minimum Rent, Percentage Rent, Taxes and all other sums which would have been payable hereunder by Tenant for the period commencing with the day following the date of such termination and ending with the date hereinbefore set for the expiration of the then Term hereby granted reduced to present value and using a discount rate of five percent (5%) per annum, over (bb) the aggregate reasonable rental value of the Premises for the same period, all of which excess sum shall be deemed immediately due and payable; or

29

(iii) Without terminating this Lease, recover possession of the Premises and receive all Minimum Rent, Taxes and other rents and amounts due and coming due under this Lease for the entire remaining Term, together with all other amounts previously due. Upon making such payments, Tenant shall be entitled to receive from Landlord all rents received by Landlord from other assignees, tenants, and subtenants on account of the Premises during the Term provided that the monies to which Tenant shall so become entitled shall in no event exceed the entire amount actually paid by Tenant to Landlord pursuant to the preceding sentence less all costs, expenses and attorneys' fees of Landlord incurred in connection with the reletting of the Premises; and/or

(iv)    Pursue such other remedies as are available at law or equity.

(c) Notwithstanding anything herein to the contrary, in the event of a default by Tenant where Landlord has recovered possession of the Premises, Landlord shall thereupon undertake commercially reasonable efforts to mitigate its damages and relet the Premises, but in no event shall Landlord be required to: (i) give priority to the reletting of the Premises over any other space in the Shopping Center, (ii) contract with a party at a rental below fair market value, as determined by Landlord, (iii) contract with a party which may impose an increased burden on the services or facilities of the Shopping Center, (iv) contract with a party represented by a broker, agent or salesperson who requests of Landlord a commission on terms unacceptable to Landlord, (v) contract with a party who Landlord considers in its reasonable judgment as non-creditworthy, or (vi) contract with a party whose use is not compatible in Landlord's judgment with the tenant mix of the Shopping Center or with a use that may have an adverse impact on other tenants in the Shopping Center. Notwithstanding the generality of the foregoing, Landlord may (but shall have no obligation to) perform any covenant or agreement required to be performed by Tenant under this Lease but which Tenant has failed to perform, provided Landlord has first given notice to Tenant of its intention to do so. Any costs incurred by Landlord in performing such covenant or agreement shall be reimbursed immediately upon notice thereof.

(d) Landlord's pursuit of any remedy or remedies, including, without limitation, any one or more of the remedies stated in this Article 25 shall not (i) constitute an election of remedies or preclude pursuit of any other remedy or remedies provided in this Lease or any other remedy or remedies provided by law or in equity, separately or concurrently or in any combination, or (ii) serve as the basis for any claim of constructive eviction, or allow Tenant to withhold any payments under this Lease.

(e) Tenant shall pay all costs, expenses and attorneys' fees that may be incurred or paid by Landlord in enforcing the terms of this Lease.

(f) Bankruptcy.

(i)    Neither Tenant's interest in this Lease, any guarantor of this Lease, any estate hereby created in Tenant nor any interest herein or therein, shall pass to any trustee or receiver or assignee for the benefit of creditors or otherwise by operation of law, except as may specifically be provided pursuant to the Bankruptcy Code (11 USC §101 et. seq.), as the same may be amended from time to time.

(ii)    It is understood and agreed that this Lease is a lease of real property in a shopping center as such lease is described in Section 365 of the Bankruptcy Code, as the same may be amended from time to time. Upon the filing of a petition by or against Tenant or any guarantor of this Lease under the Bankruptcy Code, Tenant or any guarantor of this Lease, as debtor and as debtor-in-possession, and any trustee who may be appointed with respect to the assets of or estate in bankruptcy of Tenant or any guarantor of this Lease, agree to pay monthly in advance on the first day of each month, as reasonable compensation for the use and occupancy of the Premises, an amount equal to all Minimum Rent, additional rent and other charges otherwise due pursuant to this Lease, and to pay Percentage Rent monthly, at the percentage factor set forth in this Lease for the Lease Year in which such month falls, on all of the Gross Sales during such month in excess

30

of one-twelfth (1/12th) of the Sales Breakpoint for such Lease Year, payment of all such Percentage Rent to be made by the tenth (10th) day of the succeeding month. Included within and in addition to any other conditions or obligations imposed upon Tenant or its successor in the event of the assumption and/or assignment of this Lease are the following: (1) the cure of any monetary defaults and reimbursement of pecuniary loss within not more than thirty (30) days of assumption and/or assignment; (2) the deposit of a sum equal to not less than three (3) months' Minimum Rent and additional rent, which sum shall be determined by Landlord, in its sole discretion, to be a necessary deposit to secure the future performance under this Lease of Tenant or its assignee; (3) the use of the Premises as set forth in the Fundamental Lease Provisions, and the quality, quantity and/or lines of merchandise, goods or services required to be offered for sale being unchanged; and (4) the prior written consent of any mortgagee to which this Lease has been assigned as collateral security.

26. **MORTGAGES.**

(a)  Upon request by any holder of a mortgage ("Mortgagee") which now or hereafter has a mortgage encumbering the Shopping Center ("Mortgage"), Tenant covenants and agrees to subordinate Tenant's rights under this Lease to such Mortgagee, and to any and all advances to be made under its Mortgage and the interest thereon, and to all renewals, modifications, replacements, and extensions thereof. Tenant also agrees that any Mortgagee may elect to have this Lease made prior to the Mortgage, and in the event of such election and upon notification by any such Mortgagee to Tenant to that effect, this Lease shall be deemed prior in lien to any such Mortgage, whether this Lease is dated or filed prior to or subsequent to the date of the Mortgage. Tenant agrees to such modifications of this Lease as Mortgagee may request so long as such changes do not materially and adversely increase Tenant's obligation or decrease Landlord's obligations.

(b)  Tenant shall, in the event of the exercise of the power of sale or deed in lieu of foreclosure under any Mortgage covering the Shopping Center, attorn to and recognize such purchaser as landlord under this Lease; provided that said purchaser shall not be liable for any act or omission of any prior landlord or be subject to any offsets or defenses which Tenant may have against any prior landlord (except to the extent of ongoing items).  Tenant further covenants and agrees that, should any party so succeeding to the interest of Landlord require a separate agreement of attornment regarding the matters covered by this Lease, and provided the Mortgagee agrees to deliver to Tenant an agreement not to disturb Tenant's quiet enjoyment of the Premises as long as Tenant is not in default under this Lease, then Tenant shall promptly, upon request, enter into any such attornment agreement.  Failure of Tenant to execute any statements, certificates or instruments necessary or desirable to effectuate the provisions of this Article 26(b) within twenty (20) days after written request to do so by Landlord, shall constitute a material breach of this Lease following a second written notice to Tenant and further cure period of ten (10) days.

(c)  At any time and from time to time, Tenant agrees, upon request from Landlord, to execute, acknowledge and deliver to Landlord or any potential purchaser of the Shopping Center, or to any mortgagee or potential mortgagee, within twenty (20) days after request, an estoppel certificate or statement in writing certifying to all or any part of the following information as Landlord shall request, to the extent such facts are true and ascertainable: (i) that this Lease constitutes the entire agreement between Landlord and Tenant and is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modification), (ii) the amounts of Minimum Rent, Percentage Rent, additional rent and other charges under this Lease and the dates to which same have been paid, and that there are no prepaid rents or other sums hereunder, and the amount of security, if any, deposited with Landlord, (iii) that the Premises have been satisfactorily completed, and that all conditions precedent to this Lease taking effect have been carried out, (iv) that Tenant has accepted possession of the Premises, that the Term has commenced, that Tenant is occupying the Premises and operating Tenant's business full-time therefrom, and there are no defaults or offsets which Tenant has against enforcement of this Lease by Landlord, and (v) the actual Commencement Date and expiration date of this Lease. Tenant's certificate or statement shall also contain such other information as may be reasonably or customarily required by the present or potential landlord or

31

mortgagee. Failure of Tenant to execute any statements, certificates or instruments necessary or desirable to effectuate the provisions of this Article 26 within twenty (20) days after written request to do so by Landlord shall constitute a material breach of this Lease following a second written notice to Tenant and further cure period of ten (10) days.

27. <u>SUCCESSORS AND ASSIGNS</u>. The provisions of this Lease shall extend to and bind  Landlord and Tenant and their respective successors, heirs, legal representatives, and permitted assigns; provided, however, that no assignment or subletting by, through or under Tenant in violation of Article 23 hereof shall vest in such assignee or subtenant any right, title or interest whatsoever.  Upon any sale or transfer of the Premises, the Landlord named herein shall be, and hereby is, entirely free and relieved of all covenants and obligations of Landlord hereunder arising or occurring on or after such sale or conveyance.

28. <u>ACCESS TO PREMISES</u>.  Upon notice to Tenant (except no notice shall be necessary in the event of an emergency) Landlord shall have free access to the Premises at all times for purposes of inspecting, examining, showing or displaying same, or placing "For Rent" notices no larger than 10 square feet upon the Premises during the last six (6) months of the Term or for making any repairs thereto or to Landlord's adjoining property.  All such notices shall not be removed, molested or hidden by Tenant.  Landlord shall use reasonable efforts to avoid material interference with the operation of Tenant's business during such entry. Any such entry or action shall not be deemed an actual or constructive eviction or disturbance by Tenant, nor shall Tenant be allowed any abatement of rent of any sort, or damages for any injury and inconvenience occasioned thereby. Nothing contained in this Article 28 or elsewhere in this Lease shall obligate Landlord in any fashion under any circumstances to enter or inspect the Premises. Except in the event of an emergency, Landlord shall not enter the Premises without an employee of Tenant accompanying Landlord's representative provided Tenant makes an employee available following Landlord's notice to Tenant of the necessity therefor.

29. <u>TERMINATION</u>.  No termination of this Lease prior to the normal expiration thereof, shall affect Landlord's right to collect rent for the period prior to termination thereof.  No surrender of the Premises or any party thereof by delivery of keys or otherwise shall operate to terminate this Lease unless and until accepted in writing by an authorized officer or authorized representative of Landlord.

30. <u>ESTATE IN LAND</u>.  This Lease shall create the leasehold relationship of Landlord and Tenant between the parties hereto, and no estate shall pass out of Landlord.

31. <u>HOLDING OVER.</u>

(a)  If this Lease is not renewed or extended or a new Lease is not entered into between the parties, and if Tenant shall then hold over after the termination date, and if Landlord shall then not proceed to remove Tenant from the Premises in the manner permitted by law (or shall not have given written notice to Tenant that Tenant may vacate the Premises) irrespective of whether or not Landlord accepts rent from Tenant for a period beyond the termination date, the parties agree that Tenant's occupancy of the Premises after the termination date shall be upon all of the terms set forth in this Lease except Tenant shall pay on the first day of each month of the holdover period as Minimum Rent, an amount equal to one and one quarter (1.25) times one-twelfth (1/12th) of the sum of the Minimum Rent, Percentage Rent, Taxes, Common Area Maintenance Cost and additional rent payable by Tenant during the last year of the Term (i.e., the year immediately prior to the holdover period), except that Landlord shall not be required to perform any work, furnish any materials or make any repairs within the Premises during the holdover period and except that such tenancy shall be on a month-to-month basis.  If Landlord shall, at any time after the expiration of the Term or after the expiration of the term created thereafter, proceed to remove Tenant from the Premises as a holdover, the Minimum Rent for the use and occupancy of the Premises during any holdover period shall be calculated in the same manner as set forth above.

(b) No extension or renewal of this Lease shall be deemed to have occurred by any holding over. If Tenant shall hold-over or remain in possession of any portion of the Premises beyond the termination date, Tenant shall be subject not only to summary proceeding and all damages related thereto, but also to any damages arising out of any lost opportunities (and/or new Leases) by Landlord to relet the Premises (or any part thereof). All damages to Landlord by reason of such holding over by Tenant may be subject of a separate action and they need not be asserted by Landlord in any summary proceedings against Tenant.

32. <u>INTEREST; ATTORNEYS' FEES</u>.

(a) All Minimum Rent, Percentage Rent, additional rent, other rent, and any other costs, expenses, sums or amounts payable or reimbursable hereunder by Tenant to Landlord shall be deemed to be rental hereunder whether or not designated as such, which, if not promptly paid on or before the date due, time being of the essence, shall bear interest at the rate of four hundred (400) basis points in excess of the prime rate published in the Wall Street Journal or its successor (but in no event higher than the highest rate enforceable by law) from the due date until paid. Such interest shall be due if payment is not made on the due date, regardless of whether Article 25 provides for any additional grace period or notice.

(b) If any amounts owing under this Lease are collected from Tenant or any guarantor of Tenant's obligations hereunder by or with any assistance from or consultation with any attorney at law or a collection agent, Tenant covenants and agrees to reimburse Landlord for its legal fees and collection agency fees, and such fees shall constitute additional rent hereunder.

33. <u>RECORDING</u>. This Lease may not be recorded under any circumstances; however Landlord consents, in concept only and subject to its review and approval of a form of Memorandum of Lease reasonably acceptable to Landlord, to the recording of a Memorandum of Lease with respect to this transaction. Tenant shall, at its sole cost and expense, pay all costs, including any taxes imposed in connection with such filing. Tenant agrees to execute and deliver to Landlord a termination of Memorandum of Lease in recordable form in connection with the expiration or earlier termination of this Lease.

34. <u>NON-WAIVER</u>.

(a) Except as otherwise provided herein, no failure by Landlord to timely bill Tenant for any payments hereunder, or to insist upon the strict performance, in any of one or more instances, upon any breach of any term, covenant, or condition herein contained shall be deemed to be a waiver of such term, covenant or condition, nor of any subsequent breach of the same or any other term, covenant or condition herein contained. Any subsequent acceptance by Landlord of any Minimum Rent, Percentage Rent, additional rent, other rent, or any other sums due hereunder shall not be deemed to be a waiver of any breach or default by Tenant of any term, covenant, or condition of this Lease regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such sum. No covenant, term, or condition of this Lease shall be deemed to have been waived by Landlord unless such waiver shall be in writing by an authorized officer of Landlord.

(b) No payment by Tenant or receipt by Landlord of an amount less than the entire Minimum Rent or other rent or other sum required herein shall be deemed a waiver of Landlord's right to receive the entire amount herein stipulated. No partial payment or endorsement on any check or any letter accompanying such payment or rent shall be deemed an accord and satisfaction, and Landlord may accept such payment without prejudice to Landlord's right to collect the balance of any rents due under this Lease. After service of any notice of termination, or other notice, or commencement of any suit or dispossessory or distress proceeding, Landlord may receive and collect any rent due and such collection or receipt shall not operate as a (a) reinstatement, continuance, renewal, or extension of the Term of (b) waiver affecting such notice, suit or proceeding.

33

**35. TIME OF THE ESSENCE.** Time is of the essence with respect to Tenant's obligations and covenants under this Lease.

**36. SEVERABILITY.** If any clause, provision, subparagraph or paragraph of this Lease is or becomes unconstitutional, illegal, invalid, or unenforceable because of present or future Laws, the remaining parts of this Lease shall not be affected thereby unless such invalidity is, in the sole determination of Landlord, an essential element of this Lease in which event Landlord has the right to terminate this Lease on written notice to Tenant.

**37. RELOCATION.** Tenant agrees that, at any time during the term of this Lease, Tenant shall, if requested by Landlord, vacate the Premises and relocate to a space designated by Landlord within the area indicated on Exhibit A (the "Relocation Area"), such space to be comparable to the dimensions of the Premises (i.e., within five percent [5%] of the size of the Premises). Prior to the effective date of Tenant's relocation, Landlord shall improve the designated space to a condition substantially similar to the condition existing in the Premises on the date immediately prior to Tenant's receipt of Landlord's notice of relocation and in accordance with working drawings originally approved by Landlord with respect to Tenant's Work (as defined in Section 8) in connection with Tenant's initial occupancy of the Premises, including a new pizza oven equal to or better than the oven then existing in the Premises, and such designated space to be occupied by Tenant for the balance of the Term set forth herein. The Minimum Rent and additional rent shall be proportionately adjusted should the designated space be larger or smaller than the Premises. Landlord shall reimburse Tenant for its actual and reasonable documented out-of-pocket costs incurred as a direct result of Tenant's relocation to the space designated by Landlord including moving costs for Tenant's furniture, fixtures, equipment and the printing of reasonable amounts of stationery with Tenant's new address and relocating telephone equipment. Landlord shall use commercially reasonable efforts to avoid downtime, to the extent reasonably practicable, or minimize any period of time during which Tenant shall be unable to operate as a result of Tenant's relocation to the designated space. In the event that Tenant is unable to operate for the Permitted Use as a result of Tenant's relocation to the designated space, all Minimum Rent and additional rent shall abate for the period during which discontinues operations in the Premises through and including the date upon which Tenant is able to open for business in the designated space, which period shall in no event exceed ten (10) days following the date upon which the designated space has been delivered to Tenant in the condition required by this Section 37.

**38. NOTICES.** All notices, consents, approvals or demands with respect to this Lease shall be in writing, and if to Tenant the original shall be sent by certified mail, return receipt requested, or by a nationally recognized overnight courier service which provides delivery receipts, to the Tenant specified in the Fundamental Lease Provisions or to such other persons at such other addresses as Tenant shall notify Landlord in accordance with this Article 38. All notices or demands to Landlord shall be sent certified mail, return receipt requested, or national overnight commercial courier to the address of Landlord specified in the Fundamental Lease Provisions or to such other persons and at such other places as Landlord may designate to Tenant in writing in accordance with this Article 38. Notice shall be deemed received (i) if mailed, three (3) business days after the date of posting by U.S. Mail; or (ii) if sent by overnight courier, on the following business day after depositing such notice with the courier service. Upon request by Landlord or any Mortgagee of the Shopping Center, a copy of all notices or demands to Landlord shall also be sent to such Mortgagee(s).

**39. FORCE MAJEURE.** The parties hereto shall be excused for the period of any delay in the performance of any obligations hereunder, when prevented from so doing by cause or causes beyond such party's control which shall include, without limitation, industry-wide labor disputes, civil commotion, war, war-like operations, invasion, rebellion, hostilities, military or usurped power, sabotage, acts of terrorism, governmental regulations or controls, fire or other casualty, inability to obtain any material, services or through acts of God except that in no event shall Tenant's obligation to pay Minimum Rent, Percentage Rent or any additional rent be affected by the provisions of this Article 39.

34

40. **BROKERAGE.** Landlord and Tenant each warrant to the other that it had no dealing with any broker or agent in connection with this Lease other than The Providence Group of the Carolinas, LLC. ("Broker"). Landlord and Tenant each agree to hold harmless and indemnify the other from and against any and all costs, expense or liability (including attorneys' fees) for any compensation, commissions and charges claimed by any broker or agent (other than the Broker) by reason of any broker or agent having had conversations or dealings with such party with respect to this Lease or the negotiation thereof. Landlord represents that it shall be responsible for the payment of the Broker's commission, pursuant to a separate written agreement.

41. **ENTIRE AGREEMENT; AMENDMENT; CONSENTS.** This Lease and all exhibits or riders attached hereto (if any) set forth the entire agreement between the parties hereto concerning the Premises and no representations, inducements, promises and agreements, oral or otherwise, between the parties not embodied herein, shall be of any force and effect. No amendment, modification, termination, change or addition to this lease shall be binding upon either party unless reduced to writing and signed by Tenant and Landlord. Any consent required or requested of Landlord under this Lease or any portion thereof, may be granted or withheld by Landlord, without inquiry into the reasonableness or unreasonableness of the granting or withholding of same unless this Lease provides that such consent or approval for such matter must be reasonable.

42. **JURISDICTION AND VENUE.** The parties agree that with respect to any dispute arising under or in connection with this Lease that the exclusive jurisdiction and venue shall reside with the courts of the county and State in which the Shopping Center shall be located and/or the United States District Courts, and such appellate courts as have supervision thereof, and the parties agreed to submit to such exclusive jurisdiction and venue, and service of process by certified mail to the addresses for notice set forth in Article 38 hereof.

43. **RULES AND REGULATIONS.** The rules and regulations annexed hereto, and all reasonable and non-discriminatory rules and regulations which Landlord may hereafter from time to time adopt, and promulgate for the government and management of the Shopping Center, are hereby made a part of this Lease and shall, during and within the term, be fully observed and performed by Tenant as if the same were contained herein as covenants. A breach of said rules and regulations by Tenant shall be deemed a material breach of this Lease.

44. **WAIVER OF COUNTERCLAIMS.** TENANT SHALL NOT IMPOSE ANY NON-COMPULSORY COUNTERCLAIM OR COUNTERCLAIMS IN A SUMMARY PROCEEDING OR OTHER ACTION BASED ON TERMINATION OR HOLDOVER, IT BEING THE INTENT OF THE PARTIES HERETO THAT TENANT BE STRICTLY LIMITED IN SUCH INSTANCE TO BRINGING A SEPARATE ACTION IN THE COURT OF APPROPRIATE JURISDICTION. THE FOREGOING WAIVER IS A MATERIAL INDUCEMENT TO LANDLORD MAKING, EXECUTING AND DELIVERING THIS LEASE, AND TENANT'S WAIVER OF ITS RIGHT TO COUNTERCLAIM IN ANY SUMMARY PROCEEDING OR OTHER ACTION BASED ON TERMINATION OR HOLDOVER IS DONE KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY.

45. **QUIET ENJOYMENT.** Upon payment by Tenant of the rents herein provided, and upon the observance of all covenants, terms and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term without hindrance or interruption by Landlord or any other person or persons lawfully claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease, and any mortgage and/or deed of trust to which this Lease is subordinate.

46. **FURNISHING OF FINANCIAL STATEMENTS.** Upon Landlord's written request from time to time not more than once during any Lease Year, Tenant shall within ten (10) days after Landlord's request therefor, furnish Landlord with financial statements (including, without limitation, operating statements including an annual profit and loss statement for the individual store unit covered by this Lease) reflecting

35

Tenant's current financial condition, and written evidence of ownership of managing and controlling interests in Tenant and for any Guarantor (if applicable), not more than once per Lease Year. Landlord shall maintain all financial information provided in a confidential manner.

47.  TRADE NAME.  Tenant agrees to operate its business in the Premises only under the name designated on the Fundamental Lease Provisions so long as the same shall not be held to be in violation of any applicable law.  Tenant hereby warrants that it has the full and unfettered right to use such name and that such use does not in any way infringe upon the rights of others. Tenant shall protect, defend, save and hold harmless Landlord against and from any and all claims, demands, fines, suits, actions, proceedings, orders, decrees and judgments of any kind or nature and against and from any and all costs, damages and expenses, including attorneys' fees, resulting from, or in connection with Tenant's use of its trade name at the Premises.  Tenant shall procure all license(s) and/or permit(s) required for the lawful conduct of Tenant's business and submit the same for inspection by Landlord. Tenant, at Tenant's expense, shall at all times comply with the requirements of such license(s) or permit(s).

48.  WAIVER OF JURY TRIAL.  LANDLORD AND TENANT HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON, OR IN RESPECT OF, ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT HEREUNDER, TENANT'S USE OR OCCUPANCY OF THE PREMISES AND/OR ANY CLAIM OF INJURY OR DAMAGE.

49.  SPECIFIC PERFORMANCE OF LANDLORD'S RIGHTS.  Landlord shall have the right to obtain specific performance of any and all of the covenants or obligations of Tenant under this Lease, and nothing contained in this Lease shall be construed as or shall have the effect of limiting such right.

50.  EXECUTION AND AUTHORITY.

(a)  This Lease shall not be binding upon either party until each party actually physically receives a fully executed copy of (i) this Lease, and (ii) each guaranty agreement, if any, of all guarantors of this Lease.  In the event Landlord executes this Lease first, same shall be regarded as an offer to Tenant, which may be accepted by Tenant only by delivering a fully executed copy of this Lease to Landlord, together with a fully executed copy of each guaranty agreement attached hereto which offer may be withdrawn at any time before Tenant so delivers the fully executed Lease to Landlord.

(b)  As a material inducement to Landlord to enter into this Lease, Tenant (and, individually which party executing this Lease on behalf of Tenant), knowing that Landlord is relying on each such representation and warranty, represents and warrants to Landlord that:

(i)  Tenant and the party and/or individual executing on behalf of Tenant are fully and duly authorized to execute this Lease on behalf of Tenant and to deliver same to Landlord, and the performance by Tenant of Tenant's obligations under this Lease, have been duly authorized and approved by all necessary corporate or partnership action, as the case may be, and the execution, delivery and performance of this Lease by Tenant is not in conflict with Tenant's bylaws or articles of incorporation (if a corporation), agreement of partnership (if a partnership), or other charters, agreements, rules or regulations governing Tenant's business as any of the foregoing may have been supplemented, modified, amended, or altered in any manner;

(ii)  The execution, delivery and full performance of this Lease by Tenant do not and shall not constitute a violation of any contract, agreement, undertaking, judgment, laws, decree,

36

governmental or court order or other restriction of any kind to which Tenant is a party or by which Tenant may be bound;

(iii)  Tenant has executed and entered into this Lease free and from fraud, undue influence, duress, coercion or other defenses to the execution of this Lease;

(iv)  This Lease constitutes a valid and binding obligation of Tenant, enforceable against Tenant in accordance with its terms;

(v)  Tenant is duly organized, validly existing and in good standing under the laws of the state of its organization and has full power and authority to enter into this Lease, to perform Tenant's obligations under this Lease in accordance with its terms, and to transact business in the state in which the Premises are located.

(vi) OFAC Certification.  Tenant certifies that (i) it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person", or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control; and (ii) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation. Landlord certifies that (a) it is not acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person", or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control; and (b) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation.

(c)  Landlord represents to Tenant that:

(i)  Landlord is duly authorized to execute this Lease and the party signing on behalf of Landlord is a duly authorized signatory;

(ii)  Landlord holds a fee ownership interest in the Shopping Center and has the requisite authority to enter into this Lease without the need for the approval or consent from any lender, mortgagee or third party;  and

(iii)  Landlord has received no written notice from any governmental authority of a taking of any land by eminent domain and to Landlord's knowledge, Landlord has no knowledge of a special tax assessment to be imposed by the taxing authority.

This Lease shall be executed in duplicate, each of which shall be deemed an original and each of which shall be deemed to be complete of itself and may be introduced into evidence or used for any purpose without the production of the copies.

51.  **TENANT DAMAGES**.  If Tenant shall request Landlord's consent and Landlord shall fail or refuse to give such consent, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent, it being intended that Tenant's sole remedy shall be an action for specific performance or injunction, and that such remedy shall be available only in those cases where Landlord has agreed not to unreasonably withhold its consent or where, as a matter of law, Landlord may not unreasonably withhold its consent.

300609184 v5

52. **GUARANTY.** It is a condition to Landlord's obligations hereunder that Tenant deliver to Landlord a guaranty from SD-Missouri, LLC (the "Guarantor") of all of Tenant's obligations under and pursuant to this Lease, in the form of Exhibit E attached hereto (the "Guaranty"). Tenant acknowledges that Landlord would not have entered into this Lease in the absence thereof.

53. **SATELLITE DISH.** Tenant shall have the right to erect and maintain an antenna and a satellite dish, provided (a) Tenant's plans for the installation of such equipment are previously approved by Landlord, (b) Tenant utilizes a contractor designated or approved by Landlord for all roof penetrations so as not to void any existing warranties, (c) Tenant maintains the area where roof penetrations are made while Tenant's equipment is present, (d) Tenant repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (e) such satellite dish shall be in a location determined solely by Landlord and shall be screened from ground view. In all events, Tenant access to the roof of the Premises or the roof of the building in which the Premises is located shall be in conformity with the Rules and Regulations. Tenant hereby acknowledges and agrees that Landlord has the right to determine the location of any and all satellite dishes located in the Shopping Center, and such location may or may not include the roof of the Premises, and any such Landlord-determined location may include the roof of the Premises, and may include satellite dishes belonging to other tenants of the Shopping Center.

54. **MISCELLANEOUS.**

(a) Other Tenants. Except as specifically set forth herein, Landlord reserves the absolute right to effect other tenancies in the Shopping Center as Landlord shall determine in the exercise of its sole business judgment, nor does Tenant does not rely on the fact, nor does Tenant represent, that any specific stores or occupants, or any particular number of stores or occupants, shall occupy any space in the Shopping Center during the Term.

(b) Confidentiality. It is agreed and understood that Tenant may acknowledge only the existence of this Lease by and between Landlord and Tenant (and Tenant's members, managers, employees, investors, lenders, franchisor and potential assignees and sublessees and as otherwise needed for the conduct of Tenant's business), and that Tenant may not disclose any of the terms and provisions contained in this Lease to any other tenant or occupant in the Shopping Center or to any agent, employee, subtenant or assignee of such tenant or occupant. Tenant acknowledges that any breach by Tenant of the agreements set forth in this Article 54(b) shall cause Landlord irreparable harm. The terms and provisions of this Article 54(b) shall survive the termination of this Lease (whether by lapse of time or otherwise).

(c) Attorney's Fees. In any action or proceeding hereunder, the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs (including non-taxable costs) and expenses. The prevailing party shall be entitled to recover all of its reasonable attorneys' fees in any dispute arising under this Lease, without regard to the applicability of any applicable fee-limiting statute. If either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding incurred by the other party, including reasonable attorneys' fees, costs (including non-taxable costs) and expenses.

(d) Waiver of Redemption by Tenant. TENANT HEREBY WAIVES FOR TENANT AND FOR ALL THOSE CLAIMING UNDER TENANT ALL RIGHT NOW OR HEREAFTER EXISTING TO REDEEM BY ORDER OR JUDGMENT OF ANY COURT OR BY ANY LEGAL PROCESS OR WRIT, TENANT'S RIGHT OF OCCUPANCY OF THE PREMISES AFTER ANY TERMINATION OF THIS LEASE.

(e) Non-Discrimination. Tenant herein covenants by and for itself, its successors and assigns, and all persons claiming under or through them, and this Lease is made and accepted upon and subject to the following conditions: That there shall be no discrimination against or segregation of any person or group of persons, on account of race, color, religion, creed, national origin, ancestry, handicap, age, marital status, or sex in the leasing, subleasing, renting, transferring, use, occupancy, tenure or enjoyment of the Premises, nor shall Tenant for itself, or for any person claiming under or through it, establish or permit such practice or practices of discrimination or segregation with reference to the selection, location, number or occupancy of tenants, leases, subleases, subtenants, or vendors in the Premises.

(f) Excavation. If an excavation shall be made upon land adjacent to the Premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation license to enter upon the Premises for the purpose of doing such work as said person shall deem necessary to preserve the wall or the building of which the Premises form a part from injury or damage and to support the same by proper foundation.

(g) Facsimile/PDF. Facsimile or PDF copies of the Lease, any amendment to this Lease or any consent, approval or other indication of acceptance pursuant to this Lease executed by Landlord or Tenant may be relied upon as an original signature.

(h) Captions. The captions of Articles hereunder are inserted only as a matter of convenience and, for reference, and in no way define, limit, or describe the scope or intent of this lease nor in any manner affect this lease.

(i) Franchisor Provisions. The terms and conditions of the Addendum attached hereto are hereby incorporated herein by reference and shall control over any conflicting term hereof.

**55.    RADIUS RESTRICTION.** During the Term, if Tenant or Guarantor of this Lease, or franchisee, or any person, firm, entity or corporation who or which controls or is controlled by, or is under common control with Tenant or Guarantor of this Lease (an "**Affiliate**") shall directly or indirectly, either individually or as a partner, officer, director or stockholder or otherwise, own, operate, or become financially interested in any business whose principal business (which is defined for this purpose as at least 25% of aggregate gross sales) is the operation of a fast casual, or limited service, pizza restaurant for either dine-in, take out, or delivery service ("**competing business**"), which competing business is conducted within the Area (as hereinafter defined), then, the same shall be a default by Tenant under the Lease; and in addition to all other rights and remedies available to Landlord due to Tenant's breach of the Lease,  the gross sales of any such competing business within said Area shall be included in Tenant's Gross Sales made from the Premises and the Percentage Rent hereunder shall be computed upon the aggregate of Tenant's Gross Sales made from the Premises and Tenant's (or Tenant's Affiliate's) gross sales made from each such competing business then conducted within said Area. Tenant shall be obligated to provide Landlord with full and complete gross sales information and reports with respect to any competing business within the Area in accordance with the requirements of Article 6 of this Lease. The "Area" shall be defined as the area falling within a radius of two (2) miles measured from the outside boundary of the Shopping Center.

**56.    TENANT'S EXCLUSIVE USE.**  (a) Provided that Tenant has continually operated (and continues to operate) its business under the trade name and for the Permitted Use, subject to temporary closure due to casualty, condemnation or force majeure, Landlord agrees that, from the Commencement Date of this Lease through the end of the Term, Landlord will not hereafter execute a lease for space in the Shopping Center with any person or entity (or voluntarily permit any existing tenant in the Shopping Center to change its use) whose "principal and primary business" (which is defined for this purpose as at least 25% of aggregate gross sales) is the operation of a fast casual  or limited service pizza restaurant for either dine-in, take out, or delivery

39

service ("Tenant's Exclusive Use"). The foregoing exclusive use: (x) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants, licensees and assigns or any of their replacements, to the extent their existing leases allow (directly or indirectly) such use; or (y) shall not apply to full service sit down restaurants; or (z) shall not require Landlord to litigate against another tenant/occupant of the Shopping Center to enforce such Tenant's Exclusive Use.

(b)    Tenant's Exclusive Use shall expire upon the earlier of: (i) the date that the Lease is terminated and ceases to be of full force and effect; or (ii) the Expiration Date; or (iii) the date that Tenant is in default of any term or condition of the Lease beyond any applicable notice and cure period; or (iv) the date that Tenant's principal and primary use ceases to be for the operation of a pizza restaurant; or (v) the date that Tenant closes for business for reasons other than casualty, condemnation or force majeure and such closure continues for more than 60 days.

(c)    This Article 56 shall automatically expire if an order or decision by any court having jurisdiction declares such covenant void. Further, in the event that any prospective tenant or any governmental authority challenges the validity of all or any part of this Article, Tenant shall upon written notice thereof from Landlord either forfeit and waive all benefits and protections arising under this covenant of Landlord, or defend the challenge with counsel of Landlord's own selection, whereupon Tenant agrees to indemnify, defend and hold Landlord harmless from and against any claims, expenses, damages, fines and liability arising from the granting to Tenant of this covenant of Landlord. Landlord agrees that it shall not initiate or encourage any challenge to Tenant's Exclusive Use. This indemnity shall survive the termination of this Lease.

(d)    Notwithstanding anything contained herein to the contrary, if in violation of its lease with Landlord a tenant or occupant violates the provisions of this Article 56 (such tenant or occupant being herein known as a "Renegade Tenant"), then Landlord shall not be in violation of this Article 56 so long as Landlord uses its commercially reasonable efforts to cause such Renegade Tenant to cease violating the provisions of this Article 56. Solely with respect to a Renegade Tenant violation of Tenant's Exclusive Use, as used herein, the term "commercially reasonable efforts" shall mean the institution (within 120 days of the date that Tenant notifies Landlord in writing of the actions of the Renegade Tenant, which notice shall refer to this Article 56) and good faith and diligent prosecution of appropriate legal action against the Renegade Tenant in a court of competent jurisdiction to cause the Renegade Tenant to cease and desist from violating the provisions of this Section. It is expressly understood that Landlord shall not be required to (x) defend a favorable decision if the Renegade Tenant appeals or (y) appeal an adverse decision of the court of original jurisdiction, unless so requested in either case by Tenant, with any such appeal to be at Tenant's sole cost and expense.

57. <u>EXISTING TENANT.</u>

Notwithstanding anything contained in the Lease to the contrary, in the event that the Tenant first named in this Lease shall be unable to operate in the Premises for the operation of a pizza restaurant as a result of the entry of a final, non-appealable judgment issued by a court of competent jurisdiction prohibiting Tenant's operation as a pizza restaurant based on the exclusive use rights held by the tenant in the Shopping Center currently doing business as "Taziki's", then upon ten (10) days prior written notice from either Landlord or Tenant, this Lease shall terminate with the same force and effect as though the date set forth in the notice of termination was the date originally set forth herein and fixed for the expiration of the then-current Term. Thereafter, Tenant shall immediately vacate and surrender the Premises to Landlord in accordance with the terms of this Lease. Following the termination of this Lease, upon Landlord's receipt of possession of the Premises in the condition required by this Lease, Landlord shall pay to Tenant (the "Early Termination Fee") the greater of (i) Tenant's unamortized and documented costs to construct the Premises (net of Landlord's Allowance) or (ii) five (5) times the immediately trailing twelve (12) calendar months of store level EBITDA generated at the Premises; but in no event shall the Early Termination Fee exceed the sum of $1,200,000.00. Upon Tenant's receipt of the Early Termination Fee, neither party shall have any further or continuing liability to the other under the terms

40

of this Lease, except with respect to those provisions which are intended to survive the expiration or sooner termination of the Lease.

Notwithstanding anything contained herein to the contrary, Landlord agrees to use reasonable efforts to defend Tenant's right to operate its business as a pizza restaurant, including legal action in defense of Tenant's rights, at no cost to Tenant. Tenant may likewise use reasonable efforts to defend Tenant's right to operate its business as a pizza restaurant, including legal action in defense of Tenant's rights, at Tenant's sole cost and expense.

[Signature Pages Follow]

41

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Lease and exhibits thereto in duplicate, individually or through their authorized officers, agents, or attorneys-in-fact, as the case may be, causing their respective seals to be affixed hereto the day and year first above written.

WITNESS:

LANDLORD:

NWWP LP

By:_____

Name:

Title:    Brian Crittendon
          Managing Director

## ACKNOWLEDGMENT OF LANDLORD

STATE OF New York    )
                     ) SS
COUNTY OF New York   )

On August 14th 2017, before me, Melissa Lopez                personally appeared Brian Crittendon personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

MELISSA LOPEZ
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LO6044421
Qualified in Nassau County
Certificate Filed in New York County
My Commission Expires July 03, 2018

Notary Public

My Commission Expires: July 3, 2018

42

300609184 v5

TENANT:

RTHT INVESTMENTS, LLC

By: _____
Name: Yaron Godman
Title: CEO/manager

## ACKNOWLEDGMENT OF TENANT

STATE OF Colorado    )
                     ) SS
COUNTY OF Larimer    )

On July, 20th, 2017, before me, Jerney Kellar, personally appeared Yaron Godman, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed                    the                    instrument.

WITNESS my hand and official seal.

```
┌─────────────────────────────────────┐
│          JERNEY KELLAR              │
│  NOTARY PUBLIC - STATE OF COLORADO  │
│   Notary Identification #20154040488│
│   My Commission Expires 10/15/2019  │
└─────────────────────────────────────┘
```

Notary Public

My Commission Expires: 10/15/2019

300609184 v5

EXHIBIT A

SITE PLAN OF SHOPPING CENTER



Note:  All spaces depicted on this site plan are for general informational purposes only, and are not
represented to be drawn to scale.  No party shall rely upon this drawing with respect to the final size of
spaces within the Shopping Center.  Additionally, no representation is made with respect to the
continuing occupancy of any tenant depicted on the site plan unless expressly contained in the body of
the Lease.

EXHIBIT B

PREMISES





Note:  All spaces depicted on this site plan are for general informational purposes only, and are not represented to be drawn to scale.  No party shall rely upon this drawing with respect to the final size of spaces within the Shopping Center.  Additionally, no representation is made with respect to the continuing occupancy of any tenant depicted on the site plan unless expressly contained in the body of the Lease.

## EXHIBIT C

### LANDLORD'S WORK AND TENANT'S WORK

This Exhibit C shall apply only to Landlord's Work and Tenant's Work. The body of the Lease shall govern with respect to any other work done with respect to the Premises.

I.     **General**

1.     <u>Notices and Delivery with respect to Working Documents</u>. Whenever any plans, diagrams, schedules, specifications, documents, other data and notices (collectively the "Working Documents") relating to Tenant's Work at the Premises are required or permitted to be delivered under this Exhibit "X" of this Lease, such Working Documents shall be delivered electronically and via overnight delivery to Landlord's address as set forth in the Fundamental Lease Provisions Section (n) of this Lease, with copies to the following parties (in lieu of copies to the parties designated to receive copies as set forth in the Fundamental Lease Provisions Section [n] of this Lease):

Delivery of Working Documents to Landlord shall include a copy to Landlord's Architect:

c/o Northwood Retail LLC
8080 Park Lane, Suite 770
Dallas, TX 75231
Attn: Michael Tussey
Phone: (469) 828-3304
Fax: (214) 365-0333
Email: mtussey@northwoodretail.com

2.     <u>Tenant's Modifications to Interior of Premises</u>. Should Tenant request and Landlord approve any variation in the front and/or interior finishing of the Premises, the variation shall be incorporated in the plans to be furnished by Tenant.

3.     <u>Insurance and Indemnity</u>. The insurance and indemnity requirements contained in the Lease shall apply during the construction contemplated in this Exhibit "C" of this Lease, and Tenant shall provide evidence of appropriate insurance coverage prior to beginning any of Tenant's Work. In addition, and without limiting the generality of the immediately preceding sentence, at Landlord's option, Landlord may require that prior to beginning any of Tenant's Work, Tenant shall provide Landlord with evidence of insurance covering both Tenant and Tenant's contractor against damage to their personal property, as well as against third-party liability and worker's compensation claims arising out of all construction and associated activities. All policies of insurance shall be subject to Landlord's prior approval and shall be endorsed showing Landlord as an additional insured (or, if permitted by Landlord, may provide a waiver of subrogation against Landlord).

II.    **Description of Landlord's Work**

Excepting the work described in this paragraph, the Premises are delivered to Tenant in what is generally known as "as-is, where-is" condition. Prior to the Anticipated Delivery Date, Landlord shall (a) provide structural support for Tenant's pizza oven, (b) remove any presently existing landscaping located in or immediately adjacent to the Patio Area and install any additional landscaping required by governmental authorities as a direct result of the creation of the Patio Area, (c) install the metal studs for the demising wall of the Premises, extending to the roof deck and in accordance with applicable laws and (d) ensure that the Premises and all portions thereof, including systems are in good and working order in compliance with applicable laws upon delivery. Tenant shall coordinate and provide information to Landlord as to timely allow this work to proceed.

300609184 v5

**III.    Description of Tenant's Work**

Tenant, at Tenant's sole cost and expense, shall perform and complete each of the following items (collectively "Tenant's Work") within 180 days following the Delivery Dates (as such time period may be shortened pursuant to Section 8(a) of the Lease).

1.    Signs.  Tenant shall pay for all signs for the Premises and the installation thereof, including electrical hook-up, subject to the provisions of this Lease.

2.    Utilities.  All service deposits shall be made by Tenant at Tenant's expense.

3.    Interior Work.  Tenant shall complete the interior of the Premises in accordance with the Plans and Specifications using materials approved by Landlord.  Only contractors approved by Landlord pursuant to contracts approved by Landlord may complete Tenant's Work.  Tenant's Work shall be completed by Tenant pursuant to the Plans and Specifications and shall include, but not be limited to, the purchase, construction and installation of the following:

(a)    Any additional electrical service, panel, wiring, and fixtures to operate Tenant's business under the Trade Name similar to Tenant's other sites operating under such Trade Name.
(b)    Any natural gas service extensions necessary from the existing gas manifold.
(c)    Interior partitions, including finishing, electrical wiring, and connections within the Premises.
(d)    Lighting fixtures in adequate number per the Landlord approved Tenant plans; plus light covers and special hung or furred ceilings.
(e)    Interior painting.
(f)    Floor covering.
(g)    Installation of all furniture, fixtures and equipment necessary for Tenant to operate Tenant's business under the Trade Name similar to Tenant's other sites operating under such Trade Name.
(h)    Tenant shall provide any venting required by Code for Tenant's use.  Tenant shall tie to an existing shared grease trap as required by Code for Tenant's use.
(i)    Tenant shall provide water submeter.
(j)    Any and all additional work within the Premises required for Tenant to obtain a Certificate of Occupancy.

4.    Conditions.  Notwithstanding any other matter to the contrary, Tenant shall complete Tenant's Work in compliance with the Underlying Documents, the Contractor Rules and Regulations and all Laws.  The actual construction and completion of Tenant's Work shall be subject to Landlord's approval and acceptance, which shall be a condition to any reimbursement to Tenant hereinafter provided.  All construction and work to be undertaken by Tenant as well as all construction and work which is not defined in this Exhibit "C" of this Lease shall be undertaken by Tenant at Tenant's expense, in strict compliance with the plans and specifications approved by Landlord, and shall not damage the Building or any part thereof.  Any slab penetration shall be performed by Landlord's contractor, or, at Landlord's option, by a third party approved in writing in advance by Landlord.  The work relating to any slab penetration shall commence only after Landlord has given written consent, which consent shall in part be conditioned upon Tenant's Plans and Specifications, to include materials acceptable to Landlord, in order to prevent injury to the roof and to spread the weight of the equipment to be installed.  Tenant shall also be responsible for obtaining, and paying for, professional inspections of any structural work (including, without limitation, any roof work or concrete work) required by Tenant's Work.

EXHIBIT C-1

CONSTRUCTION RULES



# Construction Rules and Regulations

The purpose of the attached document is to outline minimum criteria for completion of construction in demised areas located in Waverly Place in Cary, NC. Information contained herein is not intended to be all-inclusive. Drawings are subject to review. In the event of any discrepancy, the more stringent of the requirements shall apply.

In cooperation with and prior to commencement of construction Tenant, or Tenant's representative shall as a matter of course:

- Provide a full set of plans to the Landlord for review and approval.
- Provide a copy of the stamped drawings and permit issued by both the Town of Cary.
- Submit to the Landlord Certificates of Insurance from the GC and all sub-contractors showing proof of General Liability and for Builders Risk insurance, and showing **NWWP LP, Northwood Retail LLC & Northwood Investors** as additional insured.
- Provide a listing of sub-contractors with mailing address, phone contact and after hour's emergency phone numbers.
- Provide a copy of the approved demolition and building permits.
- Provide a construction schedule.

There are no work hour limitations at this time, but Contractor shall abide by the notations below relative to noisy activities or activities that may produce offensive odors. Landlord reserves the right to establish limitations at any time.

NOISE / ODORS
- No work producing noise that can be heard outside of the construction area may occur during business hours.
- All work that produces excessive noise must be performed after business hours.  This includes, activities such as hammer drilling, shooting of metal track, cores through floors (which must be coordinated for access), floor grinding, roofing curb cuts, or any other activity that can be heard by adjacent tenants or tenants located on lower or upper floors.
- Any work that is performed during business hours which produces excessive noise shall be immediately stopped if notified by the Landlord and may not recommence until after business hours.  IF ANY CONTRACTOR OR SUBCONTRACTOR DOES NOT CONFORM TO THESE RULES, LANDLORD MAY ELECT TO SHUT THE JOB DOWN AND ALL TRADES, REGARDLESS OF WHAT IS PRODUCING THE NOISE, WILL BE ASKED TO LEAVE FOR THE DAY.

- Landlord must be notified at least two business days in advance of any loud or noisy work to be completed.
- Landlord must be notified at least three business days in advance of any work that will emit noxious fumes, harmful gases and/or foul odors that could potentially affect the quiet enjoyment of other tenants. Any such work shall be mitigated by fan forced ventilation during and after such work until fumes/odors subside, and may be required to be done off-hours.

## STOREFRONT / SIGNAGE / SIDEWALKS

- The exterior portions of the building are to be kept clean and free of construction debris at all times.

- No tools, construction related materials, equipment, or supplies shall be placed outside the space at any time.

- No work allowed to be completed outside on sidewalks in front of store.

- All exterior areas in front of and behind each space shall be free of any food product wrappings, drink containers, etc. at all times.

- All construction personnel to take breaks within the construction areas only, lunch and breaks not allowed in public areas in front of the building.

- No signs are to be placed at the construction location without prior approval. However, Landlord shall not withhold reasonable approval of posting of one window sign in the storefront giving the main contractor's company name, logo and phone number only totaling no more than six square feet in size. Approved sign must be placed in the bottom corner of a storefront window.

- Permits shall be posted to comply with Town of Cary requirements.

## DELIVERIES

- All deliveries shall be through the rear doors if available. Deliveries through front doors should be at off business hours only.

## GENERAL

- Landlord must be notified at least three business days in advance of any utility shut downs, including fire alarm monitoring systems, that may be required that will affect any other tenant.

- Landlord must be notified immediately of any changes to original plans that will affect the exterior of the building either structurally or aesthetically.

Contractor shall not proceed with these changes without written approval from the Landlord. Landlord to provide comments/approval as soon as reasonably possible as to not affect the tenant's construction schedule.

- Tenant will be back-charged for any costs of the Landlord to clean up debris or repair damage caused by Tenant's contractor.

- Tenant and their contractor will install a water sub-meter, in an easily accessible area, as a portion of their finish out.

- No smoking is permitted on site.

TRASH
- All contractors must provide their own trash receptacles and regular pick-up. Contact Mary Langdon at 919-859-5818 or 919-987-5855 to coordinate location of trash containers. All roll off trash containers shall have plywood under ALL wheels as to not damage finished asphalt or concrete. Any damage resulting from not following this procedure will be repaired by Landlord and back charged to the Tenant or Tenant's GC.

- No trash shall be stored within the tenant space, but must be placed within the trash receptacles. No stacking of trash or overflow will be allowed within the contractor's containers.

- Under no circumstances may any trash or construction materials be stored on the side or the front of the building or in the rear of the building.

- Landlord shall not be responsible for any non-authorized dumping of debris from either another construction contractor or other party in your container.

BATHROOM FACILITIES
- Tenant's general contractor must direct all workers to use either the existing facilities within the space, or provide their own facilities at a location approved by the Landlord. The location of the portable toilets must be approved in advance.

PARKING
- All required vehicles for construction must park behind the building in the spaces designated on the attached site plan. This will include any construction equipment and/or vehicles, passenger vehicles as well as any delivery vehicles. No parking will be allowed in front of the building at any time.

- In no event shall <u>any</u> vehicle be parked in a drive aisle or in a designated handicapped parking space.

- All workers' passenger vehicles should be parked as far from the tenant building as possible as to not hinder or prohibit delivery of materials and/or trash pick up to and from the building.

FIRE ALARM SYSTEM
- All devices shall be compatible with Landlord's House Fire Alarm panel.

- <u>Please call the Northwood Retail Office and notify the general manager prior to starting any work with the fire alarm panel. Only authorized personnel can call the monitoring company for this property and have the system put on "Test". Failure to do so will result in the payment of any charges relative to a false alarm being received by the local fire department.</u>

      Contact:  Mary Langdon
                General Manager
                919-859-5818 office
                919-987-5855 cell

- All existing shell building horns and strobes are connected and currently being monitored. Any removal, relocation or disconnection will result in a false alarm notice and fee, which shall be paid by Tenant's general contractor. Contact Landlord three business days in advance if any devices need to be removed, relocated or disconnected.

- Plans showing intended alarm devices must be prepared by alarm device installer and reviewed by the Fire Department prior to installation. This is a separate review, not part of the normal building permitting process. Failure to start this process early enough has often caused delay of inspections for tenant's contractors.

GREASE DRAIN LINE / SANITARY SEWER
- In most cases, there is a sanitary sewer and possibly a grease drain line in the 10' slab leave-out area at the rear of the shops or below the space. It is critical that no connections are made in error to the wrong line. Any cost incurred to remedy a cross-connection later will be the tenant's responsibility.

**LANDLORD'S REQUIRED FIRE ALARM MONITORING COMPANY FOR ALL DEVICE WIRING, TIE-IN AND PROGRAMMING INTO HOUSE FACP:**

| | |
|---|---|
| Company Name: | BFPE |
| Address: | 115 Bestwood Drive |
| | Clayton, NC 27520 |
| | 919-550-2699 |

**LANDLORD'S REQUIRED ROOFING COMPANY FOR ALL ROOF PENETRATIONS:**

| | |
|---|---|
| Company Name: | Commercial Solutions |
| Address: | 9400-1 Ransdell Road |
| | Raleigh, NC 27603 |
| Contact: | Neal |
| | 919-567-2840 |

**UTILITIES**

Prior to start of construction, contractor shall take any and all actions required to secure utilities in either contractor or tenant name, removing Waverly Place (NWWP, LP) from any and all liability associated with same.

| | | |
|---|---|---|
| Electrical: | Duke Energy | 866-582-6345 |
| Gas: | PSNC | 877-776-2427 |

- Installation of a water sub-meter is required.
- It is the Tenants responsibility to reach the centrally located riser for any required gas service by routing on roof, not in rear wall. Any damage to sidewalk, stone, landscape or grass areas caused by Tenant's gas service installation either by the Gas Company or Tenant's contractor(s) shall be the sole responsibility of the Tenant.
- 

**RTU'S**
- The location of all existing RTU's are structured for their support. Any RTU's to be added must be addressed in plans submitted, reviewed and approved by the Landlord. Drawings shall include details from a licensed structural engineer showing added structural supports.

**LANDLORD CONTACT:**
Northwood Retail
Mary Langdon
302 Colonades Way
Cary, NC 27518
919-859-5818 office
919-987-5855 cell

Landlord reserves the right to modify these regulations from time to time as needed. Superintendents will be issued any revisions while under construction in the field by property management.  All general contractors shall post these regulations within each space in a conspicuous area for all sub-contractors to read.  <u>All general contractors shall abide by these regulations and at ALL times.</u>

Please sign below and return acknowledging receipt and understanding

_____

## EXHIBIT D

### RULES AND REGULATIONS

Tenant expressly covenants and agrees, at all times during the Term, and at such other times as Tenant occupies the Premises or any part thereof, to comply, at its own cost and expense, with the following:

1.    Any handling of freight for any purpose, or deliveries to or from the Premises, shall be made in a manner which is consistent with good shopping center practice and only at such times, in such areas, and through such entrances and exits as are from time to time designated for such purposes by Landlord (the "Loading Area"). Any truck or machine used for handling freight or making deliveries in the Premises or in the Shopping Center shall have rubber tires and side guards. There shall not be any parking or standing by delivery vehicles outside of the Loading Area or in any location that interferes with the use of any travel lanes or the parking garage. Between the hours of 7:00a.m. and 10:00 a.m. of each day, Tenant shall complete, or cause to be completed, all deliveries, loading, unloading, and services to the Premises. No hand trucks, mail carts or mailbags shall be used in customer elevators or carried through customer entrances and exits.

2.    Tenant shall not (i) suffer, allow or permit any vibration, noise, odor or flashing or bright light to emanate from the Premises when its doors are closed or from any machine or other installation located therein, or otherwise suffer, allow or permit the same to constitute a nuisance to or interfere with the safety, comfort or convenience of Landlord or of any other occupant or user of the Shopping Center; (ii) display, paint, or place any handbills, bumper stickers or other advertising devices on any vehicle(s) parked in the parking area(s) of the Shopping Center or the parking deck, whether belonging to Tenant, its employee(s), or any other person(s); (iii) solicit business or distribute any handbills or other advertising materials in the Common Area; (iv) conduct or permit any activities in the Shopping Center that constitute a public or private nuisance; (v) permit the parking of any vehicles or the placement of any displays, trash receptacles or other items, so as to interfere with the use of any driveway, fire lane, corridor, walkway, parking area, mall or any other Common Area; (vi) use or occupy the Premises or permit anything to be done therein which in any manner might cause injury or damage in or about the Shopping Center; or (vii) use or occupy the Premises in any manner which is unreasonably annoying to other tenants in the Shopping Center unless directly occasioned by the proper conduct of Tenant's business in the Premises.

3.    Tenant shall secure and protect the Premises, and all property located within the Premises. Tenant acknowledges and agrees that it, and not Landlord, is solely responsible for securing and protecting the Premises, and all property located within the Premises.

4.    Tenant shall use the plumbing within the Premises and the Shopping Center only for the purpose for which it is designed. Tenant shall be solely

responsible for any breakage, stoppage or damage resulting from its violation of this provision, and shall pay any costs associated therewith to Landlord upon demand as additional rent.

5.    Tenant shall contract for and use termite and pest extermination services for the Premises, and with such contractor, as Landlord may from time to time designate. Tenant shall not be obligated to pay more for such service than the prevailing competitive rate charged by reputable, independent contractors. If Landlord does not designate such contractor, Tenant may employ a reputable contractor of its choosing, subject to Landlord's reasonable prior written consent.

6.    Tenant shall install and maintain at all times a display of merchandise in the display windows (if any) of the Premises and shall keep such display windows well lighted during all Shopping Center business hours and for at least one (1) hour thereafter. All articles, and the arrangement, style, color and general appearance thereof, shall be in keeping with the character and standards of the Shopping Center as reasonably determined by Landlord.

7.    Tenant shall participate in any window cleaning program that may be established by Landlord. Tenant shall not be obligated to pay more for its participation in such window cleaning program than the prevailing competitive rate charged by reputable independent window cleaning contractors for equal service on a direct and individual basis.

8.    If Tenant undertakes any construction activities which cause any work stoppage, picketing, labor disruption or dispute, so as to interfere with activities at the Shopping Center, Tenant shall, upon request from Landlord, immediately suspend any construction work being performed in the Premises giving rise to such labor problems. Tenant shall have no claim for damages of any nature against Landlord for such suspension nor shall the Commencement Date be extended as a result thereof.

9.    Tenant shall promptly obtain all permits, including occupancy permits, for the Premises or its use thereof (excluding those related to Landlord's Work). Tenant shall pay before delinquency all license and permit fees, and other charges of a similar nature, for the conduct of any business in, or any use of, the Premises. Upon request Tenant shall provide to Landlord a copy of all its permits, including the certificate of occupancy.

10.    Tenant may not display or sell merchandise outside the defined exterior walls and permanent doorways of the Premises or the boundaries of the Patio Area, nor shall Tenant permit grocery carts, portable signs, or any other objects to be placed or stored or to remain outside of said exterior walls and doorways. If Tenant does display or sell merchandise outside of the Premises, or does permit any objects to be placed or stored outside of the Premises, with or without Landlord's permission, Tenant's indemnification and insurance coverage (as provided in the Lease) shall apply

to such conduct and the foregoing shall not be deemed to be Landlord's consent to any such conduct by Tenant.

11.    Tenant shall not conduct or permit to be conducted any auction, fire, "going out of business" or similar type of sale (whether real or fictitious) from the Premises; provided, however that this provision shall not restrict the absolute freedom (as between Landlord and Tenant) of Tenant to determine its own selling prices nor shall it preclude periodic, seasonal, promotional or clearance sales held in the ordinary course of business.

12.    Subject to the structural supports to be constructed by Landlord for Tenant's equipment as provided in Exhibit C, Section II, Tenant shall not place a load on any floor in the Shopping Center which exceeds the load which the floor was designed to carry, or which may result in improper weight distribution on such floors.

13.    Tenant shall not install, operate or maintain in the Premises, or in any other area of the Shopping Center, electrical equipment which does not bear the Underwriters Laboratories seal of approval, or which would overload the electrical system or any part thereof beyond its capacity for proper, efficient and safe operation.

14.    Tenant shall provide sound barriers for all mechanical systems serving the Premises.

15.    Tenant shall not store, display, sell, or distribute any alcoholic beverages, dangerous materials, flammable materials, explosives, or weapons in the Premises, or conduct any unsafe activities therein, unless permitted pursuant to the Permitted Use.

16.    Tenant shall not sell, distribute, display or offer for sale (i) any paraphernalia commonly employed in the use or ingestion of illicit drugs, or (ii) any X-rated, pornographic, lewd, or so-called "adult" newspaper, book, magazine, film, picture, video tape or video disk.

17.    Tenant shall not operate or permit to be operated in the Premises any automatic teller machines, or any coin or token operated vending machine or similar device including telephones, lockers, toilets, scales, amusement devices, and machines for the sale of beverages, foods, candy, cigarettes or other goods.

18.    No radio or television aerial, HVAC unit or other equipment or device may be erected by Tenant on the roof or on any exterior wall of the Premises, or the building in which the Premises is located, without Landlord's prior written consent. Any aerial or other equipment installed without such written consent shall be subject to removal by Landlord, at Tenant's sole risk and expense, without notice. Notwithstanding any contrary provision of this Lease, Tenant shall have no right to access the roof of the Premises or of the building in which the Premises is located for any reason (including, without limitation, repair and maintenance obligations,

installation and/or repair of communications systems, etc.) without the prior written consent of Landlord, which consent shall be conditioned upon, but not limited to (a) the prior approval by Landlord of Tenant's plans for the installation, repair or maintenance of any equipment; (b) Tenant utilization of a contractor designated or approved by Landlord for all roof penetrations and access so as not to void any existing roof warranties; (c) Tenant maintenance of the area where roof penetrations or installations are made while Tenant's equipment is present; (d) insuring the structural soundness of the roof; (e) the repair by Tenant of any damage to the roof caused by the making of roof penetrations or equipment installation, maintenance or repair, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon; (f) the coordination of the time and method of roof access, (g) the accompaniment by Landlord's designated representative for such roof access.

19.    Tenant shall not affix or maintain upon the glass panes and supports of the show windows, entrance ways, doors, exterior walls or roof of the Premises any signs, advertising placards, names, insignia, trademarks, descriptive material or any other such like item or items except those which shall have first received the written approval of Landlord as to size, color, type, location, duration, copy, nature and display qualities. Tenant shall not affix, tape, place or maintain within the interior of the Premises any paper signs, cardboard signs, advertising placards, descriptive material or other such item or items within five feet (5') of the front entrance to the Premises that can be seen from the common area of the Shopping Center, except those which shall have first received the written approval of Landlord as to form, size, type, color, location, duration, copy, nature and display qualities. Tenant shall not install or maintain any flashing, revolving, travelling, fiber optic or other lighting deemed distractive by Landlord anywhere within or upon the Premises. Landlord may, at Tenant's cost, remove any item erected in violation of this subsection.

20.    The Premises shall not be used for housing, lodging or sleeping purposes or for any immoral or illegal purposes.

21.    Tenant shall not place any furniture, accessories or other materials on any balconies located within or adjacent to the Premises without having obtained Landlord's express written approval thereof in each instance.

22.    No sunscreen or other films shall be applied to the interior surface of any window glass. All glass, locks and trimmings in or upon the doors and windows of the Premises shall be kept whole, and when any part thereof shall be broken, the same shall be immediately replaced or repaired and put in order at Tenant's expense under the direction and to the satisfaction of Landlord, and shall be left whole and in good repair.

23.    Open fires of any type are hereby prohibited (except Tenant's ovens and stoves if the operation of a restaurant is the Permitted Use).

24.     The listing of the aforementioned items is not intended to be exclusive, but rather to indicate part of the scope and nature of the types of rules and regulations Landlord may impose. Landlord reserves the right, in its reasonable discretion and from time to time, to amend, alter, add and subtract from these rules and to make specific exceptions thereto and Landlord shall have no obligation to enforce these rules as they may apply to other tenants or occupants in the Shopping Center. The Rules and Regulations set forth herein are intended to supplement the provisions of the Lease; in the event that any of the provisions of the Rules and Regulations conflict with the provisions of the Lease, the provisions of the Lease shall govern.

## EXHIBIT E

## GUARANTY OF LEASE

**THIS GUARANTY OF LEASE** (this "Guaranty") is made as of the ____ day of _____, 2017, by **SD-MISSOURI, LLC**, a Delaware limited liability company ("Guarantor"), to and for the benefit of NWWP LP ("Landlord").

## RECITALS

Landlord, as landlord, and RTHT INVESTMENTS, LLC, a Delaware limited liability company ("Tenant"), as tenant, have entered into, or are about to enter into, a certain Shopping Center Lease dated as of _____, 2017, pursuant to which Tenant leases or will lease from Landlord certain premises in the shopping center to be known as Waverly Place Shopping Center and located in the City of Cary, North Carolina, all as more particularly described in said Lease. Said Lease, as heretofore or hereafter supplemented, amended, restated, renewed, extended, replaced or modified, is hereinafter referred to as the "Lease". All capitalized terms that are not expressly defined in this Guaranty shall have the same meanings herein as are ascribed to such terms in the Lease.

A.      Landlord has required, as a condition to its execution and performance of the Lease, that Guarantor execute and deliver this Guaranty of all obligations of Tenant arising and all sums due by Tenant under the Lease. The execution and delivery of this Guaranty by Guarantor is a material inducement to Landlord for the execution and performance of the Lease.

B.      Guarantor has a financial interest in Tenant and will be benefited by the Lease. Accordingly, Guarantor has agreed to execute, deliver and perform this Guaranty.

**NOW, THEREFORE**, in consideration of the Recitals set forth above and in consideration of Landlord executing and performing its obligations under the Lease and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

1.      _Recitals_. The Recitals set forth above are incorporated herein and shall be deemed terms and provisions hereof.

2.      _Guaranty_. For the term of the Lease, Guarantor absolutely, unconditionally and irrevocably guarantees to Landlord:

(a)      The full and prompt payment when due, whether upon acceleration or otherwise, and at all times thereafter, of any and all rentals, debts and obligations of Tenant for the payment of money, however created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, due or to become due, known or unknown to Guarantor at the time of the execution of this Guaranty, including, without limitation, all Rent, late fees, payments in respect of real estate taxes, assessments, governmental charges, premiums for insurance policies, amounts required to discharge mechanics' and materialmen's liens and claims therefor, and any other sums which may now be or hereafter become due by Tenant under the Lease;

(b)      The payment of all Enforcement Costs (as hereinafter defined); and

(c)      The full, complete and punctual observance, performance and satisfaction of all covenants, terms, conditions, obligations, duties and agreements of Tenant under the Lease.

300609184 v5

All amounts due and debts, liabilities and payment obligations described in subparagraphs (a) and (b) of this Paragraph 2 are referred to herein as the "Liabilities." All obligations described in subparagraph (c) of this Paragraph 2 are referred to herein as the "Obligations." Guarantor shall be required, during the term of this Guaranty, to maintain a net worth value of no less than its net worth as presented to Landlord as of the date of execution of this Lease (the "Guarantor Net Worth"). Guarantor agrees that it shall not (i) sell or convey a controlling interest in Guarantor's stock or membership interest or (ii) sell assets out of the ordinary course of Guarantor's business without notifying Landlord of the same.

3.    Landlord's Remedies.

(a)    This Guaranty is an absolute, irrevocable, present and continuing guaranty of payment and performance and not merely a guaranty of collection. In the event of any default by Tenant under the Lease or under any other obligation to Landlord, after the expiration of any cure period applicable thereto, Guarantor agrees, on demand by Landlord, to pay all Liabilities then due hereunder. In the event that there shall be any default by Tenant, Guarantor or any other party under the Lease in the due and timely performance and observance of the Obligations or any of them after the expiration of any cure period applicable thereto, then, in such event, Guarantor agrees, on demand by Landlord: (i) to perform the Obligations; and (ii) to indemnify and hold Landlord and the other Indemnified Parties (hereinafter defined) harmless from and against any and all loss, damage, cost, expense, injury or liability Landlord or the Indemnified Parties may suffer or incur in connection with the exercise of the rights under the Lease, this Guaranty or otherwise in respect of the Premises. If Guarantor fails to commence and pursue diligently the performance of the Obligations after the expiration of any cure period applicable thereto as provided in the immediately preceding sentence and if such failure continues for five (5) days after receipt by Guarantor of written notice from Landlord demanding the performance of Guarantor, then, either before or after pursuing any other remedy of Landlord against Guarantor or Tenant and regardless of whether Landlord shall ever pursue any such other remedy, Landlord shall have the right (but not the obligation) to perform the Obligations or to call upon any other reputable parties to perform the Obligations, and shall have the right to expend such sums as Landlord in its reasonable discretion deems proper in order so to complete the performance of the Obligations. During the course of the performance of any Obligations undertaken by Landlord or by any other party on behalf of Landlord, Guarantor shall pay on demand any amounts due to third parties in connection therewith. All amounts required to be paid by the terms hereof shall be included within the term "Liabilities," and all obligations required to be performed by the terms hereof shall be included within the term "Obligations."

(b)    Notwithstanding anything to the contrary herein contained, in any action to enforce any of the liabilities or obligations of the Guarantor under this Guaranty, Landlord, at its election, may proceed against the Guarantor with or without: (i) joining Tenant in any such action; (ii) commencing any action against or obtaining any judgment against Tenant; or (iii) commencing any proceeding to enforce or realize upon any collateral or other security (including, without limitation, any security deposit or other guaranties) which may be given to secure Tenant's obligations under the Lease, or to obtain any judgment, decree or foreclosure sale with respect thereto. Nevertheless, the maintenance of any action or proceeding by Landlord to recover any sum or sums that may be or become due under the Lease or to secure the performance of any of the other terms, covenants and conditions of the Lease shall not preclude Landlord from demanding and receiving the payment of such sums and the performance of such other terms, covenants and conditions from Guarantor, or from thereafter instituting and maintaining subsequent actions or proceedings for any subsequent default or defaults of Tenant under the Lease. Guarantor does hereby consent that, without affecting the liability of Guarantor under this Guaranty and without notice to Guarantor, time may be given by Landlord to Tenant for payment of rent and such other sums and performance of said other terms, covenants and conditions, or any of them, and such time extended and indulgence granted from time to time, or Tenant may be dispossessed or Landlord may avail itself of or exercise any or all of the rights and remedies against Tenant provided by law or by the Lease,

and may proceed either against Tenant alone or jointly against Tenant and Guarantor or against Guarantor alone without first proceeding or exhausting any remedy or claim against Tenant.

4.    **Return of Payments**. Guarantor agrees that, if at any time all or any part of any payment theretofore applied by Landlord to any Liabilities is rescinded or returned by Landlord for any reason whatsoever (including, without limitation, the insolvency, bankruptcy, liquidation or reorganization of any party), such Liabilities shall, for the purposes of this Guaranty, be deemed to have continued in existence to the extent of such payment, notwithstanding such application by Landlord, and this Guaranty shall continue to be effective or be reinstated, as the case may be, as to such Indebtedness, all as though such application by Landlord had not been made. Guarantor does hereby further agree that with respect to any payments made by Guarantor hereunder, Guarantor shall not have any rights based on suretyship, subrogation or otherwise to stand in the place of Landlord so as to compete with Landlord as a creditor of Tenant, and Guarantor hereby waives all such rights to the fullest extent permitted by law.

5.    **No Discharge**. Guarantor agrees that the obligations, covenants and agreements of Guarantor under this Guaranty shall not be affected or impaired by any act of Landlord, or any event or condition except the full, final and unavoidable performance of all Obligations and payment of all Liabilities and any other sums due hereunder. Guarantor agrees that the liability of Guarantor hereunder shall not be discharged by, and Guarantor hereby irrevocably consents to: (i) any subsequent change, modification or amendment of the Lease in any of its terms, covenants and conditions, or in the Rent or any other sums payable thereunder, or in the term thereof (the "Term"), or in the Premises demised thereby (whether said Premises be expanded, contracted, relocated, substituted or otherwise altered), and to any assignments of the Lease and to any sublettings of the Premises, and to any extensions or renewals of the Lease or its Term; (ii) the renewal or extension of time for the payment of the Liabilities or performance of the Obligations under the Lease or any other agreement relating to the Premises; (iii) any failure, omission, delay or inadequacy, whether entire or partial, of Landlord to exercise any right, power or remedy regarding the Lease or to enforce or realize upon (or to make any guarantor a party to the enforcement or realization upon) any of Landlord's security for the Lease, including, but not limited to, any impairment or release of such security for the Lease; (iv) the existence of any set off, claim or counterclaim or the reduction or diminution of the Liabilities, or any defense of any kind or nature, which Guarantor may have against Tenant or which any party other than Tenant has against Landlord; (v) the application of payments received from any source to the payment of any obligation other than the Liabilities, even though Landlord might lawfully have elected to apply such payments to any part or all of the Liabilities; (vi) the addition or release of any and all other guarantors, obligor and other persons liable for the payment of the Liabilities and/or performance of the Obligations, and the acceptance or release of any and all other security for the payment of the Indebtedness and/or performance of the Obligations; or (vii) any distress or reentry by Landlord or dispossession of Tenant or any action or remedy taken by Landlord under the Lease, or any failure to notify' Guarantor of any default by Tenant; all whether or not Guarantor shall have had notice or knowledge of any act or omission referred to in the foregoing clauses (i) through (vii) inclusive of this Paragraph.

In the event that the Lease is modified, renewed or extended in any respect by agreement between Landlord and Tenant either pursuant to an option granted in the Lease or otherwise, or in the event that Tenant holds over beyond the Term of the Lease, then the obligations hereunder of Guarantor shall extend to the full and faithful performance and observance of all of the covenants, terms and conditions of the Lease and of any such modification, renewal or extension thereof Guarantor intends that Guarantor shall remain liable hereunder as a principal until the full, final and unavoidable performance of all of the Obligations and the full, final and unavoidable payment of all Liabilities, notwithstanding any fact, act, event or occurrence which might otherwise operate as a legal or equitable discharge of a surety or guarantor.

Notwithstanding the generality of the foregoing, in the event that the Lease shall be assigned as permitted under the Lease, to a party or an entity not controlled by or under common control with the original named Tenant, then the Guarantor's liability shall be limited to the Liabilities and Obligations of Tenant

accruing during the original Term of the Lease and any Option(s) to Renew, or such other extensions or options to the Term negotiated by the original named Tenant prior to the effective date of such assignment of the Lease.

6.    **Application of Amounts Received.** Any amounts received by Landlord from whatsoever source on account of any Liabilities may be applied by Landlord toward the payment of such Indebtedness, and in such order of application, as Landlord may from time to time elect.

7.    **Waiver.** With respect to the originally named Tenant, Guarantor expressly waives: (i) notice of the acceptance by Landlord of this Guaranty; (ii) notice of the existence, creation, payment or nonpayment of the Liabilities; (iii) presentment, demand, notice of dishonor, protest and all other notices whatsoever; and (iv) any failure by Landlord to inform Guarantor of any facts Landlord may now or hereafter know about Tenant, the Lease or the Premises, it being understood and agreed that Guarantor has and will maintain personal knowledge of and is familiar with Tenant's financial condition and business affairs and has the ability to influence Tenant's decision-making processes, and that Landlord has no duty so to inform, and that Guarantor is fully responsible for being and remaining informed by, Tenant of all circumstances bearing on the Lease and this Guaranty. No modification or waiver of any of the provisions of this Guaranty will be binding upon Landlord except as expressly set forth in a writing duly signed and delivered on behalf of Landlord.

8.    **Enforcement Costs.** If (i) the Lease or this Guaranty is placed in the hands of an attorney for enforcement or collection or is enforced or collected through any legal proceeding; (ii) an attorney is retained to represent Landlord in any proceeding (including, without limitation, any bankruptcy, reorganization, receivership or other proceeding affecting creditors' rights) involving a claim under or related to the Lease or this Guaranty, then Guarantor shall pay to Landlord upon demand all reasonable attorneys' fees, costs and expenses, including, without limitation, court costs and filing fees, and all other costs and expenses incurred in connection therewith (all of which are referred to herein as "Enforcement Costs"), in addition to all other amounts due hereunder, provided Landlord prevails in such legal proceeding.

9.    **Transfer of Lease.** Notwithstanding any assignment or transfer of the Lease or any interest therein by Landlord, for collateral purposes or otherwise, each and every immediate and successive assignee, transferee or other successor in interest with respect to Landlord's interest under the Lease shall, to the extent of the interests assigned or transferred, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were Landlord.

10.    **Governing Law Interpretation.** This Guaranty shall be governed by the laws of the State of North Carolina without reference to the conflicts of law principles of that state. The headings of Paragraphs in this Guaranty are for convenience only and shall not be construed in any way to limit or define the content, scope or intent of the provisions hereof As used in this Guaranty, the singular shall include the plural, and masculine, feminine and neuter pronouns shall be fully interchangeable where the context so requires. If this Guaranty is executed by more than one person or entity, then references to "Guarantor" herein shall be deemed to refer to each such person or entity and the liability of each such person or entity shall be joint and several, and the release by Landlord of any of them shall not release or affect in any manner the obligations of any other of them, and this Guaranty shall not be revoked, discharged or impaired as to any such persons or entities by reason of the death or incapacity or insolvency of any other of them. If any provision of this Guaranty, or any paragraph, sentence, clause, phrase or word, or the application thereof, in any circumstances, is adjudicated by a court of competent jurisdiction to be invalid, the validity of the remainder of this Guaranty shall be construed as if such invalid part were never included herein. Time is of the essence of this Guaranty. All payments to be made hereunder shall be made in currency and coin of the United States of America, which is legal tender for public and private debts at the time of payment.

11.    **Entire Agreement.** This Guaranty constitutes the entire agreement between Guarantor and Landlord with respect to the subject matter hereof and supersedes all prior such agreements and understandings, both

written and oral. This Guaranty may not be modified or amended except by a written instrument signed by Landlord and Guarantor. If this Guaranty is executed in several counterparts, each of those counterparts shall be deemed an original, and all of them together shall constitute one and the same instrument.

12.     Successors and Assigns.

(a)     This Guaranty shall bind Guarantor and the heirs, assigns, successors, executors, administrators and legal and personal representatives of Guarantor; provided that Guarantor shall not be entitled to transfer or delegate its obligations hereunder. Regardless of whether this Guaranty is executed by more than one person or entity, it is agreed that the undersigned's liability hereunder is several and independent of any other guaranties or other obligations at any time in effect with respect to the Indebtedness, the Obligations or any part thereof and that each Guarantor's liability hereunder may be enforced regardless of the existence, validity, enforcement or non-enforcement of any such other guaranties or other obligations.

(b)     This Guaranty shall inure to the benefit of and be enforceable by Landlord and Landlord's officers, agents, employees, partners, directors and shareholders, each of their respective successors and assigns, and each present or subsequent mortgagee of the Premises and its successors and assigns (all such persons and entities shall be "Indemnified Parties" herein).

13.     Certain Waivers by Guarantor. Guarantor hereby waives the benefit of (a) any statutes of limitation or repose affecting Tenant's liability under the Lease or Guarantor's liability under this Guaranty, and (b) the right to trial by jury in any action or proceeding that hereafter may be instituted in respect of the Lease or this Guaranty.

14.     Notices. Any notice, demand or other communication which is given hereunder shall be in writing and shall be deemed given and served (a) upon receipt or refusal, if delivered personally, (b) one (1) business day after deposit with an overnight carrier service, or (c) upon deposit in the United States mail (certified or registered mail only), if mailed, and addressed to the intended recipient at its address set forth below or to such other address as such intended recipient may have designated by notice furnished in accordance herewith:

if to Landlord:

    Landlord:

    NWWP LP
    c/o Northwood Investors
    575 Fifth Avenue, 23rd Floor
    New York, New York 10017
    Attention: Brian Crittendon
    Email: bcrittendon@northwoodinvestors.com

    with a copy to:    c/o Northwood Investors
                1819 Wazee Street, 2nd Floor
                Denver, Colorado 80202
                Attention: Michael O'Shaughnessy
                Email: osh@northwoodinvestors.com
    and
                Northwood Retail, LLC
                302 Colonades Way, Suite 205
                Cary, North Carolina 27518
                Attention: Mary Langdon

Email: mlangdon@northwoodretail.com

if to Guarantor:

      Guarantor:

      SD-Missouri, LLC
      131 East Lincoln Ave, Suite C
      Fort Collins, CO 80524

      Except as otherwise specifically required herein, notice of the exercise of any right, option or power granted to Landlord by this Guaranty is not required to be given.

SIGNED AND DELIVERED as of the date first specified above.

GUARANTOR:

**SD MISSOURI, LLC**

**By:** _____
**Name:** _____
**Title:** _____

STATE OF            )
                     ) SS
COUNTY OF       )

      On _____, 2017, before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed                     the                      instrument.

      WITNESS my hand and official seal.

                                  _____
                                  Notary Public

                                  My Commission Expires:_____

## EXHIBIT F

### EXISTING EXCLUSIVES AND PROHIBITED USES

A.    EXISTING EXCLUSIVE USES:

TRE Nail Spa

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity (or voluntarily permit any existing tenant in the Shopping Center to change its use) whose primary business activity is the provision of manicure or pedicure services ("Tenant's Exclusive Use"). The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease to the extent their leases allow (directly or indirectly) such exclusive use; (b) shall not apply to the provision of incidental manicure or pedicure services by other occupants or tenants; (c) shall not require Landlord to litigate against another tenant/occupant of the Shopping Center to enforce such Tenant's Exclusive Use.

Enrigo Italian Bistro

Provided Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Effective Date of this First Amendment through the end of the Term, as extended by this First Amendment, Landlord will not execute a lease for space in the Shopping Center, with any person or entity (or voluntarily permit any existing tenant in the Shopping Center to change its use) whose principal and primary business is the operation of a full service, white tablecloth, sit-down restaurant offering a full complement of traditional Italian cuisine, including but not limited to pasta dishes but excluding the sale of pizza in any manner ("Tenant's Exclusive Use"). The foregoing Exclusive Use shall be subject to the following terms and conditions: (a)    (i) Tenant's Exclusive Use shall not apply to any current tenants or occupants of the Shopping Center and their successors, subtenants, licensees and assigns or any of their replacements, to the extent their existing leases allow (directly or indirectly) such use; (ii) Tenant's Exclusive Use shall not apply to tenants and other occupants offering less than a full complement of Italian food, such as a restaurant specializing in "Continental" food which also offers some Italian dishes such as "spaghetti and meatballs"; (iii) Tenant's Exclusive Use shall not apply to a primarily take-out or fast casual restaurant;  (iv) Tenant's Exclusive Use shall not apply to tenants and other occupants leasing space in excess of 10,000 square feet; and (vii) Tenant's Exclusive Use shall not require Landlord to litigate against another tenant/occupant of the Shopping Center to enforce such Tenant's Exclusive Use....It is expressly understood that the furnishing of Italian style food items on an incidental basis (i.e., less than twenty-five percent [25%] of menu offerings) shall not be construed as a violation of Tenant's Exclusive Use. It is further understood that the furnishing of pizza, in any manner, shall not be construed as a violation of Tenant's Exclusive Use.

Hand and Stone

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity (or voluntarily permit any existing tenant in the Shopping Center to change its use) whose primary business activity is to offer massages, facials, and waxing services, or any one of the foregoing ("Tenant's Exclusive Use").  For purposes herein, a business conducted by another occupant at the Shopping Center shall not be deemed to have a

business whose "primary" business activity is the Tenant's Exclusive Use if, on an annual basis, less than ten percent (10%) of the gross sales from such occupant's premises are generated from massages, facials, or waxing services. The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease; (b) shall not apply to the incidental or ancillary provision of massages, facials, or waxing services by other occupants or tenants (including, without limitation, any medspa), which incidental or ancillary services shall be defined as the provision of any one or more of such services that does not amount to a primary business activity as defined above; (c) shall not apply to any hair salon (provided that such salon may not offer massages or facials); (d) shall not apply to any nail salon (provided that such nail salon may not offer massages or skin care services); and (e) shall not apply to any make up establishments (such as, by way of example only, Merle Norman), provided such make up establishments may not offer massages or facials. In furtherance of the foregoing, Landlord shall not lease space in the Shopping Center to a tenant that operates as, and advertises itself as, a day spa, skin spa, or med spa (a "Spa Tenant") unless the following conditions are contained in such lease: (w) the Spa Tenant is prohibited from providing massages at the Spa Tenant's premises in the Shopping Center, (x) the Spa Tenant is prohibited from advertising facials as an a la carte offering at the Spa Tenant's premises in the Shopping Center, (y) the Spa Tenant may provide facials provided that such facials do not generate more than ten percent (10%) of the Gross Sales from such Spa Tenant's premises per annum, and (z) such Spa Tenant shall deliver statements of Gross Sales to Landlord within thirty (30) days after the close of each calendar quarter, which Gross Sales must reflect a breakdown of Gross Sales generated by facials and, if offered, waxing services as a percentage of the Spa Tenant's total Gross Sales, and such Spa Tenant must consent to Landlord's disclosure of the foregoing statement to Tenant. Landlord agrees to provide the foregoing statement of such Spa Tenant to Tenant within thirty (30) days following the receipt thereof.

In no event shall Landlord enter into any lease with respect to any premises located immediately adjacent to the Premises for use as any of the following primary uses: martial arts studio, music studio, gym, child daycare center, drop-in or short term child care center as defined in G.S. 110-86(2)(d)(d1) (provided that this is not intended to prevent the use of any premises for tutoring services, or to prevent the use of a children's area within the adjacent tenant's premises so long as the children's area is an ancillary or incidental part of the use of the premises and the parents do not leave their children within the premises to be supervised by the business establishment at the premises), or children's inflatable party area.


Menchie's

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted use is for the operation of a frozen dessert concept retail store that generates more than twenty percent (20%) of its Gross Sales per annum from the sale of frozen desserts ("Tenant's Exclusive Use"). The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease to the extent their leases allow (directly or indirectly) such exclusive use; (b) shall not apply to the incidental or ancillary sale of frozen desserts by other occupants or tenants (and as used herein, "incidental or ancillary sale" shall mean the sale of frozen desserts constituting twenty percent (20%) or less of total Gross Sales per annum of such occupants or tenants); (c) shall not apply to the tenant operating under the trade name "Fresca" or a similar trade name (Tenant hereby expressly acknowledging that such other tenant will be selling gelato and other desserts); (d) shall not require Landlord to litigate against another tenant/occupant of the Shopping Center to enforce such Tenant's Exclusive Use.


Fresca

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that,

from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted primary use is for the retail sale of: (i) specialty or gourmet coffee, (ii) frozen desserts, and (iii) gelato and crepes ("Tenant's Exclusive Use"). Notwithstanding the foregoing, the foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease to the extent their leases allow (directly or indirectly) such exclusive use (provided that if Landlord has the right to approve of a change of use for an existing tenant or occupant pursuant to the lease with such tenant or occupant, to the extent Landlord may do so without breaching or otherwise violating the terms of such lease, Landlord shall use its best efforts to not expressly approve of a change of use to a use that will violate the Tenant's Exclusive Use); (b) shall not apply to the retail sale of any of the items described in Tenant's Exclusive Use by other occupants or tenants as long as the business of such other occupant or tenant does not consist primarily of the sale of any of such items (and as used herein, the business of a tenant or occupant shall be deemed to consist primarily of the sale of any of such items if the sale of any one of the items described in subclauses (i) through (ii) above constitutes more than five percent (5%) of total Gross Sales per annum of such occupant or tenant, or for subclause (iii) above constitutes more than one percent (1%) of the total Gross Sales per annum of such occupant or tenant); (c) other than the retail sale of gelato, the Tenant's Exclusive Use shall not apply to any retail establishment primarily serving or identified as a yogurt store; (d) shall not require Landlord to litigate against another tenant/occupant of the Shopping Center to enforce such Tenant's Exclusive Use.

## Gigi's Cupcakes

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted primary use is for the retail sale of cupcakes for on- and off-premises consumption ("Tenant's Exclusive Use"). Notwithstanding the foregoing, the foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center existing as of the mutual execution of this Lease and their successors, subtenants and assigns to the extent their leases allow (directly or indirectly) such exclusive use (provided that if Landlord has the right to approve of a change of use for an existing tenant or occupant pursuant to the lease with such tenant or occupant, to the extent Landlord may do so without breaching or otherwise violating the terms of such lease, Landlord shall not expressly approve of a change of use to a use that will violate the Tenant's Exclusive Use); (b) shall not apply to the retail sale of any of the items described in Tenant's Exclusive Use by other occupants or tenants as long as the business of such other occupant or tenant does not consist primarily of the sale of any of such items; (c) shall not apply to any existing or future grocery store in the Shopping Center; (d) shall not require Landlord to litigate against another tenant/occupant of the Shopping Center to enforce such Tenant's Exclusive Use.

## Green Pea Baby

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted use is primarily for the retail sale of (i) baby and children's furniture, (ii) baby and children's décor, (iii) baby and children's bedding, (iv) breastfeeding products, and (v) apparel from the following brands, but only for sizes from newborn to 6X: Zutano, Kissy Kissy, Le Za Me, Cach Cach, Paty, Le Top, Rabbit Moon, Persnickity, Bailey Boys, Ruffle Butts, Lemon Loves Lime, and Tea Collection (collectively, the "Tenant's Exclusive Use"). The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease; (b) shall not apply to the sale of items otherwise included in the definition of Tenant's Exclusive Use by other occupants or tenants as long as the business of such other occupant or tenant does not consist primarily of the retail sale of such items (and as used herein, the business of a tenant or occupant shall

only be deemed to consist primarily of the sale of such items if the sale of any category [and as used herein, each separate subclause set forth above in the definition of Tenant's Exclusive Use shall be deemed a separate category] of such items constitutes twenty percent (20%) or more of total Gross Sales per annum of such occupant or tenant); (c) shall not apply to the sale of apparel with brand names set forth in subclause (v) above for any and all sizes other than from newborn to 6X; (d) shall not apply to the sale of any apparel under any brand name (regardless of the sizes) other than those expressly described in subclause (v) above; (e) other than the specific items expressly included within Tenant's Exclusive Use as set forth above, shall not include any other items, including, without limitation, cloth diapers and/or baby and/or children's toys, gifts, gear and/or accessories; (f) shall not require Landlord to litigate against another tenant/occupant of the Shopping Center to enforce such Tenant's Exclusive Use.

Taziki's

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted use is for the operation of a restaurant whose business shall consist predominantly of the sale of Mediterranean-style food for on-site and off-site consumption ("Tenant's Exclusive Use"). Tenant shall have the right to file a lawsuit for injunctive, declaratory or other type of legal or equitable relief against any tenant/occupant to prohibit the unauthorized use by such other tenant/occupant, and Landlord shall reasonably cooperate with Tenant's efforts to enforce the same to the extent reasonably required by Tenant, but in no event shall Landlord be liable for any monetary damages resulting from such other tenant's/occupant's breach. The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease to the extent their leases allow (directly or indirectly) such exclusive use; (b) shall not apply to the sale of Mediterranean-style food items by other occupants or tenants as long as the business of such other occupant or tenant does not consist predominantly of the sale of Mediterranean-style food items (and as used herein, the business of a tenant or occupant shall be deemed to consist predominantly of Mediterranean-style food items if the sale of such items constitutes twenty percent (20%) or more of total Gross Sales per annum of such occupant or tenant).

Walgreens

Landlord covenants and agrees that, during the Term and any extensions or renewals thereof, no portion of the Adjacent Parcels will be used for any one or combination of the following: (i) the operation of a drug store or a so-called prescription pharmacy or prescription ordering, processing or delivery facility, whether or not a pharmacist is present at such facility, or for any other purpose requiring a qualified pharmacist or other person authorized by law to dispense medicinal drugs, directly or indirectly, for a fee or remuneration of any kind; (ii) the operation of a medical diagnostic lab or the provision of treatment services (other than as part of a medical, dental, physician, surgical or chiropractic office[s], which office[s] shall not be restricted by this subclause [ii]); (iii) the sale of so-called health and beauty aids or drug sundries; (iv) the operation of a business in which alcoholic beverages shall be sold for consumption off the premises; (v) the operation of a business in which photofinishing services (including, without limitation, digital photographic processing or printing, or the sale of any other imaging services, processes or goods) or photographic film are offered for sale; (vi) the operation of a business in which greeting cards or gift wrap are offered for sale; and (vii) the operation of a business in which prepackaged food items for off premises consumption are offered for sale as a part of a so called food mart or convenience store].

Notwithstanding the foregoing restrictions and provisions of Section (a) above and the restrictions and provisions of Article 8(b) below, the following shall not be restricted on the Adjacent Parcels: (1) a physician, dentist, chiropractor, veterinarian, urgent care or other medical or treatment use or operation that provides sample doses of medicinal drugs to their patients during office visits, without fee or remuneration of any kind, and a doctor, dentist, chiropractor, veterinarian or other medical professional that administers medicinal drugs to their patients in connection with treatment given during office visits whether or not any fee or remuneration

is received therefor; (2) a grocery store whose building premises shall exceed 30,000 square feet of floor area (as used herein the term grocery store shall mean a retail store commonly understood in the retail industry as a grocery store or food supermarket and which operates its stores in a manner consistent with the operations of supermarket operators such as [by way of example and without limitation] Kroger, Albertsons, Publix, Food Lion, Whole Foods, Aldi, Fresh and Easy, and the like); (3) a discount department store whose building premises shall exceed 30,000 square feet of floor area (as used herein the term discount department store shall mean a retail store commonly understood in the retail industry as a discount department store, a so called discount superstore or a warehouse store, and which operates its stores in a manner consistent with the operations of discount department, superstore or warehouse store operators such as [by way of example and without limitation] Target, Wal-Mart, Costco, Sam's Club, and the like); and (4) any tenant, occupant or other operation at the Adjacent Parcels whose building premises shall exceed 35,000 square feet of floor area.

Notwithstanding the foregoing restrictions and provisions of Section (a)(ii), (iii), (iv), (v), (vi) and (vii) above and the restrictions and provisions of Article 8(b) below, the following shall not be restricted on the Adjacent Parcels: a grocery store (defined above) whose building premises shall exceed 15,000 square feet of floor area but that shall not exceed 30,000 square feet of floor area (herein called a "Specialty Grocer"); it being agreed and understood that as to a Specialty Grocer defined in this paragraph, the restrictions of Article 8(a)(i) above shall apply and prohibit such Specialty Grocer from operating a drug store or a so-called prescription pharmacy or prescription ordering, processing or delivery facility, whether or not a pharmacist is present at such facility, or for any other purpose requiring a qualified pharmacist or other person authorized by law to dispense medicinal drugs, directly or indirectly, for a fee or remuneration of any kind.

In addition, notwithstanding the foregoing restrictions and provisions of Section (a) above and the restrictions and provisions of Article 8(b) below, the following shall not be restricted on the Adjacent Parcels: (1) the incidental sale of health and beauty aids or drug sundries in the lesser of 25% of such tenant's sales area or 250 square feet of sales area, (2) the incidental sale of photographic film in the lesser of 10% of such tenant's sales area or 100 square feet of sales area, (3) the incidental sale of greeting cards and gift wrap in the lesser of 25% of such tenant's sales area or 250 square feet of sales area, (4) the operation of a FedEx Kinko's, UPS Store and the like engaged in printing, digital printing, digital imaging and digital photo processing notwithstanding the use restriction set forth in Article 8(a)(v) of the Lease, provided that (i) said operation does not contain more than one (1) photofinishing kiosk for self service attached or in any way connected to a photo processing lab or similar device; and (ii) in no event may said operation engaged in mass production of photographic prints or photographic paper; (5) alcoholic beverage sales and/or food sales in connection with a restaurant, which alcoholic beverage sales by a restaurant may be in the form of a bar or lounge area within the restaurant or in connection with another primary use, (6) an "accommodation" food user which shall mean a user that does not offer full meals, but rather offers a limited product line such as cookies, bagels, cinnamon rolls, donuts, pastries, candy, ice cream, frozen yogurt, juice drinks, smoothies, coffee shops (including but not limited to Starbucks and/or Caribou Coffee), bakeries, delicatessens, or the like; and, provided further, a so-called "accommodation" food user shall in no event include the operation of a so-called "food mart" or "convenience store" which are prohibited; and (7) the sale of alcohol as part of a wine store and/or wine bar, which may also include the sale of wine, beer and other spirits for either on or off premises consumption.

In addition, Landlord covenants and agrees that, during the Term and any extensions or renewals thereof, no portion of the Adjacent Parcels will be used for any one or more of the following: a cocktail lounge, bar, any other establishment that sells alcoholic beverages for on-premises consumption (other than in connection with a restaurant, which may be in the form of a bar or lounge area within the restaurant, or in connection with another primary use), disco, pool hall or billiard parlor (except incidental to a bowling alley or another primary use), skating rink, roller rink, amusement arcade (except incidental to a bowling alley), theatre or another primary use), a children's play or party facility (except in connection with a so called quick service or fast food restaurant, except for such facilities that are not in excess of 7,500 square feet of floor area at the Adjacent Parcels, and except incidental to a bowling alley, theatre or another primary use; provided, however, none of the forgoing exceptions shall be allowed in the premises immediately adjacent to the Leased Premises), adult book store, adult theatre, adult amusement facility, any facility selling or displaying pornographic materials or having such displays, second hand store (except to the extent operated in a first class manner such as without limitation Play It Again Sports, Goodwill, and the like), odd lot, closeout or liquidation store, auction house, flea market, gymnasium, sport or health club (except to the extent that a gymnasium, sport or health club that

does not occupy more than 5,000 square feet of floor area at the Adjacent Parcels shall be permitted), blood bank, funeral home, sleeping quarters or lodging, the outdoor housing or raising of animals, the sale, leasing or storage of automobiles, boats or other vehicles (except that an automotive or vehicle rental business shall not be prohibited so long as the rental automobiles or vehicles are located, parked or stored on property not within the Shopping Center), any industrial use (including, without limitation, any manufacturing, smelting, rendering, brewing, refining, chemical manufacturing or processing, or other manufacturing uses [except that an operation that brews beer on premises shall not be restricted)), any mining or mineral exploration or development except by non-surface means, a carnival, amusement park or circus (except that the foregoing will not prohibit periodic events in the parking or common areas at the Adjacent Parcels, such as periodic entertainment, music, dancing, carnivals, holiday activities and the like; provided, however such events shall not be held in the parking areas immediately adjacent to the Leased Premises or the parking areas located between the Leased Premises and the Whole Foods parking lot), an assembly hall, off track betting establishment, bingo hall, any use involving the use, storage, disposal or handling of hazardous materials or underground storage tanks, a church, temple, synagogue, mosque, or other house of worship, any facility for the sale of paraphernalia for use with illicit drugs, or any use which creates a nuisance.

Whole Foods

Except as prohibited by law, Landlord shall not permit any tenant of Suite A-101, which is approximately 23,913 square feet of rentable area, as indicated on Exhibit A to conduct business as a bakery, grocery store, or vitamin health store, without the specific prior written consent of Tenant, which consent may be withheld for any reason.

Elegant Stitches

Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business, using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions of this Lease, Landlord will not hereafter enter into a new lease in the Shopping Center with a tenant whose principal permitted use is the retail sale of fabric and sewing machines (the "Exclusive Use"). The aforementioned restriction shall not apply to: (i) any existing tenants at the Shopping Center or their successors, assigns or replacements; or (ii) any existing leases at the Shopping Center as same may be renewed, extended, modified or amended (except that no such modification shall grant a tenant the right to engage in the Exclusive Use where such tenant did not previously have that right); (iii) any store measuring 10,000 sq. ft. or more.

Whisk

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity (or voluntarily permit any existing tenant in the Shopping Center to change its use) whose express primary business use includes the retail sale of the following items:  (i) bakeware, (ii) baking tools, (iii) cooking tools and gadgets, (iv) cookware, (v) cooking cutlery, (vi) servingware, including flatware, platters and serving pieces, (vii) kitchen electrics (including but not limited to espresso and coffee machines, blenders, mixers, and toaster ovens), (viii) kitchen and dining textiles, and (ix) for adult cooking instruction and demonstration (or any of the foregoing) (collectively, the "Tenant's Exclusive Use").  As used herein, each of the foregoing subclauses (i) through (ix) shall be separately referred to herein as an "Exclusive Use Category Item" (by way of clarification, "cookware" will be a separate Exclusive Use Category Item, and "kitchen and dining textiles" shall be a separate Exclusive Use Category Item).  For purposes herein, another occupant at the Shopping Center shall only be deemed to have a business whose "primary" business use is in violation of the Tenant's Exclusive Use if, on an annual basis, more than five percent (5%) of the gross sales from such occupant's premises are generated from the sale of any one Exclusive Use Category Item.  By way of clarification, the

five percent (5%) figure shall be calculated and based on the sale of each Exclusive Use Category Item separately, and not based on a combination of two or more Exclusive Use Category Items (by way of example only, the sale of baking tools constituting 6% of another occupant's total annual gross sales would be a violation of Tenant's Exclusive Use, but the sale of baking tools constituting 3% of total gross sales and the sale of kitchen electrics constituting 3% of total gross sales shall not be a violation of Tenant's Exclusive Use). The parties acknowledge and agree that the Tenant's Exclusive Use shall also prohibit Landlord from executing leases with future tenants for the operation of a business under any of the following trade names: Sur La Table, Williams Sonoma, Maverick Southern Kitchens, and Charleston Cooks.  The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease to the extent their leases allow (directly or indirectly) such exclusive use; and (b) shall not apply to the ancillary sale of any items otherwise included in Tenant's Exclusive Use by other occupants or tenants, which ancillary sales shall be defined as the sale of any such item that does not amount to a primary business activity as defined above (i.e. the sale of any Exclusive Use Category Item which, on an annual basis, constitutes five percent [5%] or less of its total sales, shall be deemed an ancillary sale).

### Esteem Me

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted primary use is for (i) an early childhood educational school with related child care or (ii) children's craft or children's creative art classes (collectively, "Tenant's Exclusive Use"). The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease; (b) shall not apply to tutoring schools or programs (such as, by way of example only, Sylvan Learning Center and Kumon), (c) shall not apply to any schools, or any businesses offering crafts and/or art classes, that are not primarily for children (by way of example only, businesses offering adult cooking classes shall be permitted), (d) the offering of early childhood education, child care, and/or classes, by other occupants or tenants as long as the primary business of such other occupant or tenant does not consist primarily of an early childhood educational school with related child care, or children's craft or children's creative art classes; (e) shall not require Landlord to litigate against another tenant/occupant of the Shopping Center to enforce such Tenant's Exclusive Use.

### Gigi's Boutique / Finley's

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted use is for the sale of ladies apparel solely under the following brands: Miss Me, Silver Jeans, Jag Jeans, Tribal & Multiples, Areyh, Downeast, Blu Pepper, Umgee, YA, and for the sale of shoes under the brand Madeline shoes (collectively, the "Tenant's Exclusive Use"). The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease to the extent their leases allow (directly or indirectly) such exclusive use; (b) shall not apply to the sale of any items otherwise included in Tenant's Exclusive Use by other occupants or tenants as long as the business of such other occupant or tenant does not consist predominately of the sale of such items (and as used herein, the business of a tenant or occupant shall be deemed to consist predominantly of the sale of such items if the sale of such items constitutes twenty percent (20%) or more of total Gross Sales per annum of such occupant or tenant); (c) shall not apply to the sale of ladies apparel or shoes other than the specific brands expressly set forth above in Tenant's Exclusive Use; (d) shall not require Landlord to litigate against another tenant/occupant of the Shopping Center to enforce such Tenant's Exclusive Use.

Chick-fil-A

So long as Tenant continues to operate as a Chick-fil-A restaurant (or such other name as a majority of the restaurants which previously operated as a Chick-fil-A restaurant are currently operating under) and subject to the terms of ground leases existing as of the date hereof, Landlord covenants and agrees that no "out-parcel" or free standing building on the Adjoining Property, shown on Exhibit "A-2" attached hereto and incorporated herein, which is owned by Landlord shall, during the term of this Lease, be leased, used or occupied as a restaurant selling or serving chicken as a principal menu item. For purposes hereof, "principal menu item" shall mean any restaurant deriving twenty-five percent (25%) or more of its gross sales from the sale of chicken. It is mutually agreed that the covenants set forth in this section shall run with the title to the Land and the Adjoining Property.

Landlord further covenants and agrees that, subject to the terms of ground leases existing as of the date hereof, no portion of the Adjoining Property, owned by the Landlord shall, during the term of this Lease, be leased, used or occupied for any of the following: Boston Market, Kenny Roger's, Kentucky Fried Chicken, Popeye's, Church's, Bojangle's, Mrs. Winner's, Tanner's, Chicken Out, Willie May's Chicken, or Ranch One. Notwithstanding anything to the contrary herein, Landlord and Tenant agree that permitted restaurants shall include McDonald's, Burger King, Wendy's Hardee's, Arby and Biscuitville.

Vom Fass

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted use is for the retail sale of food oils, vinegars and spices and/or the offering of small samples small samples of such retail items for consumption on the Premises (collectively, the "Tenant's Exclusive Use"). The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease to the extent their leases allow (directly or indirectly) such exclusive use; (b) shall not apply to the sale of any items otherwise included in Tenant's Exclusive Use by other occupants or tenants as long as the business of such other occupant or tenant does not consist predominately of the sale of such items (and as used herein, the business of a tenant or occupant shall be deemed to consist predominantly of the sale of such items if the sale of such items constitutes twenty-five percent (25%) or more of total Gross Sales per annum of such occupant or tenant); (c) shall not require Landlord to litigate against another tenant/occupant of the Shopping Center to enforce such Tenant's Exclusive Use.

Color Me Mine

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express whose primary business activity is to offer pottery painting and pottery firing, and painting on canvas ("Tenant's Exclusive Use"). The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease; (b) shall not apply to the sale or offering of any items otherwise included in Tenant's Exclusive Use by other occupants or tenants as long as the sale or offering of such items is not the primary business activity of such other occupant or tenant (and as used herein, the business of a tenant or occupant shall be deemed to consist of a primary business activity if the sale of the items included within Tenant's Exclusive Use constitutes ten percent (10%) or more of total Gross Sales per annum of such occupant or tenant); (c) shall not require Landlord to litigate against another tenant/occupant of the Shopping Center to enforce such Tenant's Exclusive Use.

Violets

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted use is for the retail sale of clothing under the following brands: Free People, Wildfox, Nation Ltd., Raleigh Denim, Chan Luu, Deborah Lippmann, Liebeskind, and AG Jeans (collectively, the "Tenant's Exclusive Use"). The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease to the extent their leases allow (directly or indirectly) such exclusive use; (b) shall not apply to the sale of any items otherwise included in Tenant's Exclusive Use by other occupants or tenants as long as the business of such other occupant or tenant does not consist predominately of the sale of such items (and as used herein, the business of a tenant or occupant shall be deemed to consist predominantly of the sale of such items if the sale of such items constitutes twenty-five percent (25%) or more of total Gross Sales per annum of such occupant or tenant); (c) shall not apply to the sale of any clothing other than the specific brands expressly set forth above in Tenant's Exclusive Use; (d) shall not require Landlord to litigate against another tenant/occupant of the Shopping Center to enforce such Tenant's Exclusive Use.

Taco Mac (language from the Restrictive Covenant Agreement referenced in the Taco Mac lease)

Declarant hereby declares that as of the date of this Agreement (i) Declarant, as landlord, and Waverly Mac, LLC ("Taco Mac"), as tenant, entered into a certain lease dated December 16, 2013 (the "Taco Mac Lease") pursuant to which Taco Mac leased from Declarant the Pad Parcel for the operation of a restaurant under the trade name "Taco Mac", and (ii) for so long as Taco Mac continues to use its premises on the Pad Parcel for Tenant's Wing Exclusive Use (as defined below) and the Tenant's Draft Beer Exclusive Use (as defined below), as applicable, pursuant to the terms of the Taco Mac Lease, (a) neither the Main Parcel Owner (or any successor owner of the Main Parcel) will, during the term of the Taco Mac Lease, enter into any future leases for space on the Main Parcel with any person or entity which would permit the use of such space in violation of Tenant's Wing Exclusive Use and/or the Tenant's Draft Beer Exclusive Use, as applicable; and (b) the Main Parcel Owner (and all successor owners of the Main Parcel) shall, during the term of the Taco Mac Lease, be subject to, and shall not violate, Tenant's Wing Exclusive Use and/or Tenant's Draft Beer Exclusive Use, as applicable. As used herein, "Tenant's Wing Exclusive Use" shall mean the operation of a restaurant which both (A) offers chicken wings as a primary menu item (and for purposes hereof, chicken wings will be deemed a primary menu item if the sale of chicken wings comprises ten percent (10%) or more of total food Gross Sales per annum of such other occupant or tenant); and (B) offers more than (i) fifteen (15) different kinds of draft beer and (ii) thirty (30) different kinds of bottled beer. As used herein, "Tenant's Draft Beer Exclusive Use" shall mean the operation of a restaurant that offers more than thirty (30) different kinds of draft beer. Notwithstanding anything to the contrary contained herein, (1) neither the Tenant's Wing Exclusive Use nor the Tenant's Draft Beer Exclusive Use shall apply to the uses of any Permittees of the Main Parcel and their successors and assigns existing as of the date of the Taco Mac Lease, and (2) in the event the Taco Mac Lease (as the same may be extended, renewed, modified, assigned or otherwise transferred) is terminated, then, upon the effective termination of such Taco Mac Lease, the Tenant's Wing Exclusive Use and the Tenant's Draft Beer Exclusive Use shall concurrently terminate (if not previously terminated in accordance with the terms of such Taco Mac Lease) and the Main Parcel shall no longer be bound by the Tenant's Wing Exclusive Use or the Tenant's Draft Beer Exclusive Use.

During the term of the Taco Mac Lease, neither the Main Parcel Owner, or any successor owner of the Main Parcel, will enter into any future leases for space on the Main Parcel with any person or entity, for the operation of any of the Prohibited Restaurants (as defined below). As used herein, "Prohibited Restaurants" shall mean any of the following restaurants: Three Dollar Café, Beef O'Brady's, Hooters, Wild Wing Café, Wings, Wing Stop, Wing Zone, Buffalo's, Buffalo Wild Wings, Bob Baumhauser's Wings, Miller's Ale House, Yardbirds, Zaxby's, Loco's Deli & Pub, Summit Wayside Tavern, Kayson's Grill, Hudson Grill, Tilted

Kilt, Carolina Ale House, Twin Peaks, Tyler's Taproom and Flying Saucer. Notwithstanding anything to the contrary contained herein, (1) the foregoing Prohibited Restaurants restrictions shall not apply to the uses of any Permittees of the Main Parcel and their successors and assigns existing as of the date of the Taco Mac Lease, and (2) in the event the Taco Mac Lease (as the same may be extended, renewed, modified, assigned or otherwise transferred) is terminated, then, upon the effective termination of such Taco Mac Lease, the foregoing Prohibited Restaurants restrictions shall concurrently terminate (if not previously terminated in accordance with the terms of such Taco Mac Lease) and the Main Parcel shall no longer be bound by the Prohibited Restaurants restrictions set forth above.

Toast City Kitchen

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted use is for a full-service, sit-down restaurant that predominately sells traditional American breakfast items cooked to order on-site (such as, by way of example, bacon, eggs, pancakes and waffles) (the "Tenant's Exclusive Use"). The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease to the extent their leases allow (directly or indirectly) such exclusive use; (b) shall not apply to the sale of any items otherwise included in Tenant's Exclusive Use by other occupants or tenants as long as the business of such other occupant or tenant does not consist predominately of the sale of such items (and as used herein, the business of a tenant or occupant shall be deemed to consist predominantly of the sale of such items only if the sale of such items constitutes twenty percent (20%) or more of total Gross Sales per annum of such occupant or tenant); (c) shall not apply to any tenant or occupant operating a restaurant that is not a full-service, sit-down restaurant; (d) shall not apply to any breakfast items (whether traditional, American or otherwise) that are not cooked to order on-site (by way of example only, the Tenant's Exclusive Use shall not apply to donut or bagel stores); and (e) shall not require Landlord to litigate against another tenant/occupant of the Shopping Center to enforce such Tenant's Exclusive Use.

Triangle Wine Company

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted use is for, and whose business is primarily identified as, the retail sale of wine and beer for off-site consumption (collectively, the "Tenant's Exclusive Use"). The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease to the extent their leases allow (directly or indirectly) such exclusive use; (b) shall not apply to the sale of any items otherwise included in Tenant's Exclusive Use by other occupants or tenants as long as the business of such other occupant or tenant is not primarily identified as a retail store selling wine and beer for off-site consumption; (c) shall not apply to the sale of any items otherwise included in Tenant's Exclusive Use by other occupants or tenants as long as the business of such other occupant or tenant does not consist predominately of the sale of such items for off-site consumption (and as used herein, the business of a tenant or occupant shall be deemed to consist predominantly of the sale of such items if the sale of such items for off-site consumption constitutes fifty percent (50%) or more of total Gross Sales per annum of such occupant or tenant); (d) shall not apply to the sale of wine and/or beer offered for on-site consumption.

V's Barbershop

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use as provided in and subject to Section 6.2 of this Lease, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted use is for a business that specializes in the operation of, and is primarily identified as (i) a men's and boy's barber shop or men's salon, or (b) haircuts, hair care services, including hair beautification and/or styling, for men (the "Tenant's Exclusive Use"). The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease to the extent their leases allow (directly or indirectly) such exclusive use; (b) shall not apply to any salon or other business that does not specialize in, is primarily identified as, or primarily caters to, men (and without limiting the generality of the foregoing exclusion, the Tenant's Exclusive shall not apply to any unisex salon or salons catering primarily to female clientele) (and additionally, without limiting the generality of the foregoing, Tenant acknowledges and agrees that Landlord may enter into a lease for the operation of a Phenix Salon Suites and that such lease shall not be a violation of Tenant's Exclusive).


TFTC Academy

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted use is for a martial arts studio (the "Tenant's Exclusive Use"). The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease; (b) shall not apply to any gym or fitness facilities such as 24-Hour Fitness or Gold's Gym; (c) shall not apply to any gym or fitness facilities located in any residential building within the Shopping Center for use by the residents and guests of such residential portions of the building; (d) shall not apply to any ancillary use by any other tenant or occupant which ancillary use would otherwise be for the Tenant's Exclusive Use.


The Joint

So long as Tenant is not in default and is open and operating as a chiropractic clinic and has not opened another chiropractic clinic within a radius of two (2) miles measured from the outside boundary of the Shopping Center (the "Exclusive Use Radius"), Tenant, subject to the rights of all existing tenants or occupants, shall have the exclusive right to offer chiropractic services (defined as 15% or greater of Chiropractic services) within the Shopping Center (the "Exclusive Use").


My Salon Suite

Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business under the Trade Name and for the Permitted Use, Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, as the same may be extended, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose express permitted use (i) is for an upscale hair salon that licenses suites within the Premises to independent hair stylist professionals or (ii) permits the offering of tanning services as an incidental part of such other person's or entity's other primary use (the "Tenant's Exclusive Use"). The foregoing exclusive use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease to the extent their leases allow (directly or indirectly) such exclusive use (and without limiting the generality of the foregoing, Tenant acknowledges and agrees that Landlord has entered into a lease for the operation of a V's Barbershop and that such lease shall not be a violation of Tenant's Exclusive); (b) shall not apply to any tenant or occupant whose primary use is for the operation of a tanning salon or the provision of tanning services (Tenant expressly acknowledging and

agreeing that Tenant's Exclusive Use only applies to the offering of tanning services as an incidental part of such other tenant's or occupant's other primary use).

CorePower Yoga

So long as Tenant is not in default under this Lease, Landlord agrees that from and after the date of full execution of this Lease through the Lease Term, it will not knowingly and intentionally enter into a lease (other than the Selective Tenants as defined herein) at the Shopping Center or any retail area(s) immediately contiguous to the Shopping Center that is owned or controlled by Landlord or an affiliate of Landlord to another enterprise whose primary and principal use is a facility "specializing" in yoga or yoga-related classes or activities, including yoga certification courses (i.e., at least twenty five percent (25%) of the activities and classes are yoga-related) (the "Use Restriction"). Further, except in the instance of a Selective Tenant, Landlord agrees that it will not lease space to any of the following specialty boutique fitness tenants, and that each of the same shall be considered a Use Restriction: Orange Theory Fitness, Pure Barre, Fit Republic, Barry's Boot Camp, Barre Method, Barre Code, The Daily Method, Shred 415, LifePower and any other specialty boutique fitness tenant that: (i) occupies over 15,000 square feet of gross leasable area within the Shopping Center and (ii) is substantially similar to those specialty boutique fitness tenants specifically identified by name in this sentence. Landlord also agrees that, except for Selective Tenants, it will not lease space at the Shopping Center to another fitness facility that is not hereby restricted on the same level of the Shopping Center as the Premises, and the foregoing shall also be deemed a Use Restriction.

For purposes of this Section 2.6, "Selective Tenants" shall mean (i) any tenant under a lease signed prior to the date of this Lease, (ii) any tenant whose lease permits the assignment thereof or the subletting of the premises demised thereby to operate for the Use Restriction, or (iii) any tenant occupying at least 15,000 square feet of gross leasable area within the Shopping Center.

Gonza Tacos & Tequila

Landlord agrees that from and after the Effective Date of this Lease throughout the Lease Term, it will not willfully enter into a lease (other than the Selective Tenants as defined herein) with, or sell space in the Shopping Center to, a full-service sitdown restaurant whose principal and primary use is for the service of traditional Mexican, Southwestern Tex-Mex or South American cuisine ("Competing Business"). For purposes of this Section, "Selective Tenants" shall mean any tenant (or successor, assignee, subtenant or licensee thereof) under a lease signed prior to the Effective Date.

It is expressly understood that (i) the selling of traditional Mexican, Southwestern Tex-Mex and/or South American cuisine on an incidental basis shall not be construed as a Competing Business and (ii) a restaurant operated as other than a full-service sitdown restaurant (e.g., fast casual, quick service, fast food, etc.) shall not be construed as a Competing Business. For purposes of this Section 2.5(c), the term "incidental" shall mean less than thirty percent (30%) of the Competing Business' offerings and/or sales.

BodyLace Med Spa

Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, Landlord will not execute a lease for space in the Shopping Center with any person or entity (or voluntarily permit any existing tenant in the Shopping Center to change its use) whose "principal and primary business" (which is defined for this purpose as at least 15% of aggregate gross sales) is the operation of a full service of medical spa offering a full complement of the following services: laser skin rejuvenation treatments; cosmetic injectable treatments, body contouring/fat reduction treatments, and laser hair removal ("Tenant's Exclusive Use"). It is expressly understood and agreed that Tenant shall have no exclusive for non-medical treatments such as facials, massage, hair, body or skin care therapies or treatments which therapies or treatments are presently, typically obtained in a day spa, beauty parlor, gym or health and wellness center or any similar, non-medical facilities offering such services as an accessory use. It is further expressly understood and agreed that Tenant's Exclusive Use will not extend to weight loss services of the type like Weight Watchers.

Tasu Asian Bistro

300609184 v8

Landlord agrees that, from the Commencement Date of this Lease through the end of the Lease Term, Landlord will not execute a lease for space in the portion of the Shopping Center described on Exhibit A as the "Restricted Area", with any person or entity (or voluntarily permit any existing tenant in the Restricted Area to change its use) whose principal and primary business is the operation of a full service, white tablecloth, sit-down restaurant offering a full complement of Japanese (including sushi) Vietnamese, Chinese and Thai cuisines ("Tenant's Exclusive Use").... Tenant's Exclusive Use shall not apply to: (i) any current tenants or occupants of the Shopping Center and their successors, subtenants, licensees and assigns or any of their replacements, to the extent their existing leases allow (directly or indirectly) such use; (ii) tenants and other occupants occupying space beyond the boundaries of the Restricted Area; (iii) tenants and other occupants offering less than a full complement of Japanese, Vietnamese, Chinese and Thai foods, such as a restaurant specializing in Chinese food that offers some Japanese dishes such as sushi; (iv) a primarily take-out or fast casual restaurant; (v) a restaurant serving primarily ramen noodle dishes as main course items with additional accessory Asian style food items (such as Futobuta restaurant and restaurants operating in a similar manner); (vi) tenants and other occupants leasing space in excess of 10,000 square feet.

Cinebistro

Landlord shall not permit the sale of fresh popped popcorn in the Shopping Center or at any location in the parking areas, it being the intention that Tenant shall have the exclusive right to sell fresh popped popcorn in the Shopping Center.... Landlord will not permit any tenants, kiosks or other vendors in the Shopping Center whose lease is executed after the execution of this lease to sell fresh popped popcorn, such being the exclusive use of Tenant, except for vendors who may be part of a farmer's market, or similar event, as sponsored by Landlord from time to time.

Kale Me Crazy

Landlord will not willfully enter into a lease (other than the Selective Tenants as defined herein) with, or sell space in any portion of the Shopping Center to a restaurant whose principal and primary use is for the sale of fresh and bottled non-pasteurized fruit or vegetable juices and smoothies ("Competing Business"). For purposes of this Section, "Selective Tenants" shall mean any tenant (or successor, assignee, subtenant or licensee thereof) under a lease signed prior to the Effective Date whose use does not restrict the operation of the Competing Business...It is expressly understood that the dispensing of fresh and bottled non-pasteurized fruit or vegetable juices and smoothies on an incidental basis (i.e. less than twenty percent [20%] of a tenant's Gross Sales) shall not be construed as a violation of Tenant's Exclusive Use.

B.      EXISTING PROHIBITED USES:

Tenant agrees that the Premises shall not be used for any of the purposes listed below:
(a)      Swap, shop, pawn shop, "second hand store", "surplus store", liquidation outlet, or stores selling primarily merchandise that is used or damaged, with the exception of stores such as Plato's Closet and "Designer Consignment", shops which shall be permitted;
(b)      Check cashing facility (except as part of a permitted bank);
(c)      Massage parlor, except massage as performed by a certified massage therapist;
(d)      Adult bookstore, or any other facility for the sale or display of pornographic material (without limiting the right of a national bookstore chain such as Barnes & Noble to sell merchandise offered customarily in its stores in North Carolina);
(e)      Facility for the sale of paraphernalia for use with illicit drugs;
(f)      Funeral parlor or mortuary;
(g)      Gambling for money facility or operation, including, but not limited to: a so-called "head" shop, off-track or sports betting parlor, table games such as blackjack, poker slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, the prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable gambling activities are incidental to the business operation being conducted by Tenant, or to activities which might be associated with gambling but where no money changes hands;

(h)     New or used car, truck, recreational vehicle, trailer or boat dealership or leasing facility;

(i)     Body and fender shop, other automobile repair or service shop, or car wash;

(j)     Mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(k)     Dumping, disposing, incinerating, or reducing of garbage or refuse (exclusive of dumpsters for the temporary storage of garbage and any garbage compactors, in each case which are regularly emptied so as to minimize offensive odors);

(l)     Fire sale or bankruptcy sale (unless pursuant to court order);

(m)     Dry cleaning, laundry plants, or laundromats (except as to an establishment which receives and dispenses items for laundering and/or dry cleaning but the processing of such items is done elsewhere);

(n)     Tattoo parlor;

(o)     Gas station or other similar type store selling gasoline;

(p)     Printing shop or business (except to the extent that such shop or business does not utilize "Hazardous Materials");

(q)     Except for office space located above retail, or on second level and above, a school of any kind, including cooking schools (except a retailer may provide instructional classes on how to use its products), library, or reading room (except if part of a retail bookstore such as Barnes & Noble);

(r)     Any manufacturing, warehouse, or office use (except if incidental to a retail operation); or

(s)     Animal raising or storing facility, or veterinary office; or

(t)     Dance hall/disco;

(u)     Marijuana dispensary; or

(v)     Church, synagogue or other recognized religious facility.

Cinebistro

Landlord shall not permit any tenant s whose lease is executed after the dare of execution of this Lease and whose primary use is the dale of packaged soft drinks, candy or other movie theatre type general concessions within one hundred fifty (150) feet of the entrance to the Demised Premises.

### EXHIBIT G

**TENANT'S ROUGH SKETCH FOR IMPROVEMENTS TO THE PREMISES.**



## EXHIBIT H

### MENU

## MOD PIZZA or SALAD

any toppings, same price,


MINI
$4.87
6" pizza
or side salad
130 - 400 cal


$7.87
11" pizza or entrée salad
190 - 800 cal

MEGA
$10.87
double 11" crust pizza
or family size salad
370 - 1300 cal


PIZZA SALAD $9.87   create your own salad on
warm asiago pizza crust · 450 cal

gluten-free crust* +2.00 · 350 cal

---

### MORE STUFF

**STRIP & DIP**

garlic strips 340 cal
dip with red sauce · 30 cal
pesto · 290 cal
ranch 200 cal
$2.97
marinara · 40 cal

cinnamon strips 350 cal
dip into chocolate · 225 cal
strawberry · 100 cal
cinnamon glaze · 100 cal

---

### DRINKS

**DRAFT BEER**
locally brewed
glass 140 - 350 cal
pitcher 430 - 1170 cal

**WINE**
glass 120 - 180 cal
carafe 400 - 640 cal

$4.97
glass

$11.27
pitcher · carafe

**MILKSHAKES**
$3.27
vanilla 870 cal
strawberry 900 cal
chocolate 930 cal

**FLOATS**
$2.27
make it your own
350 - 570 cal

**FOUNTAIN DRINKS**
$1.97
diet/cal
sodas 0 - 370 cal
house-made
iced teas &
lemonades
0 - 200 cal

---

MOD is what YOU make it.

WE ARE MOD

SIMPLE FOOD FOR COMPLEX TIMES



individual artisan-style pizzas & salads

choose a classic or make your own

## CLASSIC PIZZAS

**'MADDY'**
red sauce
mozzarella

**'MAD DOG'**
red sauce
mozzarella
pepperoni
mild sausage
ground beef

**'TRISTAN'**
asiago
mushrooms
sundried peppers
garlic-drizzle finish

**'DOMINIC'**
white sauce
fresh chopped basil
asiago
mild sausage
red onion
tomatoes

**'LUCY SUNSHINE'**
garlic
mozzarella
artichoke

parmesan
red sauce dollops finish

**'JASPER'**
red sauce
mozzarella
mozzarella
spicy sausage

**'DILLON JAMES'**
red sauce
garlic
4-mile chopped basil
mozzarella
tomatoes
asiago

**'CALEXICO'**
red sauce
mozzarella
grilled chicken
jalapeño
gorgonzola
hot buffalo sauce finish

**'CASPIAN'**
bbq sauce
mozzarella
grilled chicken
red onion
gorgonzola
bbq swirl finish

## CLASSIC SALADS

**SIMPLE**
mixed greens
roasted red peppers
asiago

**DELUXE**
grilled chicken
salami
green bell peppers
black olives
tomatoes
parmesan

**CAESAR**
romaine
tomatoes
parmesan
asiago
croutons

## PIZZA & SALAD TOPPINGS

| BASES | VEGGIES, HERBS & GOOD STUFF | MEATS |
|---|---|---|
| bbq sauce | artichoke | prosciutto |
| pesto | arugula | bacon |
| red sauce | basil | grilled chicken |
| white sauce | black olives | ground beef |
| garlic rub | cilantro | mild italian sausage |
| CHEESES | gorgonzola | spicy italian sausage |
| asiago | fresh chopped basil | canadian bacon |
| dairy-free cheese | green olives | pepperoni |
| feta | ground beef | salami |
| mozzarella | jalapeño | FINISHES |
| gorgonzola | green bell pepper | balsamic fig glaze |
| parmesan | mama lil's sweet | bbq swirl |
| ricotta | hot peppers | hot buffalo sauce |
| DRESSINGS | mushrooms | pesto drizzle |
| balsamic | red onion | red sauce dollops |
| blue cheese | roasted broccoli | sriracha |
| caesar | roasted corn | sriracha |
| garden ranch | roasted garlic | |
| greek | roasted red pepper | |
| salad | spinach | |
| chipotle | sun-dried tomato | |
| greek | sweet corn | |
| red wine vinegar | | |

## ANY TOPPINGS. SAME PRICE

MOD SUPER FAST PIZZA FRANCHISING, LLC
FORM OF LEASE ADDENDUM

LEASE ADDENDUM

This Addendum to Lease ("**Addendum**"), dated _____, 2017, is entered into by and between NWWP LP ("**Lessor**"), and RTHT INVESTMENTS, LLC ("**Lessee**"). In the event of any contradiction or inconsistency between the terms and provisions of this Addendum and the terms and provisions of the Lease to which it is attached, the terms and provisions of this Addendum shall control and be interpreted in such a manner as to override any provision of the Lease which would prevent the spirit and letter of the terms and provisions of this Addendum from being given full force and effect. All defined terms not specifically defined in this Addendum shall be given the same meaning as the defined terms in the Lease.

A.      The parties hereto have entered into a certain Lease Agreement ("**Lease**"), dated _____, 2017, and pertaining to the premises located at 302 Colonades Way, Suite 206, Cary, North Carolina ("**Premises**").

B.      Lessor acknowledges that Lessee intends to operate a MOD Pizza franchise from the leased Premises pursuant to a Franchise Agreement ("**Franchise Agreement**") with MOD Super Fast Pizza Franchising, LLC ("**Franchisor**") under the name "MOD Pizza®" or other name designated by Franchisor (herein referred to as "**Franchised Business**").

C.      The parties now desire to amend the Lease in accordance with the terms and conditions contained herein.

**NOW, THEREFORE**, it is hereby mutually covenanted and agreed between Lessor and Lessee as follows:

1.      <u>Remodeling and Decor</u>.  Lessor agrees that subject to the provisions of Article 19 of the Lease, Lessee shall have the right to make interior, nonstructural changes to the Premises, equip, paint and decorate the interior of the Premises and to display the proprietary marks and signs on the interior of the Premises as Lessee is reasonably required to do pursuant to the Franchise Agreement and any successor Franchise Agreement under which Lessee may operate a Franchised Business on the Premises. All signage on the exterior of the Premises shall remain subject to the provisions of Article 18 of the Lease.

2.      <u>Assignment or Subletting</u>.  Subject to the provisions of Article 23 of the Lease, Lessee shall agree to attorn to any assignee of Lessor. Subject to the provisions of Article 23 of the Lease, and upon prior written notice to Lessor, Lessee shall have the right to assign or sublet all of its right, title and interest in the Lease, at any time during the term of the Lease, including any extensions or renewals thereof, without charge and without first obtaining Lessor's consent to Franchisor. However, no assignment or sublease shall be effective until such time as Franchisor gives Lessor written notice of its acceptance of <u>the</u> assignment, and nothing contained herein or in any other document shall constitute Franchisor a party to the Lease, or guarantor thereof, and shall not create any liability or obligation of Franchisor unless and until the Lease is assigned or sublet to, and accepted in writing by, Franchisor. In addition, any transfer without Landlord's consent shall be conditioned upon Tenant's Franchisor having a tangible net worth that is at least equal to the combined tangible net worth of Tenant and Guarantor on (i) the date of the Lease; or (ii) the effective date of such assignment, whichever is greater. In the

event of any assignment or sublease, Lessee and any Guarantor shall at all times remain liable under the terms of the Lease and/or Guaranty of Lease. Subject to the provisions of Article 23 of the Lease, Franchisor shall have the right to reassign or sublease the Lease to another franchisee.

3. Default and Notice.

(a)    In the event there is a default or violation by Lessee under the terms of the Lease, Lessor shall give Lessee and Franchisor written notice of the default or violation within a reasonable time after Lessor receives knowledge of its occurrence. If Lessor gives Lessee a default notice, Lessor shall contemporaneously give Franchisor a copy of the notice. Franchisor shall have the right, but not the obligation, to cure the default.

(b)  All notices to Franchisor shall be sent by registered or certified mail, postage prepaid, or by a recognized overnight courier or delivery services to the following address:

MOD Super Fast Pizza Franchising, LLC
2035 158th Court NE, Suite 150 Bellevue, Washington 98008
Attention:  Vice President of Legal
Phone:  (425) 467-1144

Franchisor may change its address for receiving notices by giving Lessor written notice of the new address. Lessor agrees that it will notify both Lessee and Franchisor of any change in Lessor's mailing address to which notices should be sent.

4.    Termination or Expiration.

(a)  Within the later of (i) the cure period provided in the Lease and (ii) ten (10) business days following receipt of notice of an event of default, under either the Lease or the Franchise Agreement, Franchisor will, at its option, have the right, but not the obligation, to cure the Lessee's non-monetary default and take an assignment of Lessee's interest under the Lease, provided Franchisor agrees to assume Lessee's obligations and the Lease. Notwithstanding the foregoing, any assignment of the Lease shall be predicated upon the cure of any default under the Lease. Lessee and Guarantor on the Lease shall continue to remain fully liable for all monetary obligations under the Lease.

(b)  Subject to the provision of Section 10 below, prior to the expiration or termination of either the Lease or the Franchise Agreement, Lessor will allow Franchisor to enter the Premises, to remove all signs and all other items identifying the Premises as a Franchised Business and to make other purely decorative modifications (such as repainting) as are reasonably necessary to protect the "MOD Pizza®" marks and system, and to distinguish the Premises from a Franchised Business. In the event Franchisor exercises its option to purchase assets of Lessee, Lessor shall permit Franchisor to remove all the assets being purchased by Franchisor.

5.    Consideration; No Liability.

300609184 v8

(a) Lessor hereby acknowledges that the provisions of this Addendum to Lease are required pursuant to the Franchise Agreement under which Lessee plans to operate its Franchised Business and Lessee would not lease the Premises without this Addendum.

(b) Lessor further acknowledges that Lessee is not an agent or employee of Franchisor and Lessee has no authority or power to act for, or to create any liability on behalf of, or to in any way bind Franchisor or any affiliate of Franchisor, and that Lessor has entered into this Addendum to Lease with full understanding that it creates no duties, obligations or liabilities or of against Franchisor or any affiliate of Franchisor.

6.    <u>Sales Reports and Inspection</u>.  If requested in writing by Franchisor, Lessor will provide Franchisor with whatever information Lessor has regarding Lessee's sales from its Franchised Business.  Lessor acknowledges that the Franchise Agreement grants Franchisor the right of inspection of Lessee's Premises, and Lessor agrees, at no cost or expense to Lessor, to reasonably cooperate with Franchisor's efforts to enforce Franchisor's inspection rights.

7.    <u>Lessor Warranties</u>. Lessor represents (i) that Lessor has lawful title to the Shopping Center and has full right, power and authority to enter into this Lease; and (ii) that to the best of Lessor's knowledge, the Common Areas of the Shopping Center are in compliance with applicable laws, including, without limitation, with the Americans with Disabilities Act ("**ADA**").

8.    <u>Lessee Financing</u>.  Notwithstanding anything to the contrary contained in this Lease, Lessee shall have the right to obtain financing secured by its inventory, personal property, movable fixtures and equipment.  Further, for so long as there exists any third party financing, Lessor hereby waives any contractual or statutory lien available to Lessor with respect to Tenant's inventory, personal property, movable fixtures and equipment.  Under no circumstances, however, shall Lessee's lender or Franchisor have any security interest in any permanent leasehold improvements or to the leasehold estate itself or to any fixtures or improvements paid for in whole or in part with any Allowance provide by Landlord; and further, under no circumstances shall the lender have any greater rights than does the Lessee under the Lease, unless otherwise specifically provided in the document, which document shall be subject to Lessor's reasonable approval.

9.    <u>Continued Business Operation</u>. Upon prior written notice and Lessor's written consent, Lessee may close its business once every five (5) years for a reasonable time to refurbish and redecorate the Premises.

10.   <u>Removal Of Trade Dress/Personal Property</u>.   During the term of the Lease, the Lessor and Lessee acknowledge and agree that Franchisor will have access to the Premises to inspect all of the signage, artwork and trade dress items provided to Tenant in accordance with the Franchise Agreement and located on or in the Premises (the "Art") and to remove the Art located in or upon the Premises at any time, subject only to the terms of the Franchise Agreement provided, however, at no time shall Franchisor be permitted to interfere with or disrupt the permitted use of other occupants of the Shopping Center. Excepting negligent or willful acts by Lessor, Lessor's managing agent, and the officers, directors, partners, agents and employees of each such entity, Franchisor shall be responsible for the repair of any damage to the Premises or the Shopping Center, to the extent resulting from Franchisor's removal of all or any portion of the Art or any other trade dress items from the Premises, provided, however, that in no event shall Franchisor

be permitted to remove any improvements to the Premises paid for in whole or in part by Lessor or with any Allowance provided by Lessor without Lessor's prior written approval and consent. Lessee hereby releases, acquits and discharges Lessor, Lessor's managing agent, their directors, officers, shareholders, partners, agents, representatives and employees, their successors and assigns, from any and all claims, demands, accounts, actions and causes of action, known or unknown, vested or contingent, which any of them may have, ever had, now has, or may hereafter have by reason of any event, transaction or circumstance arising out of or relating to the exercise by Franchisor pursuant to the provisions of this Section 10 of this Lease Addendum.

11.     _Amendments_.  No amendment or variation of the terms of the Lease or this Addendum to the Lease shall be valid unless made in writing and signed by the parties hereto.

12.     _Reaffirmation of Lease_.  Except as amended or modified herein, all of the terms, conditions and covenants of the Lease shall remain in full force and effect and are incorporated herein by reference and made a part of this Agreement as though copies herein in full.

(THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK.)

300609184 v8

13.    <u>Beneficiary</u>.  Lessor and Lessee expressly agree that Franchisor is a third party beneficiary of this Addendum.

**IN TESTIMONY WHEREOF,** witness the signatures of the parties hereto as of the day, month and year first written above.

**LESSOR:**                              **LESSEE:**

_____          _____

By: _____         By: _____

Title: _____        Title: _____

MOD SUPER FAST PIZZA FRANCHISING, LLC
FORM OF LEASE ADDENDUM

### LEASE ADDENDUM

This Addendum to Lease ("**Addendum**"), dated _July 28_, 2017, is entered into by and between NWWP LP ("**Lessor**"), and RTHT INVESTMENTS, LLC ("**Lessee**"). In the event of any contradiction or inconsistency between the terms and provisions of this Addendum and the terms and provisions of the Lease to which it is attached, the terms and provisions of this Addendum shall control and be interpreted in such a manner as to override any provision of the Lease which would prevent the spirit and letter of the terms and provisions of this Addendum from being given full force and effect. All defined terms not specifically defined in this Addendum shall be given the same meaning as the defined terms in the Lease.

A.     The parties hereto have entered into a certain Lease Agreement ("**Lease**"), dated _July 28_, 2017, and pertaining to the premises located at 302 Colonades Way, Suite 206, Cary, North Carolina ("**Premises**").

B.     Lessor acknowledges that Lessee intends to operate a MOD Pizza franchise from the leased Premises pursuant to a Franchise Agreement ("**Franchise Agreement**") with MOD Super Fast Pizza Franchising, LLC ("**Franchisor**") under the name "MOD Pizza®" or other name designated by Franchisor (herein referred to as "**Franchised Business**").

C.     The parties now desire to amend the Lease in accordance with the terms and conditions contained herein.

**NOW, THEREFORE**, it is hereby mutually covenanted and agreed between Lessor and Lessee as follows:

1.     <u>Remodeling and Decor</u>. Lessor agrees that subject to the provisions of Article 19 of the Lease, Lessee shall have the right to make interior, nonstructural changes to the Premises, equip, paint and decorate the interior of the Premises and to display the proprietary marks and signs on the interior of the Premises as Lessee is reasonably required to do pursuant to the Franchise Agreement and any successor Franchise Agreement under which Lessee may operate a Franchised Business on the Premises. All signage on the exterior of the Premises shall remain subject to the provisions of Article 18 of the Lease.

2.     <u>Assignment or Subletting</u>. Subject to the provisions of Article 23 of the Lease, Lessee shall agree to attorn to any assignee of Lessor. Subject to the provisions of Article 23 of the Lease, and upon prior written notice to Lessor, Lessee shall have the right to assign or sublet all of its right, title and interest in the Lease, at any time during the term of the Lease, including any extensions or renewals thereof, without charge and without first obtaining Lessor's consent to Franchisor. However, no assignment or sublease shall be effective until such time as Franchisor gives Lessor written notice of its acceptance of the assignment, and nothing contained herein or in any other document shall constitute Franchisor a party to the Lease, or guarantor

thereof, and shall not create any liability or obligation of Franchisor unless and until the Lease is assigned or sublet to, and accepted in writing by, Franchisor. In addition, any transfer without Landlord's consent shall be conditioned upon Tenant's Franchisor having a tangible net worth that is at least equal to the combined tangible net worth of Tenant and Guarantor on (i) the date of the Lease; or (ii) the effective date of such assignment, whichever is greater. In the event of any assignment or sublease, Lessee and any Guarantor shall at all times remain liable under the terms of the Lease and/or Guaranty of Lease. Subject to the provisions of Article 23 of the Lease, Franchisor shall have the right to reassign or sublease the Lease to another franchisee.

3.     <u>Default and Notice</u>.

(a)     In the event there is a default or violation by Lessee under the terms of the Lease, Lessor shall give Lessee and Franchisor written notice of the default or violation within a reasonable time after Lessor receives knowledge of its occurrence. If Lessor gives Lessee a default notice, Lessor shall contemporaneously give Franchisor a copy of the notice. Franchisor shall have the right, but not the obligation, to cure the default.

(b)     All notices to Franchisor shall be sent by registered or certified mail, postage prepaid, or by a recognized overnight courier or delivery services to the following address:

        MOD Super Fast Pizza Franchising, LLC
        2035 158th Court NE, Suite 150 Bellevue, Washington 98008
        Attention: Vice President of Legal
        Phone: (425) 467-1144

Franchisor may change its address for receiving notices by giving Lessor written notice of the new address. Lessor agrees that it will notify both Lessee and Franchisor of any change in Lessor's mailing address to which notices should be sent.

4.     <u>Termination or Expiration</u>.

(a)     Within the later of (i) the cure period provided in the Lease and (ii) ten (10) business days following receipt of notice of an event of default, under either the Lease or the Franchise Agreement, Franchisor will, at its option, have the right, but not the obligation, to cure the Lessee's non-monetary default and take an assignment of Lessee's interest under the Lease, provided Franchisor agrees to assume Lessee's obligations and the Lease. Notwithstanding the foregoing, any assignment of the Lease shall be predicated upon the cure of any default under the Lease. Lessee and Guarantor on the Lease shall continue to remain fully liable for all monetary obligations under the Lease.

(b)     Subject to the provision of Section 10 below, prior to the expiration or termination of either the Lease or the Franchise Agreement, Lessor will allow Franchisor to enter the Premises, to remove all signs and all other items identifying the Premises as a Franchised

Business and to make other purely decorative modifications (such as repainting) as are reasonably necessary to protect the "MOD Pizza®" marks and system, and to distinguish the Premises from a Franchised Business. In the event Franchisor exercises its option to purchase assets of Lessee, Lessor shall permit Franchisor to remove all the assets being purchased by Franchisor.

5.     Consideration; No Liability.

(a)     Lessor hereby acknowledges that the provisions of this Addendum to Lease are required pursuant to the Franchise Agreement under which Lessee plans to operate its Franchised Business and Lessee would not lease the Premises without this Addendum.

(b)     Lessor further acknowledges that Lessee is not an agent or employee of Franchisor and Lessee has no authority or power to act for, or to create any liability on behalf of, or to in any way bind Franchisor or any affiliate of Franchisor, and that Lessor has entered into this Addendum to Lease with full understanding that it creates no duties, obligations or liabilities of or against Franchisor or any affiliate of Franchisor.

6.     Sales Reports and Inspection.  If requested in writing by Franchisor, Lessor will provide Franchisor with whatever information Lessor has regarding Lessee's sales from its Franchised Business.  Lessor acknowledges that the Franchise Agreement grants Franchisor the right of inspection of Lessee's Premises, and Lessor agrees, at no cost or expense to Lessor, to reasonably cooperate with Franchisor's efforts to enforce Franchisor's inspection rights.

7.     Lessor Warranties. Lessor represents (i) that Lessor has lawful title to the Shopping Center and has full right, power and authority to enter into this Lease; and (ii) that to the best of Lessor's knowledge, the Common Areas of the Shopping Center are in compliance with applicable laws, including, without limitation, with the Americans with Disabilities Act ("ADA").

8.     Lessee Financing.  Notwithstanding anything to the contrary contained in this Lease, Lessee shall have the right to obtain financing secured by its inventory, personal property, movable fixtures and equipment.  Further, for so long as there exists any third party financing, Lessor hereby waives any contractual or statutory lien available to Lessor with respect to Tenant's inventory, personal property, movable fixtures and equipment.   Under no circumstances, however, shall Lessee's lender or Franchisor have any security interest in any permanent leasehold improvements or to the leasehold estate itself or to any fixtures or improvements paid for in whole or in part with any Allowance provide by Landlord; and further, under no circumstances shall the lender have any greater rights than does the Lessee under the Lease, unless otherwise specifically provided in the document, which document shall be subject to Lessor's reasonable approval.

9.     Continued Business Operation. Upon prior written notice and Lessor's written consent, Lessee may close its business once every five (5) years for a reasonable time to refurbish and redecorate the Premises.

10.   <u>Removal Of Trade Dress/Personal Property</u>.   During the term of the Lease, the Lessor and Lessee acknowledge and agree that Franchisor will have access to the Premises to inspect all of the signage, artwork and trade dress items provided to Tenant in accordance with the Franchise Agreement and located on or in the Premises (the "Art") and to remove the Art located in or upon the Premises at any time, subject only to the terms of the Franchise Agreement provided, however, at no time shall Franchisor be permitted to interfere with or disrupt the permitted use of other occupants of the Shopping Center. Excepting negligent or willful acts by Lessor, Lessor's managing agent, and the officers, directors, partners, agents and employees of each such entity, Franchisor shall be responsible for the repair of any damage to the Premises or the Shopping Center, to the extent resulting from Franchisor's removal of all or any portion of the Art or any other trade dress items from the Premises, provided, however, that in no event shall Franchisor be permitted to remove any improvements to the Premises paid for in whole or in part by Lessor or with any Allowance provided by Lessor without Lessor's prior written approval and consent. Lessee hereby releases, acquits and discharges Lessor, Lessor's managing agent, their directors, officers, shareholders, partners, agents, representatives and employees, their successors and assigns, from any and all claims, demands, accounts, actions and causes of action, known or unknown, vested or contingent, which any of them may have, ever had, now has, or may hereafter have by reason of any event, transaction or circumstance arising out of or relating to the exercise by Franchisor pursuant to the provisions of this Section 10 of this Lease Addendum.

11.   <u>Amendments</u>.   No amendment or variation of the terms of the Lease or this Addendum to the Lease shall be valid unless made in writing and signed by the parties hereto.

12.   <u>Reaffirmation of Lease</u>.   Except as amended or modified herein, all of the terms, conditions and covenants of the Lease shall remain in full force and effect and are incorporated herein by reference and made a part of this Agreement as though copies herein in full.

(THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK.)

13.     <u>Beneficiary</u>.  Lessor and Lessee expressly agree that Franchisor is a third party beneficiary of this Addendum.

**IN TESTIMONY WHEREOF,** witness the signatures of the parties hereto as of the day, month and year first written above.

**LESSOR:**

_____

By: _____

Title: _____

**LESSEE:**

Yaron Goldman
_____

By: _____

Title: CEO/Manager _____

300609184 v8

13.    Beneficiary.  Lessor and Lessee expressly agree that Franchisor is a third party beneficiary of this Addendum.

IN TESTIMONY WHEREOF, witness the signatures of the parties hereto as of the day, month and year first written above.

LESSOR:

By: _Bron Cattenday_

Title: _Managing Director_

LESSEE: Yaron Godman

By: _____

Title: _CEO/Manager_

300009184 v8

## FIRST AMENDMENT TO SHOPPING CENTER LEASE

THIS FIRST AMENDMENT TO SHOPPING CENTER LEASE ("First Amendment"), dated as of this 2 5 day of *April*, 2018 ("**Effective Date**"), is made and entered into by and between NWWP LP, a Delaware limited partnership ("**Landlord**"), and RTHT INVESTMENTS, LLC, a Delaware limited liability company ("**Tenant**").

### WITNESSETH:

**WHEREAS**, Landlord and Tenant entered into that certain Shopping Center Lease dated August 14, 2017 ("**Lease**"), pursuant to which Tenant leases from Landlord approximately 2,800 square feet of floor area and identified as Suite 206-C ("**Premises**") located in that certain shopping center commonly known as Waverly Place in Cary, North Carolina ("**Shopping Center**"); and

**WHEREAS**, the Lease inadvertently failed to include the correct street address of building in which the Premises is located;

**WHEREAS**, the Lease inadvertently failed to correctly describe the Shopping Center and its state of being;

**WHEREAS**, Landlord and Tenant desire to rectify the error;

**NOW THEREFORE**, for and in consideration of the sum of one dollar ($1.00) and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. References to "302 Colonades Way" on the cover page of the Lease and the Lease Addendum, Section A, are hereby deleted and replaced by "316 Colonades Way".

2. **Premises.** Section 2 (a) of the Lease is hereby deleted and is replaced by the following:

"(a) For and in consideration of the rents, covenants and agreements hereinafter reserved and contained on the part of Tenant to be observed and performed, Landlord leases to Tenant, and Tenant leases and agrees to accept from Landlord certain premises constituting a portion of the mixed use center known as Waverly Place Shopping Center, or such other name as Landlord may designate from time to time, located in the City of Cary, State of North Carolina ("Shopping Center") as more particularly shown on Exhibit A attached hereto and made a part hereof which premises leased to Tenant ("Premises") are described as follows:

A store without basement having a GLA of Premises, indicated on the Fundamental Lease Provisions, measured from the center lines of common walls and from the exterior of any walls not shared by Tenant in common with others), the approximate boundaries and location of which store are shown on Exhibit B attached hereto and made a part hereof.

The Premises are demised and leased subject to all applicable zoning ordinances, laws, ordinances, orders, regulations, rules or requirements of any federal, state, city, county or other governmental, public or quasi-public authority, or any department or bureau thereof, now existing or hereafter created (collectively, "Laws"), and the state of title of the Shopping Center, and any statement of facts which an accurate survey may disclose, together with all easements, mortgages, deeds of trust, agreements, encumbrances, and all other liens, charges or other matters of any nature, recorded, now or hereafter affecting the Premises or the Shopping Center, including but not limited to the (i) Declaration of Covenants, Conditions and Restrictions for Waverly Place, dated December 18,1987 and recorded in the Registry of Deeds on December 23, 1987 ("Declaration") and (ii) the Notice of Dry-Cleaning

Solvent Remediation recorded in Book 16396, Page 2444 of the Wake County Registry regarding dry-cleaning solvent contamination on portions of the Shopping Center (the "NDSR"). To the extent applicable to Tenant, Tenant agrees to comply with the provisions of the Declaration, the NDSR, and any other currently existing recorded or unrecorded documents affecting the Shopping Center of which Landlord has provided a copy to Tenant. The Premises do not include the exterior walls, any space above the underside of the roof deck of the ceiling above the Premises, roof, slab or the land beneath the Premises, and no rights, licenses or easements are created hereunder, except as expressly demised hereunder, and no easement for light or air is leased with or included in the Premises. Exhibit A shall not be deemed to be a warranty, representation or agreement on the part of the Landlord that the Shopping Center is or will be as indicated on said diagram. As soon as the Commencement Date (as hereinafter defined) is known, Landlord and Tenant shall execute an agreement setting forth the Commencement Date and termination date of the initial term.

Soil and groundwater at the Shopping Center are contaminated with dry-cleaning solvents associated with dry-cleaning operations at the former Galaxy Cleaners (DSCA Site DC920029) located at 101-B New Waverly Place in the Waverly Place Shopping Center, such contamination has been remediated to levels deemed acceptable by the North Carolina Department of Environmental Quality, subject to the restrictions set forth in the NDSR."

    3.   **Full Force and Effect**. The Lease, as amended, is ratified and confirmed and will remain in full force and effect. In the event of any conflict between the Lease and this First Amendment, the terms and conditions of this First Amendment shall control. This First Amendment may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, will constitute one and the same agreement. For purposes of executing this First Amendment, a document signed and transmitted by email in PDF file will be treated as an original document.

    (THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK.)

4.   **Capitalized Terms**.  Any capitalized term used and not otherwise defined herein shall have the same meaning ascribed to it in the Lease.

**IN WITNESS WHEREOF**, the parties have executed this First Amendment as of the date and year first above written.

SIGNED, SEALED AND
DELIVERED IN THE
PRESENCE OF:

Witness: MARA ELSER

LANDLORD:

NWWP LP

By: _____
Name:   Michael O'Shaughnessy
Title:    Managing Director


SIGNED, SEALED AND
DELIVERED IN THE
PRESENCE OF:

Witness: Meagan McGuire

TENANT:

RTHT INVESTMENTS, LLC

By: _____
Name: Yaron Goldman
Title: manager


**ACKNOWLEDGED, RATIFIED AND AFFIRMED:**

Guarantor has joined in the execution of this First Amendment to Lease Agreement for the purpose of providing consent to the terms and provisions of this Agreement and acknowledging that the Lease Guaranty Agreement dated July 20, 2017, executed by Guarantor, remains in full force and effect to secure the payment and performance of all liabilities, obligations and duties of Tenant under the Lease, as amended by this First Amendment to Lease Agreement.

SIGNED, SEALED AND
DELIVERED IN THE
PRESENCE OF:

Witness

GUARANTOR:

SD MISSOURI, LLC

By: _____
Name: Yaron Goldman
Title: manager

3

# GUARANTY OF LEASE

THIS GUARANTY OF LEASE (this "Guaranty") is made as of the 28th day of July, 2017, by **SD-MISSOURI, LLC**, a Delaware limited liability company ("Guarantor"), to and for the benefit of NWWP LP ("Landlord").

## RECITALS

Landlord, as landlord, and RTHT INVESTMENTS, LLC, a Delaware limited liability company ("Tenant"), as tenant, have entered into, or are about to enter into, a certain Shopping Center Lease dated as of July 28, _____, 2017, pursuant to which Tenant leases or will lease from Landlord certain premises in the shopping center to be known as Waverly Place Shopping Center and located in the City of Cary, North Carolina, all as more particularly described in said Lease. Said Lease, as heretofore or hereafter supplemented, amended, restated, renewed, extended, replaced or modified, is hereinafter referred to as the "Lease". All capitalized terms that are not expressly defined in this Guaranty shall have the same meanings herein as are ascribed to such terms in the Lease.

A.      Landlord has required, as a condition to its execution and performance of the Lease, that Guarantor execute and deliver this Guaranty of all obligations of Tenant arising and all sums due by Tenant under the Lease. The execution and delivery of this Guaranty by Guarantor is a material inducement to Landlord for the execution and performance of the Lease.

B.      Guarantor has a financial interest in Tenant and will be benefited by the Lease. Accordingly, Guarantor has agreed to execute, deliver and perform this Guaranty.

NOW, THEREFORE, in consideration of the Recitals set forth above and in consideration of Landlord executing and performing its obligations under the Lease and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

1.      **Recitals**. The Recitals set forth above are incorporated herein and shall be deemed terms and provisions hereof.

2.      **Guaranty**. For the term of the Lease, Guarantor absolutely, unconditionally and irrevocably guarantees to Landlord:

(a)      The full and prompt payment when due, whether upon acceleration or otherwise, and at all times thereafter, of any and all rentals, debts and obligations of Tenant for the payment of money, however created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, due or to become due, known or unknown to Guarantor at the time of the execution of this Guaranty, including, without limitation, all Rent, late fees, payments in respect of real estate taxes, assessments, governmental charges, premiums for insurance policies, amounts required to discharge mechanics' and materialmen's liens and claims therefor, and any other sums which may now be or hereafter become due by Tenant under the Lease;

(b)      The payment of all Enforcement Costs (as hereinafter defined); and

(c)      The full, complete and punctual observance, performance and satisfaction of all covenants, terms, conditions, obligations, duties and agreements of Tenant under the Lease.

All amounts due and debts, liabilities and payment obligations described in subparagraphs (a) and (b) of this Paragraph 2 are referred to herein as the "Liabilities." All obligations described in subparagraph (c) of this Paragraph 2 are referred to herein as the "Obligations." Guarantor shall be required, during the term of this Guaranty, to maintain a net worth value of no less than its net worth as presented to Landlord as of the date of execution of this Lease (the "Guarantor Net Worth"). Guarantor agrees that it shall not (i) sell or convey a controlling interest in Guarantor's stock or membership interest or (ii) sell assets out of the ordinary course of Guarantor's business without notifying Landlord of the same.

3.      Landlord's Remedies.

(a)      This Guaranty is an absolute, irrevocable, present and continuing guaranty of payment and performance and not merely a guaranty of collection. In the event of any default by Tenant under the Lease or under any other obligation to Landlord, after the expiration of any cure period applicable thereto, Guarantor agrees, on demand by Landlord, to pay all Liabilities then due hereunder. In the event that there shall be any default by Tenant, Guarantor or any other party under the Lease in the due and timely performance and observance of the Obligations or any of them after the expiration of any cure period applicable thereto, then, in such event, Guarantor agrees, on demand by Landlord: (i) to perform the Obligations; and (ii) to indemnify and hold Landlord and the other Indemnified Parties (hereinafter defined) harmless from and against any and all loss, damage, cost, expense, injury or liability Landlord or the Indemnified Parties may suffer or incur in connection with the exercise of the rights under the Lease, this Guaranty or otherwise in respect of the Premises. If Guarantor fails to commence and pursue diligently the performance of the Obligations after the expiration of any cure period applicable thereto as provided in the immediately preceding sentence and if such failure continues for five (5) days after receipt by Guarantor of written notice from Landlord demanding the performance of Guarantor, then, either before or after pursuing any other remedy of Landlord against Guarantor or Tenant and regardless of whether Landlord shall ever pursue any such other remedy, Landlord shall have the right (but not the obligation) to perform the Obligations or to call upon any other reputable parties to perform the Obligations, and shall have the right to expend such sums as Landlord in its reasonable discretion deems proper in order so to complete the performance of the Obligations. During the course of the performance of any Obligations undertaken by Landlord or by any other party on behalf of Landlord, Guarantor shall pay on demand any amounts due to third parties in connection therewith. All amounts required to be paid by the terms hereof shall be included within the term "Liabilities," and all obligations required to be performed by the terms hereof shall be included within the term "Obligations."

(b)      Notwithstanding anything to the contrary herein contained, in any action to enforce any of the liabilities or obligations of the Guarantor under this Guaranty, Landlord, at its election, may proceed against the Guarantor with or without: (i) joining Tenant in any such action; (ii) commencing any action against or obtaining any judgment against Tenant; or (iii) commencing any proceeding to enforce or realize upon any collateral or other security (including, without limitation, any security deposit or other guaranties) which may be given to secure Tenant's obligations under the Lease, or to obtain any judgment, decree or foreclosure sale with respect thereto. Nevertheless, the maintenance of any action or proceeding by Landlord to recover any sum or sums that may be or become due under the Lease or to secure the performance of any of the other terms, covenants and conditions of the Lease shall not preclude Landlord from demanding and receiving the payment of such sums and the performance of such other terms, covenants and conditions from Guarantor, or from thereafter instituting and maintaining subsequent actions or proceedings for any subsequent default or defaults of Tenant under the Lease. Guarantor does hereby consent that, without affecting the liability of Guarantor under this Guaranty and without notice to Guarantor, time may be given by Landlord to Tenant for payment of rent and such other sums and performance of said other terms, covenants and conditions, or any of them, and such time extended and indulgence granted from time to time, or Tenant may be dispossessed or Landlord may avail itself of or exercise any or all of the rights and remedies against Tenant provided by law or by the Lease, and may proceed either against Tenant alone or jointly against Tenant and Guarantor or against Guarantor alone without first proceeding or exhausting any remedy or claim against Tenant.

4.    <u>Return of Payments</u>. Guarantor agrees that, if at any time all or any part of any payment theretofore applied by Landlord to any Liabilities is rescinded or returned by Landlord for any reason whatsoever (including, without limitation, the insolvency, bankruptcy, liquidation or reorganization of any party), such Liabilities shall, for the purposes of this Guaranty, be deemed to have continued in existence to the extent of such payment, notwithstanding such application by Landlord, and this Guaranty shall continue to be effective or be reinstated, as the case may be, as to such Indebtedness, all as though such application by Landlord had not been made. Guarantor does hereby further agree that with respect to any payments made by Guarantor hereunder, Guarantor shall not have any rights based on suretyship, subrogation or otherwise to stand in the place of Landlord so as to compete with Landlord as a creditor of Tenant, and Guarantor hereby waives all such rights to the fullest extent permitted by law.

5.    <u>No Discharge</u>. Guarantor agrees that the obligations, covenants and agreements of Guarantor under this Guaranty shall not be affected or impaired by any act of Landlord, or any event or condition except the full, final and unavoidable performance of all Obligations and payment of all Liabilities and any other sums due hereunder. Guarantor agrees that the liability of Guarantor hereunder shall not be discharged by, and Guarantor hereby irrevocably consents to: (i) any subsequent change, modification or amendment of the Lease in any of its terms, covenants and conditions, or in the Rent or any other sums payable thereunder, or in the term thereof (the "Term"), or in the Premises demised thereby (whether said Premises be expanded, contracted, relocated, substituted or otherwise altered), and to any assignments of the Lease and to any sublettings of the Premises, and to any extensions or renewals of the Lease or its Term; (ii) the renewal or extension of time for the payment of the Liabilities or performance of the Obligations under the Lease or any other agreement relating to the Premises; (iii) any failure, omission, delay or inadequacy, whether entire or partial, of Landlord to exercise any right, power or remedy regarding the Lease or to enforce or realize upon (or to make any guarantor a party to the enforcement or realization upon) any of Landlord's security for the Lease, including, but not limited to, any impairment or release of such security by Landlord; (iv) the existence of any set off, claim or counterclaim or the reduction or diminution of the Liabilities, or any defense of any kind or nature, which Guarantor may have against Tenant or which any party other than Tenant has against Landlord; (v) the application of payments received from any source to the payment of any obligation other than the Liabilities, even though Landlord might lawfully have elected to apply such payments to any part or all of the Liabilities; (vi) the addition or release of any and all other guarantors, obligor and other persons liable for the payment of the Liabilities and/or performance of the Obligations, and the acceptance or release of any and all other security for the payment of the Indebtedness and/or performance of the Obligations; or (vii) any distress or reentry by Landlord or dispossession of Tenant or any action or remedy taken by Landlord under the Lease, or any failure to notify' Guarantor of any default by Tenant; all whether or not Guarantor shall have had notice or knowledge of any act or omission referred to in the foregoing clauses (i) through (vii) inclusive of this Paragraph.

In the event that the Lease is modified, renewed or extended in any respect by agreement between Landlord and Tenant either pursuant to an option granted in the Lease or otherwise, or in the event that Tenant holds over beyond the Term of the Lease, then the obligations hereunder of Guarantor shall extend to the full and faithful performance and observance of all of the covenants, terms and conditions of the Lease and of any such modification, renewal or extension thereof Guarantor intends that Guarantor shall remain liable hereunder as a principal until the full, final and unavoidable performance of all of the Obligations and the full, final and unavoidable payment of all Liabilities, notwithstanding any fact, act, event or occurrence which might otherwise operate as a legal or equitable discharge of a surety or guarantor.

Notwithstanding the generality of the foregoing, in the event that the Lease shall be assigned as permitted under the Lease, to a party or an entity not controlled by or under common control with the original named Tenant, then the Guarantor's liability shall be limited to the Liabilities and Obligations of Tenant accruing during the original Term of the Lease and any Option(s) to Renew, or such other extensions or options to the Term negotiated by the original named Tenant prior to the effective date of such assignment of the Lease.

6.      **Application of Amounts Received**. Any amounts received by Landlord from whatsoever source on account of any Liabilities may be applied by Landlord toward the payment of such Indebtedness, and in such order of application, as Landlord may from time to time elect.

7.      **Waiver.** With respect to the originally named Tenant, Guarantor expressly waives: (i) notice of the acceptance by Landlord of this Guaranty; (ii) notice of the existence, creation, payment or nonpayment of the Liabilities; (iii) presentment, demand, notice of dishonor, protest and all other notices whatsoever; and (iv) any failure by Landlord to inform Guarantor of any facts Landlord may now or hereafter know about Tenant, the Lease or the Premises, it being understood and agreed that Guarantor has and will maintain personal knowledge of and is familiar with Tenant's financial condition and business affairs and has the ability to influence Tenant's decision-making processes, and that Landlord has no duty so to inform, and that Guarantor is fully responsible for being and remaining informed by, Tenant of all circumstances bearing on the Lease and this Guaranty. No modification or waiver of any of the provisions of this Guaranty will be binding upon Landlord except as expressly set forth in a writing duly signed and delivered on behalf of Landlord.

8.      **Enforcement Costs.** If (i) the Lease or this Guaranty is placed in the hands of an attorney for enforcement or collection or is enforced or collected through any legal proceeding; (ii) an attorney is retained to represent Landlord in any proceeding (including, without limitation, any bankruptcy, reorganization, receivership or other proceeding affecting creditors' rights) involving a claim under or related to the Lease or this Guaranty, then Guarantor shall pay to Landlord upon demand all reasonable attorneys' fees, costs and expenses, including, without limitation, court costs and filing fees, and all other costs and expenses incurred in connection therewith (all of which are referred to herein as "Enforcement Costs"), in addition to all other amounts due hereunder, provided Landlord prevails in such legal proceeding.

9.      **Transfer of Lease**. Notwithstanding any assignment or transfer of the Lease or any interest therein by Landlord, for collateral purposes or otherwise, each and every immediate and successive assignee, transferee or other successor in interest with respect to Landlord's interest under the Lease shall, to the extent of the interests assigned or transferred, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were Landlord.

10.     **Governing Law Interpretation**. This Guaranty shall be governed by the laws of the State of North Carolina without reference to the conflicts of law principles of that state. The headings of Paragraphs in this Guaranty are for convenience only and shall not be construed in any way to limit or define the content, scope or intent of the provisions hereof As used in this Guaranty, the singular shall include the plural, and masculine, feminine and neuter pronouns shall be fully interchangeable where the context so requires. If this Guaranty is executed by more than one person or entity, then references to "Guarantor" herein shall be deemed to refer to each such person or entity and the liability of each such person or entity shall be joint and several, and the release by Landlord of any of them shall not release or affect in any manner the obligations of any other of them, and this Guaranty shall not be revoked, discharged or impaired as to any such persons or entities by reason of the death or incapacity or insolvency of any other of them. If any provision of this Guaranty, or any paragraph, sentence, clause, phrase or word, or the application thereof, in any circumstances, is adjudicated by a court of competent jurisdiction to be invalid, the validity of the remainder of this Guaranty shall be construed as if such invalid part were never included herein. Time is of the essence of this Guaranty. All payments to be made hereunder shall be made in currency and coin of the United States of America, which is legal tender for public and private debts at the time of payment.

11.     **Entire Agreement**. This Guaranty constitutes the entire agreement between Guarantor and Landlord with respect to the subject matter hereof and supersedes all prior such agreements and understandings, both written and oral. This Guaranty may not be modified or amended except by a written instrument signed by Landlord and Guarantor. If this Guaranty is executed in several counterparts, each of those counterparts shall be deemed an original, and all of them together shall constitute one and the same instrument.

**12.**    <u>Successors and Assigns.</u>

(a)      This Guaranty shall bind Guarantor and the heirs, assigns, successors, executors, administrators and legal and personal representatives of Guarantor; provided that Guarantor shall not be entitled to transfer or delegate its obligations hereunder. Regardless of whether this Guaranty is executed by more than one person or entity, it is agreed that the undersigned's liability hereunder is several and independent of any other guaranties or other obligations at any time in effect with respect to the Indebtedness, the Obligations or any part thereof and that each Guarantor's liability hereunder may be enforced regardless of the existence, validity, enforcement or non-enforcement of any such other guaranties or other obligations.

(b)      This Guaranty shall inure to the benefit of and be enforceable by Landlord and Landlord's officers, agents, employees, partners, directors and shareholders, each of their respective successors and assigns, and each present or subsequent mortgagee of the Premises and its successors and assigns (all such persons and entities shall be "Indemnified Parties" herein).

**13.**    <u>Certain Waivers by Guarantor</u>. Guarantor hereby waives the benefit of (a) any statutes of limitation or repose affecting Tenant's liability under the Lease or Guarantor's liability under this Guaranty, and (b) the right to trial by jury in any action or proceeding that hereafter may be instituted in respect of the Lease or this Guaranty.

**14.**    <u>Notices.</u> Any notice, demand or other communication which is given hereunder shall be in writing and shall be deemed given and served (a) upon receipt or refusal, if delivered personally, (b) one (1) business day after deposit with an overnight carrier service, or (c) upon deposit in the United States mail (certified or registered mail only), if mailed, and addressed to the intended recipient at its address set forth below or to such other address as such intended recipient may have designated by notice furnished in accordance herewith:

if to Landlord:

    <u>Landlord:</u>

    NWWP LP
    c/o Northwood Investors
    575 Fifth Avenue, 23rd Floor
    New York, New York 10017
    Attention: Brian Crittendon
    Email: bcrittendon@northwoodinvestors.com

    with a copy to:    c/o Northwood Investors
                    1819 Wazee Street, 2nd Floor
                    Denver, Colorado 80202
                    Attention: Michael O'Shaughnessy
                    Email: osh@northwoodinvestors.com
    and
                    Northwood Retail, LLC
                    302 Colonades Way, Suite 205
                    Cary, North Carolina 27518
                    Attention: Mary Langdon
                    Email: mlangdon@northwoodretail.com

Email: mlangdon@northwoodretail.com

if to Guarantor:

Guarantor:

SD-Missouri, LLC
131 East Lincoln Ave, Suite C
Fort Collins, CO 80524

Except as otherwise specifically required herein, notice of the exercise of any right, option or power granted to Landlord by this Guaranty is not required to be given.

SIGNED AND DELIVERED as of the date first specified above.

GUARANTOR:

SD MISSOURI, LLC

By: _____
Name: *Yaron Goldman*
Title: *CEO / Manager*

STATE OF *Colorado*  )
                     ) SS
COUNTY OF *Larimer*  )

On *July 20th*, 2017, before me, *Jerney Kellar* _____, personally appeared *Yaron Goldman* _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed                                          the                                          instrument.

WITNESS my hand and official seal.

```
+--------------------------------------+
|          JERNEY KELLAR               |
|   NOTARY PUBLIC - STATE OF COLORADO  |
|   Notary Identification #20154040488 |
|    My Commission Expires 10/15/2019  |
+--------------------------------------+
```

_____
Notary Public

My Commission Expires: *10/15/2019*

300609184 v5