**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | (Joint Administration) |
| SD-Charlotte, LLC, *et al.*,[1] | ) | |
| | ) | Case No. 20-30149 |
| Debtors. | ) | |
| | ) | |
| | ) | |

**NOTICE OF FILING OF**
**STALKING HORSE AGREEMENT SUPPLEMENT**

As per paragraphs 10, 19 and 20 of the *Debtors' Motion for Orders (I)(A) Approving Bidding Procedures and Auction and (B) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing the Sale of All of the Debtors' Assets Related to the Sonic Drive-In Restaurants Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Doc. No. 72] (the "Bidding Procedures Motion"),[2] and as a supplement to the Bidding Procedures Motion, the Debtors hereby give notice of the filing the proposed form of Stalking Horse Agreement attached as Exhibit A. The form of Stalking Horse Agreement attached hereto is in substantially final form, and the Debtors will file a proposed final version of the Stalking Horse Agreement, together with a redline reflecting any revisions to the version attached hereto, prior to the Bidding Procedures Hearing.

Dated: February 21, 2020

**MOORE & VAN ALLEN PLLC**

/s/ Zachary H. Smith
Zachary H. Smith (NC Bar 48993)
Hillary B. Crabtree (NC Bar 26500)
James Langdon (NC Bar 23241)
Gabriel Mathless (NC Bar 48857)
Joanne Wu (NC Bar 55044)
100 N. Tryon Street, Suite 4700

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: SD-Charlotte, LLC (7237); RTHT Investments, LLC (2540); SD Restaurant Group, LLC (0331); SD-Missouri, LLC (8294); and Southern Deli Holdings, LLC (9425).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed in the Bidding Procedures Motion.

Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 339-5968
Email:    zacharysmith@mvalaw.com
Email:    hillarycrabtree@mvalaw.com
Email:    jimlangdon@mvalaw.com
Email:    gabemathless@mvalaw.com
Email:    joannewu@mvalaw.com

*Counsel to the Debtors and Debtors-In-Possession*

# **EXHIBIT A**

**Stalking Horse Agreement**

---

**ASSET PURCHASE AGREEMENT**

**Dated as of February __, 2020**

**By and Among**

**SRI OPERATING COMPANY**

**as Purchaser,**

**and**

**SD-CHARLOTTE, LLC and SD-MISSOURI, LLC**

**as Sellers**

# TABLE OF CONTENTS

Article I. PURCHASE AND SALE OF THE PURCHASED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES ........................................................................................ 2

1.1    Purchase and Sale of the Purchased Assets ........................................... 2

1.2    Excluded Assets ...................................................................................... 3

1.3    Assumption of Liabilities ........................................................................ 4

1.4    Excluded Liabilities ................................................................................ 5

1.5    Post-Closing Liabilities ........................................................................... 7

1.6    Assumption/Rejection of Certain Contracts ........................................... 7

1.7    Further Conveyances and Assumptions ................................................... 9

1.8    Disclaimer ............................................................................................... 9

Article II. CONSIDERATION ............................................................................................ 9

2.1    Consideration .......................................................................................... 9

2.2    Withholding ........................................................................................... 10

2.3    Deposit ................................................................................................... 10

Article III. CLOSING AND TERMINATION .................................................................. 11

3.1    Closing ................................................................................................... 11

3.2    Closing Deliveries by Sellers ................................................................ 11

3.3    Closing Deliveries by Purchaser ........................................................... 12

3.4    Termination of Agreement ..................................................................... 12

3.5    Procedures Upon Termination ............................................................... 14

3.6    Effect of Termination ............................................................................ 15

Article IV. REPRESENTATIONS AND WARRANTIES OF THE SELLERS ................. 15

4.1    Organization and Qualification ............................................................. 15

4.2    Authorization of Agreement .................................................................. 15

4.3    Conflicts; Consents; Compliance with Law .......................................... 16

4.4    Brokers and Finders ............................................................................... 16

4.5    Title to Purchased Assets ...................................................................... 16

4.6    Real Property ......................................................................................... 16

4.7    Tangible Personal Property .................................................................... 17

4.8    Litigation ............................................................................................... 17

4.9    Permits ................................................................................................... 17

4.10   Inventory ............................................................................................... 17

4.11   Contracts ............................................................................................... 18

4.12   Tax Returns; Taxes ............................................................................... 18

4.13   Employees ............................................................................................. 18

4.14   Labor Matters ........................................................................................................ 18

4.15   WARN Act ............................................................................................................. 18

4.16   Absence of Certain Changes ................................................................................. 18

4.17   No Other Representations or Warranties .............................................................. 20

Article V. REPRESENTATIONS AND WARRANTIES OF PURCHASER .......................... 20

5.1   Organization and Qualification ............................................................................ 20

5.2   Authority ............................................................................................................... 20

5.3   No Inconsistent Obligations ................................................................................. 20

5.4   Conflicts; Consents .............................................................................................. 20

5.5   Brokers .................................................................................................................. 21

5.6   Adequate Assurances Regarding Assigned Contracts .......................................... 21

5.7   No Litigation ......................................................................................................... 21

5.8   Due Diligence ....................................................................................................... 21

Article VI. EMPLOYEES ....................................................................................................... 22

6.1   Employee Matters ................................................................................................. 22

Article VII. BANKRUPTCY COURT MATTERS .................................................................. 23

7.1   Approval of Bid Protections; Franchisor Rights .................................................. 23

7.2   Competing Bid and Other Matters ....................................................................... 23

7.3   Sale Order ............................................................................................................. 24

7.4   Contracts ............................................................................................................... 24

7.5   Bankruptcy Filings ............................................................................................... 25

7.6   Sale Free and Clear .............................................................................................. 25

Article VIII. COVENANTS AND AGREEMENTS ............................................................... 25

8.1   Conduct of Business of Sellers ............................................................................ 25

8.2   Access to Information ........................................................................................... 27

8.3   Assignability of Certain Contracts ....................................................................... 27

8.4   Rejected Contracts ................................................................................................ 28

8.5   Reasonable Efforts; Cooperation ......................................................................... 28

8.6   Further Assurances ............................................................................................... 29

8.7   Notification of Certain Matters ............................................................................ 29

8.8   Confidentiality ...................................................................................................... 29

8.9   Preservation of Records ....................................................................................... 30

8.10   Publicity ................................................................................................................ 30

8.11   Material Adverse Effect ........................................................................................ 30

8.12   Casualty Loss ........................................................................................................ 30

8.13   No Successor Liability .......................................................................................... 30

8.14    Update to Disclosure Schedules.................................................................30[1]

Article IX. CONDITIONS TO CLOSING ..............................................................31
   9.1    Conditions Precedent to the Obligations of Purchaser and Sellers ....................31
   9.2    Conditions Precedent to the Obligations of Seller .............................................32
   9.3    Conditions Precedent to the Obligations of Purchaser........................................32

Article X. ADDITIONAL DEFINITIONS ..............................................................33
   10.1   Definitions .........................................................................................................33

Article XI. TAXES ...................................................................................................42
   11.1   Certain Taxes ....................................................................................................42
   11.2   Allocation of Purchase Price.............................................................................43
   11.3   Cooperation on Tax Matters ..............................................................................44

Article XII. MISCELLANEOUS..............................................................................44
   12.1   Payment of Expenses ........................................................................................44
   12.2   Survival of Representations and Warranties; Survival of Confidentiality.......44
   12.3   Entire Agreement; Amendments and Waivers...................................................44
   12.4   Execution of Agreement; Counterparts; Electronic Signatures .........................45
   12.5   Governing Law ..................................................................................................45
   12.6   Jurisdiction, Waiver of Jury Trial .....................................................................45
   12.7   Notices ..............................................................................................................45
   12.8   Binding Effect; Assignment..............................................................................46
   12.9   Severability .......................................................................................................47
   12.10  Bulk Sales Laws................................................................................................47
   12.11  Access and Right to Use ...................................................................................47
   12.12  Certain Interpretive Matters..............................................................................47

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE

EXHIBIT B    FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT C    FORM OF ASSUMPTION AND ASSIGNMENT OF LEASES

EXHIBIT D    BIDDING PROCEDURES ORDER

EXHIBIT E    DIP BUDGET

EXHIBIT F    SALE MOTION

EXHIBIT G    SALE ORDER

## INDEX OF SCHEDULES

SCHEDULE 1.1          LIST OF FRANCHISE LOCATIONS

SCHEDULE 1.1(B)       ASSIGNED CONTRACTS

SCHEDULE 1.1(F)       ASSUMED LEASED REAL PROPERTY

SCHEDULE 1.1(H)       EXCLUDED TANGIBLE ASSETS RELATING TO THE
                      BUSINESS

SCHEDULE 1.1(J)       PERMITS

SCHEDULE 1.2(G)       EXCLUDED ASSETS – CONSENTS NOT OBTAINED

SCHEDULE 1.2(P)       EXCLUDED PROPERTIES AND ASSETS

SCHEDULE 1.3(B)       MAXIMUM DOLLAR AMOUNT OF 503(B)(9) CLAIMS

SCHEDULE 1.3(F)       ADDITIONAL ASSUMED LIABILITIES

SCHEDULE 1.4(X)       ADDITIONAL EXCLUDED LIABILITIES

SCHEDULE 1.6(A)       ASSIGNED EXECUTORY CONTRACTS

SCHEDULE 4.2(C)       NOTICES, FILINGS AND CONSENTS

SCHEDULE 4.3(A)       CONFLICTS WITH ORGANIZATIONAL DOCUMENTS

SCHEDULE 4.3(B)       CONSENTS

SCHEDULE 4.3(C)       COMPLIANCE EXCEPTIONSSCHEDULE 4.4BROKERS
                      AND FINDERS

SCHEDULE 4.6              LEASED REAL PROPERTY

SCHEDULE 4.7              PERSONAL PROPERTY LEASES

SCHEDULE 4.8              LITIGATION

SCHEDULE 4.9              PERMITS NOT IN COMPLIANCE

SCHEDULE 4.11             CONTRACTS

SCHEDULE 4.13(B)          EMPLOYEE ACTIONS

SCHEDULE 4.13(C)          EMPLOYMENT AND CONSULTING AGREEMENTS

SCHEDULE 4.16(B)          ABSENCE OF CHANGES

SCHEDULE 5.4(B)           PURCHASER CONSENTS

SCHEDULE 5.5              PURCHASER BROKERS

SCHEDULE 8.1(A)           CHANGES TO COMPENSATION/BENEFITS AND
                          BONUSES

SCHEDULE 8.1(B)           NEW EMPLOYEES

SCHEDULE 8.1(C)           REMOVAL OF ASSETS OR INVENTORY

SCHEDULE 8.1(K)           RELATED PARTY TRANSACTIONS

SCHEDULE 9.3(D)           REQUIRED CONSENTS

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), dated as of February __, 2020 (the "***Agreement Date***"), is entered into by and among SRI Operating Company, an Oklahoma corporation ("***Purchaser***") and one or more Designated Purchasers, and SD-Charlotte, LLC, a Delaware limited liability company ("***SD-Charlotte***"), and SD-Missouri, LLC, a Delaware limited liability company ("***SD-Missouri***" and, together with SD-Charlotte, collectively, the "***Sellers***" and each, individually, a "***Seller***"). Purchaser and the Sellers are collectively referred to herein as the "***Parties***" and each individually as a "***Party***". For the purposes of this Agreement, capitalized terms used herein shall have the meanings set forth herein or in Article X.

## RECITALS

WHEREAS, on February 7, 2020, each of the Sellers filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Western District of North Carolina (the "***Bankruptcy Court***") commencing chapter 11 cases (collectively, the "***Bankruptcy Cases***"). The Bankruptcy Cases are jointly administered under Case No. 20-30149.

WHEREAS, the Sellers will continue to manage their properties and operate their businesses as "***debtors-in-possession***" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code;

WHEREAS, the Sellers wish to sell the Business;

WHEREAS, Purchaser desires to purchase the Purchased Assets and assume the Assumed Liabilities from the Sellers, and the Sellers desire to sell, convey, assign and transfer to Purchaser the Purchased Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code;

WHEREAS, the Purchased Assets and Assumed Liabilities shall be purchased and assumed by Purchaser pursuant to the Sale Order approving such sale, free and clear of all Claims and Encumbrances (other than Permitted Encumbrances), pursuant to sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, which order will include the authorization for the assignment by Sellers and assumption by Purchaser of the Assigned Contracts and the liabilities thereunder in accordance with section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court (together, the "***Bankruptcy Rules***"); and

WHEREAS, the board of directors (or similar governing body) of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows:

# ARTICLE I.

## PURCHASE AND SALE OF THE PURCHASED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1     <u>Purchase and Sale of the Purchased Assets</u>.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth herein, at the Closing the Sellers shall sell, transfer, assign, convey and deliver to Purchaser or any Designated Purchaser, and Purchaser shall purchase, acquire and accept from Sellers all of Sellers' right, title and interest in, to and under the business relating to the ownership and operation of those Sonic restaurant franchise locations set forth on <u>Schedule 1.1</u> hereto (the "***Business***"), including the following, but excluding the Excluded Assets, (the "***Purchased Assets***") as of the Closing:

(a)     all of Sellers' properties, rights, claims, and assets (other than the Excluded Assets) of every kind and description, wherever situated or located, real, personal, or mixed, tangible or intangible, contingent, owned, leased, or licensed, used or held for use in, or otherwise relating to, useful in or necessary for the conduct of the Business, whether or not reflected on the books and records of Sellers, as the same shall exist on the Closing Date;

(b)     subject to <u>Section 1.6</u>, to the extent assignable pursuant to section 365 of the Bankruptcy Code, all rights under Contracts, agreements and purchase and sale orders that are not Rejected Contracts (as defined in <u>Section 1.6(a)(i)</u>), including all rights under any lease for Assumed Leased Real Property and any contract renewal rights, but excluding obligations under the DIP Financing Agreements and the Excluded Assets (the "***Assigned Contracts***"), each as listed on <u>Schedule 1.1(b)</u>;

(c)     all trade and non-trade accounts receivable, notes receivable and negotiable instruments of Sellers, but excluding any intercompany Indebtedness among the Sellers (the "***Accounts Receivable***");

(d)     the amount of cash present at each of the Business locations, excluding any un-deposited receipts, as of the Closing Date (the "***Petty Cash***");

(e)     all Documents relating to the Purchased Assets or Assumed Liabilities, including, without limitation, customer lists, but excluding any Consolidated Tax Returns;

(f)     the Leased Real Property listed on <u>Schedule 1.1(f)</u> (the "***Assumed Leased Real Property***"), including any security deposits or other deposits delivered in connection therewith;

(g)     [RESERVED];

(h)     all tangible assets of Sellers used in connection with the Business, other than the assets set forth on <u>Schedule 1.1(h)</u>, including, without limitation, the tangible assets of Sellers located at any Assumed Leased Real Property or at the Business locations listed on <u>Schedule 1.1(f)</u>;

(i)     all other or additional assets, properties, privileges, rights (including prepaid expenses) and interests of Sellers relating to the Business or the Purchased Assets other than the Excluded Assets of every kind and description and wherever located, whether known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, and whether or not specifically referred to in this Agreement;

(j)     all Permits and all pending applications therefor, including those set forth on <u>Schedule 1.1(j)</u>, in each case, to the extent such Permits and pending applications therefor are transferrable;

2

(k)      all express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits, rebates, causes of action or rights of set off against third parties relating to the Purchased Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to the Assigned Contracts) or Assumed Liabilities, including rights under vendors' and manufacturers' warranties, indemnities, guaranties and avoidance claims and causes of action under the Bankruptcy Code or applicable Law that are possessed by the Sellers (excluding Avoidance Actions that are not Assigned Avoidance Actions);

(l)      all Inventory, including merchantable inventory of food, beverages and other consumables, paper products and supplies, promotional glass inventory and uniform inventory, wherever located and whether or not obsolete or carried on the Sellers' books of account, in each case with any transferable warranty and service rights of the applicable Seller with respect to such Purchased Assets;

(m)      to the extent transferable, all rights and obligations under or arising out of all insurance policies relating to the Business or any of the Purchased Assets or Assumed Liabilities, but solely with respect to any claims made (or that could have been made) against such insurance policies for insured matters arising prior to the Closing Date and directly relating to the Business or any of the Purchased Assets or Assumed Liabilities, but specifically excluding (i) any returns and refunds of any premiums paid, and (ii) other amounts due back to Sellers in respect to cancelled policies;

(n)      all rights and obligations under non-disclosure, confidentiality, and similar arrangements with (or for the benefit of) Employees and agents of Sellers or with third parties (including any non-disclosure, confidentiality agreements, or similar arrangements entered into in connection with or in contemplation of the filing of the Bankruptcy Cases and the Auction contemplated by the Bidding Procedures Order);

(o)      all fixed assets and other personal property and interests related to the Business or Purchased Assets, wherever located, including all vehicles, tools, parts and supplies, fuel, machinery, equipment, furniture, furnishing, appliances, fixtures, office equipment and supplies, owned and licensed computer hardware and related documentation, stored data, communication equipment, trade fixtures and leasehold improvements, in each case with any freely transferable warranty and service rights of the applicable Seller with respect to such Purchased Assets;

(p)      telephone, fax numbers and email addresses related to the Business; and

(q)      all Avoidance Actions, but solely to the extent relating to vendors and service providers used in the Business that are counterparties to Assigned Contracts or relating to Assumed Liabilities (the "**Assigned Avoidance Actions**").

1.2      <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign or convey, and Sellers shall retain all right, title and interest to, in and under only the following assets, properties, interests and rights of such Seller (collectively, the "**Excluded Assets**"):

(a)      any asset of Sellers that otherwise would constitute a Purchased Asset but for the fact that it is sold or otherwise disposed of in the ordinary course of business and in compliance with the terms and conditions of this Agreement, including <u>Section 8.1</u> hereof, during the time from the Agreement Date until the Closing Date;

(b)      [RESERVED];

3

(c)     any intangible assets that are not used exclusively in the operation of the Business;

(d)     any asset of the Sellers, if any, used exclusively in the operation of any MOD Pizza franchise or Fuzzy's Taco Shop franchise or any other non-Sonic business;

(e)     all agreements and contracts of Sellers other than the Assigned Contracts;

(f)     any cash or cash equivalents other than Petty Cash;

(g)     subject to Section 1.6, any Assigned Contract listed on Schedule 1.2(g) that requires the consent of a third party to be assumed and assigned hereunder as to which, by the Closing Date, such consent has not been obtained;

(h)     all shares of capital stock or other equity interests issued by any Seller or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests;

(i)     all Avoidance Actions and all other claims or causes of action under any other provision of the Bankruptcy Code or applicable laws that are not Purchased Assets pursuant to Section 1.1;

(j)     all Claims that any of the Sellers may have against any Person that relate exclusively to any Excluded Assets or any Excluded Liabilities;

(k)     Sellers' rights under this Agreement, the Purchase Price hereunder, any agreement, certificate, instrument or other document executed and delivered by Purchaser to any Seller in connection with the transactions contemplated hereby;

(l)     all current and prior director and officer insurance policies of the Sellers and all rights of any nature with respect thereto running in favor of Sellers, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case as the same may run in favor of Sellers and arising out of actions taking place prior to the Closing Date;

(m)     the Sellers' financial accounting books and records, corporate charter, minute and stock record books, income Tax Returns, corporate seal, checkbooks and canceled checks that relate solely to Excluded Assets, and any Consolidated Tax Returns;

(n)     all Benefit Plans, together with all funding arrangements or obligations of any type relating thereto (including all assets, trusts, insurance policies and administration service contracts related thereto);

(o)     all personnel files for Employees;

(p)     except to the extent set forth on Schedule 1.2(p), any and all claims, deposits, prepayments, refunds, rebates, causes of action, rights of recovery, rights of set-off and rights of recoupment relating solely to or in respect of an Excluded Asset; and

(q)     all intercompany Claims against any other Debtor.

1.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, Purchaser shall assume from the Sellers (and pay, perform, discharge or otherwise satisfy in accordance with their respective terms), and the Sellers shall

irrevocably convey, transfer and assign to Purchaser, the following Liabilities (and only the following Liabilities) (collectively, the "**Assumed Liabilities**"):

(a)     Liabilities and obligations of Sellers under the Assigned Contracts, in each case solely to the extent arising on or after the Closing Date and required to be performed on or after the Closing Date, including, without limitation, all Cure Costs; provided, however, that all Assumed Leased Real Property Cure Costs shall be the sole and exclusive responsibility of the Sellers; and

(b)     all open purchase orders set forth on Schedule 1.3(b) arising in the Ordinary Course of Business.

The assumption by Purchaser of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

1.4     Excluded Liabilities.  Notwithstanding any provision in this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming, and shall not be deemed to have assumed, any other Liabilities of any Seller of whatever nature (whether arising prior to, at the time of, or subsequent to Closing), whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not assets, and whether or not known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and the Sellers shall be solely and exclusively liable for any and all such Liabilities, including those relating to, arising out of or in connection with the operation of the Business or the Purchased Assets (including the use and ownership thereof) at any time prior to the Closing Date, and including, without limitation, those Liabilities set forth below (collectively, the "**Excluded Liabilities**"):

(a)     all Liabilities arising out of, relating to or otherwise in respect of the Purchased Assets and/or Business attributable to the conduct of business prior to the Closing other than the Assumed Liabilities;

(b)     all Liabilities of the Sellers relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(c)     any and all Liabilities for Indebtedness with respect to borrowed money and the intercompany Indebtedness among the Sellers or their Affiliates;

(d)     all guarantees of third party obligations and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit;

(e)     any and all (i) Taxes of the Sellers (or any member, stockholder or Affiliate of the Sellers), or for which the Sellers (or any member, stockholder or Affiliate of the Sellers) are liable, for any taxable period (other than Transfer Taxes), (ii) any Taxes imposed on any Person that are the responsibility of the Sellers pursuant to Section 11.1, (iii) any Taxes attributable to the ownership of the Purchased Assets, the operation of the Business, or related to the Assumed Liabilities for any Pre-Closing Tax Period (as determined under Section 11.1 with respect to any Proration Period), or (iv) any Taxes arising from or in connection with an Excluded Asset or Excluded Liability;

(f)     any and all Liabilities of the Sellers in respect of Contracts that are not Assigned Contracts;

(g)     all Liabilities relating to or in any way arising out of any present and past employees of Sellers or their Affiliates and/or the employment or service of any such Person including with

5

respect to any Benefit Plans, other plans, programs, policies, commitments, terms and conditions of employment, employment decisions, compensation or other benefits or entitlements established or existing on or prior to Closing (whether or not such liabilities are accrued or payable at Closing, and whether or not such liabilities are contingent in nature), including, without limitation, any liability (i) for any accrued wages or salaries for periods prior to the Closing, (ii) for severance, dismissal pay damages or otherwise in connection with any termination of employment by Sellers or their Affiliates on or prior to the Closing, (iii) for accrued vacation, sick time or other paid time off accrued prior to the Closing, (iv) relating to any Benefit Plan and any Contract or insurance policy or other funding medium with respect thereto, (v) for misclassification of any employee or independent contractor prior to the Closing, (vi) any failure to comply with federal, state or local wage and hour Laws, scheduling Laws or other Laws relating to employment terms and conditions, or (vii) any commission, transaction incentive bonus, change in control bonus or payment, "stay" bonus or similar arrangement or agreement that is owed to employees or other service providers of Sellers or their Affiliates that arose on, prior to or in connection with the Closing, whether due, payable or accrued prior to or after the Closing;

(h)      drafts or checks outstanding at the Closing (except to the extent an Assumed Liability);

(i)      all Liabilities under any futures contracts, options on futures, swap agreements or forward sale agreements;

(j)      all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Sellers in connection with this Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by Sellers) and administrative expenses and priority claims accrued through the Closing Date and specified post-closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code (which such amounts shall be paid by the Sellers) and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the transactions contemplated under this Agreement and each of the other documents delivered in connection herewith, (ii) the preparation and submission of any filing or notice required to be made or given in connection with any of the transactions contemplated by this Agreement, and the obtaining of any consent required to be obtained in connection with any of such transactions; (iii) the negotiation, execution and consummation of the DIP Financing Agreements, and (iv) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Sellers payable as a result of the consummation of the transactions contemplated by this Agreement and the documents delivered in connection herewith;

(k)      all Liabilities related to the WARN Act, to the extent applicable, for any action resulting from Employees' separation of employment prior to or on the Closing Date;

(l)      all Liabilities of any Seller to its equity holders, including but not limited to those respecting dividends, distributions in liquidation, redemptions of interests, option payments, claims for damages or otherwise, and any Liability of any Seller pursuant to any Affiliate Agreement;

(m)      all Liabilities arising out of or relating to any business or property formerly owned or operated by any Seller, any Affiliate or predecessor thereof, but not presently owned and operated by the Sellers;

(n)      [RESERVED];

(o)      all obligations of the Sellers arising and to be performed prior to the Closing Date;

(p)     all Environmental Liabilities and Obligations;

(q)     all Liabilities of any Seller or their predecessors arising out of any contract, agreement, Permit, franchise or claim that is not transferred to Purchaser as part of the Purchased Assets or, is not transferred to Purchaser because of any failure to obtain any third-party or governmental consent required for such transfer;

(r)     all Liabilities of any kind relating to Avoidance Actions that are not Assigned Avoidance Actions;

(s)     all Liabilities for intercompany Indebtedness, accounts payable, or other Liabilities or obligations of any Seller or for which any Seller is an obligor or is otherwise responsible or liable;

(t)     all payroll Liabilities and withholding obligations related thereto during any payroll period prior to or that include the Closing Date; provided, for the avoidance of doubt, it is the intention of the Parties that the final day of the final payroll period of the Sellers shall occur on the date immediately prior to the Closing Date;

(u)     all Assumed Leased Real Property Cure Costs;

(v)     all Liabilities with respect to any and all 503(b)(9) Claims;

(w)     all Liabilities of Sellers relating to operation of or otherwise related to the business of any MOD Pizza franchise or Fuzzy's Taco Shop franchise or any other non-Sonic business; and

(x)     all Liabilities set forth on Schedule 1.4(x).

1.5     Post-Closing Liabilities.  Except as provided in Section 1.4, Purchaser acknowledges that Purchaser shall be responsible for all Liabilities and obligations of Purchaser relating to Purchaser's ownership or use of, or right to use, the Purchased Assets and the Assumed Liabilities after the Closing Date, including (a) Taxes arising out of or related to the Purchased Assets or the operation or conduct of the Business acquired pursuant to this Agreement for all Post-Closing Tax Periods (as determined under Section 11.1 with respect to any Proration Period), and (b) Assumed Liabilities.

1.6     Assumption/Rejection of Certain Contracts.

(a)     Assignment and Assumption at Closing.

(i)     Schedule 1.6(a) sets forth a list of all executory Contracts (including all leases with respect to Leased Real Property) to which, to the Sellers' Knowledge, one or more of the Sellers are party and which are to be included in the Assigned Contracts.  From and after the date hereof until two (2) Business Days prior to Closing, the Sellers shall make such deletions to Schedule 1.6(a) as Purchaser shall, in its sole discretion, request in writing.  Any such deleted Contract shall be deemed to no longer be an Assigned Contract.  All Contracts of Sellers that are not listed on Schedule 1.6(a) shall not be considered Assigned Contracts or Purchased Assets and shall be deemed "***Rejected Contracts***."

(ii)     At Sellers' sole cost and expense (except as otherwise set forth herein with respect to Cure Costs), Sellers shall take all actions required to assume and assign the Assigned Contracts to Purchaser. Such actions shall include payment of all Assumed Leased Real Property Cure Costs, facilitating any negotiations with the counterparties to such Assigned Contracts, and

7

obtaining an Order containing a finding that the proposed assumption and assignment of the Assigned Contracts to Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(iii)     At Closing, (x) Sellers shall, pursuant to the Sale Order and the Assumption and Assignment Agreement or the Assumption and Assignment of Leases, as applicable, assume and assign to Purchaser (the consideration for which is included in the Purchase Price) each of the Assigned Contracts that is capable of being assumed and assigned and pay all unpaid Assumed Leased Real Property Cure Costs (if any) in connection with such assumption and assignment, and (y) Purchaser shall pay promptly all Cure Costs (other than the Assumed Leased Real Property Cure Costs), and shall assume, perform, and discharge the Assumed Liabilities (if any) under the Assigned Contracts, pursuant to the Assumption and Assignment Agreement or the Assumption and Assignment of Leases, as applicable.

(iv)     At any time at least two (2) Business Days prior to the Closing, Purchaser may, in its discretion by written notice to the Sellers, designate any of the Purchased Assets as additional Excluded Assets, which notice shall set forth in reasonable detail the Purchased Assets so designated. Purchaser acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Purchased Assets as Excluded Assets. Notwithstanding any other provision hereof, the Liabilities of the Sellers under or related to any Purchased Asset excluded under this paragraph will constitute Excluded Liabilities.

(b)     <u>Previously Omitted Contracts</u>.

(i)     If prior to or following Closing, it is discovered that a Contract should have been listed on <u>Schedule 1.6(a)</u> but was not listed on <u>Schedule 1.6(a)</u>, or if Purchaser desires, in its sole discretion, to acquire any Contract to which one or more of the Sellers are party (including any Rejected Contract prior to the entry by the Bankruptcy Court of an order with respect thereto or otherwise being deemed rejected pursuant to the Bankruptcy Code) (any such Contract, a "***Previously Omitted Contract***"), then (x) in the case of the discovery of such a Previously Omitted Contract prior to the Closing, Sellers shall, promptly, following the discovery thereof or receipt of notice from Purchaser of its desire to acquire any such Contract (but in no event later than two (2) Business Days following the discovery thereof or receipt of such notice), notify Purchaser in writing of such Previously Omitted Contract and all Cure Costs or Assumed Leased Real Property Cure Costs (if any) for such Previously Omitted Contract or (y) in the case of the discovery of such a Previously Omitted Contract following the Closing, Purchaser shall, promptly, following the discovery thereof or Purchaser provides notice to Sellers of its desire to acquire any such Contract (but in no event later than two (2) Business Days following the discovery thereof or receipt of such notice), notify Sellers in writing of such Previously Omitted Contract and all Cure Costs or Assumed Leased Real Property Cure Costs (if any) for such Previously Omitted Contract. Purchaser shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from Sellers pursuant to clause (x) above or upon its own determination pursuant to clause (y) above, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "***Previously Omitted Contract Designation***"). A Previously Omitted Contract designated in accordance with this <u>Section 1.6(b)(i)</u> as "Rejected," or with respect to which Purchaser fails to timely deliver a Previously Omitted Contract Designation, shall be a Rejected Contract.

(ii)     If Purchaser designates a Previously Omitted Contract as "Assumed" in accordance with <u>Section 1.6(b)(i)</u>, Sellers shall, within five (5) Business Days following receipt of Purchaser's designation of the Previously Omitted Contract as "Assumed" (A) amend <u>Schedule</u>

8

1.6(a) to include such Previously Omitted Contract and (B) serve a notice (the "***Previously Omitted Contract Notice***") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs or Assumed Leased Real Property Cure Costs, as applicable, with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Section 1.6. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with fifteen (15) Business Days to object, in writing to the Sellers and Purchaser, to the Cure Costs or Assumed Leased Real Property Cure Costs, as applicable, associated with the assumption of its Contract. If the counterparties, Sellers, and Purchaser are unable to reach a consensual resolution with respect to the objection, the Sellers shall seek an expedited hearing before Bankruptcy Court to determine the Cure Costs or Assumed Leased Real Property Cure Costs, as applicable, and approve the assumption/assignment of the Previously Omitted Contract to the Purchaser. If no objection is timely served on and received by the Sellers and Purchaser, Sellers shall obtain an order of the Bankruptcy Court approving the Cure Costs or Assumed Leased Real Property Cure Costs, as applicable, and assumption/assignment of the Previously Omitted Contract. The payment of the Cure Costs and all other costs associated with the process of assuming and assigning the Previously Omitted Contract shall be the responsibility of Purchaser, provided, however, that if such Previously Omitted Contract relates to Assumed Leased Real Property, then the payment of the Assumed Leased Real Property Cure Costs and all other costs associated with the process of assuming and assignment such Previously Omitted Contract shall be the responsibility of the Sellers.

1.7     Further Conveyances and Assumptions. From time to time following the Closing, Sellers and Purchaser will, and will cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each Seller and its Affiliates and their successors and assigns, the assumption of the Assumed Liabilities, and to otherwise make effective the transactions, except that nothing in this Section 1.7 will require Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

1.8     Disclaimer**. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS PROVIDED IN THIS AGREEMENT OR ANY CERTIFICATE OR DOCUMENT DELIVERED PURSUANT TO THIS AGREEMENT, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, ANY MATTER RELATING TO THE PURCHASED ASSETS, THE BUSINESS OR THE ASSUMED LIABILITIES. WITHOUT LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE FOREGOING LIMITATIONS SHALL NOT APPLY TO, AND NOTHING HEREIN SHALL LIMIT, THE PURCHASER'S REMEDIES IN THE EVENT OF FRAUD.**

ARTICLE II.

CONSIDERATION

2.1     Consideration.

(a)      The aggregate consideration for the purchase of the Purchased Assets (collectively, the "**Purchase Price**") shall be (i) the assumption of Assumed Liabilities, and (ii) $15,000,000, composed of (x) the Deposit, (y) the amounts credit bid under the DIP Financing Agreements, and (z) cash in the amount of $15,000,000 less the amounts set forth in (x) and (y), above; provided, however, that to the extent that the DIP Order does not provide for a "roll-up" (the "**Roll-Up**") of certain prepetition obligations due and owing by SD-Missouri to the Purchaser in the amount of $450,000 plus accrued interest (the "***Prepetition SRI Loan Amount***"), then the Purchase Price shall be reduced by the Prepetition SRI Loan Amount; provided, further that Purchaser reserves the right to increase the Purchase Price, subject to the Bidding Procedures Order and applicable Law.

(b)      <u>Limitation on Purchaser Liability</u>.  For the avoidance of doubt, Purchaser shall have no liability with respect to any costs, fees or expenses of any nature incurred by the Sellers or, if different, the Debtors, following the Closing Date.

2.2      <u>Withholding</u>.  Purchaser shall be entitled to deduct and withhold from all amounts payable pursuant to this Agreement all amounts that Purchaser may be required to deduct and withhold under any provision of applicable Law.  To the extent such amounts are withheld and paid over to the applicable Governmental Body, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid. Purchaser will use reasonable efforts to reduce or eliminate any such withholding including by requesting any appropriate Tax forms, including IRS Form W-9 or the appropriate series of IRS Form W-8, as applicable, or any similar information, from the applicable payee prior to withholding on any such payment.

2.3      <u>Deposit</u>.  No later than two (2) Business Days following the entry of the Bidding Procedures Order, Purchaser will make an earnest money deposit in the amount of $1,500,000 (the "***Deposit***") to the Escrow Agent pursuant to the terms of the Escrow Agreement, substantially in the form attached hereto as <u>Exhibit [    ]</u>. If the Closing occurs, the Parties shall instruct the Escrow Agent to release the Deposit to the Sellers and the Deposit shall be applied against payment of the Purchase Price on the Closing Date. If this Agreement is terminated pursuant to <u>Section 3.4</u> hereof (other than pursuant to <u>Section 3.4(n)</u>), or in the event that any Person other than Purchaser or a Designated Purchaser purchases all or any material portion of the Purchased Assets, then the Deposit shall be returned to Purchaser promptly, and in no event later than two (2) Business Days after such termination.  If this Agreement shall be terminated by the Sellers pursuant to <u>Section 3.4(n)</u> hereof, then the Parties shall instruct the Escrow Agent to release the Deposit to the Sellers, and the Sellers shall retain the Deposit. The Parties agree that the Sellers' right to retain the Deposit, as set forth herein, is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Sellers for their respective efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision. Notwithstanding anything to the contrary in this Agreement, the Parties agree that if this Agreement is terminated under circumstances in which Sellers are entitled to the Deposit, the delivery of the Deposit is the sole and exclusive remedy available to Sellers with respect to this Agreement and the transactions contemplated hereby, and, upon delivery of the Deposit, none of the Purchaser or any of its former, current or future equity holders, directors, officers, Affiliates, agents or Representatives (collectively, the "***Purchaser Releasees***") shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.

10

ARTICLE III.

CLOSING AND TERMINATION

3.1    Closing.  Subject to the satisfaction or waiver by the appropriate Party of the conditions set forth in Article IX, the closing of the purchase and sale of the Purchased Assets, the payment of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "**Closing**") shall occur as soon as practicable following the satisfaction or waiver of all conditions set forth in this Agreement (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions); provided, however, that the Closing shall occur on a Monday mutually agreed by the Parties.  The Closing shall take place at the offices of DLA Piper LLP (US), 1201 West Peachtree Street, Suite 2800, Atlanta, Georgia 30309-3450 or at such other place as the Parties may agree.  Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of each of the Sellers in the Purchased Assets to be acquired by Purchaser hereunder shall be deemed to have passed to Purchaser and the assumption of all of the Assumed Liabilities shall be deemed to have occurred as of 12:01 a.m. Eastern Time on the Closing Date.

3.2    Closing Deliveries by Sellers.  At or prior to the Closing, the Sellers shall deliver, or cause to be delivered, to Purchaser:

(a)    bill of sale substantially in the form of Exhibit A (the "**Bill of Sale**") duly executed by the Sellers;

(b)    assignment and assumption agreement substantially in the form of Exhibit B (the "**Assignment and Assumption Agreement**") duly executed by the Sellers;

(c)    a certified copy of the Sale Order;

(d)    copies of all instruments, certificates, documents and other filings (if applicable) necessary to release the Purchased Assets from all Encumbrances (other than Permitted Encumbrances), including any applicable UCC termination statements and releases of Mortgages, all in a form reasonably satisfactory to Purchaser;

(e)    copies of the waivers, consents and approvals for those executory contracts on Schedule 1.1(b);

(f)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of each of the Sellers certifying that the conditions set forth in Section 9.3(b) and (c) have been satisfied;

(g)    a copy of the resolutions adopted by the board of directors (or similar governing body) of each of the Sellers evidencing the authorization of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, certified by an authorized officer of such Seller;

(h)    instrument of assumption and assignment of the Assumed Leases substantially in the form of Exhibit C (the "**Assumption and Assignment of Leases**"), duly executed by the Sellers, in form for recordation with the appropriate public land records, if necessary;

11

(i)      a termination agreement for each franchise agreement by and between any Seller and the Purchaser or the Purchaser's Affiliates, as applicable, duly executed by each franchisee party thereto;

(j)      possession of the Purchased Assets and the Business;

(k)      such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Purchaser, as Purchaser may reasonably request to vest in Purchaser all of Sellers' right, title and interest of Sellers in, to or under any or all the Purchased Assets;

(l)      evidence satisfactory to the Purchaser that Sellers paid all Assumed Leased Real Property Cure Costs to the Assigned Contract counterparties;

(m)      from each Seller, (A) a non-foreign Person affidavit from such Seller dated as of the date hereof, sworn under penalties of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that such Seller is not a "foreign person" as defined in Code Section 1445 and (B) a duly completed and executed IRS Form W-9;

(n)      evidence satisfactory to the Purchaser that all 503(b)(9) Claims have been satisfied by the Sellers or will be satisfied by the Sellers; and

(o)      such other documents as Purchaser may reasonably request that are not inconsistent with the terms of this Agreement and customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

3.3      <u>Closing Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver to (or at the direction of) the Sellers:

(a)      the Assignment and Assumption Agreement duly executed by Purchaser;

(b)      satisfactory evidence of payment of the Cure Costs;

(c)      copy of the resolutions adopted by the board of directors (or similar governing body) of Purchaser evidencing the authorization of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, certified by an authorized officer of Purchaser;

(d)      the Purchase Price;

(e)      the Assumption and Assignment of Leases, duly executed by the Purchaser;

(f)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in <u>Sections 9.2(a)</u> and <u>9.2(b)</u> have been satisfied;

(g)      written instructions to the Escrow Agent directing the Escrow Agent to release the Deposit to the Sellers; and

(h)      such other documents as Sellers may reasonably request that are not inconsistent with the terms of this Agreement and customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

3.4     Termination of Agreement.  This Agreement may be terminated only in accordance with this Section 3.4.  This Agreement may be terminated at any time prior to the Closing, as follows:

(a)     by the mutual written consent of the Sellers and Purchaser;

(b)     by written notice of either the Sellers or the Purchaser to such other Party, if the Closing shall not have been consummated prior to May 31, 2020 (the "**Outside Date**"); provided, however, that the Outside Date may be extended by the mutual written consent of Sellers and Purchaser, for a period up to thirty (30) days to the extent that all conditions to Closing set forth in this Agreement are capable of being satisfied as of such time; provided further, however, that a Party shall not be permitted to terminate this Agreement pursuant to this Section 3.4(b) if the failure of the Closing to occur prior to the Outside Date is as a result of the failure of the Party seeking to terminate this Agreement to materially perform any of its obligations or covenants under this Agreement required to be performed by it at or prior to the Closing;

(c)     by written notice from Purchaser to the Sellers, if (i) any Seller seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases, or appointing a trustee in the Bankruptcy Cases or appointing a responsible officer or an examiner with enlarged power relating to the operation of the Business (beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code section 1106(b), or (ii) an order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within fourteen (14) days after entry thereof;

(d)     [intentionally omitted];

(e)     by written notice from Purchaser to the Sellers if the Sellers have not filed a motion seeking approval of the Bidding Procedures Order with the Bankruptcy Court, attaching this Agreement and seeking Bankruptcy Court approval of the Bid Protections, no later than the close of business on February 17, 2020;

(f)     by written notice from Purchaser to the Sellers, if (i) the Bidding Procedures Order shall not have been approved by the Bankruptcy Court in a form satisfactory to Purchaser and SRI Holding Company by the close of business on March 9, 2020, (ii) the Bankruptcy Court issues an order granting leave to any Person to commence an appeal of the Bidding Procedures Order, or (iii) following its entry, the Bidding Procedures Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of Purchaser;

(g)     by written notice from Purchaser to the Sellers if (i) the Sale Hearing has not taken place on or prior to April 8, 2020, (ii) the Bankruptcy Court has not entered the Sale Order on or prior to April 10, 2020, or (iii) the Sale Order shall have been stayed (and such stay results in the Closing not being consummated prior to the Outside Date), vacated, modified or supplemented without Purchaser's prior written consent;

(h)     by written notice from Purchaser to the Sellers, if (i) the Sale Order has not become a Final Order within fourteen (14) days after the entry thereof or (ii) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed (and such stay results in the Closing not being consummated prior to the Outside Date), vacated, reversed, modified, supplemented or amended in any respect without the prior written consent of Purchaser;

13

(i)      by written notice from Purchaser to the Sellers, if Sellers are in default (after giving effect to all applicable cure periods) under the DIP Credit Agreement, if such notice is delivered while the default remains uncured or unwaived;

(j)      by the Sellers or Purchaser to the Sellers, if there is in effect a Final Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement;

(k)      by written notice of either the Sellers or Purchaser, if Sellers have entered into an Alternative Transaction;

(l)      by written notice of either the Sellers or Purchaser, if, under section 363(k) of the Bankruptcy Code, Purchaser is disallowed from credit bidding the amount set forth in Section 2.1(a)(ii) hereof (or such amount as agreed by the parties hereto) in payment of the Purchase Price;

(m)     automatically upon the consummation of an Alternative Transaction;

(n)      by written notice from the Sellers to Purchaser, if Purchaser breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform:  (i) would give rise to the failure of a condition set forth in Article IX, (ii) cannot be or has not been cured within thirty (30) days following delivery of notice to Purchaser of such breach or failure to perform and (iii) has not been waived by the Sellers; or

(o)      by written notice from Purchaser to the Sellers, if any Seller breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform:  (i) would give rise to the failure of a condition set forth in Article IX, (ii) cannot be or has not been cured within thirty (30) days following delivery of notice to the Sellers of such breach or failure to perform and (iii) has not been waived by Purchaser.

Each condition set forth in this Section 3.4, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition.  If more than one of the termination conditions set forth in this Section 3.4 is applicable, the applicable Party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.  The Parties acknowledge and agree that no notice of termination or extension of the Outside Date provided pursuant to this Section 3.4 shall become effective until two (2) Business Days after the delivery of such notice to the other Parties, and only if such notice shall not have been withdrawn during such two (2) Business Day period.

3.5      Procedures Upon Termination.  In the event of termination and abandonment by Purchaser or Sellers, or both such Parties, pursuant to Section 3.4 hereof, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall be abandoned, without further action by Purchaser or Sellers.  If this Agreement is terminated as provided herein, each Party shall return or destroy all documents, work papers and other material of any other Party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Party furnishing the same.  If this Agreement is terminated other than pursuant to Section 3.4(a) or (n) or by Purchaser as a result of Purchaser claiming a failure to satisfy the condition set forth in Section 9.3(i), Sellers shall pay in cash to Purchaser the Bid Protections, and the Parties shall have no further obligations to one another except for any obligations that, by their terms, survive the termination of this Agreement, as described in Section 3.6.  If this Agreement is terminated pursuant to Section 3.4(n) then the Parties shall promptly instruct the Escrow Agent in writing to release the Deposit to Sellers.

3.6    Effect of Termination.    In the event of termination of this Agreement pursuant to Section 3.4, this Agreement shall forthwith become null and void and there shall be no liability on the part of any Party or any of its partners, officers, directors or shareholders; provided, however, that this Section 3.6, Section 2.3, the Sellers' obligation to pay the Bid Protections pursuant to Section 7.1, Article XII (Miscellaneous), the Bidding Procedures Order (if entered) and the NDA, if any, shall survive any such termination.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.  Each Party acknowledges that the agreements contained in this Section 3.6 and in Section 3.5 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement, and that any amounts payable pursuant to this Section 3.6 and Section 3.5 do not constitute a penalty.

ARTICLE IV.

REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Subject to the exceptions noted in the schedules delivered by the Sellers concurrently herewith, the Sellers, jointly and severally, represent and warrant to Purchaser as follows as of the date hereof and as of the Closing Date:

4.1    Organization and Qualification.    Each Seller is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or formation.  Such Seller has all requisite power and authority to own, lease and operate its properties and to carry on its business (including the Business) as it is now being conducted, subject to the provisions of the Bankruptcy Code.  Sellers have previously delivered to Purchaser complete and correct copies of their Organizational Documents, as amended and in effect on the Agreement Date.  Each Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of the Business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

4.2    Authorization of Agreement.    Subject to the entry of the Sale Order, each Seller has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and each of the Ancillary Documents to which it is a party, the performance by each Seller of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of each Seller.  This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which it is a party will be, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other Parties, and the entry of the Sale Order) this Agreement constitutes, and each Ancillary Document to which it is a party when so executed and delivered (assuming the due authorization, execution and delivery by the other parties thereto) will constitute, legal, valid and binding obligations of each Seller, enforceable against each Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Subject to entry of the Sale Order, except (a) for entry of the Sale Order, (b) for notices, filings and consents required in connection with the Bankruptcy Cases and (c) for the notices, filings and consents set forth on Schedule 4.2(c), Sellers are not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement and each of the Ancillary Documents or the

15

consummation or performance of any of the transactions contemplated hereby and thereby, other than such filings, notices or consents the failure of which to make or obtain would not have a Material Adverse Effect.

4.3    <u>Conflicts; Consents; Compliance with Law</u>.

(a)    Except as set forth on <u>Schedule 4.3(a)</u>, the execution, delivery and performance by each Seller of this Agreement or any Ancillary Document to which it is a party, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby and the taking by Sellers of any other action contemplated hereby or thereby, do not and will not contravene, violate or conflict with any term or provision of its respective Organizational Documents.

(b)    Except (i) for the entry of the Sale Order, and (ii) as set forth on <u>Schedule 4.3(b)</u>, no filing with, notice to or consent from any Person is required in connection with the execution, delivery and performance by each Seller of this Agreement or the Ancillary Documents to which it is a party, the compliance by each Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the taking by any Seller of any other action contemplated hereby or thereby, other than such filings, notices or consents, the failure of which to make or obtain would not have a Material Adverse Effect.

(c)    Each Seller is in compliance, in all material respects with all applicable Laws. Except as set forth on <u>Schedule 4.3(c)</u>, no Seller nor any Subsidiary has received any outstanding written notice from any Governmental Body regarding any actual or possible material violation of, or failure to comply in any material respect with, any Law.  No Seller is in default in any material respect of any order, writ, injunction, judgment or decree applicable to the Business or the Purchased Assets.

4.4    <u>Brokers and Finders</u>.  Except as set forth on <u>Schedule 4.4</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement and Purchaser is not or will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement based upon any arrangement made by or on behalf of Sellers.

4.5    <u>Title to Purchased Assets</u>.  Except for Permitted Encumbrances, Sellers have good title to or, in the case of property leased or licensed by Sellers, a valid leasehold interest or license in or all rights to use all of the Purchased Assets and, at the Closing, Purchaser, pursuant to the Sale Order, shall acquire good and marketable title or, in the case of property leased or licensed by the Sellers, a valid leasehold interest or license, in, and under all of such Purchased Assets, in each case free and clear of all Claims, Liabilities and Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances) to the fullest extent permissible under sections 363(f) and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006.  The Purchased Assets (i) include all of the properties, rights and assets necessary or required to operate the Business in the Ordinary Course of Business and (ii) are sufficient for the continued conduct of the Business after the Closing in the Ordinary Course of Business in substantially the same manner as conducted prior to the Closing.  For the sake of clarity, the right to use any assets included in the Purchased Assets in which Sellers have leasehold or non-ownership rights to use shall be assigned to Purchaser only through the assumption and assignment of the Assigned Contracts in accordance with and subject to this Agreement.

4.6    <u>Real Property</u>.  <u>Schedule 4.6</u> contains a list and brief description of all Leased Real Property held or used for, or necessary to the operation of the Business.  Sellers have made available true and complete copies of all leases with respect to such Leased Real Property (individually, a "***Lease***" and collectively, the "***Leases***") to Purchaser.  <u>Schedule 4.6</u> also identifies each ground lease between Sellers

and the owner of the fee title to the demised premises (each, a "***Ground Lease***").  Other than as set forth on Schedule 4.6, Sellers are not in breach of any material term or in "default" under any Lease and, to Sellers' Knowledge, no party to any Lease has given Sellers written notice of or made a claim with respect to any breach or default thereunder.  To Sellers' Knowledge, there are no conditions that currently exist or with the passage of time will (i) result in a default or breach of any material term by any party to a Lease or (ii) give rise to the right of the lessor to accelerate the obligations thereunder or modify the terms thereof.  To Sellers' Knowledge, other than as noted on Schedule 4.6, none of the Leased Real Property is subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of the Leased Real Property or any portion thereof that would materially impair the use of the Leased Real Property in the operation of the Business.  To Sellers' Knowledge, the Leased Real Property is not subject to any Encumbrances (other than Permitted Encumbrances) that were placed on the Leased Real Property through the action or inaction of Sellers and materially impact the Business use of the Leased Real Property.  To Sellers' Knowledge, the Leased Real Property is not subject to any use restrictions, exceptions, reservations or limitations which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business.  To Sellers' Knowledge, there are no pending or threatened condemnation or other proceedings or claims relating to any of the Leased Real Property.  To Sellers' Knowledge, the Leases with respect to the Assumed Leased Real Property will continue to be legal, valid, binding, enforceable and in full force and effect on the same material terms immediately following the consummation of the transactions contemplated hereby.

4.7    Tangible Personal Property.   Schedule 4.7 sets forth all leases of personal property ("***Personal Property Leases***") relating to personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business.  Each Seller has a valid and enforceable leasehold interest under each Personal Property Lease under which it is a lessee.

4.8    Litigation.   Except as set forth on Schedule 4.8 and other than in connection with the Bankruptcy Cases, there is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the Sellers' Knowledge, threatened against or relating to any Seller or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might adversely affect the ability of any Seller to enter into this Agreement or to consummate the transactions contemplated hereby and Sellers have no Knowledge of any existing ground on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success.

4.9    Permits.   Except as set forth on Schedule 4.9, Sellers are in compliance with the material terms of all material Permits used by Sellers in the Business, and all such Permits are valid and in full force and effect, and no proceeding is pending or, to the Knowledge of Sellers, threatened, the object of which is to revoke, limit or otherwise affect any such Permit.

4.10    Inventory.

(a)    [RESERVED].

(b)    The Inventory is not part of or subject to a current or past recall (including, to the Sellers' Knowledge, any threatened recall), nor have any such recalls been pending at any time.

(c)    To Sellers' Knowledge, the Inventory is free of any material defect or deficiency and is in working condition except for such failure to be in working condition which would not have a material and adverse effect on the Inventory taken as a whole.

(d)      Sellers do not hold any Inventory on consignment.

4.11   Contracts.  The Assigned Contracts, together with the Contracts set forth on Schedule 4.11 that are Excluded Assets, include all Contracts material to the ownership and/or operation of the Business. Except as set forth on Schedule 4.11, Sellers have not, and, to Sellers' Knowledge, no other party to any Assigned Contract has, commenced any action against any of the parties to any Assigned Contract or given or received any written notice of any default or violation under any Assigned Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Costs or Assumed Leased Real Property Cure Costs.  Assuming payment of the Cure Costs or Assumed Leased Real Property Cure Costs, as applicable, each Assigned Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

4.12   Tax Returns; Taxes.  Each Seller has filed or will file when due all Tax Returns pertaining to all federal, state and local income, franchise, sales, use, payroll, excise, business, license and other Taxes with respect to its operation of the Business or the ownership of the Purchased Assets for all periods prior to the Closing Date.  Sellers have paid or will pay all Taxes owed with respect to the Business or the ownership of the Purchased Assets for all periods prior to the Closing Date.

4.13   Employees.

(a)      Sellers have provided Purchaser with a true, complete and correct list of the Employees as of the Agreement Date, specifying their position, FLSA classification, annual salary, target bonus opportunity, value of accrued but unused vacation time, date of hire and current leave status.  The Sellers are in compliance in all material respects with all Laws relating to the employment of, classification of, and termination of employment of the Employees.

(b)      Except as set forth on Schedule 4.13(b), there are no material Actions pending or, to the Knowledge of any Seller, threatened, against any Seller by any Employee, former employee or current or former service provider of any Seller.

(c)      The employment of each Employee of Sellers is at-will except as set forth on Schedule 4.13(c).  Schedule 4.13(c) lists all written (and includes a summary of all legally binding oral) employment and consulting agreements to which any Seller is a party or by which it is bound.  Complete and correct copies of the agreements or arrangements listed and summarized on Schedule 4.13(c) have been provided or made available to Purchaser, together with all amendments thereto.

4.14   Labor Matters.

No Seller is a party to any labor or collective bargaining agreement or similar arrangement with respect to its Employees and there are no representation or certification proceedings or petitions seeking a representation election presently pending or, to the Knowledge of Sellers, threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller, nor have there been any such proceedings in the last three years.

4.15   WARN Act.  No Seller has, within the ninety (90) days immediately prior to the Closing Date, in whole or in part taken any action or actions which would, independently of the transaction contemplated hereby, result in a plant closing or mass layoff, temporary or otherwise, within the meaning of the WARN Act, or any similar Law.

4.16   Absence of Certain Changes.

18

(a)      Since the Petition Date, there has not been a Material Adverse Effect.

(b)      Except as set forth on <u>Schedule 4.16(b)</u> or as contemplated by this Agreement, from the Petition Date to the Agreement Date, Sellers have not:

(i)      except for executory contracts and unexpired leases rejected by Sellers pursuant to the Sale Order with the prior written consent of Purchaser, terminated, modified or amended any material Assigned Contract or taken any action which materially violates, materially conflicts with or resulted in a material breach of any provision of, or constitutes a default under, or give rise to the right of any counterparty to accelerate the obligations under or modify the terms of, any material Assigned Contract;

(ii)      purchased or otherwise acquired any material properties or assets (tangible or intangible) or sold, leased, transferred or otherwise disposed of any Purchased Assets, except for purchases of materials and sales of Inventory in the Ordinary Course of Business, (i) permitted, allowed or suffered any of the Purchased Assets to be subjected to any Encumbrance (other than Permitted Encumbrances), or (ii) removed any equipment or other material assets (other than Inventory) from the Leased Real Property other than in the Ordinary Course of Business;

(iii)      waived or released any claim or rights included in or related to the Purchased Assets or the Business, except for adjustments to the value of Inventory in the Ordinary Course of Business;

(iv)      entered into any material contractual relationship with any third party related to the Purchased Assets or the Business, other than in the Ordinary Course of Business;

(v)      other than in the Ordinary Course of Business and in a manner not material to the Business, increased the benefits of or compensation for Employees;

(vi)      suffered any damage or destruction to or loss of any assets or properties relating to the Purchased Assets or the Business except for any such damage as would not have a Material Adverse Effect on the Business taken as a whole whether or not covered by insurance;

(vii)      incurred any Indebtedness or paid, discharged or satisfied any claims, liabilities or obligations, other than the incurrence of Indebtedness under the DIP Financing Agreements and the payment, discharge or satisfaction in the Ordinary Course of Business of Liabilities incurred in the Ordinary Course of Business;

(viii)      made or changed any Tax election, filed any amended Tax Return, entered into any closing agreement, settled any Tax claim or assessment, surrendered any right to claim a refund of Taxes, consented to any extension or waiver of the limitation period applicable to any Tax claim or assessment, incurred any liability for Taxes outside the ordinary course of business, failed to pay any Tax that became due and payable (including any estimated tax payments), prepared or filed any Tax Return in a manner inconsistent with past practice, or adopted or changed any accounting method in respect of Taxes;

(ix)      except for consequences directly relating to the filing of the Bankruptcy Cases, introduced any material change related to pricing, discounting, repairs and maintenance, local advertising, staffing, product offerings or any other material change to the operations of the Business; or

(x)      agreed or committed to do any of the foregoing.

4.17    No Other Representations or Warranties.  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS PROVIDED IN THIS AGREEMENT OR ANY CERTIFICATE OR DOCUMENT DELIVERED PURSUANT TO THIS AGREEMENT, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, ANY MATTER RELATING TO THE PURCHASED ASSETS, THE BUSINESS OR THE ASSUMED LIABILITIES.  WITHOUT LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE FOREGOING LIMITATIONS SHALL NOT APPLY TO, AND NOTHING HEREIN SHALL LIMIT, THE PURCHASER'S REMEDIES IN THE EVENT OF FRAUD.

ARTICLE V.

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Subject to the exceptions noted in the schedules delivered by Purchaser concurrently herewith, Purchaser represents and warrants to the Sellers as follows as of the date hereof and as of the Closing Date:

5.1    Organization and Qualification.  Purchaser is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.  Purchaser has all requisite power and authority to own, lease and operate its properties and to carry on its business (including the Business) as it is now being conducted, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Purchaser's ability to consummate the transactions contemplated hereby.

5.2    Authority.  Purchaser has the requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, to consummate the transactions contemplated hereby and thereby and to assume and perform the Assumed Liabilities.  The execution and delivery of this Agreement by Purchaser and each of the Ancillary Documents to which it is a party, the performance by Purchaser of its obligations hereunder and thereunder, the consummation of the transactions contemplated hereby and thereby and the assumption and performance of the Assumed Liabilities have been duly and validly authorized by all necessary actions on the part of Purchaser.  This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which it is a party will be, duly and validly executed and delivered by Purchaser.  Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Documents by the Sellers and subject to the effectiveness of the Sale Order, this Agreement constitutes, and each Ancillary Document to which Purchaser is a party when so executed and delivered will constitute, legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms.

5.3    No Inconsistent Obligations.  Neither the execution and delivery of this Agreement or any other documents contemplated hereby, nor the consummation of the transactions contemplated herein or therein in accordance with the Sale Order, will result in a violation or breach of, or constitute a default under, (a) the certificate of incorporation, as amended, the bylaws, or other organizational instruments of Purchaser, (b) any applicable ruling or order of any Governmental Body, (c) any term or provision of any contract or agreement, (d) any writ, order, judgment, decree, law, rule, regulation or ordinance, (e) any other commitment or restriction to which Purchaser is a party.

5.4    Conflicts; Consents.

20

(a)     The execution, delivery and performance by Purchaser of this Agreement or any Ancillary Document to which it is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby and the taking by Purchaser of any other action contemplated hereby or thereby, do not and will not contravene, violate or conflict with any term or provision of its Organizational Documents.

(b)     Except as set forth on Schedule 5.4(b), no consent, waiver, approval, order or authorization of, or registration, qualification, designation or filing with any Person or Governmental Body is required in connection with the execution, delivery and performance by Purchaser of this Agreement or the Ancillary Documents to which it is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the assumption and performance of the Assumed Liabilities or the taking by Purchaser of any other action contemplated hereby or thereby, other than such filings, notices or consents, the failure of which to make or obtain would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Purchaser's ability to perform its obligations under this Agreement and the Ancillary Documents to which it is a party, to assume and perform the Assumed Liabilities or to consummate on a timely basis the transactions contemplated hereby or thereby.

5.5     Brokers.  Except as set forth on Schedule 5.5, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and Sellers are not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement based upon any arrangement made by or on behalf of Purchaser.

5.6     Adequate Assurances Regarding Assigned Contracts.  As of the Closing, Purchaser will be capable of satisfying the adequate assurance of future performance conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts, subject to the fulfillment by the Sellers of the conditions set forth in Section 3.2(n) of this Agreement.

5.7     No Litigation.   To Purchaser's knowledge, there are no actions, suits, claims, investigations, hearings, or proceedings of any type pending (or, to the knowledge of Purchaser, threatened) instituted against Purchaser challenging the legality of the transactions contemplated in this Agreement (other than with respect to any objection which may be filed in connection with the Bankruptcy Cases), except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Purchaser's ability to consummate the transactions contemplated hereby.

5.8     Sufficiency of Funds.   Purchaser has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated hereunder.

5.9      Due Diligence.  SELLERS HEREBY ACKNOWLEDGE AND AGREE THAT, EXCEPT AS PROVIDED IN THIS AGREEMENT OR ANY CERTIFICATE OR DOCUMENT DELIVERED PURSUANT TO THIS AGREEMENT, PURCHASER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS.   THE FOREGOING LIMITATIONS SHALL NOT APPLY TO, AND NOTHING HEREIN SHALL LIMIT, THE SELLERS' REMEDIES IN THE EVENT OF FRAUD.

ARTICLE VI.

EMPLOYEES

6.1    <u>Employee Matters</u>.

(a)    The Purchaser intends to extend offers of employment (which may be for employment with Purchaser or any of its Affiliates) to substantially all of the restaurant-level Employees as of the Closing Date. Sellers will make available to Purchaser a correct and complete list of all their then current restaurant-level Employees within five (5) days after the Agreement Date, and again thirty (30) days prior to the Closing Date, ten (10) days prior to the Closing Date and also on the Closing Date. Consistent with applicable law, the Sellers shall provide Purchaser access to their personnel records and personnel files and shall provide such other information regarding their restaurant-level Employees as Purchaser may reasonably request. All such restaurant-level Employees who accept such offers of employment, and commence such employment immediately after the Closing, with Purchaser or its Affiliates are hereinafter referred to as the "***Transferred Employees***". Effective as of immediately before the Closing, each Seller shall terminate the employment of its respective Employees who have accepted offers of employment with Purchaser or its Affiliates.

(b)    Subject to Purchaser's right to terminate any Transferred Employees, Purchaser shall provide, or shall cause one of its Affiliates to provide, for a period of one year from and after the Closing Date, each Transferred Employee with compensation and benefits (excluding, for this purpose, equity-based compensation, defined benefit pension, and retiree medical and life benefits) that are, in the aggregate, substantially comparable to those provided to such Transferred Employees as of the Agreement Date. For purposes of eligibility, vesting, and participation (but not benefit accrual) under any Purchaser plans and programs providing employee benefits to Transferred Employees after the Closing Date (the "***Post-Closing Plans***"), each Transferred Employee shall be credited with his or her years of service with Sellers before the Closing Date to the same extent as such Transferred Employee was entitled, before the Closing Date, to credit for such service under substantially similar Benefit Plans in which such Transferred Employees participated before the Closing Date (such Seller plans, the "***Seller Benefit Plans***"), except to the extent such credit would result in a duplication of benefits and only to the extent that such service was relevant for such determination under the corresponding Seller Benefit Plan.

(c)    For purposes of each Post-Closing Plan providing medical, dental, hospital, pharmaceutical or vision benefits to any Transferred Employee, to the extent permitted under the applicable Post-Closing Plan(s), Purchaser shall use commercially reasonable efforts to cause to be waived all pre-existing condition exclusions and actively-at-work requirements of such Post-Closing Plan for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under the comparable Seller Benefit Plan). In addition, to the extent permitted under the applicable Post-Closing Plan(s), Purchaser shall use reasonable efforts to cause any co-payments, deductibles and other eligible expenses incurred by such Transferred Employee and/or his or her covered dependents under any Seller Benefit Plan providing, medical, dental, hospital, pharmaceutical or vision benefits during the plan year prior to the Closing Date to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Post-Closing Plan in which he or she participates, and solely to the extent such amounts were credited for such purpose under the comparable Seller Benefit Plan.

(d)    The Sellers shall be responsible for the payment of any severance payment or benefits that become due to any current or former employee, officer, director, member, partner or independent contractor as a result of the termination of such individual by any Seller or ERISA Affiliate

22

thereof. The Sellers shall be responsible for all legally mandated health care continuation coverage for their, and their ERISA Affiliates', current and former employees (and their qualified beneficiaries) who had or have a loss of coverage due to a "qualifying event" (within the meaning of Section 603 of ERISA) which occurred or occurs on or prior to the Closing Date including, without limitation, any loss of coverage that results directly or indirectly from the transactions contemplated by this Agreement.

(e)    On and following the Agreement Date, Sellers and Purchaser shall reasonably cooperate in all matters reasonably necessary to effect the transactions contemplated by this Section 6.1, including exchanging information and data relating to workers' compensation, employee benefits and employee benefit plan coverage, and in obtaining any governmental approvals required hereunder, except as would result in the violation of any applicable Law, including without limitation, any Law relating to the safeguarding of data privacy.

(f)    The provisions of this Section 6.1 are for the sole benefit of the parties to this Agreement only and shall not be construed to grant any rights, as a third party beneficiary or otherwise, to any person who is not a party to this Agreement, nor shall any provision of this Agreement be deemed to be the adoption of, or an amendment to, any employee benefit plan, as that term is defined in Section 3(3) of ERISA, or otherwise to limit the right of Purchaser or the Sellers to amend, modify or terminate any such employee benefit plan. Nothing herein, expressed or implied, shall confer upon any Employee (including any Transferred Employee) any rights or remedies (including, without limitation, any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of any provision of this Agreement.

## ARTICLE VII.

## BANKRUPTCY COURT MATTERS

7.1    Approval of Bid Protections; Franchisor Rights.  Subject to the entry of the Bidding Procedures Order, in consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation hereof and the identification and quantification of assets of Sellers, Sellers shall pay in cash to Purchaser promptly upon the effective date of termination of this Agreement in accordance with, and only to the extent provided in, the provisions of Section 3.5, the Bid Protections.  The obligations of Sellers to pay the Bid Protections shall (i) be entitled to an administrative expense claim status under sections 503(b) and 507 of the Bankruptcy Code against the Sellers, and (ii) survive the termination of this Agreement in accordance with Section 3.6. The Bidding Procedures Order shall approve the Bid Protections as set forth in this paragraph.  In addition, the Bidding Procedures Order shall provide that the Purchaser, or the appropriate Affiliate of Purchaser, in its capacity as franchisor to the Sellers, shall retain any applicable consent rights arising under applicable Law or contract, based upon whether any Competing Bid (as defined below) qualifies as a potential Sonic franchisee, consistent with Sonic's standards and qualifications employed in the Ordinary Course of Business, it being understood that such franchisor shall retain all rights in connection with Cure Costs associated with existing franchise agreements in the event of a third party bidder is the eventual purchaser of the Sellers' assets.

7.2    Competing Bid and Other Matters.

(a)    The Sellers shall file with the Bankruptcy Court by no later than (i) February 17, 2020, an application or motion seeking approval of the Bidding Procedures Order (the "**Sale and Bidding Procedures Motion**") and the Sellers' authority to enter into this Agreement, and (ii) February 21, 2020, a supplement to the Sale and Bidding Procedures Motion containing the form of this Agreement, without

schedules; provided, that the Sale and Bidding Procedures Motion shall be in form and substance acceptable to Purchaser, in its sole discretion.

(b)       This Agreement and the transactions contemplated hereby are subject to Sellers' right and ability to consider higher or better competing bids with respect to the Business and a material portion of the Purchased Assets pursuant to the Bidding Procedures Order (each a "***Competing Bid***"). Following completion of the Auction, if Purchaser is the Prevailing Bidder, Sellers shall not initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person in connection with any sale or other disposition of the Purchased Assets.  In addition, unless otherwise directed by the Bankruptcy Court, Sellers shall not after completion of the Auction respond to or pursue any proposed Alternative Transaction or perform any other acts related thereto.

(c)       If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "***Prevailing Bidder***"), Purchaser shall, if its bid is determined to be the next highest bid serve as a back-up bidder (the "***Back-up Bidder***") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the date which is 15 days after the date of the Sale Hearing (the "***Outside Back-up Date***"); or (ii) the date of closing of an Alternative Transaction with the Prevailing Bidder.  Following the Sale Hearing and prior to the Outside Back-up Date, if the Prevailing Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Prevailing Bidder, the Back-up Bidder will be deemed to have the new prevailing bid, and Sellers will be authorized, without further order of the Bankruptcy Court, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement with the Back-up Bidder.

(d)       The Sellers shall promptly serve true and correct copies of the Sale and Bidding Procedures Motion and all related pleadings in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules and any other applicable order of the Bankruptcy Court.

7.3       Sale Order.  The Sale Order shall be entered by the Bankruptcy Court.  The Sale Order shall, among other things, (i) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Purchased Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (C) the performance by Sellers of their respective obligations under this Agreement; (ii) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts; and (iii) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, not a successor to any Sellers and grant Purchaser the protections of section 363(m) of the Bankruptcy Code.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, and (b) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

7.4       Contracts.  Sellers shall serve on all non-Seller counterparties to all of their Contracts a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the Cure Costs or Assumed Leased Real Property Cure Costs, if any, which deadline shall not be less than three (3) Business Days prior to the Sale Hearing.

7.5    <u>Bankruptcy Filings</u>.  From and after the Agreement Date and until the Closing Date, Sellers shall deliver to Purchaser drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement for Purchaser's prior review and comment, and such filings shall be acceptable to Purchaser in its sole discretion to the extent they relate to the Purchased Assets, any Assumed Liabilities or any of Purchaser's obligations hereunder.  Sellers agree to diligently prosecute the entry of the Bidding Procedures Order and the Sale Order.  In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, Sellers shall use their best efforts to defend such appeal.  Sellers shall comply with all notice requirements (i) of the Bankruptcy Code and the Bankruptcy Rules, or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

7.6    <u>Sale Free and Clear</u>.  Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estate, to the fullest extent permitted by section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets.  On the Closing Date, the Purchased Assets shall be transferred to Purchaser free and clear of all obligations, Liabilities and Encumbrances, other than Permitted Encumbrances and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

ARTICLE VIII.

COVENANTS AND AGREEMENTS

8.1    <u>Conduct of Business of Sellers</u>.    During the Pre-Closing Period, Sellers shall use commercially reasonable efforts, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, to operate the Business in the Ordinary Course of Business (among other things, Sellers will not incur unreasonable liabilities, including, without limitation, inappropriate increases in Inventory or factoring of accounts receivable).  Sellers shall use commercially reasonable efforts to (A) preserve intact their respective business organizations, (B) maintain the Business and the Purchased Assets (normal wear and tear excepted), (C) keep available the services of their respective officers and Employees, (D) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers, vendors and others having business relationships with Sellers in connection with the operation of the Business (other than payment of pre-petition claims), (E) pay all of their respective post-petition obligations in the Ordinary Course of Business, and (F) continue to operate the Business and Purchased Assets in all material respects in compliance with all Laws applicable to the Business and Sellers.  Without limiting the generality of the foregoing, and except (i) as otherwise expressly provided in or contemplated by this Agreement, (ii) as required pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court or (iii) in connection with the consummation of an Alternative Transaction, on or prior to the Closing Date, Sellers may not, without the prior written consent of Purchaser, take any of the following actions with respect to the Business or the Purchased Assets:

(a)    other than as set forth in <u>Schedule 8.1(a)</u>, (i) modify in any manner the compensation of any of the Employees or officers, or accelerate the payment of any such compensation (other than such that the liability associated with such modification is excluded from the Assumed Liabilities), (ii) grant any (a) bonuses, whether monetary or otherwise, (b) increase wages or salary  or (c) increase other compensation or material benefits, in any case, in respect of any current or former employee, independent contractor, director or officer of the Sellers;

(b)    other than as set forth in <u>Schedule 8.1(b)</u>, engage any new Employee other than in the Ordinary Course of Business, <u>provided</u>, <u>however</u>, that Sellers shall not engage any new Employee or

terminate any existing Employee without cause, in either case whose aggregate total compensation exceeds $50,000.00;

        (c)     except as set forth in <u>Schedule 8.1(c)</u>, remove or permit to be removed from any building, facility, or real property any asset, equipment, machinery or any Inventory (other than in connection with the sale of Inventory in the Ordinary Course of Business);

        (d)     sell, lease or otherwise dispose of, mortgage, hypothecate or otherwise encumber any asset (other than sales of Inventory in the Ordinary Course of Business and other than any liens provided for in the DIP Order);

        (e)     except in accordance with the DIP Budget, enter into, amend, terminate or renew any Contract;

        (f)     amend or modify the DIP Credit Agreement, without the consent of the DIP Lender;

        (g)     make any capital expenditures except in accordance with the DIP Budget;

        (h)     incur any Indebtedness for borrowed money other than pursuant to the DIP Financing Agreements;

        (i)     fail to use commercially reasonable efforts to renew and maintain all material Permits of Sellers, used in the operation of the Business or the Purchased Assets;

        (j)     make any unusual or extraordinary efforts to collect any outstanding Accounts Receivable or intercompany obligation, liability or Indebtedness, give any discounts or concessions for early payment of such accounts receivable or intercompany obligation, liability or Indebtedness, other than discounts consistent with past practice and given by the Business in the Ordinary Course of Business and make any sales of, or, other than liens provided for in the DIP Order, convey any interest in, any accounts receivable or intercompany obligation, liability or Indebtedness to any third party;

        (k)     other than transactions pursuant to agreements or arrangements in effect on the Petition Date as set forth on <u>Schedule 8.1(k)</u> or that are otherwise specifically set forth in the DIP Budget, engage in any transaction with any Affiliate, subsidiary, shareholder, officer or director of any Seller, incur or assume any long term or short term debt with or on behalf of any such Person or guarantee, endorse or otherwise be liable or responsible (whether directly, indirectly, contingently or otherwise) for the obligations of any such Person;

        (l)     make any change in their method of accounting, except as required by GAAP;

        (m)     fail to maintain any insurance policy in effect on the date hereof or amend any such policy (other than extensions, replacements or amendments thereof in the Ordinary Course of Business);

        (n)     accelerate the payment or funding of any obligation, Liability or Indebtedness of any Seller;

        (o)     make or change any Tax election, file any Tax Return (other than consistent with past practice and applicable Law), file any amended Tax Return, enter into any closing agreement, settle any Tax claim or assessment, surrender any right to claim a refund of Taxes, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, incur any liability for Taxes

outside the Ordinary Course of Business, fail to pay any Tax that becomes due and payable (including any estimated tax payments), prepare or file any Tax Return in a manner inconsistent with past practice, or adopt or change any accounting method in respect of Taxes;

(p)    establish, enter into, terminate, adopt or amend any Benefit Plan (other than amendments required by Law or to maintain the tax qualified status of any Benefit Plan under Section 401(a) of the Code), or any other plan, trust, policy, agreement, program or arrangement for the benefit of any current or former employees or other service providers, including but not limited to, any change in control or severance agreement;

(q)    loan to, or enter into any other similar transaction with, any employee, officer, director, or independent contractor;

(r)    settle or agree to settle any pending or threatened Action or litigation;

(s)    other than sales of Inventory in the Ordinary Course of Business, sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any postpetition lien on any Purchased Assets, whether now existing or hereafter transferred hereunder, or any interest, therein, and the Sellers will not sell, pledge, assign or suffer to exist any lien on its interest in the Purchased Assets. The Sellers will promptly notify the Purchaser of the existence of any lien placed on any Purchased Assets after the Agreement Date;

(t)    consolidate with or merge into any other Person or convey or transfer its properties and assets substantially as an entirety to any Person, or, except for sales of Inventory in the Ordinary Course of Business, sell or assign with or without recourse any Purchased Asset or any interest therein; and

(u)    agree, whether in writing or otherwise, to do any of the foregoing.

8.2    Access to Information.  Sellers agree that, between the Agreement Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, Purchaser shall be entitled, through its officers, employees, legal counsel, accountants and other authorized representatives, agents and contractors ("*Representatives*"), to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, businesses, assets, Employees, accountants, auditors, counsel and operations of Sellers as Purchaser's Representatives may reasonably request, but excluding any Consolidated Tax Return.  Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances.  Each Seller shall use commercially reasonable efforts to cause its Representatives to reasonably cooperate with Purchaser and Purchaser's Representatives in connection with such investigations and examinations, and Purchaser shall, and use its commercially reasonably efforts to cause its Representatives to, reasonably cooperate with the Sellers and their respective Representatives, and shall use its commercially reasonable efforts to minimize any disruption to the Business.

8.3    Assignability of Certain Contracts.  To the extent that the assignment to Purchaser of any Assigned Contract pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Contract or any right or interest therein unless and until such consent is obtained; provided, however, that the Parties will use their commercially reasonable efforts, before the Closing, to obtain all such consents; provided, further, that if any such consents are not obtained prior to the Closing Date, Sellers and Purchaser will reasonably cooperate with each other in any lawful and feasible arrangement designed to provide Purchaser with the benefits and obligations of any such Contract and

27

Purchaser shall be responsible for performing all obligations under such Contract required to be performed by Sellers on or after the Closing Date to the extent set forth in this Agreement.

8.4    Rejected Contracts.  Sellers shall not reject any Assigned Contract in any bankruptcy proceeding following the Agreement Date without the prior written consent of Purchaser, which Purchaser may withhold, condition or delay, in its sole discretion.

8.5    Reasonable Efforts; Cooperation.

(a)    Subject to the other provisions hereof, and unless this Agreement is terminated in accordance with its terms, each Party shall use its commercially reasonable efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper, or advisable under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, but, in any event, on or prior to the Outside Date, in accordance with the terms hereof and shall cooperate in a commercially reasonable manner with each other Party and its Representatives in connection with any step required to be taken as a part of its obligations hereunder.

(b)    In the event that any of the Parties to this Agreement discovers a Contract related to the Business, the Purchased Assets or the Assumed Liabilities during the period from and after the Agreement Date, and such Contract (i) was unknown as of the Agreement Date, (ii) is a Contract that Purchaser wishes to assume the rights and obligations of and (iii) such Contract would not be deemed a Rejected Contract by Sellers, Purchaser and Sellers shall execute, acknowledge and deliver such other instruments and take such further actions as are reasonably practicable for Purchaser to assume the rights and obligations under such Contract.

(c)    The obligations of Sellers pursuant to this Section 8.5 shall be subject to any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), and each of Seller's obligations as a debtor-in-possession to comply with any order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Business as required by the Bankruptcy Code.

(d)    Sellers, on the one hand, and Purchaser, on the other hand, (i) shall promptly inform each other of any communication from any Governmental Body concerning this Agreement, the transactions contemplated hereby, and any filing, notification, or request for approval and (ii) shall permit the other to review in advance, with a reasonable opportunity for comment thereon, any proposed written or material oral communication or information submitted to any such Governmental Body in response thereto.  In addition, none of Parties shall agree to participate in any meeting with any Governmental Body with respect to any filings, investigation, or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, unless prohibited by any such Governmental Body, gives the other Parties the opportunity to attend and participate, in each case to the maximum extent practicable.  Subject to restrictions under any Order or Law, Purchaser, on the one hand, and Sellers, on the other hand, shall furnish the other with copies of all correspondences, filings, and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Body or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business), or any such filing, notification, or request for approval.  Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration, or submissions of information to the Governmental Body

in connection with this Agreement, the transactions contemplated hereby and any such filing, notification, or request for approval. Each Party shall be responsible for payment of its own respective costs and expenses (including attorneys' fees and other legal fees and expenses) in respect of such actions.

(e)    Sellers shall reasonably assist the Purchaser, upon Purchaser's request and at Purchaser's cost and expense, in the Purchaser's submission of all required filings, notifications, or applications to all applicable Governmental Bodies in connection with or arising from the transactions contemplated by this Agreement, including without limitation, the transfer of the Permits to the Purchaser or its designee.

8.6    <u>Further Assurances</u>.  Each Party shall execute and cause to be delivered to each other Party such instruments and other documents, and shall take such other actions, as such other Party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.  After the Closing, each Seller shall promptly transfer or deliver to Purchaser cash, checks (which shall be properly endorsed) or other property that any Seller may receive in respect of any deposit, prepaid expense, receivable or other item that constitutes part of the Purchased Assets or relates to the Assumed Liabilities.  After the Closing, Purchaser shall promptly transfer or deliver to Sellers cash, checks (which shall be properly endorsed) or other property that Purchaser may receive in respect of any deposit, prepaid expense, receivable or other item that constitutes part of the Excluded Assets or relates to the Excluded Liabilities.

8.7    <u>Notification of Certain Matters</u>.  Sellers shall give prompt notice to Purchaser, and Purchaser shall give prompt notice to Sellers, of (i) any notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement or the Ancillary Documents is not likely to be obtained prior to Closing, (ii) any written objection or proceeding that challenges the transactions contemplated hereby or the entry of the approval of the Bankruptcy Court and (iii) the status of matters relating to the completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by Sellers or Purchaser or by any of their respective Affiliates (as the case may be), from any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement.

8.8    <u>Confidentiality</u>.  Following the completion of the Auction, Sellers agree (A) not to disclose to any Person, or use or otherwise exploit for their benefit  any confidential information regarding the Business, the Purchased Assets or the Assumed Liabilities or any of the discussions or negotiations conducted with Purchaser in connection with this Agreement and (B) to take all appropriate steps, to safeguard such confidential information and to protect it against disclosure, misuse, loss, or theft, <u>provided</u>, that obligations under (A) above shall not apply to information that becomes generally available to the public other than as a result of the breach of this <u>Section 8.8</u> or information not otherwise known by the Sellers that becomes available to any Seller from a Person other than Purchaser without any breach of such Person's confidentiality obligations to any other Person. Notwithstanding the foregoing, Sellers shall be entitled to disclose (i) any information required to be disclosed by Sellers to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Cases, other Persons bidding on assets of Sellers, (ii) any information required to be disclosed by Sellers pursuant to any applicable Law (including, without limitation, the Bankruptcy Code), legal proceeding, or Governmental Body, or (iii) any information to Sellers' counsel and advisors; <u>provided</u>, that, in each case, (x) such disclosure shall be limited to the information that is so required to be disclosed and to the Person(s) to whom such disclosure is required, (y) such counsel and advisors have agreed not to disclose or use such confidential information except under the conditions that Sellers are permitted to disclose or use such information pursuant to this <u>Section 8.8</u> and (z) if information is required to be disclosed pursuant to clauses (i) or (ii) above, Sellers shall provide Purchaser with prompt notice of such requirement prior to making any disclosure so that Purchaser may

seek at its own cost and expense an appropriate protective order.  Notwithstanding anything in this Section 8.8 to the contrary, unless disclosure is required by applicable Law, the confidentiality of any trade secrets of the Business shall be maintained by Sellers and their Affiliates or Representatives for so long as such trade secrets continue to be entitled to protection as trade secrets of the Business.

8.9    Preservation of Records.  Sellers (or any subsequently appointed bankruptcy estate representative, including, but not limited to, a trustee, a creditor trustee, or a plan administrator) and Purchaser agree that each of them shall preserve and keep the books and records held by it relating to the pre-Closing Business for the period commencing on the Agreement Date and ending on the earlier of (i) such date on which an orderly wind-down of the Sellers' operations has occurred in the reasonable judgment of Purchaser and Sellers and (ii) the 36 month anniversary of the Agreement Date, and during such period each of Sellers and Purchaser shall make such books and records available to the other Parties (and permit such other Party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such Party in connection with, among other things, any insurance claims by, legal proceedings, or Tax audits against or governmental investigations of Sellers or Purchaser or in order to enable Sellers or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document, or instrument contemplated hereby or thereby.  In the event any Party wishes to destroy such records during such 36-month period, such Party shall first provide ten (10) business days' prior written notice to the other, and such other Party shall have the right, at its option and expense, to take possession of such records within five (5) business days after notice thereof.

8.10    Publicity.    Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser lists securities, provided that the party intending to make such release shall use its best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

8.11    Material Adverse Effect.    Sellers shall promptly inform Purchaser in writing of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Effect.

8.12    Casualty Loss.  Notwithstanding any provision of this Agreement to the contrary, if, before the Closing, all or any portion of the Purchased Assets is (a) condemned or taken by eminent domain, or (b) is damaged or destroyed by fire, flood or other casualty, Sellers shall notify Purchaser promptly in writing of such fact, (i) in the case of condemnation or taking, Sellers shall assign or pay, as the case may be, any proceeds thereof to Purchaser at the Closing, and (ii) in the case of fire, flood or other casualty, Sellers shall assign the insurance proceeds therefrom to Purchaser at Closing.  Notwithstanding the foregoing, the provisions of this Section 8.12 shall not in any way modify Purchaser's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

8.13    No Successor Liability.  The Parties intend that, except where expressly prohibited under applicable Law, upon the Closing, Purchaser shall not be deemed to:  (i) be the successor of Sellers, (ii) have, de facto, or otherwise, merged with or into Sellers, (iii) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers, or (iv) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Purchased Assets other than as set forth in this Agreement.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Purchaser shall not be liable for any Encumbrance (other than Assumed

Liabilities and Permitted Encumbrances) against Sellers or any of Sellers predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any Liabilities of Sellers arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this <u>Section 8.13</u> shall be reflected in the Sale Order.

  8.14 <u>Update of Disclosure Schedules</u>.

    (a) Each Party has the continuing right and obligation (a) to supplement, modify or amend, with respect to any matter hereafter arising or events or conditions arising after the date hereof and prior to the Closing, the information required to be set forth on the schedules to this Agreement with respect to any matter hereafter arising or discovered which, if existing or known at the Agreement Date, would have been required to have been set forth on such Disclosure Schedules, and (b) if necessary or appropriate to correct any inaccuracy in a representation made by such Party, to add any schedules with a corresponding reference in this Agreement (such information and additional schedules collectively being called the "***Updating Information***"); and

    (b) To the extent Updating Information contains Liabilities, all such Liabilities shall be Excluded Liabilities and Purchaser shall not assume nor be deemed to have assumed such excess Liabilities unless (i) Purchaser agrees to assume such Liabilities in writing or (ii) such Liabilities fall within the definition of Assumed Liabilities.

    (c) Notwithstanding anything to the contrary contained herein, the Purchaser shall be entitled to remove and leave behind with Seller, in its sole discretion, any Sonic restaurant franchise location and the Purchased Assets (and liabilities associated therewith) located at such Sonic restaurant franchise location so long as no reduction in Purchase Price is made as a result of such removal.  Purchaser shall deliver notice to the Sellers of any such removal promptly after making such determination, but in any event at least 2 Business Days prior to the Closing Date.  In addition, the Purchaser and the Sellers shall have the right to modify the schedules attached hereto to their mutual satisfaction until _____ __, 2020 or such later date as the parties may otherwise agree.

ARTICLE IX.

CONDITIONS TO CLOSING

  9.1 <u>Conditions Precedent to the Obligations of Purchaser and Sellers</u>.  The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of the Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

    (a) there shall not be in effect, enacted, enforced or entered by a Governmental Body any Law, Order, writ, injunction, judgment, decision or decree preventing, enjoining, restraining, making illegal, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Documents; provided, however, that (i) the right to terminate this Agreement pursuant to this <u>Section 9.1(a)</u> shall not be available to any Party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such Order, writ, injunction, judgment, decision or decree, and (ii) the Party seeking to terminate this Agreement (and its Affiliates) shall have used reasonable best efforts to have such Law declared invalid or inapplicable or such Order, writ, injunction, judgment, decision or decree vacated;

31

(b)      the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order (as provided in <u>Article VII</u>) and each of such orders shall be a Final Order and in form and substance reasonably satisfactory to Sellers and Purchaser, which orders shall not have been reversed, modified, amended or stayed; and

(c)      to the extent applicable, any waiting period (including any extension thereof) applicable to the purchase and sale of the Purchased Assets under any other applicable antitrust or competition Law shall have expired or been terminated.

9.2      <u>Conditions Precedent to the Obligations of Seller</u>.   The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Sellers in their sole discretion:

(a)      the representations and warranties made by Purchaser in this Agreement or in any Ancillary Document shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the Agreement Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date);

(b)      Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date; and

(c)      Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 3.3</u>.

9.3      <u>Conditions Precedent to the Obligations of Purchaser</u>.   The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Purchaser in its sole discretion:

(a)      Sellers shall have delivered to Purchaser (i) a certified copy of the Sale Order (which shall contain the terms described in <u>Section 7.3</u>) and (ii) copies of all affidavits of service of the Sale Motion or notice of such motion filed by or on behalf of Sellers (which service shall comply with <u>Section 7.2(d)</u>);

(b)      the representations and warranties made by Sellers in this Agreement or in any Ancillary Document shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the Agreement Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date);

(c)      Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them on or prior to the Closing Date;

(d)      each consent, approval, assignment or waiver of any third party identified on <u>Schedule 9.3(d)</u> shall, in each case, (i) have been obtained and delivered to Purchaser, (ii) be in form and

substance reasonably satisfactory to Purchaser, (iii) not be subject to the satisfaction of any condition that has not been satisfied or waived and (iv) be in full force and effect;

(e)    Sellers shall have delivered, or caused to be delivered, to Purchaser, all of the items set forth in Section 3.2;

(f)    Any Permits necessary for the Sellers to perform their respective obligations under this Agreement and to consummate the transactions contemplated herein and necessary to operate the Business shall have been transferred to the Purchaser to the extent the same are transferrable;

(g)    all consents, approvals and actions of, and filings with any Governmental Body necessary to permit the Sellers to perform their respective obligations under this Agreement and to consummate the transactions contemplated herein shall have been duly obtained, made or given;

(h)    Sellers shall have complied with the sale process deadlines set forth in the Bidding Procedures Order; and

(i)    Any updated schedules Purchaser has received from Sellers containing Updating Information shall be satisfactory to the Purchaser in its sole discretion.

## ARTICLE X.

## ADDITIONAL DEFINITIONS

10.1    _Definitions_.  As used herein:

"***503(b)(9) Claim***" means any Claim asserted against the Sellers related to the Business pursuant to section 503(b)(9) of the Bankruptcy Code.

"***Accounts Receivable***" shall have the meaning set forth in Section 1.1(c).

"***Action***" means any action, claim, complaint, grievance, summons, suit, litigation, arbitration, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation by or before any Governmental Body.

"***Affiliate***" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means (i) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise or (ii) an officer, director, or any Person that has the power, directly or indirectly, to vote 5% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person.

"***Affiliate Agreement***" means any agreement or contract between any director, officer, employee or greater than five percent (5%) stockholder of any Seller or Affiliate of any such Person, on one hand, and any Seller, on the other hand, related to the Business, including any contract providing for the employment of, furnishing of services by, rental of real or personal property from or otherwise requiring payments to any such Person or firm, other than employment-at-will arrangements in the ordinary course of business.

33

"***Agreement***" shall have the meaning set forth in the preamble.

"***Agreement Date***" shall have the meaning set forth in the preamble.

"***Allocation***" shall have the meaning set forth in <u>Section 11.2</u>.

"***Alternative Transaction***" means (i) the approval by the Bankruptcy Court of a sale or sales of a material portion of the Purchased Assets to a Person other than Purchaser, or (ii) the filing of a plan of reorganization that does not contemplate the sale of the Purchased Assets to Purchaser in accordance with the terms hereof.

"***Ancillary Documents***" means any certificate, agreement, document or other instrument (other than this Agreement) to be executed and delivered by a Party in connection with the consummation of the transactions contemplated this Agreement.

"***Arbitrating Accountant***" means (a) a nationally recognized certified public accounting firm jointly selected by Purchaser and the Sellers that is not then engaged to perform accounting, tax or auditing services for the Sellers or Purchaser or (b) if the Sellers and Purchaser are unable to agree on an accountant, then a nationally recognized certified public accounting firm jointly selected by the Sellers' accounting firm and Purchaser's accounting firm.

"***Assigned Avoidance Actions***" shall have the meaning set forth in <u>Section 1.1(a)</u>**.**

"***Assigned Contracts***" shall have the meaning set forth in <u>Section 1.1(b)</u>.

"***Assignment and Assumption Agreement***" shall have the meaning set forth in <u>Section 3.2(b)</u>.

"***Assumed Leased Real Property"*** shall have the meaning set forth in <u>Section 1.1(h)</u>.

"***Assumed Leased Real Property Cure Costs"*** means all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Leased Real Property.

"***Assumed Liabilities***" shall have the meaning set forth in <u>Section 1.3</u>.

"***Assumption and Assignment of Leases***" shall have the meaning set forth in <u>Section 3.2(h)</u>.

"***Auction***" has that meaning ascribed to such term by the Bidding Procedures Order.

"***Avoidance Actions***" means all avoidance claims or causes of action under the Bankruptcy Code or applicable Law (including, without limitation, any preference or fraudulent conveyance), and all other claims or causes of action under any other provision of the Bankruptcy Code or applicable Law, in each case belonging to a Seller.

"***Back-up Bidder***" shall have the meaning set forth in <u>Section 7.2(c)</u>.

"***Bankruptcy Cases***" shall have the meaning set forth in the Recitals.

"***Bankruptcy Code***" shall have the meaning set forth in the Recitals.

"*Bankruptcy Court*" shall have the meaning set forth in the Recitals.

"*Bankruptcy Rules*" shall have the meaning set forth in the Recitals.

"*Benefit Plan*" means (i) all "*employee benefit plans*" (including, without limitation, as defined in Section 3(3) of ERISA), including all employee benefit plans which are "*pension plans*" (including, without limitation, as defined in Section 3(2) of ERISA) and any other employee benefit arrangements or payroll practices (including severance pay, vacation pay, company awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life, insurance, fringe benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive compensation, stock purchase, equity-based, stock option, stock appreciation rights, restricted stock and phantom stock arrangements or policies) and (ii) all other employment, termination, bonus, severance, change in control, collective bargaining or other similar plans, programs, policies, contracts, or arrangements (whether written or unwritten), in each case, adopted, sponsored by, entered into, maintained, contributed to, or required to be contributed to by any Seller or any ERISA Affiliate for the benefit of any current or former employee, director, officer or independent contractor of any Seller, under or with respect to which any Seller or ERISA Affiliate has any Liability.

"*Bid Protections*" means the Break-up Fee and the Expense Reimbursement.

"*Bidding Procedures Order*" means an order substantially in the form attached hereto as Exhibit D and otherwise in form and substance reasonably satisfactory to Sellers and Purchaser.

"*Bill of Sale*" shall have the meaning set forth in Section 3.2(a).

"*Break-up Fee*" means $450,000.00, which shall be waived in the event that the DIP Order approves the Roll-Up.

"*Business*" shall have the meaning set forth in the Section 1.1.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

"*Claim*" has the meaning given that term in section 101(5) of the Bankruptcy Code and includes, *inter alia*, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment right, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"*Closing*" shall have the meaning set forth in Section 3.1.

"*Closing Date*" means the date on which the Closing occurs.

"*Code*" means the United States Internal Revenue Code of 1986, as the same may be amended from time to time.

"*Competing Bid*" shall have the meaning set forth in Section 7.2(b).

"*Consolidated Tax Return*" means any Tax Return (i) filed on a consolidated, combined, unitary, aggregate or similar basis with another Person that owns, directly or indirectly, equity interests in

the Sellers or (ii) that includes items attributable to an asset or business other than the Purchased Assets or the Business.

"***Contract***" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, license, understanding, instrument or other agreement, arrangement or commitment that is binding upon a Person or its property, whether express or implied.

"***Cure Costs***" means all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts other than those cure costs related to the Assumed Leased Real Property.

"***Debtors***" means the Sellers and each of RTHT Investments, LLC, SD Restaurant Group, LLC, and Southern Deli Holdings, LLC.

"***Deposit***" shall have the meaning set forth in Section 2.3.

"***Designated Purchaser***" shall have the meaning set forth in Section 12.8.

"***DIP Credit Agreement***" means that certain Superpriority Debtor-in-Possession Secured Promissory Note, dated February 11, 2020, by and among SD-Charlotte, LLC, the guarantors party thereto and SRI Holding Company as the lender thereunder.

"***DIP Financing Agreements***" means the DIP Credit Agreement, any amendments to the DIP Credit Agreement, the Budget and the other Loan Documents (each as defined in the DIP Credit Agreement).

"***DIP Budget***" means the pro forma budget delivered to the Purchaser specifying the Sellers' operating budget as debtor-in-possession, in the form attached hereto as Exhibit E, with any modifications thereto subject to Purchaser's prior written consent.

"***DIP Order***" means an order or orders entered by the Bankruptcy Court which approve the DIP Financing Agreements on a final basis, in form and substance satisfactory to the Purchaser, with any modifications thereto subject to Purchaser's prior written consent.

"***Documents***" means all of Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental plans and reports, data, Permits and Permit applications, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form, relating to the Business.

"***Employee***" means an individual who, as of the applicable date, is employed by any Seller in connection with the Business.

"***Employment Contracts***" shall have the meaning set forth in Section 6.1(g).

"***Encumbrance***" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), right, demand, charge,

mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, rights of first refusal, preemptive rights, judgments, conditional sale or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever.

"***Environmental Law***" means any foreign, federal, state or local law, statute, regulation, or ordinance relating to the protection of human health, safety, the environment, natural resources or consumer products.

"***Environmental Liabilities and Obligations***" means all Liabilities from any impairment, impact or damage before the Closing Date to the environment, health or safety, or any failure to comply with Environmental Law before the Closing Date in connection with the operation of the Business, the Purchased Assets, or the Assumed Leased Real Property, including Liabilities related to: (i) the transportation, storage, use, arrangement for disposal or disposal of, or exposure to, Hazardous Materials; (ii) the Release of Hazardous Materials, including migration onto or from the Assumed Leased Real Property; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Law including pursuant to any applicable Permits issued pursuant to under any Environmental Law; (v) Orders, notices to comply, notices of violation, alleged non-compliance and inspection reports with respect to any Liabilities pursuant to Environmental Law; and (vi) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Environmental Law but only as a result of any of the matters identified in clauses (i)-(v) of this definition.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"***ERISA Affiliate***" means any entity which is a member of (A) a controlled group of corporations (as defined in Section 414(b) of the Code), (B) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (C) an affiliated service group (as defined under Section 414(m) of the Code) or (D) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included any Seller.

"***Escrow Agent***" means a third-party entity approved by the parties hereto, which entity will have fiduciary obligations with respect to the transfer of funds related to this Agreement and whose actions will be governed by an escrow agreement approved by the parties hereto.

"***Excluded Assets***" shall have the meaning set forth in <u>Section 1.2</u>.

"***Excluded Liabilities***" shall have the meaning set forth in <u>Section 1.4</u>.

"***Expense Reimbursement***" shall mean the reasonable out-of-pocket fees, costs and expenses of the Purchaser incurred in connection with any of the transactions contemplated under this Agreement.

"***Final Order***" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in Seller' Bankruptcy Cases or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari,* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other

court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

"***Fraud***" means, with respect to any Person, such Person's making of a representation or warranty contained in this Agreement, (i) which representation is made (A) with such Person's actual knowledge or belief of the falsity of such representation or warranty and (B) with an intent by such Person to deceive another party to this Agreement with respect to the making of such representation or warranty; and (ii) such other Person relies upon such false representation or warranty and is damaged by such reliance.

"***GAAP***" means United States generally accepted accounting principles as in effect from time to time.

"***Governmental Body***" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether national, international, multi-national, supra-national, foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

"***Ground Lease***" shall have the meaning set forth in <u>Section 4.6</u>.

"***Hazardous Material***" means any substance, material or waste which is regulated by any Governmental Body, including petroleum and its by-products, asbestos, polychlorinated biphenyls and any material, waste or substance which is defined or identified as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under or subject to any provision of Environmental Law.

"***Indebtedness***" of any Person means, without duplication, (i) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person with respect to any Contracts relating to the deferred and unpaid purchase price of property or services, including any interest accrued thereon and prepayment or similar penalties and expenses; (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Encumbrance (other than Permitted Encumbrances), on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"***Inventory***" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) related to the Business maintained or held by, stored by or on behalf of, or in transit to, any of the Sellers.

"***Initial Allocation***" shall have the meaning set forth in <u>Section 11.2</u>.

"***IRS***" shall have the meaning set forth in <u>Section 4.14(c)</u>.

"***Knowledge***" or ("***Knowledge of Sellers***" or "***Sellers' Knowledge***") means the actual knowledge of a natural person, or, with respect to a Person that is not a natural person, the actual knowledge of the officers or limited liability company managers of any person, in each case, after due inquiry.

"***Law***" means any federal, state, local, municipal, foreign or international, multinational or other law, treaty, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body, in each case as in effect as of the Closing Date.

"***Lease***" shall have the meaning set forth in <u>Section 4.6</u>.

"***Leased Real Property***" means all of the real property leased, subleased, used or occupied by any of the Sellers, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Business.

"***Liability***" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"***Material Adverse Effect***" means any event, change, occurrence or state of facts that has had, or is reasonably likely to have, individually or in the aggregate, a material adverse effect on the (i) Purchased Assets, Assumed Liabilities, or Business, taken as a whole, <u>provided</u>, <u>however</u>, that in no event shall any of the following, alone or in combination, be deemed to constitute**,** or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (a) changes in the U.S. economy or capital markets in general but that do not have a disproportionate effect on the Sellers relative to other participants in the industry in which the Sellers conduct the Business, (b) changes that affect generally the industry in which the Sellers operate but that do not have a disproportionate effect on the Business relative to other participants in the industry in which the Sellers conduct the Business, (c) changes after the Agreement Date in any applicable Law or GAAP or (d) the commencement of the Bankruptcy Cases; or (ii) the ability of Sellers to consummate the transactions contemplated hereby pursuant to the terms of this Agreement.

"***NDA***" means an non-disclosure agreement or confidentiality agreement in a form satisfactory to the Sellers and executed by Purchaser and Sellers.

"***Objection Notice***" shall have the meaning set forth in <u>Section 11.2</u>.

"***Order***" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Body.

"***Ordinary Course of Business***" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice.

"***Organizational Documents***" means, with respect to a particular entity Person, (i) if a corporation, the articles or certificate of incorporation and bylaws, (ii) if a general partnership, the partnership agreement and any statement of partnership, (iii) if a limited partnership, the limited partnership agreement and certificate of limited partnership, (iv) if a limited liability company, the articles or certificate of organization or formation and any limited liability company or operating agreement, (v) if another type of Person, all other charter and similar documents adopted or filed in connection with the creation, formation or organization of the Person, and (vi) all amendments or supplements to any of the foregoing.

"***Outside Back-up Date***" shall have the meaning set forth in Section 7.2(c).

"***Outside Date***" shall have the meaning set forth in Section 3.4(b).

"***Party***" shall have the meaning set forth in the preamble.

"***Permits***" means to the fullest extent permitted under applicable law, all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body to any of the Sellers and used, or held for use, in connection with the operation of the Business or applicable to ownership of the Purchased Assets or assumption of the Assumed Liabilities.

"***Permitted Encumbrances***" means (i) Encumbrances for utilities and current Taxes not yet due and payable or being contested in good faith and for which adequate reserves have been established in accordance with GAAP, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Business and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Business or materially detract from the value of the Leased Real Property, (iii) with respect to Leased Real Property, those Encumbrances required by applicable Law or the Sale Order; (iv) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law, (v) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business, (vi) licenses granted on a non-exclusive basis, (vii) Encumbrances under Assigned Contracts as set forth on Schedule 10.1; and (viii) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially and adversely affect the operation of the Business.

"***Person***" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

"***Personal Property Leases***" shall have the meaning set forth in Section 4.7.

"***Petition Date***" means February 7, 2020.

"***Post-Closing Plans***" shall have the meaning set forth in Section 6.1(b).

"*Post-Closing Tax Period*" means any taxable period (or portion thereof) beginning after the Closing Date.

"*Pre-Closing Period*" means the period commencing on the Agreement Date and ending on the earlier of the date upon which this Agreement is terminated pursuant to Section 3.4 or the Closing Date.

"*Pre-Closing Tax Period*" means any taxable period (or portion thereof) ending on or before the Closing Date.

"*Prevailing Bidder*" shall have the meaning set forth in Section 7.2(c).

"*Previously Omitted Contract*" shall have the meaning set forth in Section 1.6(b)(i).

"*Previously Omitted Contract Designation*" shall have the meaning set forth in Section 1.6(b)(i).

"*Previously Omitted Contract Notice*" shall have the meaning set forth in Section 1.6(b)(ii).

"*Proration Period*" shall have the meaning set forth in Section 11.1(b).

"*Purchase Price*" shall have the meaning set forth in Section 2.1(a).

"*Purchased Assets*" shall have the meaning set forth in Section 1.1.

"*Purchaser*" shall have the meaning set forth in the preamble.

"*Regulatory Approvals*" means any consents, waivers, approvals, orders Permits or authorizations of any Governmental Body required in connection with the execution, delivery and performance of this Agreement of any Ancillary Document and the consummation of the transactions contemplated hereby and thereby.

"*Rejected Contracts*" shall have the meaning set forth in Section 1.6(a)(i).

"*Release*" means any actual or threatened release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal or leaching into the indoor or outdoor environment, or including migration to or from a property, including but not limited to any Leased Real Property.

"*Representatives*" shall have the meaning set forth in Section 8.2.

"*Sale and Bidding Procedures Motion*" shall have the meaning set forth in Section 7.2(a).

"*Sale Hearing*" means the hearing to approve this Agreement and seeking entry of the Sale Order.

"*Sale Motion*" means the motion or motions of Seller, in form and substance acceptable to the Purchaser, seeking approval and entry of the Bidding Procedures Order and Sale Order, attached hereto as Exhibit F and otherwise in form and substance satisfactory to the Purchaser.

"*Sale Order*" means an order substantially in the form attached hereto as Exhibit G and otherwise in form and substance satisfactory to the Purchaser.

41

"***Sellers***" shall have the meaning set forth in the preamble.

"***Seller Benefit Plans***" shall have the meaning set forth in <u>Section 6.1(b)</u>.

"***Subsidiary***" or "***Subsidiaries***" means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (a) beneficially owns, either directly or indirectly, more than fifty percent (50%) of (i) the total combined voting power of all classes of voting securities of such entity, (ii) the total combined equity interests, or (iii) the capital or profit interests, in the case of a partnership; or (b) otherwise has the power to vote or to direct the voting of sufficient securities to elect a majority of the board of directors or similar governing body.

"***Tax***" and "***Taxes***" mean any federal, state, provincial, local, foreign or other income, gross receipts, sales, value added, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, capital, production, recapture, net worth, surplus, customs, duties, levies, surtaxes or other taxes, fees, assessments, reassessments or charges of any kind whatsoever, together with any interest, additions, installments or penalties with respect thereto and any interest in respect of such additions or penalties, in each case, imposed by a Governmental Body.

"***Tax Proceeding***" means any action, suit, investigation, audit, Claim, investigation, or other action or proceeding with respect to Taxes.

"***Tax Return***" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

"***Transferred Employee***" shall have the meaning set forth in <u>Section 6.1(a)</u>.

"***Treasury Regulations***" means the regulations promulgated under the Code by the United States Department of the Treasury (whether in final, proposed or temporary form), as the same may be amended from time to time.

"***WARN Act***" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder.

ARTICLE XI.

TAXES

11.1    <u>Certain Taxes</u>.

(a)      Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby, and that are not exempt under Section 1146(a) of the Bankruptcy Code, shall be borne 50% by the Sellers and 50% by the Purchaser, and timely paid by the responsible Party.  The Purchaser shall, at its own expense, timely file any Tax Return or other document required to be filed with respect to such Taxes, and the Sellers shall join in the execution of any such Tax Return if required by Law.

(b)      As to any Purchased Asset acquired by the Purchaser, the Sellers and the Purchaser shall apportion the liability for real and personal property Taxes, ad valorem Taxes, and similar Taxes ("*Periodic Taxes*") for all Tax periods including but not ending on the Closing Date applicable to such Purchased Asset (all such periods of time being hereinafter called "*Proration Periods*"). The Periodic Taxes described in this Section 11.1(b) shall be apportioned between the Sellers and the Purchaser as of the Closing Date, with the Purchaser liable for that portion of the Periodic Taxes equal to the Periodic Tax for the Proration Period multiplied by a fraction, the numerator of which is the number of days remaining in the applicable Proration Period after the Closing Date, and the denominator of which is the total number of days covered by such Proration Period. The Sellers shall be liable for that portion of the Periodic Taxes for a Proration Period for which the Purchaser is not liable under the preceding sentence. The Purchaser and the Sellers shall pay or be reimbursed for Periodic Taxes (including instances in which such Periodic Taxes have been paid before the Closing Date) on this prorated basis at Closing, with such payment or reimbursement occurring via an adjustment to the Purchase Price. To the extent the liability for Periodic Taxes for a certain Proration Period is not determinable at the time of Closing or such Periodic Taxes are charged in arrears, such Periodic Taxes shall be prorated for such Proration Period, based on the most recent ascertainable full tax year without adjustment and an adjustment to the Purchase Price shall be made on that basis. The Party hereto responsible under applicable Law for paying a Tax described in this Section 11.1(b) shall be responsible for administering the payment of such Tax. For purposes of this Section 11.1(b), the Proration Period for ad valorem Taxes and real and personal property Taxes shall be the fiscal period for which such Taxes were assessed by the applicable Tax jurisdiction.

(c)      To the extent not addressed via an adjustment to the Purchase Price as set forth in Section 11.1(b), the Sellers, on the one hand, or the Purchaser, on the other hand, as the case may be (the "*Reimbursing Party*"), shall provide reimbursement for any Tax paid by the other (the "*Paying Party*"), all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this Section 11.1 or which represents an overpayment for Taxes by the Paying Party. Within a reasonable time prior to the payment of any such Tax, the Paying Party shall give notice to the Reimbursing Party of the Tax payable and the Paying Party's and Reimbursing Party's respective liability therefor, although failure to do so will not relieve the Reimbursing Party from its liability hereunder except to the extent the Reimbursing Party is prejudiced thereby.

11.2     Allocation of Purchase Price. As soon as reasonably practicable and in no event later than sixty (60) days after the Closing Date, the Purchaser shall provide the Sellers with an allocation of the purchase price for federal income tax purposes, including any liabilities properly included therein among the Purchased Assets and the agreements provided for herein, for federal, state and local income tax purposes (the "*Initial Allocation*"). Within thirty (30) days of the receipt of the Initial Allocation, the Sellers shall deliver a written notice (the "*Objection Notice*") to the Purchaser, setting forth in reasonable detail those items in the Initial Allocation that the Sellers dispute. The Sellers may make inquiries of the Purchaser and its accountants and employees and have reasonable access to the Purchaser's books and records relating to the Initial Allocation, and the Purchaser shall use reasonable efforts to cause any such accountants and employees to cooperate with, and provide such requested information to, the Sellers in a timely manner. If prior to the conclusion of such 30-day period, the Sellers notify the Purchaser in writing that they will not provide any Objection Notice or if the Sellers do not deliver an Objection Notice within such 30-day period, then Purchaser's proposed Initial Allocation shall be deemed final, conclusive and binding upon each of the parties hereto. Within thirty (30) days of the Sellers' delivery of the Objection Notice, the Sellers and the Purchaser shall attempt to resolve in good faith any disputed items and failing such resolution, the unresolved disputed items shall be referred for final binding resolution to an Arbitrating Accountant. The fees and expenses of the Arbitrating Accountant shall be paid 50% by the Purchaser and 50% by the Sellers. Such determination by the Arbitrating Accountant shall be (i) in writing, (ii) furnished to the Purchaser and the Sellers as soon as practicable (and in no event later than thirty (30) days after the items in dispute have been referred to the Arbitrating Accountant), (iii) made in

accordance with the principles set forth in this Section 11.2, and (iv) non-appealable and incontestable by the Purchaser and the Sellers.  As used herein, the "Allocation" means the allocation of the Purchase Price, the Assumed Liabilities and other related items among the Purchased Assets and the agreements provided for herein as finally agreed between the Purchaser and the Sellers or ultimately determined by the Arbitrating Accountant, as applicable, in accordance with this Section 11.2.  The Allocation shall be prepared in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any similar provision of state, local or foreign Law, as appropriate).  The Purchaser and the Sellers shall each report the federal, state and local income and other Tax consequences of the transactions contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Code (or any successor form or successor provision of any future Tax Law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable Law.  The Sellers shall provide the Purchaser and the Purchaser shall provide Sellers with a copy of any information required to be furnished to the Secretary of the Treasury under Code Section 1060.

11.3    <u>Cooperation on Tax Matters</u>.  The Purchaser and the Sellers agree to provide each other with such information and assistance as is reasonably necessary and is reasonably requested by the other party, including access to records, Tax Returns and personnel, for the preparation and filing of any Tax Returns or for the defense of any Tax claim or assessment, whether in connection with a Tax Proceeding or otherwise; provided that the Sellers shall not be required to make available any Consolidated Tax Return.

ARTICLE XII.

MISCELLANEOUS

12.1    <u>Payment of Expenses</u>.  Except as otherwise provided in this Agreement (including, but not limited to <u>Section 3.5</u> and <u>Section 7.1</u>) and whether or not the transactions contemplated hereby are consummated, Sellers and the Purchaser shall bear their own expenses incurred or to be incurred in connection with the negotiation and execution of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

12.2    <u>Survival of Representations and Warranties; Survival of Confidentiality</u>.  The Parties agree that the representations and warranties contained in this Agreement and the Ancillary Documents shall expire upon the Closing Date.  The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

12.3    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement, together with the Ancillary Documents and the NDA, if any, represents the entire understanding and agreement between the Parties with respect to the subject matter hereof.  This Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought; <u>provided</u>, that, notwithstanding the foregoing, the Schedules hereto may be amended in accordance with <u>Section 1.6</u>.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

All remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable Law.

12.4    Execution of Agreement; Counterparts; Electronic Signatures.

(a)    This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Parties; it being understood that all Parties need not sign the same counterparts.

(b)    The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" ("*.pdf*") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

12.5    Governing Law.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF DELAWARE SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT FOR ANY LAWS OF THAT STATE WHICH WOULD RENDER SUCH CHOICE OF LAWS INEFFECTIVE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

12.6    Jurisdiction, Waiver of Jury Trial.

(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN DELAWARE WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.7    Notices.  Unless otherwise set forth herein, any notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), or (b) e-mail, in each case, if sent during the normal business hours of the recipient, with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a), in the case of each of clauses (a) and (b), to the following addresses, e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, e-mail address or person as a Party may designate by notice to the other Parties):

45

If to Sellers, to:

       SD-Charlotte, LLC
       131 East Lincoln Ave., Ste C
       Fort Collins, CO 80524
       Attention:     Brian Rosenthal, CRO
       E-mail address: brian@wearemeru.com

With a copy (which shall not constitute effective notice) to:

       Moore & Van Allen PLLC
       100 N. Tryon St., Ste 4700
       Charlotte, NC 28202
       Attention:  Zachary H. Smith
       E-mail address: zacharysmith@mvalaw.com

If to Purchaser, to:

       Inspire Brands, Inc.
       Three Glenlake Parkway
       Atlanta, Georgia 30328
       Attention:  Nils H. Okeson, General Counsel
       E-mail address: nokeson@inspirebrands.com

With a copy (which shall not constitute effective notice) to:

       DLA Piper LLP (US)
       1201 West Peachtree Street, Suite 2800
       Atlanta, Georgia 30309-3450
       Attention:     Daniel Simon & Richard Greenstein
       E-mail address:  Daniel.Simon@us.dlapiper.com;
       Rich.Greenstein@us.dlapiper.com

12.8    <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon Purchaser and, subject to entry of the Bidding Procedures Order (with respect to the matters covered thereby) and the Sale Order, Sellers, and inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 case.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except the Purchaser Releasees pursuant to <u>Section 1.6</u> and as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by Sellers or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without such required consents shall be void, except for designations by Purchaser to a Designated Purchaser (as defined below) in accordance with the immediately following paragraph.

In connection with the Closing, notwithstanding anything to the contrary contained herein, Purchaser shall be entitled to designate, in accordance with the terms of this paragraph, one or more Subsidiaries or Affiliates to (i) purchase specified Purchased Assets (including specified Assigned Contracts) and pay the corresponding Purchase Price amount and Cure Costs, as applicable and/or (ii) assume specified Assumed Liabilities (any such Subsidiary or Affiliate of Purchaser that shall be designated in accordance with this clause, a "***Designated Purchaser***").  In addition, in accordance with <u>Section 6.1</u>, a

46

Designated Purchaser shall be entitled employ specified Transferred Employees on and after the Closing Date. Each Person that is designated a Designated Purchaser shall execute a written instrument in form and substance acceptable to Sellers pursuant to which such Person agrees to become a party to this Agreement and make the same covenants, representations and warranties as the Purchaser hereunder. Any reference to Purchaser made in this Agreement in respect of any purchase, assumption or employment referred to in this paragraph shall be deemed a reference to the appropriate Designated Purchaser, if any, with respect to the given obligation. The above designations shall be made by Purchaser by way of a written notice to be delivered to the Sellers in no event later than the Business Day prior to Closing. In addition, the Parties agree to modify any Closing deliverables in accordance with the foregoing assignment.

12.9    <u>Severability</u>.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction and in lieu of such invalid, illegal or unenforceable provision or portion of any provision, there will be added automatically as a part of this Agreement a valid legal and enforceable provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible.

12.10    <u>Bulk Sales Laws</u>.  Each Party hereby waives compliance by the Parties with the "***bulk sales***," "***bulk transfers***" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement or any Ancillary Document.

12.11    <u>Access and Right to Use</u>.  Purchaser shall, upon reasonable advance notice, afford to Sellers' officers, independent public accountants, attorneys, consultants and other representatives, reasonable access during normal business hours to the Purchased Assets and all records pertaining to the Purchased Assets on a royalty-free basis solely for the purpose of enabling the Sellers to conduct an orderly wind-down of the Sellers' operations until such time as the wind-down is completed on or before the one-year anniversary of this Agreement. Sellers expressly acknowledge that nothing in this Section is intended to give rise to any contingency to Sellers' obligations to proceed with the transactions contemplated herein.

12.12    <u>Certain Interpretive Matters</u>.  (a) The information contained in the Schedules is disclosed solely for the purposes of this Agreement and may include items or information not required to be disclosed under this Agreement, and no information contained in any Schedule shall be deemed to be an admission by any party hereto to any third Person of any matter whatsoever, including an admission of any violation of any Laws or breach of any agreement, (b) no information contained in any Schedule shall be deemed to be material (whether individually or in the aggregate) to the business, assets, liabilities, financial position, operations, or results of operations of the Sellers nor shall it be deemed to give rise to circumstances which may result in a Material Adverse Effect solely by reason of it being disclosed, (c) information contained in a Section, subsection or individual Schedule (or expressly incorporated therein) shall qualify the representations and warranties made in the identically numbered Section or, if applicable, subsection of this Agreement and all other representations and warranties made in any other Section, subsection or Schedule to the extent its applicability to such Section, subsection or Schedule is reasonably apparent on its face, (d) references to agreements in the Schedules are not intended to be a full description of such agreements, and all such disclosed agreements should be read in their entirety, and (e) nothing disclosed in any Schedule is intended to broaden any representation or warranty contained in Articles IV or V.

**[Remainder of page intentionally left blank]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed and delivered as of the date first above written.

PURCHASER:

SRI Operating Company

By: _____
    Name:
    Title:

[Signature Page to Asset Purchase Agreement]

SELLERS:

SD-Charlotte, LLC

By: _____
     Name:
     Title:

SD-Missouri, LLC

By: _____
     Name:
     Title:

[Signature Page to Asset Purchase Agreement]